**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NIELSEN & BAINBRIDGE, LLC, *et al.*,[1] | ) Case No. 23-90071 (DRJ) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) (Emergency Hearing Requested) |

## DECLARATION OF AMY LEE,
## CHIEF TRANSFORMATION OFFICER OF NIELSEN & BAINBRIDGE, LLC,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Amy Lee, Chief Transformation Officer of Nielsen & Bainbridge, LLC (together with its debtor and non-debtor affiliates, "NBG Home" or the "Company"), hereby declare under penalty of perjury:

1.      I am the Chief Transformation Officer of each of the above-captioned debtors and debtors in possession (collectively, the "Debtors") and have held that position since January 24, 2022.  I am generally familiar with the Debtors' capital structure, day-to-day operations, business and financial affairs, and financial records.  I am also familiar with the Debtors' corporate structure and the status of the Debtors' relationships with various vendors and service providers.  I am authorized to submit this declaration (the "Declaration") on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

2.      I am also a Managing Director at Alvarez & Marsal North America LLP ("A&M").  A&M has been engaged by the Debtors since August 2021.  Specifically, the A&M team and I

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/NBGHome.  The Debtors' service address in these chapter 11 cases is:  12303 Technology Boulevard, Suite 950, Austin, TX 78727.

have, among other advisory services, assisted the Debtors with: (a) coordinating on resources related to the reorganization effort; (b) evaluating the Debtors' current and projected liquidity position and assisting in developing action items to help maximize liquidity; (c) analyzing purchasing requirements and managing target inventory levels; (d) preparing a cash flow forecasts reflecting potential action items to improve liquidity; (e) analyzing various profit improvement initiatives; and (f) developing a business plan.

3.     I have been a financial advisor to distressed companies for over fourteen years. I have been employed by A&M since 2006, where I primarily work with executive teams in a variety of senior advisory and interim C-suite roles to improve the performance and profitability of underperforming businesses. My expertise covers all facets of turnaround situations, including cash flow forecasting, business plan review and development, creditor negotiations, debt restructurings, preparing and operating companies through the chapter 11 process, asset dispositions, liquidations, and wind-downs. Prior to joining A&M, I was a management consultant for three years. I have a dual bachelor's degree in economics and statistics from Rutgers University.

4.     A&M is a preeminent restructuring consulting firm with extensive experience and an excellent reputation for providing high-quality, specialized management and restructuring advisory services to debtors and distressed companies. A&M provides a wide range of turnaround advisory services targeted at stabilizing and improving a company's financial position, including: (a) developing or validating forecasts, business plans, and related assessments of strategic position; (b) monitoring and managing cash, cash flow, and supplier relationships; (c) assessing and recommending cost reduction strategies; and (d) designing and negotiating financial restructuring packages. A&M is known for its ability to work alongside company management and key

constituents during chapter 11 restructurings to develop a feasible and executable plan of reorganization. Some notable publicly disclosed restructuring assignments that I have personally advised on include Murray Energy Corporation, Revlon, Nine West Holdings, Inc., Penn Virginia, Patriot Coal, Cengage Learning, Lehman Brothers Holdings Inc., New York City Department of Education, Antioch College, and Sound Shore Medical Center.

5.    Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents of the Debtors, other information prepared or collected by the Debtors' employees, my conversations with the Debtors' counsel or other advisors, information supplied to me by other members of the Debtors' management and third-party advisors, or my opinion based on my experience with the Debtors' operations and financial condition. In making my statements based on documents and other information prepared or collected by the Debtors' employees or my conversations with the Debtors' counsel or other advisors, I have relied upon the accuracy of such documentation and other information.

## Introduction[2]

6.    NBG Home[3] is a trusted wholesale supplier of home décor and other home goods to prominent brick-and-mortar and online retailers such as Walmart, Target, and Amazon. Recent events all too common for retail vendors—including supply chain disruption that pushed product delivery past store set dates, elevated freight costs (nearly 400% at peak compared to historic norms), increased tariffs on Chinese imports, and a decrease in discretionary consumer spend due to inflationary pressures—have limited the Debtors' ability to continue operating in the ordinary

---

[2]    Capitalized terms used but not defined in this section shall have the meanings set forth elsewhere in this Declaration.

[3]    The Debtors operate under the trade name NBG Home and sell products under various other brand names, as described herein. As used herein "NBG Home" is used to describe the Debtors' business operations.

course without a significant recapitalization through these chapter 11 cases.  In response to these challenges, the Company took a proactive data-driven approach to right-size their product assortment and overhead and restore profitability.  While the Debtors' management believes in this turnaround plan and it forms the basis of the go-forward business, the Company ultimately did not have the liquidity to fully implement and execute on its plan.  As of the Petition Date, the Debtors have over $413 million in funded indebtedness and approximately $82 million in outstanding trade payables, but only approximately $2 million in available liquidity.

7.      Through active negotiations, the Debtors, KKR Credit Advisors (US) LLC ("KKR") and Silver Point Capital, L.P. (collectively, the "Initial Plan Sponsors"), and the Debtors' ABL Lender, who collectively hold over 50% of the first lien debt, all of the second lien debt, and all of the ABL Credit Facility, have developed a comprehensive restructuring (the "Restructuring") memorialized in the restructuring support agreement attached hereto as **Exhibit A** (the "Restructuring Support Agreement") that contemplates saving the NBG Home business— including over 700 jobs—through these chapter 11 cases.  The Restructuring has three main components:  *First*, the Initial Plan Sponsors have agreed to provide a $60 million ($30 million new-money) DIP Facility.  *Second*, the Initial Plan Sponsors committed to bid a cash amount equal to the total amount of Allowed DIP Claims plus amounts outstanding under the ABL Credit Facility to purchase 100% of the equity of the Reorganized Debtors, subject to higher and better bids that the Company's investment banker, Guggenheim Securities, has already started seeking. *Third*, the Debtors intend to speedily confirm a chapter 11 plan, substantially in the form filed contemporaneously herewith.

8.      The Debtors are aware of the challenges they face to save NBG Home and implement the Restructuring.  Due to milestones required under the DIP Facility, the Debtors need

to emerge from these chapter 11 cases in fewer than 60 days and procure go-forward support from their vendors.  Neither task is easy, but this is the Debtor's best, *and only*, currently available option to preserve over 700 jobs and ensure ongoing supply to the Company's customers.  The Debtors intend to rise to this challenge.

9.      To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions (as defined herein), I have organized this Declaration as follows:

- **Part I** provides an overview of the Debtors' corporate history and operations;

- **Part II** provides an overview of the Debtors' prepetition capital structure;

- **Part III** describes the circumstances leading to the filing of these chapter 11 cases and Debtors' operational turnaround efforts;

- **Part IV** describes the restructuring negotiations and resulting Restructuring Support Agreement, Plan, and proposed DIP financing; and

- **Part V** summarizes the relief requested in and the legal and factual bases supporting the First Day Motions.

### Part I:  General Background

**A.      The Debtors' Corporate History and Operations.**

10.     NBG Home's namesake—Charles Bainbridge—founded the company in 1867 in Brooklyn, New York when Charles Bainbridge patented the very first decorative matboard.  In so doing, he created the framing industry as we understand it today.  The company Nielsen, founded in 1971, was known for its work in unique aluminum moulding for picture frames.  The two companies merged in 1984, forming Nielsen Bainbridge, which later rebranded as Nielsen Bainbridge Group and focused on a wider array of home goods offerings in the portable lighting, hardwire lighting, outdoor décor, soft home (*i.e.*, clothing and bedding), and wall art business categories.

11.     In the last fifteen years, the Company has quickly added to its portfolio of brands, broadening its high-quality range of product offerings and expanding its footprint in the home décor space, which now includes eight businesses operating independently under the NBG Home name.  A timeline of the acquisitions is shown below:



12.     Nielsen Bainbridge Group expanded rapidly:  the Company acquired Pinnacle Frames & Accents in 2011 and Burnes of Boston in 2012 to grow its presence in framing products. In 2014, Nielsen Bainbridge Group grew into textiles, wall décor, and furniture when it acquired The Home Décor Companies, a leading provider of home décor products to mass, home improvement, discount, and specialty retailers.  The brands under The Home Décor Companies included Patton Wall Decor, Jimco Lamps & Home Decor, and THRO.  Combined, Nielsen Bainbridge with The Home Décor Companies became known, and still is known today, as "NBG Home."  The Company next expanded into outdoor goods through the acquisition of Dwell & Decor Outdoor (also known as Plantation Patterns).  In 2017, Sycamore—a private equity firm based in New York specializing in retail and consumer investments—acquired NBG Home.  The Company then purchased Cheyenne Products to further develop its portable lighting and furniture footprint with Walmart.  In 2018, the Company entered the hardwire lighting category with the acquisition of Quoizel Lighting, which further built out NBG Home's differentiated market presence.

13.     NBG Home's growth, however, slowed as the COVID-19 pandemic affected demand for home goods in unprecedented ways and caused freight costs to rise exponentially. COVID-19 initially impacted the Company's business in the short term as brick-and-mortar stores were closed during the lockdown and consumer spend shifted toward online shopping. However, in the second half of 2020 and through 2021, consumer demand picked back up as a cash-infused economy allowed consumers to allocate more discretionary dollars toward the home goods category. As demand increased, it placed more pressure on the global supply chain. Freight rates and transit time increased significantly as container availability contracted. This led to a significant increase in the costs of the Company's delivered goods and delays in product delivery that resulted in the Company missing store set dates and increased the Company's excess inventory levels.

14.     To combat these early pressures, the Debtors responded by adjusting alongside their end consumer base. The Debtors increased focus on data analytics and online retail, divested the custom framing operations and European locations, and consolidated its wall décor, portable lighting, furniture, and outdoor divisions. These integrative efforts positioned NBG Home to offer a tighter, improved line of products. By 2021, the Company, through its focus on "pure play" eCommerce (*i.e.*, selling directly to end consumers online), maintained pole position as a trend setter in design across product categories while selling goods through an omni-channel approach servicing eCommerce, brick-and-mortar, and digital needs.

15.     NBG Home's variety of retail partners include mass merchants (*e.g.*, Walmart and Target), specialty stores (*e.g.*, Michael's), discount stores and eCommerce retailers (*e.g.*, T.J. Maxx, Amazon, Wayfair, and Overstock.com), home centers (*e.g.*, Home Depot and Lowe's), and warehouse clubs (*e.g.*, Costco). Since 2020, NBG Home has focused its efforts on

scaling its eCommerce footprint through channel optimization of digital sales, marketing, supply chain, and analytics.  NBG Home's online retail experts continue to improve the Company's offerings on "digital shelves" for end consumers to purchase ready-made and tailored products, partnering with big-name companies such as Amazon and Wayfair.

16.     NBG Home differentiates itself from market competitors by creating value for its retail partners through a combination of four key areas:

- (i) *Leader in Product Design*.  NBG Home has a dedicated product team that utilizes consumer research and insights, as well as design trends, to develop best-in-class product and merchandising solutions for customers.

- (ii) *Ability to Serve Customers Across Channels*.  NBG Home has the ability to serve customers across traditional brick-and-mortar as well as eCommerce.  The Company's capabilities across multiple channels help differentiate NBG Home from its peers and provide multiple avenues for growth.

- (iii) *Flexible Logistics*.  Varied logistical offerings provide working capital and inventory efficiency for customers.  NBG Home supports domestic warehousing, direct import, point of entry and drop-ship capabilities to assist all retail.com and pure play eCommerce end consumers.

- (iv) *Breadth of Product Offerings*.  NBG Home offers an expansive range of products across many categories.  It is the only leader across numerous key categories in an otherwise fragmented industry.  At its core, NBG Home stands apart in effectuating retailers' goals from start to finish.

17.     NBG Home provides a continuity of supply and distribution from five U.S.-based and three international centers.  The Debtors are headquartered in Texas, and their current U.S. operations are concentrated in the South:



| ★ Headquarters | ⬤ Office | ⬤ Distribution Center | ⬤ Manufacturing Facility | ⬤ Showroom |
|---|---|---|---|---|
| • Austin, TX | • Bentonville, AR | • Goose Creek, SC | • Bridgeview, IL | • New York, NY |
| • Goose Creek, SC | • Edgewood, NY | • Corona, CA | • Selma, AL | • Dallas, TX |
|  | • Mooresville, NC | • Calera, AL |  |  |
|  | • Birmingham, AL | • Pocahontas, AR |  |  |
|  | • Mechanicsburg, PA | • Southaven, MS |  |  |

18.     There are 21 NBG Home entities, fourteen of which are Debtors in these chapter 11 cases (the other seven affiliates are not).  A detailed corporate organization chart is attached

hereto as **Exhibit B**.  A simplified version of NBG Home's corporate structure differentiating

Debtor and non-Debtor affiliates is as follows:



### B.    The Debtors' Home Goods Categories.

19.    NBG Home is a market leader across each business category in which it competes.

NBG Home's dominance across multiple classes enables it to serve as a one-stop solution for

customers seeking a complete, matching, on-trend design.  When combined with the Debtors'

omni-channel distribution, the Debtors occupy a unique position in the market as a key partner to

its retail customers, providing on-trend home décor at an affordable price point.

20.    The Debtors' product categories fall into two major divisions:  (i) affordable home

décor ("AHD") and (ii) decorative hardwire lighting ("HWL").  The former houses brands such as

Cheyenne Products, Jimco Lamps & Home Decor, THRO, Patton Wall Decor, Pinnacle Frames &

Accents, and Dwell & Decor.  Major retail partners for these products include TJX, Walmart, and

Target.  The other major division—HWL—consists of hardware and portable lighting.  The

Quoizel Lighting and DSI Lighting brands design and source the products, marketing them to home centers such as Lowe's and Home Depot as well as the lighting showroom channel.

1.     **The Affordable Home Décor Segment.**

21.     AHD comprises the broader range of the Debtors' product offerings and includes everything from textiles and furniture to wall décor and frames.  In addition to its standard offerings, through the AHD division, NBG Home partners with retailers to produce private label brands, such as Threshold, Origin21, Better Homes and Gardens, Mainstays, and Allen & Roth. The following is a short summary of the primary market categories in the AHD business segment:

22.     *Wall Décor*.  Wall décor is the origin of the Debtors' business and remains a key component six decades later.  Today, NBG Home markets its products under the Patton Wall Decor and Pinnacle Frames & Accents brands.  Product lines include wall art, mirrors, clocks, art, and wall frames.

23.     *Furniture and Portable Lighting*.  Acquired in 2014–2015, the Cheyenne Products and Jimco Lamps & Home Decor brands enabled NBG Home to move into a core area of home goods, with a goal to create comfortable and functional products.  The two brands are the product of over 40 years of industry experience.  As with every line of products, NBG Home brought a renewed emphasis on affordability and long-lasting products.  Product lines in this division include portable lighting, accent and side tables, accent chairs, bar stools, bar carts, television stands, console tables, poufs, desks, bookshelves, and storage.

24.     *Frames & Tabletop Décor*.  NBG Home also acquired accent décor brands Cheyenne Products and Pinnacle Frames & Accents to bolster its expansion into furniture offerings, further cementing its place as a one-stop shop for retail partners by offering products such as frames, vases, baskets, planters, and other tabletop fixtures.

25. *Soft Home*. In 2014, NBG Home committed to its largest expansion through a trio of brand acquisitions: THRO, Patton Wall Decor, and Jimco Lamps & Home Decor. These acquisitions spearheaded efforts to reach the textiles market. Now, NBG Home is a leading player in the industry, offering a deep range of selections in pillows, doormats, throws, rugs, table linens, and more.

26. *Outdoor*. NBG Home acquired the Dwell & Decor Outdoor (also known as Plantation Patterns) brand in 2016, extending its presence into outdoor spaces and leveraging its existing expertise in high quality décor and furniture design. By creating long-lasting products, such as cushions, pillows, tables, rugs, and umbrellas, designed to withstand outdoor climates, NBG Home captured a significant market share while staying true to its commitment to innovation and design.

### 2. The Lighting Segment.

27. NBG Home is a market leader in the portable and hardwire lighting business segment, offering over 2,000 fixture complements. The Company offers both "hardwire" lighting (those permanently wired to a home's electrical system) and portable lighting solutions. NBG Home markets the hardwire lighting under the brands Quoizel Lighting and DSI Lighting and markets its portable lighting solutions, in the Company's affordable home business segment, under Jimco Lamps & Home Decor and Cheyenne Products. The Debtors partner with a variety of retailers, such as Walmart, Target, Lowe's, Home Depot, Wayfair, Amazon, and lighting showrooms to sell their lighting products. Particularly after the acquisition of Quoizel in 2018, the Debtors have capitalized on the significant white space opportunity to expand to new and existing customers with respect to the lighting products, including production for private label brands, such as Allen & Roth and Hampton Bay.

C.  **The Debtors' Operations and Assets.**

1.  **The Debtors' Omni-Channel Logistics and Distribution Model.**

28.     The Debtors' omni-channel business model, coupled with its logistics capabilities, provides the Debtors with a competitive advantage while improving inventory efficiency for customers.  Being the only leader in numerous key categories in an otherwise fragmented industry, the Debtors provide flexibility by offering a breadth of products and allowing retail partners to focus sourcing in one provider.  This logistics model provides maximum flexibility for its customers to purchase and receive products in a variety of manners to suit each customer's needs.

29.     NBG Home is the only company in the AHD segment to offer a one-stop solution for retail partners through four shipping methods:  (i) domestic shipping; (ii) direct importing; (iii) port of entry transport; and (iv) drop-ship delivery.  With domestic shipping, the Company provides goods from the NBG Home warehouses to the retail partners' locations, thus handling the logistics of warehousing and storing inventory.  Direct importing allows retail partners to pick up their products from foreign factories directly.  With port of entry transport, retail partners take possession of the goods at U.S. ports, thereby increasing merchandise margins.  Finally, drop-ship delivery allows for direct delivery from NBG Home warehouses to end consumers' homes, which eliminates the retail partner's need to take part in the shipping process.

2.  **Expansion into eCommerce and Pivot to Direct Marketing.**

30.     The shockwave brought on by the COVID-19 pandemic acutely affected the retail industry.  In response, the Company, while continuing strong relationships with its brick-and-mortar retail partners, increased focus on online sales.  Specifically, the Debtors (i) increased the volume of sales with online retailers, (ii) improved its online advertising, and (iii) added data analytics personnel to identify areas of growth in online sales.

### 3. The Debtors' Production and Distributions Center Assets.

31.     The Debtors own one fiber and one sewing manufacturing center in Alabama.  The Company also holds various leasing agreements with warehouses, offices, and distribution centers across the United States, including in Alabama, Arkansas, and Texas.  The owned and leased properties are listed on **Exhibit C**.

### 4. The Debtors' Employees.

32.     Today, the Debtors employ approximately 730 employees, over 22% of whom are covered by a collective bargaining agreement.  The Debtors' employees perform a variety of functions, including data analytics, accounting, business administration, finance, human resources, information technology, management, marketing, facilities maintenance, security, and other key functions.  They are essential to the preservation and enhancement of the value of the Debtors' business and the administration of the Debtors' estates during these chapter 11 cases.

### Part II:  The Debtors' Prepetition Capital Structure

### A. The Debtors' Funded Debt Obligations

33.     As of February 8, 2023 (the "Petition Date"), the Debtors have approximately $413 million in total funded debt, consisting of the following:

| *Funded Debt* | *Principal Amount (in USD)* |
|---|---|
| **Prepetition Funded Debt** | |
| *First Lien ABL* | $57,700,000 |
| *First Lien Initial Term Loan* | $257,262,097 |
| *First Lien 2020 Incremental Package* | $25,000,000 |
| *Second Lien Term Loan* | $73,359,377 |
| **Total Debt Obligations** | $413,321,474 |

### 1. ABL Credit Agreement.

34.     Pursuant to the ABL Credit Agreement dated as of April 26, 2017 (as amended by Amendment No. 1, dated as of July 1, 2019, Amendment No. 2, dated as of April 6, 2021, and

Amendment No. 3, dated as of July 9, 2021, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "ABL Credit Facility"), by and among NBG Intermediate Holdings Inc., as holdings, NBG Acquisition Inc., as the initial borrower, which was merged with and into KNB Holdings Corporation, which survived the merger and became the administrative borrower, the lenders party thereto from time to time (the "ABL Lenders"), and Wells Fargo, N.A. ("Wells Fargo") as administrative agent and collateral agent for the ABL Lenders, the Debtors have access to an asset-based revolving credit facility in an aggregate principal amount of $75 million.  The availability of funds under the ABL Credit Facility is subject to the size of the borrowing base and other customary limitations.  The ABL Credit Facility matures on July 9, 2026, subject to a springing maturity of 90 days prior to the earlier of the maturity of the First Lien Term Loans or Second Lien Term Loans (both as defined below).  As of the Petition Date, approximately $57.7 million in principal is drawn under the ABL Credit Facility.

## 2.    First Lien Initial Term Loan.

35.    On April 26, 2017, certain of the Debtors entered into that certain First Lien Credit Agreement (as amended by Amendment No. 1 to First Lien Credit Agreement, dated as of January 2, 2019, and Amendment No. 2 to First Lien Credit Agreement, dated as of April 6, 2020, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "First Lien Credit Agreement"), by and among NBG Intermediate Holdings Inc., as holdings, NBG Acquisition Inc., as the initial borrower, which was merged with and into KNB Holdings Corporation, which survived the merger and became the borrower, the lenders party thereto from time to time (the "First Lien Term Loan Lenders"), and Deutsche Bank AG New York Branch as administrative and collateral agent for the First Lien Term Loan Lenders.  As of the Petition Date, term loans in an aggregate principal

amount of approximately $282 million (the "First Lien Term Loans") remain outstanding under the First Lien Credit Agreement, with a maturity date of April 26, 2024.  The First Lien Term Loans are secured by substantially all of the assets of the Debtors party to the First Lien Credit Agreement.

### 3. Second Lien Term Loan.

36.     On April 26, 2017, certain of the Debtors entered into that certain Second Lien Credit Agreement (as amended by Amendment No. 1 to Second Lien Credit Agreement, dated as of April 6, 2002, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Second Lien Credit Agreement") by and among NBG Acquisition Inc., as initial borrower, NBG Intermediate Holdings Inc., as holdings, NBG Acquisition Inc., as the initial borrower, which was merged with and into KNB Holdings Corporation, which survived the merger and became the borrower, the lenders party thereto from time to time (the "Second Lien Term Loan Lenders"), and Cortland Capital Market Services LLC as administrative agent and collateral agent for the Second Lien Term Loan Lenders.  As of the Petition Date, term loans in an aggregate principal amount of approximately $73 million (the "Second Lien Term Loans") remain outstanding under the Second Lien Credit Agreement, with a maturity date of October 26, 2024.  The Second Lien Term Loans are subordinated to the First Lien Term Loans and are secured by substantially all of the assets of the Debtors party to the Second Lien Credit Agreement.

### B. The Equity Interests in the Debtors.

37.     NBG Home is a privately-held company.  As of the Petition Date, NBG Holdco LLC owns and controls 100% of the outstanding shares of NBG Topco Holdings Inc. common stock.

### Part III:  Events Leading to Chapter 11 Cases and Debtors' Turnaround Efforts

38.    The home goods industry, like many others, was not spared by the COVID-19 pandemic.  The pandemic affected demand for home goods in unprecedented ways and caused freight costs to rise exponentially.  In addition, the continued trade war between the United States and China has negatively impacted the top line of the Company.  These effects, combined with overall negative macroeconomic trends and the Debtors' burdensome capital structure, created a situation the Debtors could not resolve without an in-court restructuring.

39.    A timeline setting forth the Debtors' numerous prepetition efforts to deleverage their balance sheet and offset increasing operating and financial pressures, as described above and in greater detail herein, is as follows:



### A.    U.S.-China Trade War.

40.    In July 2018, the United States initiated trade penalties against China as competition between the two nations intensified.  The economic measures taken by the Trump administration resulted in tariffs on approximately $550 billion of Chinese goods and $185 billion of United States

goods.  These tariffs—with rates as high as 25%—affected operations of U.S.-based companies with production centers in China.

41.     NBG Home, with approximately 95% of purchase orders coming from China, could not escape the economic impact of the trade war.  The tariffs incurred by the shipping vendors were passed on to NBG Home as a function of the shipping agreements.  The trade war directly affected Company revenues from 2018 to 2019.  During that time period, EBITDA decreased from $69 million in 2018 to $25 million in 2019.  The impact of the trade war continues to create increased costs for the Company today.

**B.     Disruption Stemming from COVID-19.**

42.     The Debtors experienced three long-lasting side effects as a result of COVID-19.  *First*, region-wide quarantines, the shuttering of physical stores, and the general closure of public spaces slowed the demand for the Debtors' goods from select retail partners in the home goods space.  These business lines were slow to recover—in general, online spending simply did not compensate for onsite spending for these retail stores as end consumers sought goods from specialized online sellers.  For brick-and-mortars retailers already navigating formidable obstacles in the digital age, the transition to a predominantly work-from-home environment exacerbated these issues.  The Debtors experienced the "second wave" resulting from the reduced consumer demand due to inflationary pressure.  As the Debtors' retail partners saw demand fall, they did not meet their expected sell-through of NBG Home product, resulting in excess inventory on their shelves.  In turn, many customers, such as TJX and At Home, significantly reduced orders from the Company in order to sell through the excess inventory.

43.     *Second*, a few months into the pandemic, the company saw fixed costs rise in dramatic fashion.  NBG Home sources most[4] goods internationally and ships them to the United States.[5]  The COVID-19 pandemic created unusually heightened freight costs in 2020 and 2021.  During this time, the average container price across all ports of entry increased nearly fourfold from approximately $5,000 per shipping container in January 2021 to a peak of approximately $19,500 in October 2021.



1)   Freight projections include both ocean and ancillary costs; average cost per container includes drayage cost per container.
2)   Represents average of Charleston and Memphis routes comprising $3.3k per container plus an additional $0.5k per container of ancillary costs.

44.     *Third*, not only the did the price of shipping go up, but so did the arrival time of products.  The pandemic caused additional labor shortages and impacted nearly every component of the Debtors' supply chain.  The delay led to a backlog of shipments later when satisfying the pent-up demand.  The backlog meant the Debtors were not able to satisfy seasonal demand on time which severely affected sales.

---

[4]    Approximately 95% of purchase orders are shipped in China and 5% are produced in Vietnam and Malaysia.

[5]    Approximately 60% of spending on goods is in China, and another 35% is spent in the United States.  Other sourcing costs are from Vietnam, India, Malaysia, and Latin America.

45.     The second half of 2022 saw a significant decline in freight costs nearing a normalized, pre-COVID cost environment.  The Debtors have been capitalizing on the new market conditions to secure better fixed freight rates on a short-term basis, and the Debtors anticipate a normalized freighting cost environment going forward.  With labor markets returning as well, the Debtors do not anticipate any further seasonal product delays.  Still, the damage caused by two years of frenzied freight costs and shipping delays has had lasting repercussions.  And while the Debtors focused on online retail to meet changing consumer purchasing habits, they are still establishing themselves in those spaces.  Combined with the slowdown in customer activity in 2022 caused by macroeconomic headwinds, the Debtors could not overcome the rising costs of doing business.

     **C.     Shutdown of Account Purchase Facility.**

46.     Since November 28, 2018, the Debtors have maintained an account purchase agreement with Wells Fargo whereby Wells Fargo purchases accounts receivable of certain customers, such as Walmart, Target, Costco, Home Depot, Amazon, and TJX.  Under those terms, the Debtors submit written credit requests with respect to certain customers' accounts receivable, upon which Wells Fargo, in its discretion, approves a credit line limited to that account.  In August 2022, Wells Fargo placed the receipts account under cash dominion.  Under cash dominion, daily receipts to the account purchase facility are automatically swept to Wells Fargo with a portion of net receipts returned to the Debtors on Wednesdays and Fridays.  On January 12, 2023, Wells Fargo provided notice to the Debtors that, due to the company's credit profile risk, Wells Fargo would not purchase any additional accounts receivable and unwind its remaining balance over time, decreasing the Debtors' liquidity.

### D.    Operational Responses to Prolonged Downturn.

47.    Since the beginning of the downturn, the Debtors took steps to reduce expenditures and increase operational efficiencies.   These efforts included:   (a) focusing on pure play eCommerce and strengthening relationships with online retailers; (b) reducing selling, administrative, sourcing, and manufacturing expenses; (c) optimizing the company's real estate footprint; and (d) securing freight contracts at normalized, pre-COVID levels.

48.    As early as 2020, following the COVID-19 impact the Debtors recognized an opportunity for growth.  Because more and more end consumers' purchases were taking place online, the Company could pivot from its predominantly brick-and-mortar roots to partnering with online retailers.  The Debtors took this one step further: instead of selling wholesale customized lines to retailers, the Company capitalized on eCommerce partnerships with Amazon and Wayfair to offer goods for sale directly to end consumers without the need to invest heavily in an online platform.

49.    While expansion into online spaces is the primary potential for topline growth, the Debtors continue to actively seek out cost rationalization efforts.  The Debtors are exploring alternative sourcing in India, Malaysia, and parts of Latin America, as well as expanding their current sourcing from Vietnam.  Relatedly, the Debtors intend to review their existing real estate footprint and find opportunities to further right-size and generate savings.

50.    These cost reductions have had and will continue to have a significant positive impact on NBG Home's forecasted costs.  The Debtors believe that their turnaround plans and cost-cutting initiatives are the foundation of a strong, viable business but were unable to realize this outcome prior to the filing of these chapter 11 cases.

**Part IV:  The Restructuring Negotiations, Restructuring Support Agreement, the Plan, and the Proposed Debtor in Possession Financing**[6]

    **A.**    **The Restructuring Negotiations.**

    51.    In light of the Debtors' mounting cash flow challenges, the Debtors, with the assistance of its advisors, began outreach in August 2022 to lenders under the ABL Credit Facility, First Lien Credit Agreement, and Second Lien Credit Agreement to negotiate the terms of new-money financing or an amendment and extension of existing credit terms.  In late October 2022, the Debtors received a restructuring proposal from PJT Partners, Inc. ("PJT") on behalf of the Initial Plan Sponsors and, shortly thereafter, received correspondence from Milbank LLP ("Milbank"), counsel to the Initial Plan Sponsors, regarding the same.

    52.    Discussions have continued since that time.  As part of this process, the Debtors provided the advisors to the Initial Plan Sponsors with substantial diligence, and the parties held numerous telephone conferences among both advisors and principals.  Concurrently with the due diligence process, the Debtors and the Initial Plan Sponsors began to engage in high-level discussions about potential in- and out-of-court transaction structures, which became progressively more detailed as the Initial Plan Sponsors refined their understanding of the Debtors' enterprise, including operations, liquidity needs, contractual obligations, and unencumbered assets.

    53.    Following the loss of the Wells Fargo account purchase facility in January 2023, the Debtors, the Initial Plan Sponsors, and the ABL Lenders focused negotiations around the terms of an in-court restructuring, eventually memorialized in the Restructuring Support Agreement, the proposed $60 million superpriority debtor-in-possession financing facility (the "DIP Facility," and

---

[6]    Capitalized terms used but not defined in this section shall have the meanings set forth in the Restructuring Support Agreement.

the claims created by the DIP Facility, the "Allowed DIP Claims"), and the stalking horse bid put forward by the Initial Plan Sponsors.

54.     The decision to enter into the Restructuring Support Agreement and commence these chapter 11 cases is the culmination of weeks of negotiations and strategic review, including regular meetings of the Debtors' board, management, and advisors.  The Debtors recognized that a consensual restructuring transaction with the Initial Plan Sponsors and the ABL Lenders was the only viable path forward.  Ultimately, the board of each Debtor determined that the Restructuring Support Agreement and plan (substantially in the form filed contemporaneously herewith, and as may be amended, modified, and supplemented, the "Plan") represent the most value-maximizing path forward to unlock the Debtors' potential for future growth.  To that end, on February 8, 2023, the board authorized entry into the Restructuring Support Agreement and commencement of these chapter 11 cases.

**B.     The Prepetition Marketing Process.**

55.     In parallel with these negotiations, the Debtors, with the assistance of Guggenheim Securities, LLC ("Guggenheim Securities"), undertook a prepetition marketing process and informally engaged potential third parties for a sale of all of the Debtors' assets, of which the Initial Plan Sponsors were aware.  As of the Petition Date, the Debtors, with the assistance of Guggenheim Securities, have been engaged in discussions with 91 potential purchasers, of which 21 entered into nondisclosure agreements with the Debtors and either received access to a data room or were sent requested documentation pursuant to a diligence request list.  Guggenheim Securities will continue to engage with these parties in order to procure binding bids prior to the bid deadline in the proposed auction process.

56.     The Initial Plan Sponsors have committed to serve as a stalking horse pursuant to the Restructuring Support Agreement, serving as a floor for any forthcoming alternative proposals

from a third party.  The marketing process proposed in these chapter 11 cases will ensure that the Debtors maximize the value of their estates.

        **C.**       **The Restructuring Support Agreement and the Plan.**

      57.    After weeks of negotiations, prior to commencing these chapter 11 cases, the Debtors, the ABL Lenders, the Initial Plan Sponsors, and Sycamore (together with the ABL Lenders and the Initial Plan Sponsors, the "Consenting Parties") entered into the Restructuring Support Agreement.

      58.    The material terms of the restructuring transactions memorialized in the Restructuring Support Agreement and Plan are as follows:[7]

- Certain funds affiliated with KKR and Silver Point Capital, L.P. (such funds, the "DIP Lenders") will commit to fund the DIP Facility in the aggregate amount of $60 million on the terms set forth in the DIP Facility Term Sheet.

- The DIP Facility provides for a $30 million roll-up of prepetition funded debt held by the DIP Lenders and will be subject to a payment-in-kind fee of 5% of the DIP commitment amount.

- The Initial Plan Sponsors committed to a Stalking Horse Bid of an amount of Cash at least equal to the total amount of Allowed DIP Claims as of the Effective Date and the total amount outstanding under the ABL Facility as of the Effective Date (the "Stalking Horse Bid Consideration").  In the event of any higher or better bids above the Stalking Horse Bid Consideration, the additional value (the "Additional Value") will be distributed in accordance with the Plan.  The ultimate Plan Sponsor will be determined by the Bidding Procedures.[8]

- The DIP Lenders will receive, in consideration for their DIP claims, (i) where the Initial Plan Sponsors are the Plan Sponsor, (a) on account of DIP Roll-Up Loans (which shall include fees and interest), payment in full, in Cash, on the Effective Date, and (b) on account of DIP New Money Loans (which shall include fees and interest), at the election of the Required DIP Lenders, its *pro rata* share of an equal amount of the Exit Term Loans and/or Cash on the Effective Date, in each case of

---

[7]   Capitalized terms used but not defined in this section shall have the meanings set forth in the Restructuring Support Agreement or Plan, as applicable.

[8]   The initial "Plan Sponsor" will be the DIP Lenders.  In the event any bidder other than the Initial Plan Sponsor submits a bid that is designated the winning bid pursuant to the Bidding Procedures, then that winning bidder shall replace the Initial Plan Sponsor as the Plan Sponsor.

clauses (a) and (b), or such other terms as agreed by the Required DIP Lenders; or (ii) where any other party is the Plan Sponsor, payment in full, in Cash, on the Effective Date or such other terms agreed by the Required DIP Lenders;

- The ABL Lenders will receive either:  (i) where the Initial Plan Sponsors are the Plan Sponsor, (a) its *pro rata* share of the New ABL Credit Facility, on such terms as agreed among the Debtors, the ABL Lenders, and the Plan Sponsor, or (b) payment in full, in cash on the Plan Effective Date; or (ii) where any party other than the Initial Plan Sponsor is the Plan Sponsor, payment in full, in cash on the Plan Effective Date.

- The First Lien Term Loan Lenders will receive their *pro rata* share of Additional Value (if any);

- The Second Lien Term Loan Lenders will receive their *pro rata* share of Additional Value (if any); and

- General unsecured claims will receive their *pro rata* share of Additional Value (if any).

59.    Implementation of the transactions contemplated by the Restructuring Support Agreement will position the Debtors for long-term success and save jobs.  Without the certainty of outcome provided by the Restructuring Support Agreement, it is unlikely that the Debtors would be able to secure products, which would have a substantial, deteriorative effect on the Debtors business.  Moreover, without the clear path to emergence from chapter 11 provided by the Restructuring Support Agreement, certain of the Debtors' key counterparties may refuse to transact with the Debtors altogether.  After an extensive review process, the Debtors have determined that the Restructuring Support Agreement is the best possible path forward to ensure that the Debtors' business continues as a going concern.  For these reasons and the other reasons described in this Declaration, I believe that the Restructuring Support Agreement represents the most value-maximizing path forward for the Debtors.

60. ***Milestones***.[9]   To effectuate this comprehensive restructuring and ensure the Debtors' emergence from chapter 11, it is imperative that the Debtors meet the following milestones contained in DIP Term Sheet:

- No later than the Petition Date, the Debtors shall file an acceptable Plan of Reorganization and related disclosure statement (the "<u>Disclosure Statement</u>");

- No later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

- No later than seventeen (17) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement in form and substance satisfactory to the Required Lenders;

- No later than thirty (30) days after the Petition Date, the Debtors shall have entered into new or amended terms with vendors in a sufficient number and on terms and conditions reasonably necessary to support the Debtors' business, in each case, that are acceptable to the Debtors and the Required Lenders;

- No later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered a Final DIP Order;

- No later than forty-two (42) days after the Petition Date, the Bid Deadline (as defined in the Restructuring Support Agreement) shall have occurred;

- No later than forty-two (42) days after the Petition Date, the Auction (as defined in the Restructuring Support Agreement), if needed, shall have occurred;

- No later than forty-five (45) days after the Petition Date, a hearing to consider confirmation of an acceptable Plan of Reorganization shall have occurred;

- No later than fifty (50) days after the Petition Date, the Bankruptcy Court shall have entered a Final DIP Order, in form and substance satisfactory to the Required Lenders, confirming an Approved Plan of Reorganization; and

- No later than sixty (60) days after the Petition Date, the Plan Effective Date shall have occurred.

---

[9]   Capitalized terms used but not defined in this section shall have the meanings set forth in the DIP Credit Agreement and attached as <u>Exhibit D</u> to the Restructuring Support Agreement.

D.       **The Proposed Debtor-in-Possession Financing.**

61.     To provide the Debtors with liquidity to commence a smooth landing into these chapter 11 cases, the Initial Plan Sponsors agreed to provide the DIP Facility.  The DIP Facility and access to the prepetition secured lenders' cash collateral (the "Cash Collateral") will provide the Debtors with the necessary liquidity to fund their business operations and administrative expenses during these chapter 11 cases.

1.       **Need for DIP Financing.**

62.     As discussed throughout this Declaration, the Debtors made significant and earnest efforts to right-size their balance sheet and steer operations towards profitability.  Despite these efforts, the Debtors are now left with few viable options to continue to operate their business as a going concern and, in turn, maximize value for all of their stakeholders, outside of the bankruptcy process.

63.     As described in additional detail elsewhere in this Declaration, the DIP Facility is vital in light of the Debtors' current liquidity situation.  The Debtors intend to use the proceeds of the DIP Facility to run their everyday operations, satisfy payroll, meet overhead, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business.  The ability to satisfy these expenses when due is essential to the Debtors' continued operation of their business during the pendency of these chapter 11 cases, and the Debtors have effectively no cash to do any of these actions right now.  Failure to obtain access to the DIP Facility and the Cash Collateral will deprive the Debtors of the opportunity to reorganize for the benefit of their employees, vendors, customers, and all other stakeholders, will result in immediate and irreparable harm to the Debtors and their stakeholders, and will diminish the value of the Debtors' estates.

64.     Importantly, obtaining access to the DIP Facility will allow the Debtors to send a clear message to their customers and vendor base that these chapter 11 cases are limited to a financial restructuring that has clarity of outcome and a consensual path forward.  Accordingly, the proposed DIP Facility will provide much needed stabilization to the Debtors' vendor base.

### 2.     The DIP Sizing Process.

65.     In connection with the search for viable postpetition financing, A&M assisted the Debtors, their management, and their other advisors in preparing projected cash forecasts for the Debtors' business during these chapter 11 cases.  These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including, but not limited to, the effect of the chapter 11 filing on the operations of the business, fees and interest expenses associated with postpetition financing, professional fees, and customer and vendor obligations, as well as the operational performance of the underlying business.

66.     As of the Petition Date, substantially all of the Debtors' cash is encumbered, which means that the Debtors require immediate access to Cash Collateral to operate their enterprise and continue paying debts as they come due.  Prior to the Petition Date, the Debtors, in consultation with their advisors, reviewed and analyzed their projected cash needs and prepared projections (as updated from time to time in accordance with the terms of the DIP Facility, the "Budget") of postpetition cash needs for the Debtors' business in the initial thirteen weeks of these chapter 11 cases, including detailed line items for categories of cash flows anticipated to be received or disbursed during this period, and, along with the longer-term monthly forecasts, was utilized to determine the amount of postpetition financing required to administer these chapter 11 cases.

67.     I believe that the Budget and projections provide an accurate reflection of the Debtors' likely funding requirements over the identified period and are reasonable and appropriate under the circumstances.

68.     Based on my knowledge, the Budget, and extensive discussions with the Debtors' management team and advisors, I believe that the proposed DIP Facility gives the Debtors sufficient liquidity to stabilize their operations and fund the administration of these chapter 11 cases as the Debtors seek to proceed expeditiously toward a value-maximizing resolution.  Finally, based on extensive discussions with the Debtors and their relevant advisors, I understand that the proposed DIP Facility is on the most favorable terms available in light of the circumstances of these chapter 11 cases, the time available, and the current market for such financing.

69.     Accordingly, in my professional opinion, the relief requested in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion"), also filed today, is necessary and appropriate to avoid immediate and irreparable harm to the Debtors' estates, and should be approved by this Court.

### E.     The Debtors' Proposed Use of Cash Collateral.

70.     Pursuant to the DIP Motion, the Debtors also seek the continued use of Cash Collateral to provide sufficient liquidity for their operations during these chapter 11 cases. As described above, without access to Cash Collateral, the Debtors would be unable to operate their business and administer their estates, and their stakeholders would be immediately and irreparably harmed as a result.

71.     Authorization to use Cash Collateral during the interim period will ensure the Debtors have sufficient cash to comply with their borrowing base covenants and adequately

protect the ABL Lenders, First Lien Term Loan Lenders, and the Second Lien Term Loan Lenders during these chapter 11 cases, including by providing the Debtors with sufficient liquidity to continue operating as a going-concern and to maintain relationships with key customers.

72.     In consideration for the consensual use of Cash Collateral, the Debtors have agreed to provide the ABL Lenders with adequate protection as set forth in the DIP Motion and the accompanying interim order.  The Debtors' use of Cash Collateral will be subject to certain commitments as set forth in the interim order attached as Exhibit A to the DIP Motion.

### Part V:  Evidentiary Support for First Day Motions[10]

73.     Concurrently with this Declaration, the Debtors have filed a number of motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and minimize disruption (such motions, the "First Day Motions").  I understand the Debtors intend to seek the entry of court orders approving each of the First Day Motions as soon as possible in accordance with title 11 of the United States Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Bankruptcy Local Rules for the Southern District of Texas.  If the Court does not grant the relief requested by the Debtors in the First Day Motions on an emergency basis, I believe that the Debtors will suffer immediate and irreparable harm.

74.     The First Day Motions seek authority to, among other things, enter into the DIP Facility on an interim basis, honor employee-related wages and benefits obligations, pay critical vendors, and ensure the continuation of the Debtors' insurance, cash management systems, and other business operations without interruption.

---

[10]   Capitalized terms used but not defined in this section have the meanings given to them in the applicable First Day Motion.

75.     The relief requested in the First Day Motions is necessary and appropriate to maximize the value of the Debtors' assets and business operations.  I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors an opportunity to maximize the value of their estates.

76.     Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Bankruptcy Rule 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable value-destructive harm to the Debtors and their estates, to the detriment of all stakeholders.  Other relief will be deferred for consideration at a later hearing.

77.     The First Day Motions include the following:

- *Debtors' <u>Emergency</u> Motion For Entry of an Order Directing Joint Administration of Chapter 11 Cases*;

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of the Notice of Commencement, and (III) Granting Related Relief*;

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief*;

- *Debtors' <u>Emergency</u> Ex Parte Application for Entry of an Order (I) Authorizing and Approving the Appointment of Omni Agent Solutions as Claims and Noticing Agent and (II) Granting Related Relief*;

- *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of*

31

*and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief*;

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief*;

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Honor and Renew the Premium Financing Agreements Entered into Prepetition and Satisfy Obligations Related Thereto, (C) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (D) Continue to Pay Brokerage Fees, and (E) Maintain the Surety Bond Program, and (II) Granting Related Relief*;

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Provides from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief*;

- *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief*;

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*;

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) 503(b)(9) Claimants, (B) Lien Claimants, and (C) Critical Vendors, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief*;

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief*;

- *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*; and

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Setting the Claims Bar Dates, (II) Setting the Rejection Damages Bar Dates, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates.*

78.     I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtors to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element in the Debtors achieving a successful reorganization, and (c) is in the best interest of the Debtors' estates and stakeholders.  The facts stated herein in support of each of the First Day Motions are true and correct to the best of my knowledge, information, and belief.  If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts set forth herein and in such motions.

*<u>Administrative and Procedural Motions</u>*

A.     **Debtors' <u>Emergency</u> Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases ("<u>Joint Administration Motion</u>").**

79.     Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing procedural consolidation and joint administration of these chapter 11 cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration will also allow the United States Trustee for the Southern District of Texas and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  Moreover, joint administration will not adversely affect the Debtors' respective constituencies because the Joint Administration Motion seeks only administrative, not substantive, consolidation of the Debtors' estates.  I believe

that parties in interest will not be harmed by the relief requested, but instead will benefit from the

cost reductions associated with the joint administration of these chapter 11 cases.  Accordingly, I

believe that the joint administration of these chapter 11 cases is in the best interests of the Debtors'

estates, their creditors, and all other parties in interest.

**B.    Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of the Notice of Commencement, and (III) Granting Related Relief ("<u>Creditor Matrix Motion</u>").**

80.     Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order

(a) authorizing the Debtors to redact certain personally identifiable information, (b) approving the

form and manner of the Notice of Commencement, and (c) granting related relief.

81.     The Debtors seek to redact certain personally identifiable information due to the

privacy and safety concerns that would arise if such information were disclosed in the Debtors'

court filings and to help the Debtors comply with privacy law.

82.     In addition, the Debtors seek to serve the Notice of Commencement attached to the

Creditor Matrix Order as <u>Exhibit 1</u> on all parties to prevent confusion among creditors and to avoid

having the Debtors' estates incur unnecessary costs associated with serving multiple notices to the

parties listed on the Debtors' voluminous Creditor Matrix.

83.     Accordingly, I believe that the relief sought in the Creditor Matrix Motion is in the

best interests of the Debtors' estates, their creditors, and all other parties in interest.

**C.    Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief ("<u>SOFA Motion</u>").**

84.     Pursuant to the SOFA Motion, the Debtors seek entry of an order (a) extending the

deadline by which the Debtors must file their schedules of assets and liabilities, schedules of

current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by seven days, for a total of 21 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions, and (b) granting related relief.

85.     To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, leases, and contracts from each Debtor entity.  Accordingly, collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors, their employees, and their advisors at a time when such resources would be best used to stabilize the Debtors' business operations at the outset of these cases.  Additionally, because this information is voluminous and located in numerous places throughout the Debtors' organization, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.

86.     Although the Debtors' management, employees, professional advisors, and key personnel have prepared diligently for these chapter 11 cases, preparing the Schedules and Statements was not practicable given the complex nature of the Debtors' businesses.  In the days leading up to the Petition Date, the Debtors' primary focus has been preparing for a smooth transition into chapter 11 and negotiating with certain of the Debtors' lenders for a proposed debtor-in-possession financing facility, and the Debtors intend to focus the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of these chapter 11 cases.  Such efforts made it difficult for the Debtors to prepare the Schedules and Statements in advance of the Petition Date.

87.     Given the extensive amount of information that must be assembled and compiled, the multiple places where the information is located, and the hundreds of hours required to

complete the Schedules and Statements, I believe that the relief sought in the SOFA Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

   **D.    Debtors' <u>Emergency</u> *Ex Parte* Application for Entry of an Order (I) Authorizing and Approving the Appointment of Omni Agent Solutions as Claims and Noticing Agent and (II) Granting Related Relief ("<u>Omni 156(c) Retention Application</u>").**

88.    Pursuant to the Omni 156(c) Retention Application, the Debtors seek entry of an order appointing Omni Agent Solutions ("<u>Omni</u>") as claims, noticing, and solicitation agent (the "<u>Claims and Noticing Agent</u>") for the Debtors in their chapter 11 cases, effective as of the Petition Date.  As the Claims and Noticing Agent, Omni would assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.

89.    Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Omni to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interests of the estates.  Moreover, it is my understanding, based on all engagement proposals obtained and reviewed, that Omni's rates are competitive and comparable to the rates charged by their competitors for similar services.

90.    The Debtors anticipate that there will be thousands of persons and entities to be noticed in these chapter 11 cases.  In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent is in the best interests of the Debtors' estates, their creditors, and all other parties in interest because it will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim.

   **E.    Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief ("<u>NOL Motion</u>").**

91.     Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders: (a) approving certain notification and hearing Procedures related to certain transfers of, or declarations of worthlessness with respect to, NBG Topco Holdings Inc.'s existing classes of Common Stock or any Beneficial Ownership therein; (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock in violation of the Procedures shall be null and void *ab initio*; and (c) granting related relief.

92.     Companies generally have a variety of tax attributes.  A company generates NOLs if the operating expenses it has incurred exceed the revenues it has earned during a single tax year. A company may apply or "carry forward" NOLs to reduce future tax payments (subject to certain conditions discussed below).  *See* IRC § 172.  Generally, a company's deduction for net business interest expense is limited to 30 percent of its adjusted taxable income plus certain other amounts. Any business interest expense disallowed is carried forward and treated as business interest expense in the following tax year ("163(j) Carryforwards").  *See* IRC § 163.  Moreover, the "tax basis" in a company's assets can be vital to determining a company's tax attributes.

93.     The Debtors currently estimate that, as of December 31, 2021, they had approximately $18.4 million of federal NOLs, $61.5 million of Capital Losses, $70.4 million of 163(j) Carryforwards, and $4.1 million of foreign tax credits (together with the NOLs, Capital Losses, 163(j) Carryforwards, and certain other tax attributes, collectively, the "Tax Attributes").[11] The Debtors may generate additional Tax Attributes in the 2022 and 2023 tax years, including during the pendency of these chapter 11 cases.  The Tax Attributes are potentially of significant value to the Debtors and their estates because the Debtors may be able to utilize the Tax Attributes

---

[11]     Amounts are estimates and are subject to change.  The Tax Attributes include certain amounts that are subject to limitations on use as a result of prior ownership changes of certain Debtors under section 382 of the IRC.

to offset any taxable income generated by transactions consummated during these chapter 11 cases (including with respect to any taxable disposition of some or all of the Debtors' assets). Additionally, depending on the structure utilized in the Plan, in the event any of the Debtors' Tax Attributes were to survive, the Debtors may be able to carry forward certain of those Tax Attributes to offset federal taxable income or federal tax liability in future years.  Accordingly, the value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

94.     Because the Tax Attributes are of significant value to the Debtors and their estates, an ownership change of Common Stock may negatively impact the Debtors' utilization of the Tax Attributes.  Accordingly, it is necessary to closely monitor certain transfers of Common Stock so as to be in a position to act expeditiously to prevent such transfers, if necessary, with the purpose of preserving the Tax Attributes.

95.     The Debtors propose certain notification and hearing Procedures related to certain transfers of, or declarations of worthlessness with respect to, NBG Topco Holdings Inc. Common Stock or any related Beneficial Ownership.  The Debtors will utilize the Procedures to monitor and, if necessary, object to certain transfers of Beneficial Ownership of Common Stock and declarations of worthlessness with respect to Beneficial Ownership of Common Stock to ensure preservation of the Tax Attributes.  The Debtors also propose that the Court direct that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock in violation of the Procedures be null and void *ab initio*.

96.     For all of these reasons, I believe the relief in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

F.     **Debtors' <u>Emergency</u> Motion Seeking Entry of an Order (I) Setting the Claims Bar Date, (II) Setting the Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates ("<u>Bar Date Motion</u>").**

97.    Pursuant to the Bar Date Motion, the Debtors seek entry of an order

1.    establishing March 8, 2023 at 5:00 p.m., prevailing Central Time, as the last date and time for each entity (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) to file proofs of claim based on prepetition claims, including requests for payment under section 503(b)(9) of the Bankruptcy Code against any Debtor (the "Claims Bar Date");

2.    solely as to governmental units, establishing August 7, 2023 at 5:00 p.m., prevailing Central Time, as the last date and time for each such governmental unit to file proofs of claim against any Debtor (the "Governmental Bar Date");

3.    establishing the later of (i) the Claims Bar Date or the Governmental Bar Date, as applicable, and (ii) 5:00 p.m., prevailing Central Time, on the date that is 30 days following entry of the order approving the Debtors' rejection of the applicable executory contract of unexpired lease as the last date and time by which each claimant holding a claim based upon such rejection must file a Proof of Claim against any Debtor (the "Rejection Damages Bar Date," and together with the Claims Bar Date and the Governmental Bar Date, the "Bar Dates");

4.    approving the proposed Proof of Claim Form;

5.    approving the proposed Bar Date Notice; and

6.    approving the proposed Publication Notice.

98.    Bankruptcy Rule 3003(c)(3) provides that the Court shall fix the time within which proofs of claim must be filed in a chapter 11 case.  Bankruptcy Rule 3003(c)(2) provides that any creditor who has a claim against the Debtors that arose before the Petition Date, and whose claim is not scheduled in the Debtors' Schedules or whose claim is listed on the Schedules as disputed, contingent, or unliquidated must file a proof of claim.

99.    The Bar Dates proposed by the Debtors in this Motion are essential to the Debtors' ability to consummate a chapter 11 plan on the timeline required in these cases and emerge from these chapter 11 cases as expeditiously as possible, to the benefit of the Debtors' estates.  The proposed timeline will give all parties in interest adequate notice of the Bar Dates and an

opportunity to respond while also giving the Debtors a timely perspective on all claims asserted against them, which is important to reaching the proposed effective date of their chapter 11 plan. Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the Bar Date Motion.

*Operational Motions*

G.   **Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief ("<u>Wages Motion</u>").**

100.   Pursuant to the Wages Motion, the Debtors seek entry of an order, substantially in the form attached hereto (the "<u>Order</u>"):  (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto, and (b) granting related relief.

101.   As of the Petition Date, the Debtors have 730 employees, including 726 regular full-time employees, and four regular part-time employees, most of whom are involved in the Debtors' day-to-day operations.  The Employees perform a wide range of functions critical to the Debtors' operations and the administration of these chapter 11 cases.  In many instances, the Employees include personnel who are intimately familiar with the Debtors' business, processes, and systems, who possess unique skills and experience, or who have developed relationships with vendors that are essential to the Debtors' business.  These individuals are not easily replaced. Without the continued, uninterrupted services of the Employees, the Debtors' business operations will be halted and the administration of their estates will be substantially impaired.

102.   A small minority of Employees—163 Employees in total—are known to be members of a labor union and are covered by a collective bargaining agreement.  The Debtors also

supplement their workforce from time to time by relying on specialized individuals on a temporary or a project basis, including independent contractors and temporary workers from several staffing agencies who supplement the Debtors' workforce in the absence of Employee labor. The Debtors currently retain several Independent Contractors and Temporary Staff. The exact number fluctuates based on the Debtors' specific needs at any given time. The Independent Contractors and Temporary Staff are a critical supplement to the Employees.

103. The vast majority of the Employees, Independent Contractors, and Temporary Staff rely on their compensation and benefits to pay their daily living expenses and to support their families. These workers will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their compensation and providing them with health and other benefits. The Debtors submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

104. As of the Petition Date, the Debtors estimate that they owe approximately $348,000 on account of unpaid Wage Obligations; $540,000 on account of Staffing Agency Fees; $207,000 on account of Independent Contractor Obligations; $310,000 on account of Sales Commissions; $47,000 on account of Reimbursable Expenses; $803,000 on account of Corporate Card and P-Card Obligations; $42,500 on account of Non-Employee Director Compensation; $240,000 on account of Withholding Obligations; $48,000 on account of ESRP Payment Obligations; $15,000 on account of Payroll Processing Fees; $1,729,000 on account of Health Benefit Programs; $2,000 on account of HSAs; $7,000 on account of FSAs; $12,000 on account of Dental Plan; $8,000 on account of Vision Plan; $838,000 on account of Workers' Compensation Program; $46,000 on account of Employee Insurance Coverage; $1,000 on account of Additional Voluntary Coverage Programs; $558,000 on account of 401(k) Plan; $3,000 on account of COBRA Benefits Program;

$67,000 on account of CBA; $36,000 on account of Paid Leave; and $12,000 on account of Non-Insider Discretionary Employee Severance Program.

105.    Pursuant to the Wages Motion, the Debtors seek authority to make the payments related to prepetition amounts owed on account of the Compensation and Benefits Programs and continue to honor these obligations on a postpetition basis in the ordinary course of business.

106.    For all of these reasons, the Debtors would suffer immediate and irreparable harm to their business without the relief sought in the Wages Motion.  The Debtors' Employees are critical to their operations and restructuring efforts.  Accordingly, I believe such relief is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**H.    Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief ("<u>Taxes Motion</u>").**

107.    Pursuant to the Taxes Motion, the Debtors seek entry of an order (a) authorizing the Debtors to remit and pay (or use tax credits to offset) Taxes and Fees (as defined below) in the ordinary course of business that are payable or become payable during these chapter 11 cases (including any obligations subsequently determined upon audit or otherwise to be owed for periods prior to, including, or following the Petition Date), and (b) granting related relief.

108.    In the ordinary course of business, the Debtors collect, withhold, and incur taxes and fees related to Customs and Import Duties, Sales and Use Taxes, Commercial Activity Taxes, GST, Income and Franchise Taxes, Property Taxes, and Regulatory and Other Taxes and Fees (collectively, the "<u>Taxes and Fees</u>").  The Debtors pay or remit, as applicable, Taxes and Fees to various governmental authorities (collectively, the "<u>Authorities</u>") on a periodic basis (monthly, quarterly, annually, or biennially) depending on the nature and incurrence of a particular Tax and Fee and as required by applicable laws and regulations.  The Debtors generally pay and remit

Taxes and Fees through checks and electronic transfers that are processed through their banks and other financial institutions or service providers.  From time to time, the Debtors also receive tax credits for overpayments or refunds in respect of Taxes and Fees.  The Debtors generally use these credits in the ordinary course of business to offset against future Taxes and Fees or cause such amounts to be refunded to the Debtors.

109.    Any failure by the Debtors to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including (but not limited to):  (a) the Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from these chapter 11 cases; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the estates; and (c) in certain instances, the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the Debtors' restructuring.  Moreover, Taxes and Fees not paid on the due date as required by law may result in fines and penalties, the accrual of interest, or both.  Finally, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.

110.    The Debtors may become subject to routine audit investigations on account of tax returns and/or tax obligations in respect of prior years ("Audits") during these chapter 11 cases. Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors. The Debtors seek authority to pay or remit tax obligations on account of the Audits as they arise in the ordinary course of the Debtors' business, including as a result of any resolutions of issues addressed in an Audit.

| Category | Description | Approximate Amount Accrued and Unpaid as of Petition Date[12] |
|---|---|---|
| Customs and Import Duties | Taxes imposed on the Debtors for importing goods into a particular jurisdiction from outside that jurisdiction. | $810,000 |
| Sales and Use Taxes | Taxes imposed on the sale, purchase, and use of certain goods and services, assessed based on the value of such goods and services, generally payable on a monthly basis. | $20,000 |
| Commercial Activity Taxes | The Debtors incur an annual tax for doing business, measured by gross receipts from business activities in Ohio. | $20,000 |
| GST | Taxes imposed on the Debtors for certain goods and services supplied in Canada. | $40,000 |
| Income and Franchise Taxes | The Debtors incur various state, local, and federal Income Taxes as well as taxes imposed on the Debtors to do business in some states in the ordinary course based on the jurisdictions in which the Debtors do business. The Debtors pay state, local, and federal Income Taxes on a periodic basis. | $30,000 |
| Property Taxes | Taxes related to real and personal property holdings, generally payable on an annual basis. | $910,000 |
| Regulatory and Other Taxes and Fees | Taxes and Fees related to compliance with regulatory requirements and periodic licensing, permitting, reporting, commercial activities taxes, and similar requirements, payable on a monthly, quarterly, or annual basis, depending on the specific Tax or Fee. | $30,000 |
| **Total** | | $1,860,000 |

111.    For all of these reasons, the Debtors would suffer immediate and irreparable harm to their business without the relief sought in the Taxes Motion.  Accordingly, I believe such relief

---

12    In certain cases, the approximate amount of Taxes and Fees is based on current exchange rates and may be subject to change based on fluctuations in exchange rates.

is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

I.   **Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Honor and Renew the Premium Financing Agreements Entered into Prepetition and Satisfy Obligations Related Thereto, (C) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (D) Continue to Pay Brokerage Fees, and (E) Maintain the Surety Bond Program, and (II) Granting Related Relief ("<u>Insurance Motion</u>").**

112.   Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing the Debtors to (a) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business, (b) honor and renew the Premium Financing Agreements (as defined herein) entered into prepetition and satisfy obligations related thereto and enter into new premium financing agreements in the ordinary course of business, (c) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business on a postpetition basis, (d) satisfy payment of prepetition obligations on account of and continue to pay Brokerage Fees (as defined herein) in the ordinary course, (e) maintain the Surety Bond Program (as defined herein) on an uninterrupted basis and satisfy prepetition obligations related thereto in the ordinary course of business; and granting related relief.

113.   Continuation of the Insurance Policies and entry into new insurance policies is essential to the preservation of the value of the Debtors' businesses and operations.  In many instances, the coverage provided by the Insurance Policies is required by the regulations, laws, credit documents, customer contracts, and other arrangements that govern the Debtors' operations, as well as the Bankruptcy Code.

114.   In the ordinary course of business, the Debtors (and certain non-Debtor affiliates) maintain approximately eighteen insurance policies with approximately twelve third-party

insurance carriers.  These policies provide the Debtors and non-Debtor entities coverage for, among other things, the Debtors' property, general liability, product recall liability, directors' and officers' liability, automobile liability, umbrella, flood, earthquake, international, ocean cargo, workers' compensation, cybersecurity, and crime insurance.  The aggregate annual premium for the Insurance Policies is approximately $2.8 million, not including applicable taxes and surcharges, deductibles, and consulting fees.  As of the Petition Date, the Debtors do not believe there are any accrued but unpaid Premiums on account of the Insurance Policies.  However, the Debtors' workers' compensation Premiums are subject to regular adjustments and as a result, the aggregate amount of the Debtors' obligations on account of the workers' compensation Premiums is not known at this time.

115.     The Debtors finance a portion of the Premiums under nine of the Insurance Policies because it is not economically advantageous for the Debtors to pay the Premiums on certain of the Insurance Policies in full on or around the start date of each policy period.  The Debtors currently finance certain of their Premiums through three Premium Financing Agreements.  The aggregate monthly Financing Premium for the Insurance Policies financed under the Premium Financing Agreements is approximately $188,378.

116.     The Debtors are members of Churchill Casualty LLC, a group captive insurance company, through which they purchase certain of their Insurance Policies.  The Debtors are required to maintain a cash security of approximately $968,000 with the Group Captive, which is adjusted and trued up quarterly, and a letter of credit in the amount of $987,000, which is utilized to pay the costs of claims under various policies, as well as certain fees and expenses, on a pay-as-you-go basis.  The Debtors also employ a third-party claims administrator, who alleviates the burden that would fall on the Debtors from administering the claims process under some of the

policies.  The Insurance Administrator receives, settles, adjusts, otherwise handles claims under several of the Insurance Policies, and then pays such claims on behalf of the Debtors out of the Security Payment discussed above.  The Group Captive and the Insurance Administrator collect fees or commission payments for services rendered.  At the end of each quarter, the Debtors receive an accounting of claims, fees, and expenses paid out of the Security Payment, and the Debtors replenish the Security Payment as necessary with a true-up payment.  In fiscal year 2022, the True-Up Payment averaged $260,000 per quarter.

117.    Certain of the Insurance Policies require the Debtors to pay a Deductible.  If a claim is made under an Insurance Policy with a Deductible, the Debtors are obligated to pay any defense costs or successful or settled claims up to the amount of the Deductible.  Insurance Carriers are directly responsible for any claim to the extent such claim is in excess of the Deductible.  Alternatively, certain of the Insurance Policies use Self-Insured Retentions instead of Deductibles.  If a claim is made under these policies, the Debtors must make payments in the first instance up to the limit of the Self-Insured Retention and, once the Debtors have made such payments, the carrier is obligated to cover remaining costs.  As of the Petition Date, the Debtors do not believe there are any accrued but unpaid amounts owed pursuant to the Deductibles and Self-Insured Retentions.

118.    The Debtors obtain the Insurance Policies primarily through two Brokers, who assist the Debtors in obtaining comprehensive insurance coverage for their operations in the most cost-effective manner, negotiating policy terms, provisions, and premiums, assisting the Debtors with claims, and providing ongoing support throughout the applicable policy periods.  The Brokers collect fees or commission payments for services rendered or as part of the premiums paid on the Insurance Policies.  In the twelve months immediately preceding the Petition Date, the Debtors paid an aggregate amount of approximately $330,000 in Brokerage Fees to the Brokers.  As of the

Petition Date, the Debtors do not believe they owe any amounts to the Brokers on account of prepetition Brokerage Fees.

119.    In the ordinary course of business, the Debtors also provide Surety Bonds to governmental agencies related to United States and Canadian customs.  As of the Petition Date, the Debtors maintain seven Surety Bonds in an aggregate bond amount of approximately $6 million and those outstanding Surety Bonds are arranged by their Surety Broker.  The Debtors pay Surety Premiums directly to their Surety Broker on account of the Surety Bonds on an annual basis on or about the renewal date of each Surety Bond.  As of the Petition Date, the Debtors do not believe there are any accrued but unpaid amounts on account of the Surety Premiums.  To ensure uninterrupted coverage under the Surety Bond Program, the Debtors seek authority to honor any prepetition amounts owed on account of the Surety Premiums and to pay any Surety Premiums that may arise on a postpetition basis in the ordinary course of business consistent with past practice.

120.    Accordingly, I believe the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**J.      Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Provides from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief ("<u>Utilities Motion</u>").**

121.    Pursuant to the Utilities Motion, the Debtors seek entry of an order:  (a) determining that the Proposed Adequate Assurance provides the Utility Providers with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) prohibiting the Utility Providers from altering, refusing, or discontinuing services, (c) approving procedures for resolving

any dispute concerning adequate assurance in the event that a Utility Provider is not satisfied with the Proposed Adequate Assurance, and (d) granting related relief.

122.    In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, propane, water and sewage, telecommunications, waste, and other similar services from a number of Utility Providers. Pursuant to the leases to which the Debtors are party, certain of the Utility Services are billed directly to the Debtors' landlords and passed through to the Debtors as part of the Debtors' lease payments in accordance with the applicable lease agreements.

123.    On average, the Debtors pay approximately $204,968 each month for the Utility Services, calculated based on a historical monthly average of payments to the Utility Providers.  The Debtors have provided certain of the Utility Providers with prepetition cash deposits.

124.    The Debtors intend to pay postpetition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner.  The Debtors believe that cash held on hand by the Debtors and generated in the ordinary course of business and anticipated access to cash collateral will provide sufficient liquidity to pay the Utility Providers for Utility Services in accordance with prepetition practice during the pendency of their chapter 11 cases.  To provide additional assurance of payment, the Debtors propose to deposit $74,490 into a segregated bank account within five business days of entry of the Order.  The Adequate Assurance Deposit is equal to approximately one half of the Debtors' average monthly cost of Utility Services, calculated based on a historical monthly average of payments to the Utility Providers, excluding any prepaid amounts or prepetition deposit held by the Utility Provider.

125.     Additionally, any Utility Provider that is not satisfied with the Proposed Adequate Assurance may make a request for additional or different adequate assurance of future payment pursuant to the Adequate Assurance Procedures set forth in the Order.  The Adequate Assurance Procedures set forth a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance, while at the same time allowing the Debtors to continue their business operations uninterrupted.  The Adequate Assurance Procedures permit a Utility Provider to object to the Proposed Adequate Assurance by filing and serving an Adequate Assurance Request upon certain Notice Parties (as defined in the Order).  The Debtors, in their discretion, may then resolve any Adequate Assurance Request by mutual agreement with the Utility Provider and without further order of the Court.  If the Debtors determine that the Adequate Assurance Request cannot be resolved by mutual agreement, the Debtors will seek Court resolution of the Adequate Assurance Request.

126.     Uninterrupted Utility Services are essential to the Debtors' ongoing business operations, and hence the overall success of these chapter 11 cases.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations and safety procedures could be severely disrupted, and any such disruption would jeopardize the Debtors' reorganization efforts.  I believe this disruption also would adversely impact customer relationships and could result in a decline in the Debtors' revenues and profits.  For all of these reasons, I believe such relief sought in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**K.**     Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief ("<u>Cash Management Motion</u>").

127.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to (i) operate their cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto and (ii) continue intercompany transactions and funding consistent with the Debtors' historical practices, subject to the terms described therein; and (b) granting related relief.

128.    The Debtors maintain a sophisticated cash management system in the ordinary course of business to facilitate the efficient operation of their business operations.  The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions.   Additionally, the Debtors' corporate accounting and cash forecasting departments regularly reconcile the Debtors' Books and Records to ensure that all transfers are accounted for properly.

129.    As a part of the Cash Management System, the Debtors have 26 Bank Accounts with four Cash Management Banks, all of which are located in the United States:

- 23 Bank Accounts maintained at Wells Fargo;

- One Bank Account maintained at PNC Bank;

- One Bank Account maintained at Truist Bank; and

- One Bank Account maintained at Santander Bank.

130.    The Debtors incur periodic Bank Fees in connection with the maintenance of the Cash Management System, which average approximately $34,000 per month for all of the Debtors' Bank Accounts.  The Debtors estimate that they owe their Cash Management Banks approximately $45,000 in Bank Fees as of the Petition Date.

131.    The Debtors use the Cash Management System to collect, transfer, and distribute funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.

To collect customer receipts, the Debtors maintain nine Lockbox Accounts, eight of which align with one of the Debtors' eight specific business units.  On a daily basis, customer receipts from the Debtors' specific business units flow into the applicable Lockbox Account.  The Customer Receipts Account, however, is primarily structured to receive certain customer receipts that are subject to the Wells Fargo Purchase Facility.

132.    In the ordinary course of business, the Debtors sell certain receivables arising from sales of inventory or rendition of services to a limited number of designated customers in exchange for cash pursuant to the Account Purchase Agreement, providing the Debtors expedited access to the receivables generated from such customers.  As of August 2022, the Customer Receipts Account went under cash dominion at the request of Wells Fargo, and as of mid-January 2023, Wells Fargo has ceased to purchase new account receivables under their Account Purchase Agreement with the Debtors.[13]  While Wells Fargo is not currently purchasing Debtor receivables, the Debtors still owe Wells Fargo approximately $8.5 million on account of receivables.  To ensure that Wells Fargo continues to turn over the Debtors' rightful share of payments made into the Customer Receipts Account, in accordance with historic practice, it is important that the Debtors and Wells Fargo continue operating under the Wells Fargo Purchase Facility in the ordinary course of business.

133.    With the exception of funds that flow into the Customer Receipts Account, funds from the Lockbox Accounts are swept into the Debtors' ten Operating Accounts on a daily basis. Each of the ten Operating Accounts, with the exception of the Main Operating Account, is similarly aligned with one of the Debtors' specific business units and is utilized to fund daily

---

[13]    While Wells Fargo has ceased performing under the Wells Fargo Purchase Facility, the process of winding down the accounts receivable balance subject to the Wells Fargo Purchase Facility is ongoing.

operations and satisfy obligations specific to that business unit.  The Operating Accounts ending in 1726 and 4592 are both aligned with the business unit led by Nielsen & Bainbridge.  On a daily basis, the Operating Accounts are initially funded by the Lockbox Accounts.  The Main Operating Account is funded by the Operating Account ending in 4592, and funds from the Main Operating Account are then utilized to cover any deficits in the other Operating Accounts, although funds are transferred manually across all Operating Accounts as needed.  At the end of the week, any surplus funds in the Operating Accounts greater than $550,000 are manually transferred to the Main Operating Account.

134.    In addition to the Lockbox Accounts and the Operating Accounts, the Debtors have a number of additional Bank Accounts that they utilize to fulfill a variety of business needs, including making payroll payments, employee benefits payments, customs payments, and other similar operational expenses.

135.    To avoid disruption of the Cash Management System and unnecessary expense, the Debtors also request that they be authorized to continue to use their Business Forms, substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession. The Debtors use a sophisticated recordkeeping system that enables them to consolidate their Books and Records for financial reporting purposes while maintaining separate records on an entity-by-entity basis to track the operations and results of individual entities across their corporate structure.

136.    In the ordinary course of business, the Debtors maintain and engage in routine business relationships with each other and certain non-Debtor affiliates, which may result in intercompany receivables and payables.  These Intercompany Transactions occur as part of the daily operations of the Cash Management System.  Intercompany Transactions are first recorded

manually and then, on a monthly basis, entered into the Debtors' books and records via a manual journal entry. The Debtors also provide monthly funding to certain of their non-Debtor international affiliates. Historically, the Debtors have provided approximately $525,000 per month to such international affiliates and subsidiaries to cover operational costs. At any given time, there may be Intercompany Claims owing by one Debtor to another Debtor, by a non-Debtor affiliate to a Debtor, or by a Debtor to a non-Debtor affiliate in connection with the receipt and disbursement of funds. These Intercompany Transactions are crucial to the overall business operations, helping ensure that the Debtors and their non-Debtor affiliates procure goods on a timely basis, effectively test products to ensure that they meet certain quality control standards and criteria, and most importantly, maintain strong relationships with the foreign factories that produce their products.

137.    As a large supplier of goods comprised of eight business units, the Debtors depend on the timely and efficient collection, transfer, and disbursement of funds. The Cash Management System is tailored to meet the Debtors' operating needs, enable control over the Debtors' funds, ensure cash availability and liquidity, comply with requirements under their financing arrangements, and reduce administrative expenses incurred in connection with the movement of funds and the reporting of accurate account balances. In addition, continuing to operate under the Wells Fargo Purchase Facility will minimize disruption to the Debtors' Cash Management System.

138.    For all of these reasons, the Debtors would suffer immediate and irreparable harm to their business without the relief sought in the Cash Management Motion. Accordingly, I believe such relief is in the best interests of the Debtors' estates and their creditors and stakeholders and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**L.    Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) 503(b)(9) Claims, (B) Lien**

**Claimants, and (C) Critical Vendors, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief ("Critical Vendors Motion").**

139.     Pursuant to the Critical Vendors Motion, the Debtors seek entry an order: (a) authorizing the Debtors to pay in the ordinary course of business certain prepetition amounts owing on account of (i) 503(b)(9) Claims, (ii) Lien Claims, and (iii) Critical Vendor Claims, (b) confirming the administrative expense priority status of Outstanding Orders and authorizing, but not directing, the payment of such obligations in the ordinary course of business, and (c) granting certain related relief.  The Debtors' business relies on continuing access to, and relationships with, the Trade Claimants, which include a network of vendors and suppliers that supply goods or services.  Any disruption in the Debtors' access to such services and the provision of critical goods and services would have a far-reaching and adverse economic and operational impact on the Debtors' business.

1.     *503(b)(9) Claimants.*

140.     The Debtors may have received certain inventory, goods, and/or materials from various 503(b)(9) Claimants within the twenty days immediately preceding the Petition Date, thereby giving rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code.  Many of the Debtor's relationships with the 503(b)(9) Claimants are not governed by long-term contracts and instead the Debtors obtain much of their inventory, goods, and other materials from claimants on an order-by-order basis.

141.     Any interruption in the flow of these goods would be highly disruptive to the Debtors' operations and would be value destructive for the Debtors' businesses.  In light of these consequences, the Debtors believe that payment of the 503(b)(9) Claimants is essential to avoid disruptions to the Debtors' operations.  The Debtors do not seek to accelerate or modify existing

payment terms with respect to 503(b)(9) Claims (if any). Rather, the Debtors will pay the applicable 503(b)(9) Claims (if any) as they come due and in the ordinary course of business.

2.    *Lien Suppliers.*

142.    The Debtors routinely do business with a number of Third-Party Contractors that may be able to assert a variety of statutory, common law, or possessory liens against the Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered. The Debtors' ability to deliver products in a timely manner is crucial to their financial performance and depends on a seamless interaction with various third-party providers. These Third-Party Contractors perform various services for the Debtors, including the maintenance and improvement of the Debtors' real property and facilities and other repair, renovation, or construction of the facilities and property therein. Further, the Debtors' businesses depend on both the uninterrupted flow of inventory through their supply chain and distribution network. This supply and distribution network is critical to the Debtors' timely delivery of its products to its retail partners and end consumers. The supply chain depends on services provided by Shippers and Warehousemen.

143.    Under certain nonbankruptcy laws, the Third-Party Contractors, the Shippers and Warehousemen, and other claimants (the "Lien Claimants") may be able to assert liens on the goods in their possession or on the property they improved (as applicable) to secure payment of the charges or expenses incurred in connection with these prepetition obligations (the "Lien Claims"). There is significant risk that if the Debtors stop all payments to the Lien Claimants, the Lien Claimants will discontinue shipping and warehousing services, will refuse to release the Debtors' products. The Lien Claimants may also attempt to assert such liens and refuse to deliver or release goods in their possession or otherwise impede the Debtors' use of property until their claims are satisfied which would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these chapter 11 cases. The cost of such disruption to the Debtors'

estates in many cases would likely be greater than the applicable Lien Claims.  Pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would drain estate assets.

144.    For the twelve months before the Petition Date, on average, the Debtors paid the Lien Claimants, including the Third-Party Contractors and the Shippers and Warehousemen, approximately $6.6 million per month.  The Debtors estimate that, as of the Petition Date, approximately $3.3 million is outstanding on account of Lien Claims.

145.    The Debtors request authority to pay the prepetition Lien Claims as they become due and payable and to continue paying the Lien Claims in the ordinary course of business.  For the avoidance of doubt, the Debtors seek authority to pay only those amounts of Lien Claims that the Debtors determine, in their sole discretion, to be necessary or appropriate to (a) obtain release of critical or valuable goods, (b) maintain reliable, efficient, and smooth distribution systems, and (c) induce the Third-Party Contractors and other Lien Claimants to continue performing and otherwise supporting the Debtors' operations on a postpetition basis.

3.    *Critical Vendors.*

146.    The Debtors' ability to continue generating revenue and operating their businesses, and thus the success of these chapter 11 cases, fundamentally depends upon the Debtors' access to critical testing and compliance service providers in their overseas locations and warehouse material providers—all provided by a variety of Critical Vendors.  The Debtors are not able to easily switch suppliers or service providers on short notice and would face significant risks to their supply chain if prepetition amounts owed to their Critical Vendors.

147.    Given the Company's limited liquidity situation and mounting vendor payments, the Debtors entered these chapter 11 cases with a goal of resetting relationships with purchase order vendors. However, not every vendor service could be disrupted as renegotiation of terms

occur.  Accordingly, the Debtors, with the assistance of their advisors, have reviewed and analyzed their books and records, consulted operations managers and purchasing personnel, reviewed contracts and supply agreements, and analyzed applicable law, regulations, and historical practices to identify the Critical Vendors that supply the products and services most vital to the Debtors' go-forward operations.  The Critical Vendors generally fall into two categories: (i) Warehouse Material Providers; and (ii) Testing and Compliance Service Providers.

148.    *Warehouse Material Providers.*    The Debtors require daily access to domestic-based Critical Vendors that provide pallets, corrugate, fiber, wrapping materials, labels, ribbons, and other miscellaneous packaging supplies.  As of the Petition Date, the Debtors estimate that approximately $770,000 is outstanding on account of obligations to these Critical Vendors.

149.    *Testing and Compliance Service Providers.*  The Debtors require daily access to approximately seventeen Critical Vendors, primarily based in China, that provide testing and compliance services.  These Critical Vendors are essential, as they provide the means to pass compliance guidelines and subsequently ship products sourced in China.  As of the Petition Date, the Debtors estimate that approximately $130,000 is outstanding on account of obligations to the Testing and Compliance Service Providers.

150.    The Debtors believe that jeopardizing their relationships with any of the Critical Vendors and attempting to procure the Critical Vendor Products and Services from replacement vendors would impose a severe strain on the Debtors' business operations and would likely result in significant revenue loss.  Even a temporary interruption of the provision of Critical Vendor Products and Services would impede the Debtors' operations, and the cumulative impact of such events could have a severe adverse effect on the Debtors' businesses and, in turn, these chapter 11 cases.

151.    For the twelve months before the Petition Date, on average, the Debtors' paid the Critical Vendors approximately $850,000 per month.  The Debtors estimate that, as of the Petition Date, in the aggregate, approximately $900,000 is outstanding on account of obligations to the Critical Vendors.

152.    Any material interruption in the provision of the Critical Vendor Products and Services—however brief—would disrupt the Debtors' operations and could cause serious harm to the Debtors' go-forward businesses, goodwill, employees, customer base, and market share and such harm would likely far outweigh the cost of payment of the Critical Vendor Claims.  To maintain stability during this critical stage of these chapter 11 cases and to avoid jeopardizing the Debtors' sales and business operations going forward, the Debtors request authority to pay the Critical Vendor Claims as they become due and to continue paying the Critical Vendor Claims in the ordinary course of business, including on account of prepetition claims.  For the avoidance of doubt, the Debtors intend to pay the Critical Vendor Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs.

4.    *Customary Trade Terms Conditions.*

153.    Subject to the Court's approval, the Debtors intend to pay the Trade Claims only to the extent necessary to preserve the value of the estates.  To that end, in return for paying a portion of the Trade Claims, the Debtors propose that they be authorized to require the Trade Claimants to provide favorable trade terms for the postpetition procurement of their goods and services.  The Debtors seek authorization to condition payment of the Trade Claims upon each Trade Claimant's agreement to (a) continue—or recommence—providing goods and/or services to the Debtors in accordance with trade terms (including credit limits, pricing, timing of payments, availability, and other terms) at least as favorable to the Debtors as those in place during the twelve months prior

to the Petition Date (the "Customary Trade Terms"), and (b) agree that they shall not be permitted to cancel any contract, agreement, or arrangement pursuant to which they provide such goods and/or services to the Debtors during the course of these chapter 11 cases.  The Debtors also seek authorization to require, at their discretion, certain Trade Claimants to enter into a contractual agreement evidencing such Customary Trade Terms.

5.      *Payment of Outstanding Purchase Orders.*

154.    Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date.  To avoid the risk of becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to the Outstanding Purchase Orders unless the Debtors issue substitute purchase orders postpetition.  Receiving delivery of Outstanding Purchase Orders is critical to preventing any disruption to the Debtors' business operations.  Authorizing the Debtors to honor Outstanding Purchase Orders in the ordinary course of business after the Petition Date is critical to protect the Debtors' business operations.  Accordingly, the Debtors request that the Court confirm the administrative expense priority status of the Outstanding Purchase Orders and authorize the Debtors to pay the Outstanding Purchase Orders in the ordinary course of business.

155.    I believe that the relief requested in the Critical Vendors Motion will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise.  I believe that the relief requested in the Critical Vendors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Critical Vendors Motion.

**M.** **Debtors' <u>Emergency</u> Motion for Entry of An Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief ("<u>Customer Programs Motion</u>").**

156.    Pursuant to the Customer Programs Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to maintain and administer their customer-related programs, policies, and practices and honor certain prepetition obligations related thereto and (b) granting related relief.  The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand.  I believe that maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these chapter 11 cases and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

157.    The Debtors provide certain discounts and accommodations to their customers to attract and maintain positive customer relationships.  The Customer Programs are customary in the Debtors' industry and include the Sales Allowance and Markdown Programs, the Noncompliance Program, the Product Recall Program, and the eCommerce Advertising Program. These Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand.  Maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these chapter 11 cases and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

158.    As of the Petition Date, the Debtors estimate that there are approximately $14 million of prepetition obligations outstanding related to Customer Programs.   These obligations include accrued credits, adjustments, discounts, prepayments, or other similar programs owing to customers.  The majority of these obligations ***do not*** entail the expenditure of cash.

159.    I believe that continuing to administer the Customer Programs without interruption during the pendency of these chapter 11 cases is critical to preserving the value of the Debtors' estates.  Customers expect and rely on the Customer Programs and may not continue supporting the Debtors' businesses if the Customer Programs are discontinued.  Continued support from the Debtors' customers is essential for go-forward operations and value maximization.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

**N.      Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief ("<u>DIP Motion</u>").**

160.    Pursuant to the DIP Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to obtain postpetition debtor-in-possession financing.  Additional evidentiary support for the DIP Motion is provided in the Erickson Declaration filed contemporaneously therewith.

161.    Beginning in January 2022, the Debtors' management, with the assistance of Alvarez & Marsal North America, LLC, began to assess and analyze potential transactions to improve the Debtors' financial and liquidity position in light of challenges brought on by increased freight costs, cost inflation, and the U.S.-China trade war, among other challenges facing the Company at the time.  Then, in November 2022, as noted above, the Debtors engaged Guggenheim Securities, LLC to assist them in connection with their evaluation of various strategic alternatives, whether effected in the form of a potential restructuring transaction, financing transaction, or sale transaction, or any combination of the foregoing.

162.     The Debtors require immediate access to the DIP Facility in addition to continued use of Cash Collateral.  The proposed DIP Facility will provide much needed stabilization to the Debtors' business operations.  The DIP Facility will also provide the funding means to accomplish the comprehensive restructuring contemplated in these cases and ensure the Debtors' ability to operate as a going concern, preserving value of the Debtors' estates for the benefit of all of their stakeholders.  In addition, without access to Cash Collateral, the Debtors would be unable to operate their business and administer their estates, which would immediately and irreparably harm their stakeholders.

163.     If approved, the proposed DIP Facility will provide the Debtors with access to liquidity that will enable the Debtors to, among other things, honor employee wages and benefits, procure goods and services, fund general and corporate operating needs and the administration of these chapter 11 cases, and, most importantly, preserve and maximize the value of their assets for the benefit of all parties in interest.  With access to Cash Collateral, the Debtors will be able to continue their operations and preserve value for the benefit of their estates and stakeholders. Importantly, access to the proposed DIP Facility and use of Cash Collateral will send a clear signal to the Debtors' stakeholders that the Debtors' business is on the path to a reorganization, encouraging stakeholders to work cooperatively with the Debtors through the restructuring.

164.     The Debtors do not have alternative sources of financing readily available with terms better than those included in the DIP Facility.  The Debtors and their directors, in consultation with their advisors, including Guggenheim Securities, determined that the proposed DIP Facility was the best financing presently available to them under the circumstances and that it would be imprudent to forgo the lenders' DIP Facility.  The proposed DIP Facility is part of the comprehensive restructuring of the Debtors' existing debt pursuant to the Restructuring Support

Agreement that is expected to preserve over 700 jobs and maximize value for all stakeholders. The Debtors and I firmly believe that incurrence of the DIP Facility will maximize value for the Debtors' stakeholders and is in the exercise of the Debtors' sound business judgment. Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the DIP Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  February 9, 2023

*/s/ Amy Lee*
Amy Lee
Chief Transformation Officer
Nielsen & Bainbridge, LLC

**<u>Exhibit A</u>**

**Restructuring Support Agreement**

## RESTRUCTURING SUPPORT AGREEMENT

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER, ACCEPTANCE, OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY RESTRUCTURING TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO.  ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND MAY NOT BE SHARED WITH ANY PERSON OTHER THAN THE COMPANY PARTIES AND THE CONSENTING PARTIES AND THEIR RESPECTIVE ADVISORS OR EXCEPT AS SET FORTH IN ANY CONFIDENTIALITY AGREEMENT BETWEEN THE COMPANY PARTIES AND THE APPLICABLE CONSENTING PARTIES OR THEIR RESPECTIVE ADVISORS.

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 14.02 herein, this "**Agreement**") is made and entered into as of February 8, 2023 (the "**Execution Date**"), by and among the following parties, each in

the capacity set forth on its signature page to this Agreement (each of the following described in sub-clauses (i) through (vi) of this preamble, each a "**Party**" and, collectively, the "**Parties**"):

i.    NBG Intermediate Holdings Inc. ("**Holdings**"), a company incorporated under the Laws[1] of the State of Delaware, and each of its Affiliates as listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Parties (the Entities in this clause (i), collectively, the "**Company Parties**");

ii.   the undersigned Entities affiliated with Silver Point Capital, L.P. and KKR Credit Advisors (US) LLC that have executed and delivered counterpart signature pages to this Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Initial Plan Sponsors**");

iii.  the undersigned holders of, or investment advisors, sub-advisors, or managers of accounts that hold, First Lien Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (iii), collectively, the "**Consenting First Lien Term Loan Lenders**");

iv.   the undersigned holders of, or investment advisors, sub-advisors, or managers of accounts that hold, Second Lien Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (iv), collectively, the "**Consenting Second Lien Term Loan Lenders**");

v.    the undersigned holders of, or investment advisors, sub-advisors, or managers of accounts that hold, ABL Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (v), collectively, the "**Consenting ABL Lenders**"); and

vi.   Sycamore Partners Management, L.P. and certain of its affiliated investment funds and affiliates and portfolio companies of the foregoing (the Entities in this clause (vi), collectively, the "**Sponsor**" and, together with the Initial Plan Sponsors, the Consenting First Lien Term Loan Lenders, the Consenting Second Lien Term Loan Lenders, and the Consenting ABL Lenders, the "**Consenting Parties**").

### *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Parties have in good faith and at arm's length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (together with the exhibits and

---

[1]   Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1, or the Restructuring Term Sheet, as applicable.

appendices annexed to such term sheet, the "**Restructuring Term Sheet**," and, such transactions as described in this Agreement, the Restructuring Term Sheet, and the Plan, to the extent applicable, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions by commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court by means of the Plan (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**     *Definitions and Interpretation.*

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**2018 Incremental First Lien Term Loan**" means the secured loans issued in 2018 pursuant to the First Lien Credit Agreement in the aggregate principal amount of $35,000,000.

"**2020 Incremental First Lien Term Loan**" means the secured loans issued in 2020 pursuant to the First Lien Credit Agreement in the aggregate principal amount of $25,000,000.

"**ABL Agent**" means Wells Fargo Bank, N.A., solely in its capacity as administrative and collateral agent under the ABL Credit Agreement.

"**ABL Claim**" means any claim on account of the ABL Loans or otherwise arising under the ABL Credit Agreement.

"**ABL Credit Agreement**" means the ABL Credit Agreement dated as of April 26, 2017, as amended by Amendment No. 1, dated as of July 1, 2019, Amendment No. 2, dated as of April 6, 2021, and Amendment No. 3, dated as of July 9, 2021, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

"**ABL Facility**" means the asset based revolving credit facility issued in 2017 pursuant to the ABL Credit Agreement in aggregate principal amount of $75 million.

"**ABL Intercreditor Agreement**" means the ABL Intercreditor Agreement dated as of April 26, 2017, among the ABL Agent, Deutsche Bank AG New York Branch, as First Lien Term Loan Agent, and Cortland Capital Market Services LLC, as Second Lien Term Loan Agent, as

3

may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

"**ABL Lenders**" means the lenders party from time to time to the ABL Facility.

"**ABL Loans**" means the loan issued pursuant to the ABL Credit Agreement.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity was a debtor in a case under the Bankruptcy Code.

"**Agents**" means, collectively, any administrative agent, collateral agent, trustee, or similar Entity under the First Lien Credit Agreement, the Second Lien Credit Agreement, or the ABL Credit Agreement (including any successors thereto), and the DIP Agent.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes the Restructuring Term Sheet and any and all other exhibits, annexes, and schedules to this Agreement or the Restructuring Term Sheet in accordance with Section 14.02 of this Agreement.

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date (or, in the case of any Consenting Party that becomes a party hereto after the Agreement Effective Date, the date as of which such Consenting Party becomes a party hereto) to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, consent solicitation, exchange offer, tender offer, recapitalization, plan of reorganization, share exchange, business combination, joint venture or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.  For the avoidance of doubt, any sale process conducted pursuant to the Bidding Procedures is not an Alternative Restructuring Proposal.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

"**Bidding Procedures**" means the sale procedures to be agreed to by the Debtors and the Initial Plan Sponsors.

"**Bidding Procedures Motion**" means the motion seeking approval of the Bidding Procedures.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court approving the Bidding Procedures and establishing deadlines for the submission of bids and the auction in accordance with such procedures.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Interest in, a Company Party, including the DIP Claims, the ABL Claims, the First Lien Term Loan Claims, the Second Lien Term Loan Claims, and the Interests.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Company Releasing Party**" means each of the Company Parties, and, to the maximum extent permitted by Law, each of the Company Parties, on behalf of their respective Affiliates and Related Parties.

"**Confidentiality Agreement**" means an executed confidentiality agreement with a Company Party, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting ABL Lenders Consent Right**" means the right of the Consenting ABL Lenders to consent to or approve (i) any modifications, amendments, or supplements to, or waivers of conditions or requirements of, this Agreement or (ii) any of the Definitive Documents (or any amendments, modifications, or supplements hereto or thereto) that, in the case of (i) or (ii), as applicable, adversely affects (x) the economic rights, consent rights, waivers, or releases proposed to be granted to, or received by, or (y) the obligations of, the Consenting ABL Lenders pursuant to this Agreement, the Plan, or the Definitive Documents listed in Section 3.01 hereto.

"**Consenting First Lien Term Loan Lender Consent Right**" means the right of the Required Consenting First Lien Term Loan Lenders to consent to or approve (i) any modifications, amendments, or supplements to, or waivers of conditions or requirements of, this Agreement or (ii) any of the Definitive Documents (or any amendments, modifications, or supplements hereto or thereto) that, in the case of (i) or (ii), as applicable, materially and adversely affects (x) the economic rights, consent rights, waivers, or releases proposed to be granted to, or received by, or (y) the obligations of, the Consenting First Lien Term Loan Lenders pursuant to this Agreement, the Plan, or the Definitive Documents listed in Section 3.01 hereto.

"**Consenting Second Lien Term Loan Lender Consent Right**" means the right of the Required Consenting Second Lien Term Loan Lenders to consent to or approve (i) any modifications, amendments, or supplements to, or waivers of conditions or requirements of, this Agreement or (ii) any of the Definitive Documents (or any amendments, modifications, or supplements hereto or thereto) that, in the case of (i) or (ii), as applicable, materially and adversely affects (x) the economic rights, consent rights, waivers, or releases proposed to be granted to, or received by, or (y) the obligations of, the Consenting Second Lien Term Loan Lenders pursuant to this Agreement, the Plan, or the Definitive Documents listed in Section 3.01 hereto.

"**Consenting Sponsor Consent Right**" means the right of the Sponsor to consent to or approve any modifications, amendments, or supplements to, or waivers of conditions or requirements of, (i) this Agreement, or (ii) any of the Definitive Documents (or any amendments, modifications, or supplements hereto or thereto) that, in the case of (i) or (ii), as applicable, materially and adversely affects any release granted in favor of or by the Sponsor or its Affiliates.

"**Consenting Party Releasing Party**" means each of, and in each case in its capacity as such: (a) the Consenting Parties; (b) to the maximum extent permitted by Law, each current and former Affiliate of each Entity in clause (a) through the following clause (c); and (c) to the maximum extent permitted by Law, each Related Party of each Entity in clause (a) through this clause (c).

"**Consenting Parties**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means, collectively, each of the documents set forth in Section 3.01 of this Agreement.

"**DIP Agent**" means KKR Loan Administration Services LLC, in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

"**DIP Commitment Party**" means the parties that commit severally, and not jointly, to fund the DIP Facility.

"**DIP Credit Agreement**" means that certain senior secured superpriority debtor-in-possession credit agreement that governs the DIP Facility (as may be amended supplemented, or otherwise modified from time to time) among, the Company, as borrower, the Debtor guarantors as party thereto, the DIP Agent, as administrative agent and collateral agent, and the lenders party thereto, attached as **Exhibit D** hereto and which shall be consistent in all material respects with this Agreement and otherwise in form and substance satisfactory to the Initial Plan Sponsors.

"**DIP Credit Agreement Documents**" means the DIP Credit Agreement and any related documents or agreements governing the DIP Facility (including the DIP Orders), including all security and collateral documents, which documents shall be consistent in all material respects with this Agreement and otherwise in form and substance satisfactory to the Initial Plan Sponsors.

"**DIP Facility**" means the $60 million debtor-in-possession credit facility to be provided to the Company on the terms and conditions of the DIP Credit Agreement and the DIP Orders and which shall be consistent in all material respects with this Agreement and otherwise in form and substance satisfactory to the Initial Plan Sponsors.

"**DIP Lenders**" means the lenders party to the DIP Credit Agreement.

"**DIP New Money Claim**" means any Claim derived from or based upon the DIP New Money Loans.

"**DIP New Money Loans**" means the $30 million in new money term loans extended to the Debtors pursuant to the DIP Credit Agreement and DIP Orders.

"**DIP Order(s)**" means the interim and/or final, as applicable, orders of the Bankruptcy Court approving the terms of debtor-in-possession financing and use of cash collateral, which shall be consistent with the form attached hereto as **Exhibit E**, the DIP Credit Agreement, this Agreement, and otherwise in form and substance satisfactory to the Initial Plan Sponsors and, with respect to the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) and the provisions and protections provided with respect to the Consenting ABL Lenders or the ABL Debt Obligations (as defined in the ABL Intercreditor Agreement), reasonably acceptable to the Consenting ABL Lenders.

"**DIP Roll-Up Claim**" means any Claim derived from or based upon the DIP Roll-Up Loans.

"**DIP Roll-Up Loans**" means the $30 million of First Lien Term Loans rolled up pursuant to the DIP Credit Agreement and the DIP Orders.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit Financing**" means the debt instruments to be issued or executed as part of the Exit Term Loan Facility (if any) and the New ABL Credit Facility and any additional exit financing that may be obtained by the Reorganized Debtors, as determined by the Plan Sponsor.

"**Exit Financing Documents**" means, collectively, all agreements, documents, and instruments entered into in connection with the Exit Financing, including the Exit Term Loan Documents (if any) and the New ABL Credit Facility Documents.

"**Exit Financing Parties**" means the New ABL Credit Facility Lender Parties, the Exit Term Loan Facility Lender Parties, and any other lenders that provide any portion of the Exit Financing.

"**Exit Term Loan Credit Agreement**" means the definitive credit agreement governing the Exit Term Loan Facility, a form of which shall be included in the Plan Supplement, which shall be in form and substance acceptable to the Company Parties and the Required DIP Lenders.

"**Exit Term Loan Documents**" means, collectively, the Exit Term Loan Credit Agreement (if any) and any and all other documents related thereto, which shall be in form and substance acceptable to the Company Parties and the Required DIP Lenders.

"**Exit Term Loan Facility**" means the exit term loan facility that may be provided by the DIP Lenders at their election on terms and conditions acceptable to the Debtors and the Required DIP Lenders.

"**Exit Term Loan Facility Lender Parties**" means the DIP Lenders that may provide the Exit Term Loan Facility.

"**Exit Term Loans**" means the term loans under the Exit Term Loan Facility that may be extended to the Reorganized Debtors pursuant to the Exit Term Loan Documents.

"**First Day Pleadings**" means the first-day motions, applications, and related pleadings that the Debtors determine, in consultation with the Initial Plan Sponsors, are necessary or desirable to file upon the commencement of the Chapter 11 Cases.

"**First Lien Credit Agreement**" means the credit agreement dated as of April 26, 2017, as amended by Amendment No. 1 to the First Lien Credit Agreement, dated as of January 2, 2019, and Amendment No. 2 to the First Lien Credit Agreement, dated as of April 6, 2020, among KNB Holdings Corporation, as borrower, Holdings, as parent, the other guarantors party thereto, the lenders party thereto, and Deutsche Bank AG New York Branch, as administrative agent (as may otherwise be amended, restated, supplemented, or otherwise modified from time to time).

"**First Lien Term Loans**" means, collectively, the Initial First Lien Term Loan, the 2018 Incremental First Lien Term Loan, and the 2020 Incremental First Lien Term Loan.

"**First Lien Term Loan Claims**" means any Claim on account of First Lien Term Loans or otherwise arising under the First Lien Credit Agreement.

"**Governmental Body**" means any U.S. or non-U.S. federal, state, municipal, or other government, or other department, commission, board, bureau, agency, public authority, or instrumentality thereof, or any other U.S. or non-U.S. court or arbitrator.

"**Initial First Lien Term Loan**" means the secured loans issued in 2017 pursuant to the First Lien Credit Agreement in the aggregate principal amount of $260,000,000.

"**Interest**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Joinder**" means a joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit F** providing, among other things, that such newly joining Person signatory thereto is bound by the terms of this Agreement.  For the avoidance of doubt, any party that executes a Joinder shall be a "Party" under this Agreement as provided therein.

"**Law**" means any federal, state, local, or non-U.S. law (including, in each case, any common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Body of competent jurisdiction (including the Bankruptcy Court).

"**Lien**" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"**New ABL Credit Agreement**" means the definitive credit agreement governing the New ABL Facility, a form of which shall be included in the Plan Supplement.

"**New ABL Credit Facility**" means the asset based revolving credit facility to be provided by the Consenting ABL Lenders.

"**New ABL Credit Facility Documents**" means, collectively, the New ABL Credit Agreement and any and all security documents or other documents related thereto.

"**New ABL Credit Facility Lender Parties**" means one or more commercial lending institutions or such other entities that will provide the New ABL Credit Facility.

"**New Organizational Documents**" means the new Organizational Documents of a Company Party and its direct or indirect subsidiaries, including any shareholders agreement(s) or similar documents.

"**Organizational Documents**" means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership, or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as by-laws, a

9

partnership agreement, or an operating, limited liability company, shareholders, or members agreement).

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests that meets the requirements of Section 8.01 of this Agreement.

"**Person**" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Body, or any legal entity or association.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the chapter 11 plan substantially in the form attached hereto as **Exhibit C** (which may be amended, modified, and supplemented consistent with this Agreement).

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Solicitation**" means the solicitation of votes in favor of the Plan.

"**Plan Sponsor**" means the Initial Plan Sponsors unless, following the conclusion of the auction (if any) pursuant to the Bidding Procedures Order and consistent with the Restructuring Term Sheet, a bidder submits a bid that is designated the winning bid pursuant to the Bidding Procedures such that the winning bidder shall become the Plan Sponsor.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Qualified Marketmaker**" means an Entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Releases**" means the releases, injunction, and exculpation provisions contemplated by Article VIII of the Plan.

"**Restructuring Term Sheet**" has the meaning set forth in the preamble to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the preamble to this Agreement.

"**Required Consenting First Lien Term Loan Lenders**" means, as of the relevant date, each Initial Plan Sponsor that holds First Lien Term Loans.

10

"**Required Consenting Second Lien Term Loan Lenders**" means, as of the relevant date, Consenting Second Lien Term Loan Lenders holding at least 50.01 percent of the aggregate outstanding principal amount of Second Lien Term Loans that are held by Consenting Second Lien Term Loan Lenders.

"**Required DIP Lenders**" has the meaning set forth in the DIP Credit Agreement.

"**Restructuring Transactions**" means, collectively, those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions, that the Debtors and the Plan Sponsor reasonably determine to be necessary to implement the Plan in a manner consistent with this Agreement, the Restructuring Term Sheet, and the Restructuring Transactions Memorandum, and which shall include the Sponsor causing NBG Topco Holdings Inc. and NBG PropCo LLC to take all actions necessary to effectuate the Restructuring Transactions in accordance with the Plan and the Restructuring Transactions Memorandum.

"**Restructuring Transactions Memorandum**" means one or more written documents (which may be in the form of a written memorandum or a PowerPoint or similar presentation format) illustrating the various Restructuring Transactions used to effect the Tax Structure, which documents may be amended from time to time prior to the Plan Effective Date in accordance with this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Second Lien Term Loans**" means the secured loans issued pursuant to the Second Lien Credit Agreement in the aggregate principal amount of $70,000,000.

"**Second Lien Term Loan Claim**" means any Claim on account of the Second Lien Term Loans or otherwise arising under the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" means the credit agreement dated as of April 26, 2017, among KNB Holdings Corporation, as borrower, Holdings, as parent, the other guarantors party thereto, the lenders party thereto, and Cortland Capital Market Services LLC, as administrative agent, including all amendments, modifications, and supplements thereto.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means, as applicable, any documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on the Plan, as approved by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"**Sponsor**" has the meaning set forth in the preamble to this Agreement.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective as to such Party in accordance with, as applicable, Sections 11.01, 11.02, 11.03, or 11.04 of this Agreement.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other Restructuring Transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement substantially in the form attached to this Agreement as **Exhibit G** providing, among other things, that a transferee is bound by the terms of this Agreement applicable to its transferor with respect to the Company Claims/Interests transferred or being transferred.  For the avoidance of doubt, any transferee that executes a Transfer Agreement shall be a "Party" under this Agreement as provided therein.

"**U.S. Trustee**" means the Office of the United States Trustee for the Southern District of Texas.

      1.02.    <u>Interpretation</u>.  For purposes of this Agreement:

      (a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

      (b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

      (c)    unless otherwise specified, any reference in this Agreement to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

      (d)    unless otherwise specified, any reference in this Agreement to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time; *provided* that, notwithstanding the foregoing, any capitalized terms in this Agreement which are defined with reference to another agreement (other than the Restructuring Term Sheet), are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the Execution Date;

      (e)    unless otherwise specified, all references to "Sections" are references to Sections of this Agreement;

      (f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

      (g)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

      (h)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not;

(j)      the phrase "counsel to the Consenting Parties" refers to each counsel specified in Section 14.10 other than counsel to the Company Parties; and

(k)      unless otherwise specified, references to "days" shall mean calendar days.

**Section 2.**      *Effectiveness of this Agreement.*

2.01.   This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Consenting Parties;

(b)      the Initial Plan Sponsors shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties;

(c)      holders of at least two-thirds of the aggregate outstanding principal amount of ABL Loans shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties;

(d)      holders of at least one-half of the aggregate outstanding principal amount of First Lien Term Loans shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties;

(e)      holders of at least two-thirds of the aggregate outstanding principal amount of Second Lien Term Loans shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties;

(f)      the Sponsor shall have executed and delivered a counterpart signature page of this Agreement to counsel to the Company Parties; and

(g)      counsel to the Company Parties shall have given notice to counsel to the Consenting Parties in the manner set forth in Section 14.10 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred.

**Section 3.**      *Definitive Documents.*

3.01.   The Definitive Documents governing the Restructuring Transactions shall include this Agreement, the Restructuring Term Sheet, and each of the following:

(a)      the First Day Pleadings;

(b)      the Bidding Procedures, the Bidding Procedures Motion, and the Bidding Procedures Order;

(c)      the DIP Credit Agreement Documents;

(d)      the DIP Orders (and related motion(s));

(e)      the Disclosure Statement;

(f)      the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials (and related motion(s));

(g)      the Solicitation Materials;

(h)      the Plan;

(i)      the Plan Supplement;

(j)      the Confirmation Order;

(k)      the Exit Financing Documents;

(l)      the New Organizational Documents;

(m)      the Restructuring Transactions Memorandum;

(n)      all pleadings filed by the Company Parties in connection with the Chapter 11 Cases (and related orders), including the First Day Pleadings and all orders sought pursuant thereto;

(o)      any and all filings with or requests for regulatory or other approvals from any Governmental Body; and

(p)      such other agreements, instruments, and documentations as may be necessary or reasonably desirable to consummate and document the Restructuring Transactions.

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement.  Further, except as otherwise set forth herein, any amendments, waivers, supplements, or modifications to the Definitive Documents and any Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date, in each case, shall otherwise be in form and substance reasonably acceptable to (a)(i) the Company Parties and (ii) the Initial Plan Sponsors; *provided* that, the Exit Term Loan Documents (if any) shall be in form and substance acceptable to the Company Parties and the Required DIP Lenders; *provided*, *further*, that the New ABL Credit Facility Documents shall be in form and substance acceptable to the Company Parties, the Initial Plan Sponsors, and the Consenting ABL Lenders; and (b)(i) solely with respect to matters for which the Consenting ABL Lenders Consent Right applies, the Consenting ABL Lenders; (ii) solely with respect to matters for which the Consenting First Lien Term Loan Lenders Consent Right applies, the Required Consenting First Lien Term Loan Lenders; (iii) solely with respect to

14

matters for which the Consenting Second Lien Term Loan Lenders Consent Right applies, the Required Consenting Second Lien Term Loan Lenders; and (iv) solely with respect to matters for which the Consenting Sponsor Consent Right applies, the Sponsor.

**Section 4.** *[Reserved.]*

**Section 5.** *Commitments of the Consenting Parties.*

5.01. <u>General Commitments, Forbearances, and Waivers.</u>

(a) During the Agreement Effective Period, each Consenting Party (but, with respect to the Consenting ABL Lenders, solely as to sub-paragraphs (v) and (vi) below), severally, and not jointly, agrees, in respect of all of its Company Claims/Interests to:

(i) use commercially reasonable efforts to support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii) use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii) use commercially reasonable efforts to oppose any Party or Person from taking any actions contemplated in <u>Section 5.01(b)</u>;

(iv) give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions[2];

(v) negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party; and

(vi) forbear from the exercise of its rights (including any right of set-off) or remedies it may have under the ABL Credit Agreement, the First Lien Credit Agreement, or the Second Lien Credit Agreement, as applicable, and any agreement contemplated thereby or executed in connection therewith, as applicable, and under applicable U.S. or non-U.S. law or otherwise, in each case, with respect to any breaches, defaults, events of defaults, or potential defaults (expressly including, for the avoidance of doubt, any such breaches, defaults, events of defaults, or potential defaults resulting from any maturities, including springing maturities, occurring during the Agreement Effective Period) by the Company Parties.  For the avoidance of doubt, nothing in this <u>Section 5.01(a)</u> shall restrict or limit the Consenting Parties or the Agents

---

[2] Each Consenting First Lien Term Loan Lender and each Consenting Second Lien Term Loan Lender specifically agrees that this Agreement constitutes a direction to the Agents/Trustees to refrain from exercising any remedy available or power conferred to the Agents/Trustees against the Company Parties or any of their assets except as strictly necessary to effectuate the Restructuring Transactions.

from taking any action (a) permitted or required to be taken hereunder for the purposes of consummating the Restructuring Transactions, including pursuant to any Definitive Document, or (b) permitted pursuant to the DIP Orders.

(b)        During the Agreement Effective Period, each Consenting Party, severally, and not jointly, agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly (unless otherwise provided for in a Definitive Document):

(i)        object to, delay, impede, or take any other action, directly or indirectly, to interfere with, delay, or impede the acceptance, implementation, or consummation of the Restructuring Transactions (including, as applicable, through instructions, directions, notices, or orders to the Agents);

(ii)        propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)        execute or file any motion, pleading, agreement, instrument, order, form, or other document with any court (including any modifications or amendments to any of the foregoing with any court) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv)        initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)        exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Interests in the Company Parties;

(vi)        object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code;

(vii)        exercise any right or remedy, directly or indirectly, for the enforcement, collection, or recovery of any of the ABL Claims, the First Lien Term Loan Claims, or the Second Lien Term Loan Claims against the Company Parties, including in connection with any payment obligations of the Company Parties under the ABL Credit Agreement, the First Lien Credit Agreement, or the Second Lien Credit Agreement, as applicable, that come due, if any, during the Agreement Effective Period, other than in accordance with this Agreement;

(viii)        object to any First Day Pleadings and "second day" pleadings consistent with this Agreement filed by the Debtors in furtherance of the Restructuring Transactions, including any motion seeking approval of the DIP Facility on the terms set forth herein and the DIP Credit Agreement;

(ix)        object to or commence any legal proceeding challenging the liens or claims (including the priority thereof) granted or proposed to be granted to the DIP Commitment Parties under the DIP Order;

16

(x)     announce publicly their intention to not support the Restructuring Transactions; or

(xi)     take any action that is inconsistent in any material respect with the Restructuring Transactions.

5.02.   <u>Commitments with Respect to Chapter 11 Cases.</u>

(a)     In addition to the affirmative and negative commitments set forth in Sections 5.01(a) and 5.01(b), during the Agreement Effective Period, each Consenting Party (but with respect to the Consenting ABL Lenders, subject to the negotiation of the New ABL Facility Documents and such Consenting ABL Lenders' receipt of internal credit approvals to issue a commitment to enter into such New ABL Facility Documents) that is entitled to vote to accept or reject the Plan pursuant to its terms, severally, and not jointly, agrees that it shall, subject to receipt of the Solicitation Materials by such Consenting Party:

(i)     vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials;

(ii)     to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(iii)     to the extent it is required to elect to opt into the releases set forth in the Plan, elect to opt into the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(iv)     not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i)–(iii) above; and

(v)     support and take all actions reasonably necessary or requested by the Company Parties to facilitate the solicitation and approval of the Disclosure Statement, and acceptance, confirmation, consummation, and implementation of the Plan and the Restructuring Transactions.

(b)     During the Agreement Effective Period, each Consenting Party, in respect of each of its Company Claims/Interests, severally, and not jointly, will not directly or indirectly object to, delay, impede, or take any other action in violation of this Agreement to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement or the Restructuring Transactions.

(c)     Notwithstanding the foregoing, nothing in this Agreement shall require any Consenting Party to (a) incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to any Consenting Party or its Affiliates; or (b) provide any information that it reasonably determines to be sensitive or confidential.

17

**Section 6.**     ***Additional Provisions Regarding the Consenting Parties' Commitments***.

6.01.     Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a)     affect the ability of any Consenting Party to consult with any other Consenting Party, the Company Parties, or, if applicable, any other party in interest in the Chapter 11 Cases (including any official committee and the U.S. Trustee), to the extent applicable;

(b)     impair or waive the rights of any Consenting Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(c)     prohibit any Consenting Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying, or preventing the consummation of the Restructuring Transactions; and

(d)     prevent any Consenting Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

6.02.     [RESERVED.]

6.03.     <u>DIP Facility</u>.  Capitalized terms used but not defined in this <u>Section 6.03</u> shall have the meaning set forth in the DIP Credit Agreement Documents and the DIP Orders.

(a)     Notwithstanding anything contained in this Agreement, nothing in this Agreement shall affect the rights of the DIP Agent and the DIP Lenders under the DIP Orders or the DIP Credit Agreement Documents and to the extent of any conflict between this Agreement and the DIP Orders or the DIP Credit Agreement Documents, the DIP Orders or the DIP Credit Agreement Documents, as applicable, shall govern.

(b)     Notwithstanding anything contained in this Agreement, nothing in this Agreement shall affect the rights of the Prepetition ABL Agent and the Prepetition ABL Lenders under the DIP Orders and to the extent of any conflict between this Agreement and the DIP Orders or the DIP Credit Agreement Documents, the DIP Orders or the DIP Credit Agreement Documents, as applicable, shall govern.

(c)     Each of the Consenting Parties irrevocably consents to (i) the DIP Facility and the use of Cash Collateral (each as defined in the DIP Orders); (ii) the priming of the First Lien Term Loan and the Second Lien Term Loan by the DIP Liens (each as defined in the DIP Orders), as set forth in the DIP Orders, and (iii) the entry of the DIP Orders; *provided* that such consent is conditioned upon the DIP Orders being consistent with the form attached hereto as **<u>Exhibit E</u>** and otherwise in form and substance satisfactory to the Initial Plan Sponsors and, with respect to the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) and the provisions and protections provided with respect to the Consenting ABL Lenders or the ABL Debt Obligations (as defined in the ABL Intercreditor Agreement), reasonably acceptable to the Consenting ABL Lenders.

6.04.   <u>Sponsor</u>.

(a)      The Sponsor shall, to the extent required or desirable to effectuate the Restructuring Transactions, direct NBG Holdco LLC and NBG Topco Holdings Inc. to take such actions as are reasonably necessary to fulfill Sponsor and the Company's obligations hereunder.

(b)      Notwithstanding anything contained in this Agreement, during the Agreement Effective Period, the Sponsor agrees that it shall not (A)(i) pledge, encumber, assign, sell, or otherwise transfer, including by the declaration of a worthless stock deduction for any tax year ending on or prior to the Plan Effective Date, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, directly or indirectly, any portion of its right, title, or interests in any of its shares, stock, or other interests in NBG Topco Holdings Inc. or any subsidiary thereof, (ii) acquire any outstanding indebtedness of the NBG Topco Holdings Inc. or any subsidiary thereof, or (iii) make any worthless stock deduction for any tax year ending on or prior to the Plan Effective Date, in each case of (i), (ii) and (iii), to the extent such pledge, encumbrance, assignment, sale, acquisition, declaration of worthlessness or other transaction or event may impair or adversely affect any of the tax attributes of NBG Topco Holdings Inc. or any subsidiary thereof or (B) take or cause to be taken, any other action that could reasonably be expected to have an adverse tax impact on NBG Topco Holdings Inc. or any subsidiary thereof.

**Section 7.      *Commitments of the Company Parties.***

7.01.   <u>Affirmative Commitments</u>.  During the Agreement Effective Period, the Company Parties agree to:

(a)      support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(c)      use reasonable best efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(d)      negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(f)      take all reasonable actions necessary or reasonably requested by the Initial Plan Sponsors to facilitate the consummation of the Restructuring Transactions;

(g)      provide counsel for the Initial Plan Sponsors, the Consenting ABL Lenders, the Consenting First Lien Term Loan Lenders, and the Consenting Second Lien Term Loan Lenders with draft copies of all material (i) motions, (ii) documents, and (iii) other pleadings to be filed in

19

the Chapter 11 Cases as soon as reasonably practicable  prior to the date when the Company Parties intend to file such documents with the Bankruptcy Court, and without limiting any approval rights set forth herein, and consult in good faith with counsel to the Initial Plan Sponsors regarding the form and substance of any such proposed filing;

(h)     continue ordinary course practices to maintain good standing under the jurisdiction in which each Company Party and each of its subsidiaries is incorporated or organized;

(i)     pay in full and in cash all fees, costs, and expenses in accordance with <u>Section 14.21</u> of this Agreement and the DIP Orders;

(j)     provide (whether directly or through their employees, officers, and other representatives) to the Initial Plan Sponsors and the advisors to the Initial Plan Sponsors (i) reasonable access to the Company Parties' books and records during normal business hours on reasonable advance notice to the Company Parties' representatives and without disruption to the operation of the Company Parties' business, (ii) reasonable access to the management of the Company Parties on reasonable advance notice to such persons and without disruption to the operation of the Company Parties' business, and (iii) such other information as reasonably requested by the Initial Plan Sponsors or the Initial Plan Sponsors' advisors; in all cases, subject to the appropriate agreement on use and confidentiality;

(k)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order: (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code); (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (iii) dismissing any of the Chapter 11 Cases;

(l)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable; and

(m)     comply with the terms, conditions, and obligations of the DIP Credit Agreement Documents, including the DIP Orders, once approved or entered, as applicable, by the Bankruptcy Court.

7.02.   <u>Negative Commitments</u>.  During the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions described in this Agreement or the Plan;

(c)     seek to modify the Plan or any other Definitive Documents, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

20

(d)     seek, solicit, or support any Alternative Restructuring Proposal; or

(e)     file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan.

7.03.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent that taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law; *provided*, that the Company Parties shall promptly provide notice to counsel to the Consenting Parties of any determination made in connection with this <u>Section 7.03</u>.

7.04.    Notwithstanding anything to the contrary in this Agreement, but subject to <u>Section 7.01</u>, each Company Party and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (a) consider, respond to, and facilitate the sale process contemplated by the Bidding Procedures (b) consider, respond to, and negotiate any alternative DIP proposals, (c) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity in connection with the Bidding Procedures; and (d) enter into or continue discussions or negotiations with holders of Claims against or Interests in a Company Party (including any Consenting Party), or any other party in interest in the Chapter 11 Cases (including any official committee and the U.S. Trustee, if applicable), or any other Entity, in each case, consistent with the Bidding Procedures or in connection with an alternative DIP proposal.

7.05.    Nothing in this Agreement shall:  (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**       *Transfer of Company Claims/Interests.*

8.01.    During the Agreement Effective Period (and subject to <u>Section 6.04</u> with respect to the Sponsor), no Consenting Party shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)     in the case of any Company Claims/Interests, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), (4) a Consenting Party, or (5) with respect to the Consenting ABL Lenders, a Eligible Assignee (as defined in the ABL Credit Agreement); and

(b)     either (1) the transferee executes and delivers to counsel to the Company Parties and counsel to the Initial Plan Sponsors, at or before the time of the proposed Transfer, a Transfer Agreement; or (2) the transferee is a Consenting Party or an affiliate thereof bound by the terms of this Agreement and the transferee provides notice of such Transfer (including the amount and type of Company Claims/Interests Transferred) to counsel to the Company Parties and counsel to the Initial Plan Sponsors at or before the time of the proposed Transfer.

8.02.    Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement only to the extent of the rights and obligations in respect of such transferred Company Claims/Interests, and the transferee shall be deemed a "Consenting Party" (and as a "Consenting ABL Lender," "Consenting First Lien Term Loan Lender," or a "Consenting Second Lien Term Loan Lender," as applicable) and a "Party" under this Agreement.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.    Subject to Section 6.04, this Agreement shall in no way be construed to preclude the Consenting Parties from acquiring additional Company Claims/Interests, *provided*, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Party be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Initial Plan Sponsors) and (b) such Consenting Party must provide notice of such acquisition (including the amount and type of Company Claims/Interests acquired) to counsel to the Company Parties and counsel to the Initial Plan Sponsors within five (5) Business Days of such acquisition.

8.04.    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Party to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary in this Agreement, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently Transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is a permitted Transfer under Section 8.01.  To the extent that a Consenting Party is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Party without the requirement that the transferee be a Permitted Transferee.  For the avoidance of doubt, if a Qualified Marketmaker acquires any Company Claims/Interests from a Consenting Party and is unable to Transfer such Company Claims/Interests within the five (5) Business Day-

period referred to above, the Qualified Marketmaker shall execute and deliver a Transfer Agreement in respect of such Company Claims/Interests.

8.06.   Notwithstanding anything to the contrary in this <u>Section 8</u>, the restrictions on Transfer set forth in this <u>Section 8</u> shall not apply to the grant of any Liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such Claims and Interests in the ordinary course of business and which Lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 9.**   ***Representations and Warranties of Consenting Parties.***  Each Consenting Party severally, and not jointly, represents and warrants that, as of the date such Consenting Party executes and delivers this Agreement and as of the Plan Effective Date:

(a)   it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in such Consenting Party's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to <u>Section 8</u>);

(b)   it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)   such Company Claims/Interests are free and clear of any pledge, Lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, Transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Party's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)   it has the full power to vote, approve changes to, and Transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)   it has not relied upon any other Party in deciding to enter into this Agreement and has instead made its own independent analysis and decision to enter into this Agreement;

(f)   it has made no prior assignment, sale, participation, grant, conveyance, or other Transfer of, and has not entered into any agreement to assign, sell, participate, grant, convey, or otherwise Transfer, in whole or in part, any portion of its rights, title, or interest in any Company Claims/Interests that is inconsistent with the representations and warranties of such Consenting Party herein or would render such Consenting Party otherwise unable to comply with this Agreement and perform its obligations hereunder; and

(g)   solely with respect to holders of Company Claims/Interests (other than with respect to the Consenting ABL Lenders), (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), (ii) any securities acquired by the Consenting Party in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities

Act, (iii) understand that the securities contemplated by this Agreement have not been registered under the Securities Act as of the date hereof and may not be resold without registration under the Securities Act as of the date hereof and may not be resold without registration under the Securities Act except pursuant to a specific exemption from the registration provisions of the Securities Act; and (iv) is not acquiring the securities contemplated by this Agreement as a result of any advertisement, article, notice, or other communication regarding such securities published in any newspaper, magazine, or similar media or broadcast over television or radio or presented at any seminar or any other general solicitation or general advertisement.

**Section 10.**   *Mutual Representations, Warranties, and Covenants*.   Each of the Parties represents, warrants, and covenants to each other Party, severally, and not jointly, that, as of the date such Party executes and delivers this Agreement and as of the Plan Effective Date:

(a)   it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)   except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, if applicable, no consent or approval is required by any other person or Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)   the entry into and performance by it of, and the Restructuring Transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its certificates of incorporation, bylaws, limited liability company agreements, or other constitutional documents;

(d)   except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)   except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 11.**   *Termination Events*.

11.01.   <u>Consenting Party Termination Events</u>.   This Agreement may be terminated: (a) with respect to the Initial Plan Sponsors, by either Initial Plan Sponsor; (b) with respect to the Consenting ABL Lenders, by the Consenting ABL Lenders; (c) with respect to the Consenting First Lien Term Loan Lenders, by the Required Consenting First Lien Term Loan Lenders; (d) with respect to the Consenting Second Lien Term Loan Lenders, by the Required Consenting Second Lien Term Loan Lenders; and (e) with respect to the Sponsor, by the Sponsor, in each case by the delivery to the Company Parties of a written notice in accordance with <u>Section 14.10</u> hereof upon the occurrence of the following events; *provided*, that, the Sponsor shall only be entitled to

24

terminate this Agreement upon the occurrence of any of the events described in subsection (c) of this Section 11.01:

(a)     the breach in any material respect by any Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Party seeking termination pursuant to this provision and (ii) remains uncured for ten (10) Business Days after such terminating Consenting Party transmits a written notice in accordance with Section 14.10 hereof detailing any such breach;

(b)     the issuance by any Governmental Body, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Consenting Party transmits a written notice in accordance with Section 14.10 hereof detailing any such issuance; *provided*, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)     the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for ten (10) Business Days after entry of such order;

(d)     the occurrence of an "Event of Default" under (and as defined in) the DIP Credit Agreement or the DIP Orders for which the DIP Lenders have not provided a forbearance or that has not been cured (if susceptible to cure) or waived in accordance with the terms thereof;

(e)     the occurrence of a "Cash Collateral Termination Event" under (and as defined in) the DIP Orders for which the Prepetition ABL Agent (as defined in the DIP Orders) has not provided a forbearance or that has not been cured (if susceptible to cure) or waived in accordance with the terms thereof;

(f)     the failure of the Company Parties and the Consenting ABL Lenders, within 30 days after the Petition Date (or such later date as the Consenting ABL Lenders may agree in their sole discretion), to enter into a term sheet in connection with the New ABL Facility, in form and substance (and on terms and conditions) acceptable to the Consenting ABL Lenders in their sole discretion;

(g)     this Agreement or any Definitive Document is amended, waived, or modified in any manner not consistent in any material respect with the terms of this Agreement;

(h)     any Company Party files or supports another party in filing (i) a motion or pleading challenging the amount, validity, or priority of any claims held by any Consenting Party against the Company (or any liens securing such claims) or (ii) a motion or pleading asserting (or seeking standing to assert) any purported claims or causes of action against any of the Consenting Parties; *provided*, that, only the Consenting Party(ies) who holds Company Claims/Interests that are the subject of such challenge shall be entitled to terminate under this Section 11.01(f);

(i)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Parties required by Section 3.02 herein, not to be unreasonably withheld), (i) converting one or

25

more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing any of the Chapter 11 Cases; or (iv) rejecting this Agreement;

(j)     any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable;

(k)     solely with respect to the Initial Plan Sponsors, the Company Parties fail to comply with their obligations under Section 14.21 of this Agreement; or

(l)     the entry of an order by any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the ABL Claims, the First Lien Term Loan Claims, or the Second Lien Term Loan Claims, other than an order approving the transactions contemplated by this Agreement or the Plan, as applicable, or the filing of any motion by the Company Parties that, if approved, would result in any of the foregoing; *provided*, that, only the Consenting Party(ies) who holds Company Claims/Interests that are the subject of such order shall be entitled to terminate under this Section 11.01(j).

11.02.   Company Party Termination Events.  Any Company Party may terminate this Agreement solely as to itself upon prior written notice to all Parties in accordance with Section 14.10 hereof upon the occurrence of any of the following events:

(a)     the breach in any material respect by the Initial Plan Sponsors or any of their affiliates in their capacities as Initial Plan Sponsor, Plan Sponsor, Consenting First Lien Term Loan Lenders, Consenting Second Lien Term Loan Lenders, DIP Lenders, or Stalking Horse Bidder (as applicable) of any material provision set forth in this Agreement that remains uncured for a period of ten (10) Business Days after receipt by the Consenting Parties of notice of such breach;

(b)     the breach in any material respect by one or more Consenting Party holding, in the aggregate among all such breaching Consenting Parties, more than 33.34% of the ABL Claims, 33.34% of the First Lien Term Loan Claims, or 33.34% of the Second Lien Term Loan Claims of any material provision set forth in this Agreement that remains uncured for a period of ten (10) Business Days after receipt by the Consenting Parties of notice of such breach;

(c)     the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(d)     the issuance by any Governmental Body, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after the terminating Company Party transmits a written notice in

26

accordance with <u>Section 14.10</u> of this Agreement detailing any such issuance; *provided*, this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(e)      the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for fifteen (15) Business Days after entry of such order.

11.03.   <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Consenting ABL Lenders; (b) the Required Consenting First Lien Term Loan Lenders; (b) the Required Consenting Second Lien Term Loan Lenders; (c) the Sponsor; (d) the Initial Plan Sponsors; and (e) each Company Party.

11.04.   <u>Automatic Termination</u>.  This Agreement shall terminate automatically as to all Parties without any further required action or notice immediately after the occurrence of the Plan Effective Date.

11.05.   <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action.  Upon the occurrence of a Termination Date prior to the Plan Effective Date, any and all consents or ballots provided or tendered by the Parties subject to such termination with respect to the Restructuring Transactions, in each case before the Termination Date, shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions, this Agreement, or otherwise; *provided*, *however*, any Consenting Party withdrawing or changing its vote pursuant to this <u>Section 11.05</u> shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Parties from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Party, and (b) any right of any Consenting Party or the ability of any Consenting Party, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or other Consenting Parties.  No purported termination of this Agreement shall be effective under this <u>Section 11.05</u> or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to <u>Section 11.01(c)</u>, <u>Section 11.02(c)</u>, or <u>Section11.02(e)</u>.  Nothing in this <u>Section 11.05</u> shall restrict any Company Party's right to terminate this Agreement in accordance with <u>Section 11.02(c)</u>.

**Section 12.**    *Amendments and Waivers.*

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this <u>Section 12</u>.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party, (b) the Initial Plan Sponsors; and (c)(i) solely with respect to matters for which the Consenting ABL Lenders Consent Right applies, the Consenting ABL Lenders; (ii) solely with respect to matters for which the Consenting First Lien Term Loan Lenders Consent Right applies, the Required Consenting First Lien Term Loan Lenders; (iii) solely with respect to matters for which the Consenting Second Lien Term Loan Lenders Consent Right applies, the Required Consenting Second Lien Term Loan Lenders; and (iv) solely with respect to matters for which the Consenting Sponsor Consent Right applies, the Sponsor; *provided*, *however*, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate (as compared to other Consenting Parties holding Company Claims/Interests within the same class as provided for in the Restructuring Term Sheet), and adverse effect on any of the Company Claims/Interests held by a Consenting Party, then the consent of each such affected Consenting Party shall also be required to effectuate such modification, amendment, waiver, or supplement.

(c)    Any proposed modification, amendment, waiver, or supplement that does not comply with this <u>Section 12</u> shall be ineffective and void *ab initio*.

(d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.**    *Mutual Releases*.  The Parties agree to support the Releases, which shall become effective on the Plan Effective Date.

**Section 14.**    *Miscellaneous*.

14.01.    <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02.  Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated in, and made a part of, this Agreement, and all references to this Agreement shall include such exhibits, annexes, signature pages, and schedules.  To the extent there is a conflict between the body of this Agreement (without reference to the exhibits, annexes, and schedules hereto), on the one hand, and the Restructuring Term Sheet or any other exhibits, annexes, and schedules to this Agreement, on the other hand, the terms and provisions of the Restructuring Term Sheet or any other exhibits, annexes, and schedules to this Agreement shall govern.

14.03.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters in this Agreement specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions and intent of this Agreement.

14.04.  Complete Agreement.  Except as otherwise explicitly provided in this Agreement, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect to the subject matter of this Agreement, other than any Confidentiality Agreement.

14.05.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.  Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Federal District Court for the Southern District of New York in New York City, New York or the state courts located therein, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of such court; (b) waives any objection to laying venue in any such action or proceeding in such court; and (c) waives any objection that such court is an inconvenient forum or does not have jurisdiction over any Party to this Agreement.  Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.  By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

14.06.  TRIAL BY JURY WAIVER.  EACH OF THE PARTIES IRREVOCABLY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN ANY OF THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RESTRUCTURING TRANSACTIONS CONTEMPLATED HEREBY.  INSTEAD, ANY

DISPUTES RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

14.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Parties, and in the enforcement or interpretation of this Agreement, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement.  The Company Parties and the Consenting Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09.  <u>Successors and Assigns; Third Parties</u>.  Subject to <u>Section 8</u>, neither this Agreement nor any of the rights or obligations hereunder may be assigned by any Party hereto without the prior written consent of the other Parties hereto, and then only to a Person who has agreed to be bound by the provisions of this Agreement.  This Agreement is intended to (and does) bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  Other than with respect to the Persons or Entities referenced in <u>Section 14.11</u>, there are no third party beneficiaries under this Agreement, except for the Released Parties (solely with respect to <u>Section 13</u> of this Agreement and in accordance with <u>Section 11.05</u> hereof).  The rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Entity except as expressly permitted in this Agreement.

14.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

if to a Company Party, to:

> NBG Intermediate Holdings Inc.
> 12303 Technology Blvd #950
> Austin, TX 78727
> Attention:  Hope Margala, President and CEO
> Stephanie Suggs, CFO
>
> E-mail address:  hmargala@nbg-home.com
> ssuggs@nbg-home.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Ave.
New York, NY 10022
Attention:  Steven N. Serajeddini, P.C.
     Rachael M. Bentley
E-mail address:  steven.serajeddini@kirkland.com
       rachael.bentley@kirkland.com

if to the Sponsor, to:

Pachulski Stang Ziehl & Jones LLP
919 North Market Street
17th Floor
Wilmington, DE 19801
Attention:  Laura Jones
E-mail address:  ljones@pszjlaw.com

if to the Initial Plan Sponsors, to the address and e-mail address set forth on such Initial Plan Sponsors' signature pages to this Agreement, with copies to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention:  Dennis F. Dunne and Matthew L. Brod
E-mail address:  ddunne@milbank.com
       mbrod@milbank.com

if to a Consenting First Lien Term Loan Lender, to the address and e-mail address set forth on such Consenting First Lien Term Loan Lender's signature page to this Agreement, with copies to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention:  Dennis F. Dunne and Matthew L. Brod
E-mail address:  ddunne@milbank.com
       mbrod@milbank.com

if to a Consenting Second Lien Term Loan Lender, to the address and e-mail address set forth on such Consenting Second Lien Term Loan Lender's signature page to this Agreement, with copies to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention:  Dennis F. Dunne and Matthew L. Brod

E-mail address:  ddunne@milbank.com
mbrod@milbank.com

if to a Consenting ABL Lender, to the address and e-mail address set forth on such Consenting ABL Lender's signature page to this Agreement, with copies to:

Morgan, Lewis & Bockius LLP
One Federal Street
Boston, MA 02110
Attention:  Julia Frost-Davies and Christopher L. Carter
E-mail address:  julia.frost-davies@morganlewis.com
christopher.carter@morganlewis.com

Any notice given by delivery, mail, or courier shall be effective when received.

14.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Party hereby confirms for the benefit of the Company Parties (including for the benefit of any Person acting on behalf of any of the Company Parties, including any financial, legal or other professional advisor of any of the foregoing) that (i) it has the requisite knowledge and experience in financial and business matters so that it is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Restructuring Transactions contemplated hereby and has had such opportunity as it has deemed adequate to obtain such information as is necessary to permit such Party to evaluate the merits and risks of the securities to be acquired by it pursuant to the Restructuring Transactions contemplated hereby, and (ii) that its decision to execute this Agreement and participate in any of the Restructuring Transactions contemplated hereby has been based upon its independent investigation of the operations, businesses, financial and other conditions and prospects of the Company Parties and/or the Restructuring Transactions, and such decision is not in reliance upon any representations or warranties of any other Party or Entity (or such other Party's or Entity's financial, legal or other professional advisors) other than those contained in the Definitive Documents.

14.12.  <u>Enforceability of Agreement</u>.  Each of the Parties, to the extent enforceable, waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.  <u>Waiver</u>.   If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties fully reserve any and all of their rights, remedies, claims, and defenses.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14.  <u>Specific Performance</u>.   It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of any court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.  <u>Several, Not Joint, Claims</u>.   Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.16.  <u>Severability and Construction</u>.   If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17.  <u>Remedies Cumulative</u>.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect of this Agreement at Law or in equity shall be cumulative and not alternative.  The exercise of any right, power, or remedy by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party. The failure of any Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon strict compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such strict compliance.

14.18.  <u>Capacities of Consenting Parties</u>.  Each Consenting Party, as applicable, has entered into this Agreement on account of all Company Claims/Interests that it holds or beneficially owns (directly or through discretionary accounts that it manages, advises, or subsidiary-advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.19.  <u>Survival</u>.   Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in <u>Section 14</u> and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.  For the avoidance of doubt, the Parties acknowledge and agree that if this Agreement is terminated, <u>Section 13</u> shall survive such termination, and any and all Releases shall remain in full force and effect.

14.20.  <u>Email Consents</u>.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, including a written approval by the Company Parties or the Consenting Parties, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including

electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

14.21.   <u>Fees and Expenses</u>.  The Debtors shall pay in full in cash all fees and expenses when due of the Initial Plan Sponsors, DIP Lenders and Consenting ABL Lenders (regardless of whether such fees and expenses are incurred before or after the Petition Date), including the fees and expenses of (a) Milbank LLP ("**Milbank**"), as legal counsel, (b) PJT Partners LP ("**PJT**"), as investment banker and (c) one local counsel (in the case of the foregoing (a)-(c) solely as and to the extent provided for in such advisors' engagement letters (which agreements shall not be terminated by the Debtors before the termination of this Agreement)), and any such other advisors or consultants as may be reasonably retained on behalf of the Initial Plan Sponsors, DIP Lenders and/or Consenting ABL Lenders with the consent of the Debtors (not to be unreasonably withheld) and, in each case, seek to pay such fees and expenses in connection with the DIP Orders and the Confirmation Order.

14.22.   <u>Relationship among Consenting Parties.</u>  None of the Consenting Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, the Company Parties, or any of the Company Parties' creditors or other stakeholders, and, other than as expressly set forth herein, there are no commitments among or between the Consenting Parties.  It is understood and agreed that any Consenting Party may trade in any debt or equity securities of the Company Parties without the consent of the Company Parties or any other Consenting Party, subject to applicable securities laws and this Agreement, including <u>Section 8</u> hereof.  No prior history, pattern, or practice of sharing confidences among or between any of the Consenting Parties and/or the Company Parties shall in any way affect or negate this understanding and agreement.  Nothing contained herein or in any other agreement referred to in this Agreement, and no action taken by any Consenting Parties pursuant hereto or thereto, shall be deemed to constitute the Consenting Party as, and the Debtors acknowledges that the Consenting Parties do not so constitute, a partnership, an association, a joint venture, or any other kind of entity, or create a presumption that the Consenting Parties are in any way acting in concert or as a group, including, without limitation, with respect to any agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of any Debtor or with respect to acting as a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.  Each Consenting Party confirms that it has independently participated in the negotiation of the transactions contemplated herein. Each Consenting Party shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement and it shall not be necessary for any other Consenting Party to be joined as an additional party in any proceeding for such purpose.

14.23.   <u>Confidentiality and Publicity</u>.  The Company Parties will submit to counsel to the Initial Plan Sponsors all press releases or public statements, in each case, to be made by any of the Company Parties relating to the Company Parties' businesses, this Agreement (or the transactions contemplated hereby), and any amendments thereof at least two (2) Business Days prior to issuing such press releases or public statements and shall consider and incorporate in good faith all reasonable comments of the Initial Plan Sponsors.  Except as required by law or regulation or by any governmental or regulatory (including self-regulatory) authority, no Party or its advisors shall (a) use the name of any Consenting Party in any public manner (including in any press release) or (b) disclose to any Person (including, for the avoidance of doubt, any other Consenting Party),

other than legal, accounting, financial, and other advisors to the Company Parties, the principal amount or percentage of Claims and/or Interests held by any Consenting Party, in each case, without such Consenting Party's prior written consent; *provided*, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation or by any governmental or regulatory (including self-regulatory) authority, the disclosing Party shall afford the relevant Consenting Party a reasonable opportunity to review and comment in advance of such disclosure if reasonably practicable and permitted by applicable law and shall take all reasonable measures to limit such disclosure to the extent permitted by applicable law and (ii) the foregoing shall not prohibit the public disclosure, including in connection with the Chapter 11 Cases, of the aggregate percentage or aggregate principal amount of Claims and/or Interests held by all Consenting Parties collectively or as otherwise required by the Bankruptcy Court. Notwithstanding the foregoing, (x) any Party hereto may disclose the identities of the Parties hereto in any action to enforce this Agreement or in an action for damages as a result of any breaches hereof and (y) any Party hereto may disclose, to the extent expressly consented to in writing by a Consenting Party, such Consenting Party's identity and individual holdings.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

[*Signatures Follow*]

# EXHIBIT A

**Company Parties**

Cheyenne Products LLC

Dwell & Decor Outdoor LLC

Dwelling & Decor LLC

Design Solutions International, Inc.

Home Decor Holding Company

Jimco Lamp & Manufacturing Company

KNB Holdings Corporation

N&B Industries, Inc.

NBG Topco Holdings Inc.

NBG Propco LLC

Nielsen & Bainbridge, LLC

Patton Picture Company

Quoizel, LLC

# <u>EXHIBIT B</u>

## Restructuring Term Sheet

**NBG INTERMEDIATE HOLDINGS INC.**

**RESTRUCTURING TERM SHEET**

**February 8, 2023**

This term sheet (the "**Restructuring Term Sheet**") contains certain material terms and conditions of the proposed restructuring (the "**Restructuring**," and the transactions contemplated thereunder, the "**Restructuring Transactions**") of NBG Topco Holdings Inc. ("**NBG**") and certain of its direct and indirect subsidiaries (together with NBG, each, a "**Company Party**," and collectively, the "**Company Parties**" or the "**Debtors**"). This Restructuring Term Sheet does not address all terms, conditions, or other provisions that would be required in connection with the Restructuring or that will be set forth in the Definitive Documents, which are subject to agreement in accordance with the restructuring support agreement to which this Restructuring Term Sheet is attached (the "**Restructuring Support Agreement**").[1]

**THIS RESTRUCTURING TERM SHEET IS NOT (NOR SHALL BE CONSTRUED AS) AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE, OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**NOTHING CONTAINED IN THIS RESTRUCTURING TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THE RESTRUCTURING SUPPORT AGREEMENT.**

**THIS RESTRUCTURING TERM SHEET IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS RESTRUCTURING TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND MAY NOT BE SHARED WITH ANY PERSON OTHER THAN THE COMPANY PARTIES AND THE CONSENTING STAKEHOLDERS AND THEIR RESPECTIVE ADVISORS OR EXCEPT AS SET FORTH IN ANY CONFIDENTIALITY AGREEMENT BETWEEN THE COMPANY PARTIES AND THE APPLICABLE CONSENTING STAKEHOLDERS OR THEIR RESPECTIVE ADVISORS.**

---

[1]   Capitalized terms used but not immediately defined herein have the meaning given to them in the Restructuring Support Agreement.

| OVERVIEW OF RESTRUCTURING TRANSACTIONS | |
|---|---|
| **Implementation** | The Restructuring Support Agreement contemplates that the Restructuring Transactions will be consummated through the Chapter 11 Cases under the Bankruptcy Code in the Bankruptcy Court pursuant to the Plan on the terms and subject to the conditions set forth in the Restructuring Support Agreement and this Restructuring Term Sheet. |
| | Pursuant to the Plan, the Initial Plan Sponsors shall purchase 100% of the New Common Stock issued as of the Plan Effective Date for an amount of cash at least equal to the total amount of Allowed DIP Roll-Up Claims attributable to the initial principal amount of DIP Roll-Up Loans *plus* any Additional Cash Amount (as defined below) (the "**Investment Amount**").[2]  The "**Stalking Horse Bid Consideration**" shall equal the total amount of Allowed DIP Claims as of the Plan Effective Date, *plus* the total amount outstanding under the ABL Facility of the Plan Effective Date. |
| | The Plan shall be subject to higher or better bids pursuant to bidding procedures (the "**Bidding Procedures**") to be agreed by the Debtors and the Initial Plan Sponsors.  In the event of a higher or better bid, the additional value (the "**Additional Value**") provided by the winning bidder shall be distributed as set forth in the Plan. |
| **DIP Facility** | Certain funds affiliated with Silver Point Capital, L.P. and KKR Credit Advisors (US) LLC (such funds, the "**DIP Lenders**") shall commit to fund the DIP Facility in the aggregate amount of $60 million, consisting of (a) $30 million in new money term loans (the "**DIP New Money Loans**") and (b) a roll-up of $30 million of the DIP Lenders' loans under the First Lien Term Loan (the "**DIP Roll-Up Loans**"), on the terms and conditions set forth in the DIP Credit Agreement and DIP Orders attached to the Restructuring Support Agreement as Exhibits D and E, respectively.  The DIP Orders shall provide for the Debtors' consensual use of the cash collateral of the prepetition secured parties. |
| **Plan Sponsor** | The Plan Sponsor shall be determined as set forth in the Bidding Procedures.  The Initial Plan Sponsors shall be the Plan Sponsor on account of the Stalking Horse Bid and such proposal shall be subject to higher or otherwise better proposals as set forth in the Bidding Procedures.  In the event any bidder other than the Initial Plan Sponsor submits a bid that is designated the winning bid pursuant to the Bidding Procedures, then that winning bidder shall replace the Initial Plan Sponsor as the Plan Sponsor. |

---

[2]   The Investment Amount and New Common Stock shall be allocated between each Initial Plan Sponsor in accordance with the schedule attached as **Annex 1** hereto.

| TREATMENT OF CLAIMS AND INTERESTS |
|---|
| On the Plan Effective Date, or as soon as is reasonably practicable thereafter, each holder of an Allowed[3] Claim or Interest, as applicable, shall receive under the Plan the treatment described in this Restructuring Term Sheet in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest, except to the extent different treatment is agreed to by the Debtors or the reorganized Debtors (the "**Reorganized Debtors**"), as applicable, the Plan Sponsor, and the holder of such Allowed Claim or Interest. |

| Unclassified Non-Voting Claims | |
|---|---|
| **DIP Claims** | On the Plan Effective Date, each holder of an Allowed DIP Claim (which shall include fees and interest) shall receive:<br><br>• (i) where the Initial Plan Sponsors are the Plan Sponsor, (a) on account of Allowed DIP Roll-Up Claims attributable to the initial principal amount of DIP Roll-Up Loans, payment in full, in cash, on the Plan Effective Date, and (b) on account of Allowed DIP Roll-Up Claims attributable to interest (including capitalized interest), fees, and other charges as of the Plan Effective Date and Allowed DIP New Money Claims, its *pro rata* share of an equal amount of the Exit Term Loans and a $3,322,851.52 unsecured promissory note[4] and/or cash on the Plan Effective Date at the election of the Required DIP Lenders (the amount elected to be received in cash, the "**Additional Cash Amount**"), or, in each case of clauses (a) and (b), such other terms as agreed by the Required DIP Lenders; or<br><br>• (ii) where any other party is the Plan Sponsor, payment in full, in cash on the Plan Effective Date or such other terms agreed by the Required DIP Lenders. |
| **Administrative Claims** | On the Plan Effective Date, each holder of an Allowed Administrative Claim[5] shall be paid in full in cash on the Plan Effective Date: (a) if such Administrative Claim is Allowed on or prior to the Plan Effective Date, on the Plan Effective Date (or, if not then due, when such Allowed Administrative Claim is due); (b) if such Administrative Claim is not |

---

[3]   For purposes of this Restructuring Term Sheet, "Allowed" means, with respect to any Claim or Interest, any Claim or Interest (or portion thereof) against any Debtors that: (a) is deemed allowed under the Bankruptcy Code; (b) is allowed, compromised, settled, or otherwise resolved pursuant to the terms of the Plan, in any stipulation that is approved by a Final Order of the Bankruptcy Court, or pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection therewith; or (c) has been allowed by a Final Order of the Bankruptcy Court.

[4]   The unsecured promissory note shall mature six (6) months after the stated maturity of any Exit Term Loans and shall not bear any interest.  The DIP New Money Loan funding amount and exit debt instrument allocation are set forth on the schedule attached as **Annex 2** hereto.

[5]   For purposes of this Restructuring Term Sheet, "Administrative Claim" shall mean a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Claims (as defined in the Plan); and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

| | | |
|---|---|---|
| | Allowed as of the Plan Effective Date, no later than thirty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holder of such Allowed Administrative Claim. | |
| **Priority Tax Claims** | On the Plan Effective Date, each holder of an Allowed Priority Tax Claim[6] shall receive cash in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | |
| **Classified Claims and Interests of the Debtors** | | |
| **Class 1 – Other Secured Claims** | On the Plan Effective Date, each holder of an Allowed Other Secured Claim[7] shall receive: (i) payment in full in cash in an amount equal to its Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, (iii) Reinstatement[8] of its Allowed Other Secured Claim, or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired[9] in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Presumed to Accept |
| **Class 2 – Other Priority Claims** | Each holder of an Allowed Other Priority Claim[10] shall be paid in full in cash on the Plan Effective Date or in the ordinary course of business (by the Reorganized Debtors) as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code. | Unimpaired / Presumed to Accept |

---

[6]   For purposes of this Restructuring Term Sheet, "Priority Tax Claim" shall mean any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

[7]   For purposes of this Restructuring Term Sheet, "Other Secured Claim" shall mean any Secured Claim that is not a DIP Claim, ABL Claim, First Lien Term Loan Claim, or Second Lien Term Loan Claim.

[8]   For purposes of this Restructuring Term Sheet, "Reinstate," "Reinstated," or "Reinstatement" shall mean with respect to a Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

[9]   For purposes of this Restructuring Term Sheet, "Unimpaired" shall mean means with respect to a class of Claims or Interests, a class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

[10]   For purposes of this Restructuring Term Sheet, "Other Priority Claim" shall mean any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

| Class 3 – ABL Claims | On the Plan Effective Date, each holder of an Allowed ABL Claim shall receive:<br><br>- (i) where the Initial Plan Sponsors are the Plan Sponsor, (a) its *pro rata* share of the New ABL Credit Facility, on such terms as agreed among the Debtors, the ABL Lenders, and the Plan Sponsor, or (b) with the consent of the Debtors and the Plan Sponsor, payment in full, in cash on the Plan Effective Date; or<br><br>- (ii) where any party other than the Initial Plan Sponsor is the Plan Sponsor, payment in full, in cash on the Plan Effective Date. | Impaired / Entitled to Vote |
| --- | --- | --- |
| **Class 4 – First Lien Term Loan Claims** | On the Plan Effective Date, each holder of an Allowed First Lien Term Loan Claim shall receive its pro rata share of Additional Value, if any, after all Allowed Claims in Class 3 have been satisfied in full; *provided*, *however*, that in no event shall any holder of a First Lien Term Loan Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. | Impaired / Entitled to Vote |
| **Class 5 – Second Lien Term Loan Claims** | On the Plan Effective Date, each holder of an Allowed Second Lien Term Loan Claim shall receive its Pro Rata share of Additional Value, if any, after all Allowed Claims in Class 4 have been paid in full; *provided*, *however*, that in no event shall any holder of a Second Lien Term Loan Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. | Impaired / Entitled to Vote |
| **Class 6 – General Unsecured Claims** | On the Plan Effective Date, each holder of a General Unsecured Claim[11] shall receive its Pro Rata share of Additional Value, if any, after all Class 5 Claims have been paid in full; *provided*, *however*, that in no event shall any holder of a General Unsecured Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. | Impaired / Deemed to Reject |

---

[11] For purposes of this Restructuring Term Sheet, "General Unsecured Claim" means any Claim that is not: (a) paid in full prior to the Plan Effective Date; (b) a DIP Claim; (c) an Administrative Claim; (d) a Professional Fee Claim; (e) a Priority Tax Claim; (f) an Other Secured Claim; (g) an Other Priority Claim; (h) an ABL Claim; (i) a First Lien Term Loan Claim; (j) a Second Lien Term Loan Claim; (k) an Intercompany Claim; or (l) a Section 510(b) Claim.

| Class 7 – Intercompany Claims | On the Plan Effective Date, Intercompany Claims[12] shall be reinstated, set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Reorganized Debtors, subject to the consent of the Plan Sponsor. | Impaired / Deemed to Reject or Unimpaired / Presumed to Accept |
|---|---|---|
| Class 8 – Intercompany Interests | On the Plan Effective Date, Intercompany Interests[13] shall be reinstated, set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Reorganized Debtors, subject to the consent of the Plan Sponsor. | Impaired / Deemed to Reject or Unimpaired / Presumed to Accept |
| Class 9 – Section 510(b) Claims | On the Plan Effective Date, holders of Section 510(b) Claims[14] shall not receive or retain any distribution, property, or other value on account of their Section 510(b) Claims, and all Section 510(b) Claims shall be discharged. | Impaired / Deemed to Reject |
| Class 10 – Interests in NBG | On the Plan Effective Date, all Interests in NBG shall be cancelled, released, extinguished, and discharged and will be of no further force or effect. Each holder of an Interest shall receive no recovery or distribution on account of their Interests in NBG. | Impaired / Deemed to Reject |
| **OTHER KEY TERMS** | | |
| New ABL Credit Facility | The asset-based revolving credit facility to be provided by the New ABL Credit Facility Lender Parties on or prior to the Plan Effective Date on terms and conditions acceptable to the Debtors, the Consenting ABL Lenders, and the Plan Sponsor. | |
| Exit Term Loan Facility | At the election of the Required DIP Lenders, the Exit Term Loan Facility will be provided by the DIP Lenders on terms and conditions acceptable to the Debtors and the Required DIP Lenders. | |
| New Common Stock | The equity interests in Reorganized NBG, which may be in the form of common stock, preferred stock, limited liability interests, or other ownership interests and may be issued in one or more classes of each of the foregoing, in each case, as determined by the Debtors and the Plan | |

---

[12]   For purposes of this Restructuring Term Sheet, "Intercompany Claim" shall mean any Claim against a Company Entity held by another Company Entity.

[13]   For purposes of this Restructuring Term Sheet, "Intercompany Interest" shall mean any Interest in a Company Entity held by another Company Entity.

[14]   For purposes of this Restructuring Term Sheet, "Section 510(b) Claim" means any Claim arising from: (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

| | Sponsor. |
|---|---|
| **Executory Contracts and Unexpired Leases** | The treatment (*e.g.*, assumption, assumption and assignment, and/or rejection) of all executory contracts and unexpired leases to which the any Company Party is a party, including any employment agreements, shall be subject to the consent of the Plan Sponsor. |
| **Securities Laws Matters** | To extent applicable, on the Effective Date, the Reorganized Debtors shall issue New Common Stock in accordance with the terms of the Plan, the New Organizational Documents, and applicable Law (including applicable securities laws). |
| | The New Common Stock will be issued pursuant to section 1145 of the Bankruptcy Code (the "**Section 1145 Exemption**") or, to the extent that the Section 1145 Exemption is either not permitted or not applicable, section 4(a)(2) of the Securities Act or another exemption thereunder. Any New Common Stock issued pursuant to the Section 1145 Exemption will be freely transferrable under applicable securities laws without further registration, subject to certain restrictions on affiliates and underwriters under applicable securities laws. |
| **Governance** | The new board of directors or managers of the Reorganized Debtors (as applicable) (the "**New Board**") shall consist of the Chief Executive Officer of the Reorganized Debtors and such other members appointed by the Plan Sponsor. The number and identities of directors on the New Board shall be determined by the Plan Sponsor and set forth in the Plan Supplement to the extent known at the time of filing. |
| | In connection with the Plan Effective Date, and consistent with section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtors shall adopt the applicable New Organizational Documents as determined by the Debtors and the Plan Sponsor. |
| | At the election of the Plan Sponsor, the New Common Stock will be subject to a stockholders' agreement and/or the holders of New Common Stock will be provided with registration rights, in each case, on terms and conditions that are mutually acceptable to the Company Parties and the Plan Sponsor. |
| **Reorganized NBG** | NBG, as reorganized pursuant to the Plan, or one or more new entities as determined by the Company Parties and the Plan Sponsor. |
| **Tax Structure** | The Restructuring will be effectuated and structured in a tax-efficient manner acceptable to the Company Parties and the Plan Sponsor. |
| **Discharge, Release, Injunction, and Exculpation** | The Plan will provide for customary release, discharge, injunction, and exculpation provisions. |
| **Retained Causes of Action** | The Reorganized Debtors shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action that the Debtors have released pursuant to the release and exculpation provisions. |

| Conditions Precedent to the Plan Effective Date | The occurrence of the Plan Effective Date shall be subject to the following additional conditions precedent unless otherwise agreed by the Debtors and the Plan Sponsor:<br><br>• the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;<br><br>• the Bankruptcy Court shall have entered the DIP Orders, which shall be in full force and effect;<br><br>• the Definitive Documents shall (i) be consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights set forth therein and (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties;<br><br>• the Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall not have been reversed, stayed, modified, or vacated on appeal;<br><br>• all actions, documents, and agreements necessary to implement and consummate the Plan as mutually agreed to by the Debtors and the Plan Sponsor shall have been effected and executed;<br><br>• all Exit Financing Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the required parties to the Restructuring Support Agreement), other than such conditions that relate to the effectiveness of the Plan and related transactions;<br><br>• the New Organizational Documents shall be adopted on terms consistent with the Restructuring Support Agreement and this Restructuring Term Sheet;<br><br>• all Allowed Professional Fee Claims of Professionals approved by the Bankruptcy Court shall have been paid in full and the Professional Fee Escrow Account shall have been established and funded pending approval by the Bankruptcy Court;<br><br>• all invoiced professional fees, expenses, and other amounts required to be paid pursuant to the Restructuring Support Agreement, in any Definitive Document, or in any order of the Bankruptcy Court shall have been paid in full in Cash in accordance with Article II.E of the Plan;<br><br>• the Winning Bidder shall deliver the Purchase Price to the Debtors in exchange for the Reorganized Debtors' distribution of the New Common Stock;<br><br>• the Debtors shall have entered into new or amended terms with vendors in a sufficient number and on terms and conditions reasonably necessary to support the Reorganized Debtors' |

| | |
|---|---|
| | go-forward business, in each case, that are acceptable to the Debtors and the Plan Sponsor; and<br><br>• any and all requisite governmental, regulatory, and third party approvals and consents shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired or terminated without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on the Restructuring Transactions, the financial benefits of such Restructuring Transactions to the Plan Sponsor, or the ability of the Plan Sponsor to participate in the governance of the Reorganized Debtors. |
| **Other Customary Plan Provisions** | The Plan will provide for other standard and customary provisions, including in respect of the cancellation of existing Company Claims/Interests, the vesting of assets, release of liens, the compromise and settlement of claims, the retention of jurisdiction by the Bankruptcy Court, and the resolution of disputed claims. |
| **Amendments** | This Restructuring Term Sheet may be amended only as permitted by the Restructuring Support Agreement. |

## **EXHIBIT C**

**Plan of Reorganization**

**[Filed on Docket]**

# **EXHIBIT D**

**DIP Credit Agreement**

**[Filed on Docket]**

## **EXHIBIT E**

**Interim DIP Order**

**[Filed on Docket]**

## EXHIBIT F

**Form of Joinder**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of February 8, 2023 (the "**Agreement**")[1] by and among NBG Intermediate Holdings Inc. and the other Company Parties and the Consenting Parties and agrees to be bound by the terms and conditions of the Agreement as a Consenting Party, and shall be deemed a "**Consenting Party**" and a "**Party**" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement as of the date of this Joinder and any further date specified in the Agreement.

This Joinder shall be governed by the governing law set forth in the Agreement.

Date Executed:

**[JOINDER PARTY]**

_____

Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| ABL Loans | |
| First Lien Term Loan | |
| Second Lien Term Loan | |
| Interests | |

---

[1]   Capitalized terms not used but not otherwise defined in this Joinder shall have the meanings ascribed to such terms in the Agreement.

## EXHIBIT G

**Form of Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of February 8, 2023 (the "**Agreement**"),[1] by and among NBG Intermediate Holdings Inc. and the other Company Parties and the Consenting Parties, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions of the Agreement to the extent the Transferor was bound, and shall be deemed a "**Consenting Party**" and a "**Party**" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed in this Transfer Agreement.

This Transfer Agreement shall be governed by the governing law set forth in the Agreement.

Date Executed:

**[TRANSFEREE]**

_____
Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| ABL Loans | |
| First Lien Term Loan | |
| Second Lien Term Loan | |
| Interests | |

---

[1]   Capitalized terms not used but not otherwise defined in this Transfer Agreement shall have the meanings ascribed to such terms in the Agreement.

## Exhibit B

**Corporate Organizational Structure**



NBG Holdco LLC (Delaware)
NBG Topco Holdings Inc. (Delaware)
NBG Intermediate Holdings Inc. (Delaware)
NBG Propco LLC (Delaware)
KNB Holdings Corporation (Delaware)
N&B Industries, Inc. (Delaware)
Nielsen & Bainbridge, LLC (Delaware)
NBGroup, LLC (Delaware)
99.9% LP interest
0.1% LP interest
NBH C.V. (Netherlands)
Design Solutions International, Inc. (Florida S Corporation)
Dwell & Decor Outdoor LLC (f/k/a Plantation Patterns, LLC) (Delaware)
Home Decor Holding Company (Ohio)
Quoizel, LLC (New York)
Dwelling & Decor LLC (Texas)
Nielsen & Bainbridge Holland B.V. (Netherlands)
Cheyenne Products LLC (Delaware)
Patton Picture Company (Ohio)
The Home Décor Companies (Hong Kong) Limited (Hong Kong)
Jimco Lamp & Manufacturing Company (Ohio)
The Home Décor Companies (Dongguan) Limited (China WFOE)
The Home Décor Companies (Congguan) Limited Shanghai Branch (China)

**Exhibit C**

**Debtors' Owned and Leased Facilities**

| City | State | Primary Use | Business Line | Square Footage (Approximate) |
|------|-------|-------------|---------------|------------------------------|
| **Owned Facilities** | | | | |
| Selma | AL | Manufacturing and Distribution | Outdoor | 274,000 |
| Selma | AL | Manufacturing | Outdoor | 55,000 |
| **Leased Facilities** | | | | |
| Calera | AL | Distribution Center | Outdoor | 97,000 |
| Calera | AL | Distribution Center | Outdoor | 208,000 |
| Calera | AL | Distribution Center | Outdoor | 247,000 |
| Selma | AL | Warehouse | Outdoor | 26,000 |
| Selma | AL | Warehouse | Outdoor | 37,000 |
| Bentonville | AR | Office | Cheyenne Products | 12,000 |
| Pocahontas | AR | Warehouse | Nielsen & Bainbridge | 124,000 |
| Pocahontas | AR | Distribution Center | Pinnacle Frames & Accents | 153,000 |
| Pocahontas | AR | Distribution Center | Pinnacle Frames & Accents | 579,000 |
| Corona | CA | Distribution Center and Manufacturing | Nielsen & Bainbridge | 193,000 |
| Bridgeview | IL | Manufacturing | Nielsen & Bainbridge | 184,000 |
| Southaven | MS | Office, Showroom, and Distribution Center | Jimco Lamps & Home Decor | 515,000 |
| Mooresville | NC | Office | Jimco Lamps & Home Decor | 7,000 |

| City | State | Primary Use | Business Line | Square Footage (Approximate) |
|---|---|---|---|---|
| Edgewood | NY | Office and Warehouse | Jimco Lamps & Home Decor | 21,000 |
| Goose Creek | SC | Distribution Center | Quoizel Lighting | 505,000 |
| Austin | TX | Office and Showroom | Nielsen & Bainbridge | 33,000 |
| Austin | TX | Office and Showroom | Nielsen & Bainbridge | 6,000 |
| Dallas | TX | Showroom | Quoizel Lighting | 13,000 |
| Birmingham | AL | Office | Outdoor | 7,000 |