**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NIELSEN & BAINBRIDGE, LLC, *et al.*,[1] | ) | Case No. 23-90071 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF NIELSEN & BAINBRIDGE, LLC AND ITS DEBTOR AFFILIATES**

Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
J. Machir Stull (TX Bar No. 24070697)
Victoria Argeroplos (TX Bar No. 24105799)
**JACKSON WALKER LLP**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:        (713) 752-4200
Facsimile:        (713) 752-4221
Email:        mcavenaugh@jw.com
        jwertz@jw.com
        mstull@jw.com
        vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Joshua M. Altman (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

---

[1]    A complete list of each of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/NBGHome.  The Debtors' service address in the Chapter 11 Cases is:  12303 Technology Boulevard, Suite 950, Austin, TX 78727.

# TABLE OF CONTENTS

**Page**

I.      **INTRODUCTION** .................................................................................................................**3**

II.     **PRELIMINARY STATEMENT** ..........................................................................................**3**

III.    **OVERVIEW OF THE PLAN** ..............................................................................................**5**

     A.     DIP Facility. .................................................................................................................5
     B.     Commitment of the Sponsor. .......................................................................................6
     C.     New Common Stock. ....................................................................................................6
     D.     Exit Financing. .............................................................................................................6
     E.     Marketing Process. .......................................................................................................7
     F.     Releases. .......................................................................................................................7
     G.     Corporate Structure upon Emergence. .........................................................................8

IV.    **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN** ...............................................................................................................................**8**

     A.     What is chapter 11? .......................................................................................................8
     B.     Why are the Debtors sending me this Disclosure Statement? .....................................8
     C.     Am I entitled to vote on the Plan? ...............................................................................9
     D.     What will I receive from the Debtors if the Plan is consummated? .............................9
     E.     What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim? ...................................................................................................11
     F.     What happens to my recovery if the Plan is not confirmed or does not go effective? ...................11
     G.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" ......................................................................................................11
     H.     What are the sources of Cash and other consideration required to fund the Plan? .....................11
     I.     Are there risks to owning the New Common Stock upon emergence from chapter 11? ...............12
     J.     Will the final amount of Allowed General Unsecured Claims affect my distribution under the Plan? .............................................................................................................12
     K.     Will there be releases and exculpation granted to parties in interest as part of the Plan? ...............12
     L.     What is the deadline to vote on the Plan? ..................................................................16
     M.     How do I vote for or against the Plan? ......................................................................16
     N.     Why is the Bankruptcy Court holding a Confirmation Hearing? ...............................17
     O.     What is the purpose of the Confirmation Hearing? ....................................................17
     P.     What is the effect of the Plan on the Debtors' ongoing business? ..............................18
     Q.     Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors? ...........................................................................................18
     R.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? .............................................................................................................18
     S.     Do the Debtors recommend voting in favor of the Plan? ...........................................18
     T.     Who supports the Plan? ..............................................................................................19

V.     **IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT** .............**19**

     A.     Certain Key Terms Used in this Disclosure Statement. ............................................19
     B.     Additional Important Information. ..............................................................................20

VI.    **THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE** ...............**22**

|  | A. | The Debtors' Corporate Structure and History. | 22 |
|  | B. | The Debtors' Home Goods Categories. | 25 |
|  | C. | The Debtors' Operations and Assets. | 26 |
|  | D. | The Debtors' Employees. | 27 |
|  | E. | The Debtors' Prepetition Capital Structure. | 28 |

**VII.** **EVENTS LEADING TO THE DEBTORS' FINANCIAL DIFFICULTIES AND COMMENCEMENT OF THE CHAPTER 11 CASES** ..... **29**

|  | A. | U.S.-China Trade War. | 29 |
|  | B. | Disruption Stemming from COVID-19. | 29 |
|  | C. | Shutdown of Account Purchase Facility. | 30 |
|  | D. | Operational Responses to Prolonged Downturn. | 31 |
|  | E. | The Restructuring Negotiations. | 31 |
|  | F. | The Prepetition Marketing Process. | 32 |

**VIII.** **EVENTS OF THE CHAPTER 11 CASES** ..... **32**

|  | A. | Expected Timetable of the Chapter 11 Cases. | 32 |
|  | B. | First Day Relief. | 32 |
|  | C. | Retention Applications. | 32 |
|  | D. | The Bidding Procedures. | 32 |

**IX.** **RISK FACTORS** ..... **33**

|  | A. | Risks Related to the Restructuring. | 33 |
|  | B. | Risks Related to Recoveries Under the Plan. | 36 |
|  | C. | Risks Related to the Business Operations of the Debtors and Reorganized Debtors. | 37 |
|  | D. | Miscellaneous Risk Factors and Disclaimers. | 39 |

**X.** **SOLICITATION AND VOTING PROCEDURES** ..... **40**

|  | A. | Holders of Claims Entitled to Vote on the Plan. | 41 |
|  | B. | Voting Record Date. | 41 |
|  | C. | Voting Deadline. | 41 |
|  | D. | Solicitation Procedures. | 41 |
|  | E. | Voting Procedures. | 42 |
|  | F. | Voting Tabulation. | 43 |
|  | G. | Ballots Not Counted. | 44 |

**XI.** **CONFIRMATION OF THE PLAN** ..... **44**

|  | A. | Requirements of Section 1129(a) of the Bankruptcy Code. | 44 |
|  | B. | The Debtor Release, Third-Party Release, Exculpation, and Injunction Provisions. | 45 |
|  | C. | Best Interests of Creditors—Liquidation Analysis. | 46 |
|  | D. | Feasibility/Financial Projections | 46 |
|  | E. | Acceptance by Impaired Classes. | 46 |
|  | F. | Confirmation Without Acceptance by All Impaired Classes. | 47 |
|  | G. | Valuation of the Debtors. | 48 |

**XII.** **IMPORTANT SECURITIES LAWS DISCLOSURES** ..... **48**

|  | A. | Plan Securities. | 48 |
|  | B. | Section 1145 of the Bankruptcy Code Exemption; Issuance and Resale of New Common Stock; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code. | 49 |

C.       Section 4(a)(2) of the Securities Act Exemption and Subsequent Transfers...................................50

**XIII.    CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN** ...................................................**51**

A.       Introduction...........................................................................................................................51
B.       Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors..................................................................................................................52
C.       Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims. ..................................................................................................................................55
D.       Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims. ....................................................................................................................59

**XIV.    RECOMMENDATION OF THE DEBTORS** .........................................................................................**65**

**EXHIBITS**

EXHIBIT A      Plan of Reorganization

EXHIBIT B      Corporate Structure of the Debtors

EXHIBIT C      Restructuring Support Agreement

EXHIBIT D      Valuation Analysis

EXHIBIT E      Liquidation Analysis

EXHIBIT F      Disclosure Statement Order

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF NIELSEN & BAINBRIDGE, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN PARTIES TO THE RESTRUCTURING SUPPORT AGREEMENT. EACH OF THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND CONSISTENT WITH THE RESTRUCTURING SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

## I.    INTRODUCTION

Nielsen & Bainbridge, LLC and certain of its direct and indirect affiliates, as debtors and debtors in possession (each, a "Debtor," collectively, the "Debtors"), submit this disclosure statement (including all exhibits hereto, the "Disclosure Statement") pursuant to sections 1125 and 1126 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Joint Chapter 11 Plan of Reorganization of Nielsen & Bainbridge, LLC and Its Debtor Affiliates* (as may be amended or modified from time to time consistent with the consent rights set forth in the Restructuring Support Agreement, and including all exhibits and supplements thereto, the "Plan").  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.[2]  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS AND INTERESTS. THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE OPTION FOR IMPLEMENTING A RESTRUCTURING OF THE DEBTORS' BALANCE SHEET.    THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

The Debtors, together with their controlled non-Debtor subsidiaries (collectively, the "Company"), are a key supplier of affordable home décor in the United States across a portfolio of product categories, including, among others, lighting, accent furniture, soft goods, wall décor, and frames marketed under brands such as Pinnacle Frame & Accents, Jimco Lamps & Home Decor, Patton Wall Decor, Plantation Patterns, and Quoizel Lighting.  A true end-to-end service provider, the Debtors' omni-channel business model facilitates partnerships with brick-and-mortar and eCommerce retailers from design and development to logistics and fulfillment.  Today, the Debtors are the only business in the affordable home décor industry that offers domestic, direct import, port of entry, and drop-ship delivery logistic solutions, positioning the Company as a one-stop solution for its retail customers.  The Debtors own certain manufacturing centers in Alabama, and otherwise lease offices, distribution centers, and manufacturing centers in Alabama, Arkansas, California, Illinois, Mississippi, North Carolina, New York, South Carolina, and Texas.  The Debtors primarily provide shipping and logistics services by connecting principally internationally sourced goods with mass, wholesale, and online retailers.  The Debtors are headquartered in Austin, Texas, and employ approximately 730 individuals.

On February 8, 2023 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") with broad support from their key stakeholders.  The restructuring support agreement, attached hereto as **Exhibit C** (together with all exhibits thereto, and as amended, restated, and supplemented from time to time, the "Restructuring Support Agreement"), enjoys the support of (a) the Debtors' current equity holder, Sycamore Partners Management, L.P. collectively with its affiliated investment funds and affiliates and portfolio companies of the foregoing (collectively, "Sycamore," or the "Sponsor"), (b) certain holders representing over 52% of the aggregate principal amount outstanding under the Debtors' first lien term loan facility that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a joinder, or a transfer agreement to counsel to the Company Parties (the "First Lien Term Loan," and such holders, the "Consenting First Lien Term Loan Lenders"), (c) certain holders representing 100% of the aggregate principal amount outstanding under the Debtors' second lien term loan facility that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a joinder, or a transfer agreement to counsel to the Company Parties (the "Second Lien Term Loan," and such holders, the "Consenting Second Lien Term Loan Lenders"); and (d) certain holders representing 100% of the aggregate principal amount outstanding under the ABL

---

[2]    Capitalized terms used but not otherwise defined in this Disclosure Statement have the meaning ascribed to such terms in the Plan.  Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan.  **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan, the Restructuring Support Agreement, the Restructuring Term Sheet, the Plan Supplement, and the exhibits, and other materials referenced in the foregoing, and the documents being summarized.  In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

credit facility that have executed and delivered counterparty signature pages to the Restructuring Support Agreement, a joinder, or a transfer agreement to counsel to the Company Parties (the "ABL Facility," and such holders, the "Consenting ABL Lenders").  The Restructuring Transactions embodied in the Restructuring Support Agreement and the Plan will enable the Debtors to substantially reduce their funded-debt obligations and to emerge from the Chapter 11 Cases on an expedited basis with a right-sized balance sheet and a streamlined business model poised for success in a dynamic retail environment.

The onset of the COVID-19 pandemic and its aftermath—including a challenging market environment, supply chain disruption, and increasing freight costs—created a difficult operating environment for the Debtors over the past two years.  Freight costs, at their peak, soared nearly 400% at their peak from a pre-COVID average of $5,000 to over $19,500 per shipping container.  Delays brought about by supply chain disruption caused a seasonal misalignment as many products arrived too late for the intended season.  In addition, the U.S.-China trade war has amplified these challenges by indirectly passing tariff costs on to the Debtors and further raising the fixed costs of importing internationally sourced materials and products.  Finally, the Debtors have experienced the "second wave" effect of COVID-19 as consumer demand has declined in the face of inflationary pressure.  The cumulative effect of these events has been to depress revenues as costs increased, severely undercutting profitability.

Faced with these challenges, the Debtors and their advisors have spent the past half year analyzing options for addressing long-term maturities on their funded-debt facilities while continuing to fulfill short-term obligations to vendors, customers, and other business partners.  In addition to taking other practical steps, the Debtors made significant progress toward stabilizing operations by performing extensive, data-driven analyses to right-size their product catalogue, overhead, and profitability.  Short-term cash flows declined unexpectedly in mid-January 2023, however, when Wells Fargo Bank, N.A. ("Wells Fargo") notified the Debtors that it would no longer be purchasing accounts receivables pursuant to the account purchase agreement between the parties.  With the need for cash growing more pressing by the day, the Debtors began proactively engaging with their key stakeholders to discuss the terms of a comprehensive restructuring transaction.

The Debtors ultimately determined that commencing the Chapter 11 Cases represented the best path forward to implement a restructuring that will maximize the value of the Debtors' assets and realign the Debtors' capital structure to better account for liquidity constraints resulting from macroeconomic and industry-specific challenges.  In the weeks leading up to the Petition Date, the Debtors began an extensive marketing process to solicit proposals for plan sponsorship and for going-concern sales of the Debtors' businesses (the "Marketing Process"), from strategic and financial third-party purchasers.  With the assistance of Guggenheim Securities, LLC ("Guggenheim Securities") as investment banker, the Debtors have since executed seventeen nondisclosure agreements with interested parties.

Simultaneously, the Debtors worked to build consensus for the Restructuring Transactions contemplated by the Restructuring Support Agreement and the Plan, which are supported by the Sponsor, the Initial Plan Sponsors (as defined below), the Consenting First Lien Term Loan Lenders, the Consenting Second Lien Term Loan Lenders, and the Consenting ABL Lenders (collectively, the "Consenting Parties").  In order to capitalize on the Debtors' prepetition marketing efforts, the Plan contemplates a sale of 100% of the New Common Stock to either (a) certain funds affiliated with Silver Point Capital, L.P. ("Silver Point") and KKR Credit Advisors (US) LLC ("KKR"), which have agreed to serve as initial plan sponsors (the "Initial Plan Sponsors"), or (b) a prospective third-party purchaser that submits a bid pursuant to the Bidding Procedures that the Debtors determine, in their reasonable business judgment, to be higher or otherwise better.  To establish a minimum bid and facilitate the Marketing Process on a postpetition basis, the Initial Plan Sponsors have committed to purchase 100% of the equity in Reorganized NBG (the "New Common Stock") for an amount in cash at least equal to the total amount of Allowed DIP Roll-Up Claims attributable to the initial principal amount of DIP Roll-up Loans, plus any Additional Cash Amount (the "Stalking Horse Bid").  Consideration for the Stalking Horse Bid shall equal the total amount of Allowed DIP Claims as of the Effective Date, plus the total amount outstanding under the ABL Facility as of the Plan Effective Date. (such consideration, collectively, the "Stalking Horse Bid Consideration").  Should the Debtors receive a higher or otherwise better bid, any value above the Stalking Horse Bid Consideration ("Additional Value") will be distributed as set forth in the Plan; in the event that such a bid does not materialize, the Debtors will consummate a sale transaction with the Initial Plan Sponsors.

Through the Plan, the Debtors will, among other things: (a) undertake a robust market check for the potential sale of all of the New Common Stock through the Marketing Process, (b) if necessary, conduct an auction that could result in overbids sufficient to pay in full, in Cash, the total Allowed DIP Claims (as defined below) as of the Effective

Date and the total amount outstanding under the ABL Facility as of the Effective Date; (c) obtain $30 million of new-money commitments (the "DIP New Money Loans"), in addition to the roll-up of $30 million of the First Lien Term Loan (from a tranche of the First Lien Term Loan to be determined by the Required DIP Lenders) (the "DIP Roll-Up Loans") to fund working-capital needs under the debtor-in-possession financing facility (the "DIP Facility," and claims arising under, derived from, or based upon the DIP Credit Agreement Documents, the DIP Facility, and the DIP Orders, the "DIP Claims") funded by the Initial Plan Sponsors (in their capacities as lenders under the DIP Facility, the "DIP Lenders"); (d) except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for all Allowed DIP Claims, provide each Holder of an Allowed DIP Claim (which shall include fees and interest) with: (i) where the Initial Plan Sponsors are the Plan Sponsor, (x) on account of Allowed DIP Roll-Up Claims attributable to the initial principal amount of DIP Roll-Up Loans, payment in full, in Cash, on the Effective Date; and (y) on account of Allowed DIP Roll-Up Claims attributable to interest (including capitalized interest), fees, and other charges as of the Effective Date and Allowed DIP New Money Claims, its Pro Rata share of an equal amount of the Exit Term Loans and/or Cash on the Effective Date at the election of the Required DIP Lenders, or in each case of clauses (x) and (y), or such other terms as agreed by the Required DIP Lenders; or (ii) where any other party is the Plan Sponsor, payment in full, in Cash, on the Effective Date or such other terms agreed by the Required DIP Lenders; and (e) enter into the New ABL Credit Facility to support the cash needs of the go-forward business.  The settlement embodied in the Plan provides substantial Cash and non-Cash consideration, including a purchase of the Sponsor's 100% equity position in NBG, a $60 million commitment under the DIP Facility, and $75 million in take-back debt to replace the ABL Facility.  Should a Qualified Bid be entered (as defined in the Bidding Procedures), the Debtors will conduct an auction that may result in the full payment of DIP Claims and additional recovery for other stakeholders.  Based on the milestones contained in the DIP Credit Agreement, the Debtors intend to move expeditiously through chapter 11 with a target emergence of late March or early April.

### III.    OVERVIEW OF THE PLAN

The primary objective of the Plan is to maximize the value of recoveries to all Holders of Allowed Claims and Allowed Interests and generally to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code and applicable law.  The Debtors believe that this objective is best served by means of the Marketing Process, which provides for substantial baseline value in the form of the Stalking Horse Bid Consideration, and may result in Additional Value through offers from third-party purchasers.  The key terms of the Plan are as follows:

### A.    DIP Facility.

The Debtors will have access to a $60 million DIP Facility to support working-capital needs during the Chapter 11 Cases.  Specifically, the DIP Facility will be used to administer the Chapter 11 Cases, operate the Debtors' businesses in the ordinary course, and facilitate the Marketing Process as the Debtors seek out value-maximizing alternatives to the Stalking Horse Bid.  The DIP Facility comprises (i) the DIP Roll-Up Loans and (ii) the DIP New Money Loans.  In addition to the funds made available through the DIP Facility, the DIP Lenders will, pursuant to the interim and/or final DIP orders entered in the Chapter 11 Cases (each such order, a "DIP Order"), consent to the use of cash collateral to meet the Debtors' postpetition liquidity needs.

Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for all Allowed DIP Claims, each Holder of an Allowed DIP Claim (which shall include fees and interest) shall receive: (i) where the Initial Plan Sponsors are the Plan Sponsor, (a) on account of Allowed DIP Roll-Up Claims attributable to the initial principal amount of DIP Roll-Up Loans, payment in full, in Cash, on the Effective Date; and (b) on account of Allowed DIP Roll-Up Claims attributable to interest (including capitalized interest), fees, and other charges as of the Effective Date and Allowed DIP New Money Claims, its Pro Rata share of an equal amount of the Exit Term Loans and a $3,322,851.52 unsecured promissory note[3] and/or Cash on the Effective Date at the election of the Required DIP Lenders, or, in each case of clauses (a) and (b), such other terms as agreed by the Required DIP Lenders;

---

[3]    The unsecured promissory note shall mature six (6) months after the stated maturity of any Exit Term Loans and shall not bear any interest.  The DIP New Money Loan funding amount and Exit Financing instrument allocation are set forth on the schedule attached as Annex 2 to the Restructuring Term Sheet.

or (ii) where any other party is the Plan Sponsor, payment in full, in Cash, on the Effective Date or such other terms agreed by the Required DIP Lenders.

**B.** **Commitment of the Sponsor.**

The Sponsor shall cooperate to cause and NBG Topco Holdings Inc. and NBG PropCo LLC to take all actions necessary to effectuate the Restructuring Transactions in accordance with the Plan and the Restructuring Transactions Memorandum.

**C.** **New Common Stock.**

The issuance of Securities under the Plan, including the shares of the New Common Stock and options, or other equity awards, if any, reserved under a Management Incentive Plan (if any), shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests. All of the shares of New Common Stock issued pursuant to the Plan, including any options for the purchase thereof and equity awards associated therewith, shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

**D.** **Exit Financing.**

On the Effective Date, the Reorganized Debtors, any Non-Debtor Subsidiaries agreed to by the Debtors, the Plan Sponsor, and the New ABL Credit Facility Lender Parties, and the New ABL Credit Facility Lender Parties shall consummate the New ABL Credit Facility on the terms, and subject to the conditions, acceptable to the Reorganized Debtors, the New ABL Credit Facility Lender Parties, and the Plan Sponsor.

The aggregate principal amount of the New ABL Credit Facility shall be determined by the Debtors, the Exit New ABL Credit Facility Lender Parties, and the Plan Sponsor as reasonably necessary to fund the Debtors' obligations under the Plan and the working capital needs of the Reorganized Debtors. On and after the Effective Date, the New ABL Credit Facility Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.

On the Effective Date, at the election of the Required DIP Lenders, the Reorganized Debtors, any Non-Debtor Subsidiaries agreed to by the Debtors, the Plan Sponsor, and the Exit Term Loan Facility Lender Parties, and the Exit Term Loan Facility Lender Parties shall consummate the Exit Term Loan Facility on the terms, and subject to the conditions, acceptable to the Reorganized Debtors and the Exit Term Loan Facility Lender Parties. On and after the Effective Date, the Exit Term Loan Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.

Confirmation shall be deemed approval of the Exit Financing and the Exit Financing Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Bankruptcy Court previously, and the Reorganized Debtors are authorized to execute and deliver any and all documents necessary or appropriate to consummate the Exit Financing, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person.

On the Effective Date, or as soon as reasonably practicable thereafter, all of the Liens and security interests to be granted in accordance with the Exit Financing Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Financing Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Financing Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

E.      **Marketing Process.**

Beginning in January 2023, the Debtors launched a comprehensive marketing process for plan sponsorship proposals and going-concern sales of the Debtors' businesses.  Following constructive engagement with a number of bidders, the Debtors have elected to continue the Marketing Process postpetition to assess the availability of a higher offer or combination of offers for a value-maximizing plan-sponsor recapitalization transaction.  Concurrently with the filing of this Disclosure Statement, the Debtors Filed a motion seeking Bankruptcy Court approval of the bidding procedures (the "Bidding Procedures") pursuant to which the Debtors would market and sell the New Common Stock.  The Debtors anticipate that proceeds of a sale pursuant to the Bidding Procedures, if any, will be used to fund stakeholder recoveries in the Chapter 11 Cases, among other things.  The DIP Lenders—in their role as the Initial Plan Sponsors—have established a baseline value through the Stalking Horse Bid, which consideration consists of the total amount of Allowed DIP Claims as of the Effective Date *plus* the total amount outstanding under the ABL Facility as of the Effective Date.  The Stalking Horse Bid will be subject to higher or otherwise superior bids pursuant to the Bidding Procedures.  In the event of a higher and better bid by a third party, that third party shall replace the Initial Plan sponsors as the plan sponsor (the "Plan Sponsor") and its Qualified Bid will, at a minimum, purchase all of the New Common Stock.  Any Additional Value provided by the higher and better bid shall be distributed in accordance with the class treatments provided for the in the Plan.

F.      **Releases.**

The Plan contains certain releases (as described more fully in Article XI.B hereof), including mutual releases between (a) the Debtors; (b) the Reorganized Debtors; (c) the Initial Plan Sponsors; (d) the Consenting Parties; (e) the DIP Lenders; (f) the respective Agents under the First Lien Credit Agreement, Second Lien Credit Agreement, ABL Credit Agreement, and DIP Credit Agreement; (g) all Holders of Claims; (h) all Holders of Interests; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clause (a) through this clause (j); *provided*, *however*, that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release and such objection is not withdrawn before Confirmation.

The Plan includes releases of claims held by the Debtors against the Debtors' directors and officers.  The Plan does not preserve any Claims or Causes of Action held by the Debtors against the Debtors' directors and officers.  The Debtors have analyzed and are not aware of any colorable Claims or Causes of Action against the Debtors' directors and officers.

The Plan also provides that all Holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes who abstain from voting on the Plan and do not opt out of the release provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

Importantly, all Holders of Claims and Interests that are not in voting Classes that do not File an objection with the Bankruptcy Court in the Chapter 11 Cases that expressly objects to the inclusion of such Holder as a Releasing Party under the provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties.  The releases are an integral element of the Plan.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things:  (a) the releases, exculpations, and injunctions are specific; (b) the releases provide closure with respect to prepetition Claims and Causes of Action, which the Debtors determined is a valuable component of the overall restructuring under the circumstances and is integral to the Plan; (c) the releases are a

condition to the global settlement and a necessary part of the Plan; and (d) each of the Released Parties and Exculpated Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of a value-maximizing restructuring. Further, the releases, exculpations, and injunctions have the support of the majority of the Debtors' creditors, including substantial majorities of the Holders of the First Lien Term Loan Claims and Second Lien Term Loan Claims. The Debtors believe that each of the Released Parties and Exculpated Parties has played an integral role in formulating or enabling the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.

G.     **Corporate Structure upon Emergence.**

On or prior to the Effective Date, the Sponsor will cause NBG Topco Holdings Inc. and NBG PropCo LLC to take all actions necessary for such interests to be treated in accordance with the Plan and the Restructuring Transactions Memorandum.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Restructuring Transactions Memorandum), on the Effective Date, each Reorganized Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate or articles of incorporation, bylaws, and any shareholder agreements (or other analogous formation or governance documents) in effect before the Effective Date, except to the extent such certificate or articles of incorporation, bylaws and shareholder agreements (or other analogous formation or governance documents) are amended by the Plan, the Restructuring Support Agreement or otherwise (in each case in accordance with the consent rights in the Restructuring Support Agreement, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and/or the Restructuring Support Agreement and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

**IV.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN**

A.     **What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest Holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.     **Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with these requirements.

### C.      Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | ABL Claims | Impaired | Entitled to Vote |
| 4 | First Lien Term Loan Claims | Impaired | Entitled to Vote |
| 5 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired/ Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Interests in NBG | Impaired | Not Entitled to Vote (Deemed to Reject) |

### D.      What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

The proposed distributions and classifications under the Plan are based upon a number of factors, including the Debtors' valuation and liquidation analyses.  The valuation of the Reorganized Debtors as a going concern is based upon the value of the Debtors' assets and liabilities as of an assumed Effective Date of April 8, 2023, and incorporates various assumptions and estimates, as discussed in detail in the Valuation Analysis prepared by the Debtors, together with their proposed investment banker Guggenheim Securities.  Accordingly, recoveries actually received by holders of Claims and Interests in a liquidation scenario may differ materially from the projected liquidation recoveries listed in the table below.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| Class | Claim or Interest | Treatment | Projected Plan Recovery |
|---|---|---|---|
| 1 | Other Secured Claims | On the Effective Date, each holder of an Allowed Other Secured Claim shall receive: (i) payment in full in Cash in an amount equal to its Allowed Other Secured Claim; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | 100% |
| 2 | Other Priority Claims | On the Effective Date, each holder of an Allowed Other Priority Claim shall be paid in full in Cash on the Effective Date or in the ordinary course of business (by the Reorganized Debtors) as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code. | 100% |
| 3 | ABL Claims | On the Effective Date, each holder of an Allowed ABL Claim shall receive: <br><br> (i) where the Initial Plan Sponsors are the Plan Sponsor, (a) its Pro Rata share of the New ABL Credit Facility, on such terms as agreed among the Debtors, the ABL Lenders, and the Plan Sponsor, or (b) with the consent of the Debtors and the Plan Sponsor, payment in full, in Cash, on the Effective Date; or <br><br> (ii) where any other party is the Plan Sponsor, payment in full in Cash on the Effective Date. | 100% |
| 4 | First Lien Term Loan Claims | On the Effective Date, each Holder of an Allowed First Lien Term Loan Claim shall receive its Pro Rata share of Additional Value, if any, after all Allowed Claims in Class 3 have been satisfied in full; *provided, however*, that in no event shall any Holder of a First Lien Term Loan Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. | [●]% |
| 5 | Second Lien Term Loan Claims | On the Effective Date, each Holder of an Allowed Second Lien Term Loan Claim shall receive its Pro Rata share of Additional Value, if any, after all Allowed Claims in Class 4 have been paid in full; *provided, however*, that in no event shall any Holder of a Second Lien Term Loan Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. | [●]% |
| 6 | General Unsecured Claims | On the Effective Date, each holder of a General Unsecured Claim shall receive its Pro Rata share of Additional Value (if any), after all Class 5 Claims have been paid in full; *provided, however*, that in no event shall any Holder of a General Unsecured Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. | 0% |

| Class | Claim or Interest | Treatment | Projected Plan Recovery |
|---|---|---|---|
| 7 | Intercompany Claims | On the Effective Date, Intercompany Claims shall be Reinstated, set off, settled, distributed, contributed, cancelled, released, or otherwise addressed at the option of the Reorganized Debtors, subject to the consent of the Plan Sponsor. | N/A |
| 8 | Intercompany Interests | On the Effective Date, Intercompany Interests shall be Reinstated, set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Reorganized Debtors, subject to the consent of the Plan Sponsor. | N/A |
| 9 | Section 510(b) Claims | On the Effective Date, Holders of Section 510(b) Claims shall not receive or retain any distribution, property, or other value on account of their Section 510(b) Claims, and all Section 510(b) Claims shall be discharged. | 0% |
| 10 | Interests in NBG | On the Effective Date, all Interests in NBG shall be cancelled, released, extinguished, and discharged and will be of no further force or effect.  Holders of Interests in NBG shall receive no recovery or distribution on account of their Interests in NBG. | 0% |

### E. What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  Administrative Claims will be satisfied as set forth in Article II.A of the Plan, and Priority Tax Claims will be satisfied as set forth in Article II.D of the Plan.

### F. What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative transaction may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Art. VIII.D.3 of this Disclosure Statement, and the liquidation analysis attached hereto as **Exhibit E** (the "Liquidation Analysis").

### G. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan.  *See* Article V.B of this Disclosure Statement for a discussion of the conditions precedent to consummation of the Plan.

### H. What are the sources of Cash and other consideration required to fund the Plan?

The Plan and distributions thereunder will be funded by or consist of the following sources of consideration: (a) Cash on hand; (b) Cash from the Exit Financing, and (iii) the Stalking Horse Bid Consideration (or consideration received from the Winning Bidder pursuant to the Bidding Procedures), as applicable.

**I.      Are there risks to owning the New Common Stock upon emergence from chapter 11?**

Yes.  *See* Article IX of this Disclosure Statement.

**J.      Will the final amount of Allowed General Unsecured Claims affect my distribution under the Plan?**

No.  Allowed General Unsecured Claims do not receive distributions under the Plan and, therefore, the aggregate final amount of all Allowed General Unsecured Claims will not affect the distributions to Holders of Claims in Class 6.

**K.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and the Consenting Parties in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

All Holders of Claims or Interests that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes who abstain from voting on the Plan and do not opt out of the release provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.  **Any Holder of Claims or Interests who wishes to opt of these release provisions must indicate so at: https://omniagentsolutions.com/NBG-optout.**

All Holders of Claims and Interests that are not in voting Classes that do not File an objection with the Bankruptcy Court in the Chapter 11 Cases that expressly objects to the inclusion of such Holder as a Releasing Party under the provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release and discharge of all Claims and Causes of Action against the Debtors and the Released Parties.  The releases are an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

*1.      Release of Liens*

**Except (1) with respect to the Liens securing the Exit Financing, including the New ABL Credit Agreement and the Exit Term Loan Credit Agreement, and any other financing created pursuant to the Exit Financing Documents, and (2) as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates and, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, and the Holders (and the applicable agents of such Holders) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.**

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has Filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

   2.  *Debtor Release*

   Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, their Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors by Released Parties other than the Consenting Parties), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, and related prepetition transactions, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, any other Definitive Document, or any Restructuring Transactions, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), any other Definitive Document, or any Restructuring Transactions, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions, or the distribution of property pursuant to the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause, the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any Causes of Action identified in the Schedule of Retained Causes of Action, and (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring

Transaction, or any document, instrument, or Agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Financing Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

### 3. Third-Party Release

Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permitted under applicable law, each Released Party (other than the Debtors or the Reorganized Debtors) is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each and all of the Releasing Parties (other than the Debtors or the Reorganized Debtors), from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the foregoing Entities, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, or their Estates or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before and during the Chapter 11 Cases, any other Definitive Document, or any Restructuring Transactions, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documentation, the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, any other Definitive

Document, or any Restructuring Transactions, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property pursuant to the Restructuring Transactions and/or the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility, the Exit Financing Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

4.     *Exculpation*

Notwithstanding anything contained in the Plan to the contrary, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or Third-Party Release, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), any other Definitive Document, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Exit Financing, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 5.     *Injunction*

**Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests or Causes of Action or liabilities that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities released or settled pursuant to the Plan.**

**By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth above.**

**The injunctions set forth above shall extend to any successors of the Debtors, the Reorganized Debtors, the Released Parties, and the Exculpated Parties and their respective property and interests in property.  No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.E, Article VIII.F, and Article VIII.G of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.**

**The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.**

### L.     **What is the deadline to vote on the Plan?**

The voting deadline is March 17, 2023, at 4:00 p.m. (prevailing Central Time) (the "Voting Deadline").

### M.     **How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  To be counted as votes to accept or reject the Plan, each ballot (a "Ballot") must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **actually received** (including via electronic transmission) before the Voting Deadline by Omni Agent Solutions (the "Solicitation Agent").

| DELIVERY OF BALLOTS |
|---|
| **Ballots should be sent to the Solicitation Agent via (i) paper ballot or (ii) via ballot portal at https://omniagentsolutions.com/NBG-ballots and must be received by the Solicitation Agent before the Voting Deadline.**<br><br>If you have any questions on the procedures for voting on the Plan, please contact the Solicitation Agent at the following telephone numbers or email address:<br><br>**888-729-6693 (U.S. & Canada)**<br>**or**<br>**747-263-0139 (international)**<br><br>**NBGHomeInquiries@OmniAgnt.com**<br>with a reference to "NBG" in the subject line |

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL <u>NOT</u> BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

### N. Why is the Bankruptcy Court holding a Confirmation Hearing?

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. The Confirmation Hearing will be scheduled by the Bankruptcy Court, and all parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled. The Confirmation Hearing may be adjourned from time to time without further notice. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code and the Restructuring Support Agreement, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be Filed and served on the Debtors, and certain other parties, by no later than March 17, 2023, at 4:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the *New York Times* (national edition) and the *Financial Times* (global edition) to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

### O. What is the purpose of the Confirmation Hearing?

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**P.     What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, Confirmation means that the Debtors will not be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is the first business day after which all conditions to Consummation have been satisfied or waived.  *See* Article IX of the Plan.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**Q.     Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the new board of directors or managers of Reorganized NBG (the "New Board") will consist of the Chief Executive Officer of the Reorganized Debtors and such other members as are designated by the Plan Sponsor, in its sole discretion.  The number and identities of directors on the New Board shall be determined by the Plan Sponsor.  On the Effective Date, the terms of the current members of the NBG board of directors shall expire, and the New Board will include those directors set forth in the list of directors of Reorganized NBG included in the Plan Supplement.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the New Board, as well as those Persons that will serve as an officer of the Reorganized Debtors or any of the Reorganized Debtors.  To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors.

**R.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Solicitation Agent:

By electronic mail at:
Email:  NBGHomeInquiries@OmniAgnt.com with a reference to "NBG" in the subject line.

By telephone at:
888-729-6693 (U.S. & Canada) or 747-263-0139 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Debtors' notice, claims, and solicitation agent at the address above or by downloading the exhibits and documents from the website of the Debtors' notice, claims, and solicitation agent at https://omniagentsolutions.com/NBGHome (free of charge) or the Bankruptcy Court's website at http://www.txsb.uscourts.gov (for a fee).

**S.     Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a significant deleveraging, is in the best interest of all Holders of Claims, and that other alternatives fail to realize or recognize the value inherent under the Plan.

      **T.**      **Who supports the Plan?**

The Plan is supported by the Debtors, Sycamore, over 52% of the Holders of First Lien Term Loan Claims, 100% of the Holders of Second Lien Term Loan Claims, and 100% of the Holders of ABL Claims.

**V.**      **IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

      **A.**      **Certain Key Terms Used in this Disclosure Statement.**

The following are some of the defined terms used in this Disclosure Statement. This is not an exhaustive list of defined terms in the Plan or this Disclosure Statement, but is provided for ease of reference only. In the event of an inconsistencies between defined terms in the Plan or this Disclosure, the Plan shall control. Please refer to the Plan for additional defined terms.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of Texas or such other court having jurisdiction over the Chapter 11 Cases.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of the Judicial Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 11 Cases.

"<u>Chapter 11 Cases</u>" means when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"<u>Claim</u>" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors, whether or not assessed or Allowed.

"<u>Company</u>," "<u>NBG</u>," or "<u>NBG Home</u>" means NBG Intermediate Holdings Inc., a company incorporated under the Laws of the State of Delaware, and each of its Affiliates as listed on <u>Exhibit A</u> to the Restructuring Support Agreement.

"<u>Confirmation Date</u>" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

"<u>Confirmation Hearing</u>" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and section 1128 of the Bankruptcy Code, including any adjournments thereof, at which the Bankruptcy Court will consider confirmation of the Plan.

"<u>Interests</u>" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

"<u>Person</u>" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated association, governmental entity, or political subdivision thereof, or any other entity.

"<u>Plan Supplement</u>" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and the Restructuring Support Agreement and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors prior to the Confirmation Hearing to the extent available, and any additional documents Filed prior to the Effective Date, including the following, as applicable: (a) the New Organizational Documents; (b) Exit Financing Documents; (c) the Assumed Executory Contracts and Unexpired

Leases List; (d)  the  Rejected Executory Contracts and Unexpired Leases List; (e) the Schedule of Retained Causes of Action; (f) a document listing the members of the New Board; and (g) the Restructuring Transactions Memorandum.

### B.    Additional Important Information.

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including the section entitled "*Risk Factors*," and the Plan before submitting your ballot to vote on the Plan.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan.  The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose.  In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon the Effective Date of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder (the "Securities Act"), or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in (a) section 1145 of the Bankruptcy Code or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, (b) Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  Other securities may be issued pursuant to other applicable exemptions under the federal securities laws.  All securities issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws.  The Debtors consider all statements regarding anticipated or future matters, to be forward-looking statements.  Forward-looking statements may include statements about:

- business strategy;

- technology;

- financial condition, revenues, cash flows, and expenses;

- levels of indebtedness, liquidity, and compliance with debt covenants;

- financial strategy, budget, projections, and operating results;

- freight costs;

- the overall health of the home décor industry;

- amount, nature, and timing of capital expenditures, including future development costs;

- availability and terms of capital;

- successful results from the Debtors' operations;

- integration and benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness;

- costs of conducting the Debtors' operations;

- general economic and business conditions;

- effectiveness of the Debtors' risk management activities;

- environmental liabilities;

- counterparty credit risk;

- outcome of pending and future litigation;

- governmental regulation and taxation of the home décor industry;

- developments in the home décor industry;

- uncertainty regarding the Debtors' future operating results;

- plans, objectives, and expectations;

- variations in the market demand for, and prices of, wholesale power generation;

- adequacy of the Debtors' capital resources and liquidity;

- access to capital and general economic and business conditions;

- risks in connection with acquisitions;

- potential asset sales;

- potential adoption of new governmental regulations impacting the Debtors' businesses; and

- the Debtors' ability to satisfy future cash obligations and environmental costs.

Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance.  There are risks, uncertainties, and other important factors that could cause the Debtors' actual

performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties, and factors may include: the Debtors' ability to confirm and consummate the Plan; the potential that the Debtors may need to pursue an alternative transaction if the Plan is not Confirmed; the Debtors' ability to reduce its overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees, and the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; customer responses to the Chapter 11 Cases; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; general economic, business and market conditions; currency fluctuations; interest rate fluctuations; price increases; exposure to litigation; a decline in the Debtors' market share due to competition or price pressure by customers; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing businesses; financial conditions of the Debtors' customers; adverse tax changes; limited access to capital resources; changes in domestic and foreign laws and regulations; trade balance; natural disasters; geopolitical instability; and the effects of governmental regulation on the Debtors' businesses.

## VI.    THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

NBG Home is a trusted destination for both online and brick-and-mortar retailers to find home décor and styling essentials for their customers. With decades of experience across many home décor categories, NBG Home is a leader and expert in fashion and function alike, ensuring that its customers have high-quality, trendy products available for sale at a great value.

### A.    The Debtors' Corporate History and Operations.

NBG Home's namesake—Charles Bainbridge—founded the company in 1867 in Brooklyn, New York when Charles Bainbridge patented the very first decorative matboard. In so doing, he created the framing industry as we understand it today. The company Nielsen, founded in 1971, was known for its work in unique aluminum moulding for picture frames. The two companies merged in 1984, forming Nielsen Bainbridge, which later rebranded as Nielsen Bainbridge Group and focused on a wider array of home goods offerings in the portable lighting, hardware lighting, outdoor décor, soft home (*i.e.*, clothing and bedding), and wall art business categories.

In the last fifteen years, the Company has quickly added to its portfolio of brands, broadening its high-quality range of product offerings and expanding its footprint in the home décor space, which now includes eight businesses operating independently under the NBG Home name. A timeline of the acquisitions is shown below:



Nielsen Bainbridge Group expanded rapidly: the Company acquired Pinnacle Frames & Accents in 2011 and Burnes of Boston in 2012 to grow its presence in framing products. In 2014, Nielsen Bainbridge Group grew into textiles, wall décor, and furniture when it acquired The Home Décor Companies, a leading provider of home décor products to mass, home improvement, discount, and specialty retailers. The brands under The Home Décor Companies included Patton Wall Decor, Jimco Lamps & Home Decor, and THRO. Combined, Nielsen Bainbridge with The Home Décor Companies became known, and still is known today, as "NBG Home." The Company next expanded into outdoor goods through the acquisition of Dwell & Decor Outdoor (also known as Plantation Patterns). In 2017, Sycamore—a private equity firm based in New York specializing in retail and consumer investments— acquired NBG Home. The Company then purchased Cheyenne Products to further develop its portable lighting and furniture footprint with Walmart. In 2018, the Company entered the hardware lighting category with the acquisition of Quoizel Lighting, which further built out NBG Home's differentiated market presence.

NBG Home's growth, however, slowed as the COVID-19 pandemic affected demand for home goods in unprecedented ways and caused freight costs to rise exponentially. COVID-19 initially impacted the Company's business in the short term as brick-and-mortar stores were closed during the lockdown and consumer spend shifted toward online shopping. However, in the second half of 2020 and through 2021, consumer demand picked back up as a cash-infused economy allowed consumers to allocate more discretionary dollars toward the home goods category. As demand increased, it placed more pressure on the global supply chain. Freight rates and transit time increased significantly as container availability contracted. This led to a significant increase in the costs of the Company's delivered goods and delays in product delivery that resulted in the Company missing store set dates and increased the Company's excess inventory levels.

To combat these early pressures, the Debtors responded by adjusting alongside their end consumer base. The Debtors increased focus on data analytics and online retail, divested the custom framing operations and European locations, and consolidated its wall décor, portable lighting, furniture, and outdoor divisions. These integrative efforts positioned NBG Home to offer a tighter, improved line of products. By 2021, the Company, through its focus on "pure play" eCommerce (*i.e.*, selling directly to end consumers online), maintained pole position as a trend setter in design across product categories while selling goods through an omni-channel approach servicing eCommerce, brick-and-mortar, and digital needs.

NBG Home's variety of retail partners include mass merchants (*e.g.*, Walmart and Target), specialty stores (*e.g.*, Michael's), discount stores and eCommerce retailers (*e.g.*, T.J. Maxx, Amazon, Wayfair, and Overstock.com), home centers (*e.g.*, Home Depot and Lowe's), and warehouse clubs (*e.g.*, Costco). Since 2020, NBG Home has focused its efforts on scaling its eCommerce footprint through channel optimization of digital sales, marketing, supply chain, and analytics. NBG Home's online retail experts continue to improve the Company's offerings on "digital shelves" for end consumers to purchase ready-made and tailored products, partnering with big-name companies such as Amazon and Wayfair.

NBG Home differentiates itself from market competitors by creating value for its retail partners through a combination of four key areas:

(i) *Leader in Product Design*. NBG Home has a dedicated product team that utilizes consumer research and insights, as well as design trends, to develop best-in-class product and merchandising solutions for customers.

(ii) *Ability to Serve Customers Across Channels*. NBG Home has the ability to serve customers across traditional brick-and-mortar as well as eCommerce. The Company's capabilities across multiple channels help differentiate NBG Home from its peers and provide multiple avenues for growth.

(iii) *Flexible Logistics*. Varied logistical offerings provide working capital and inventory efficiency for customers. NBG Home supports domestic warehousing, direct import, point of entry and drop-ship capabilities to assist all retail.com and pure play eCommerce end consumers.

(iv) *Breadth of Product Offerings*. NBG Home offers an expansive range of products across many categories. It is the only leader across numerous key categories in an otherwise fragmented industry. At its core, NBG Home stands apart in effectuating retailers' goals from start to finish.

NBG Home provides a continuity of supply and distribution from five U.S.-based and three international centers.  The Debtors are headquartered in Texas, and their current U.S. operations are concentrated in the South:



★ **Headquarters**
- Austin, TX
- Goose Creek, SC

📍 Office
- Bentonville, AR
- Edgewood, NY
- Mooresville, NC
- Birmingham, AL
- Mechanicsburg, PA

📍 **Distribution Center**
- Goose Creek, SC
- Corona, CA
- Calera, AL
- Pocahontas, AR
- Southaven, MS

📍 **Manufacturing Facility**
- Bridgeview, IL
- Selma, AL

📍 **Showroom**
- New York, NY
- Dallas, TX

There are 21 NBG Home entities, fourteen of which are Debtors in the Chapter 11 Cases (the other seven affiliates are not).  A simplified version of NBG Home's corporate structure differentiating Debtor and non-Debtor affiliates is as follows:



### B.    The Debtors' Home Goods Categories.

NBG Home is a market leader across each business category in which it competes.  NBG Home's dominance across multiple classes enables it to serve as a one-stop solution for customers seeking a complete, matching, on-trend design.  When combined with the Debtors' omni-channel distribution, the Debtors occupy a unique position in the market as a key partner to its retail customers, providing on-trend home décor at an affordable price point.

The Debtors' product categories fall into two major divisions:  (i) affordable home décor ("AHD") and (ii) decorative hardwire lighting ("HWL").  The former houses brands such as Cheyenne Products, Jimco Lamps & Home Decor, THRO, Patton Wall Decor, Pinnacle, Frames & Accents, and Dwell & Decor.  Major retail partners for these products include TJX, Walmart, and Target.  The other major division—HWL—consists of hardwire and portable lighting.  The Quoizel Lighting and DSI Lighting brands design and source the products, marketing them to home centers such as Lowe's and Home Depot, as well as the lighting showroom channel.

#### 1.    The Affordable Home Décor Segment.

AHD comprises the broader range of the Debtors' product offerings and includes everything from textiles and furniture to wall décor and frames.  In addition to its standard offerings, through the AHD division, NBG Home partners with retailers to produce private label brands, such as Threshold, Origin21, Better Homes and Gardens, Mainstays, and Allen & Roth.  The following is a short summary of the primary market categories in the AHD business segment:

*Wall Décor.*  Wall décor is the origin of the Debtors' business and remains a key component six decades later.  Today, NBG Home markets its products under the Patton Wall Decor and Pinnacle Frames & Accents brands.  Product lines include wall art, mirrors, clocks, art, and wall frames.

*Furniture and Portable Lighting*.  Acquired in 2014–2015, the Cheyenne Products and Jimco Lamps & Home Decor brands enabled NBG Home to move into a core area of home goods, with a goal to create comfortable and functional products.  The two brands are the product of over 40 years of industry experience.  As with every line of products, NBG Home brought a renewed emphasis on affordability and long-lasting products.  Product lines in this division include portable lighting, accent and side tables, accent chairs, bar stools, bar carts, television stands, console tables, poufs, desks, bookshelves, and storage.

*Frames & Tabletop Décor*.  NBG Home also acquired accent décor brands Cheyenne Products and Pinnacle Frames & Accents to bolster its expansion into furniture offerings, further cementing its place as a one-stop shop for retail partners by offering products such as frames, vases, baskets, planters, and other tabletop fixtures.

*Soft Home*.  In 2014, NBG Home committed to its largest expansion through a trio of brand acquisitions: THRO, Patton Wall Decor, and Jimco Lamps & Home Decor.  These acquisitions spearheaded efforts to reach the textiles market.  Now, NBG Home is a leading player in the industry, offering a deep range of selections in pillows, doormats, throws, rugs, table linens, and more.

*Outdoor*.  NBG Home acquired the Dwell & Decor Outdoor (also known as Plantation Patterns) brand in 2016, extending its presence into outdoor spaces and leveraging its existing expertise in high quality décor and furniture design.  By creating long-lasting products, such as cushions, pillows, tables, rugs, and umbrellas, designed to withstand outdoor climates, NBG Home captured a significant market share while staying true to its commitment to innovation and design.

### 2. The Lighting Segment.

NBG Home is a market leader in the portable and hardwire lighting business segment, offering over 2,000 fixture complements.  The Company offers both "hardwire" lighting (those permanently wired to a home's electrical system) and portable lighting solutions.  NBG Home markets the hardwire lighting under the brands Quoizel Lighting and DSI Lighting and markets its portable lighting solutions, in the Company's affordable home business segment, under Jimco Lamps & Home Decor and Cheyenne Products.  The Debtors partner with a variety of retailers, such as Walmart, Target, Lowe's, Home Depot, Wayfair, Amazon, and lighting showrooms to sell their lighting products.  Particularly after the acquisition of Quoizel in 2018, the Debtors have capitalized on the significant white space opportunity to expand to new and existing customers with respect to the lighting products, including production for private label brands, such as Allen & Roth and Hampton Bay.

### C. The Debtors' Operations and Assets.

### 1. The Debtors' Omni-Channel Logistics and Distribution Model.

The Debtors' omni-channel business model, coupled with its logistics capabilities, provides the Debtors with a competitive advantage while improving inventory efficiency for customers.  Being the only leader in numerous key categories in an otherwise fragmented industry, the Debtors provide flexibility by offering a breadth of products and allowing retail partners to focus sourcing in one provider.  This logistics model provides maximum flexibility for its customers to purchase and receive products in a variety of manners to suit each customer's needs.

NBG Home is the only company in the AHD segment to offer a one-stop solution for retail partners through four shipping methods:  (i) domestic shipping; (ii) direct importing; (iii) port of entry transport; and (iv) drop-ship delivery.  With domestic shipping, the Company provides goods from the NBG Home warehouses to the retail partners' locations, thus handling the logistics of warehousing and storing inventory.  Direct importing allows retail partners to pick up their products from foreign factories directly.  With port of entry transport, retail partners take possession of the goods at U.S. ports, thereby increasing merchandise margins.  Finally, drop-ship delivery allows for direct delivery from NBG Home warehouses to end consumers' homes, which eliminates the retail partner's need to take part in the shipping process.

### 2. Expansion into eCommerce and Pivot to Direct Marketing.

The shockwave brought on by the COVID-19 pandemic acutely affected the retail industry.  In response, the Company, while continuing strong relationships with its brick-and-mortar retail partners, increased focus on online

sales.  Specifically, the Debtors (i) increased the volume of sales with online retailers, (ii) improved its online advertising, and (iii) added data analytics personnel to identify areas of growth in online sales.

### 3.    The Debtors' Production and Distributions Center Assets.

The Debtors own one fiber and one sewing manufacturing centers in Alabama.  The Company also holds various leasing agreements with warehouses, offices, and distribution centers across the United States, including in Alabama, Arkansas, and Texas.  The owned and leased properties are listed below:

| City | State | Primary Use | Business Line | Square Footage (Approximate) |
|------|-------|-------------|---------------|-------------------------------|
| **Owned Facilities** | | | | |
| Selma | AL | Manufacturing and Distribution | Outdoor | 274,000 |
| Selma | AL | Manufacturing | Outdoor | 55,000 |
| **Leased Facilities** | | | | |
| Calera | AL | Distribution Center | Outdoor | 97,000 |
| Calera | AL | Distribution Center | Outdoor | 208,000 |
| Calera | AL | Distribution Center | Outdoor | 247,000 |
| Selma | AL | Warehouse | Outdoor | 26,000 |
| Selma | AL | Warehouse | Outdoor | 37,000 |
| Bentonville | AR | Office | Cheyenne Products | 12,000 |
| Pocahontas | AR | Warehouse | Nielsen & Bainbridge | 124,000 |
| Pocahontas | AR | Distribution Center | Pinnacle Frames & Accents | 153,000 |
| Pocahontas | AR | Distribution Center | Pinnacle Frames & Accents | 579,000 |
| Corona | CA | Distribution Center and Manufacturing | Nielsen & Bainbridge | 193,000 |
| Bridgeview | IL | Manufacturing | Nielsen & Bainbridge | 184,000 |
| Southaven | MS | Office, Showroom, and Distribution Center | Jimco Lamps & Home Decor | 515,000 |
| Mooresville | NC | Office | Jimco Lamps & Home Decor | 7,000 |
| Edgewood | NY | Office and Warehouse | Jimco Lamps & Home Decor | 21,000 |
| Goose Creek | SC | Distribution Center | Quoizel Lighting | 505,000 |
| Austin | TX | Office and Showroom | Nielsen & Bainbridge | 33,000 |
| Austin | TX | Office and Showroom | Nielsen & Bainbridge | 6,000 |
| Dallas | TX | Showroom | Quoizel Lighting | 13,000 |
| Birmingham | AL | Office | Outdoor | 7,000 |

### D.    The Debtors' Employees.

Today, the Debtors employ approximately 730 employees, over 22% of whom are covered by a collective bargaining agreement by and between Dwell & Decor Outdoor LLC (or its successors), on the one hand, and the Mid-South RWDSU Council, AFL-CIO (or its successors), and which agreement the Debtors intend to assume.  The Debtors' employees perform a variety of functions, including data analytics, accounting, business administration, finance, human resources, information technology, management, marketing, facilities maintenance, security, and other key functions.  They are essential to the preservation and enhancement of the value of the Debtors' business and the administration of the Debtors' estates during the Chapter 11 Cases.

E.       **The Debtors' Prepetition Capital Structure.**

1.       *The Debtors' Funded-Debt Obligations.*

As of the Petition Date, the Debtors have approximately $413 million in total funded debt, consisting of the following:

(a)       **ABL Credit Agreement.**

Pursuant to the ABL Credit Agreement dated as of April 26, 2017 (as amended by Amendment No. 1, dated as of July 1, 2019, Amendment No. 2, dated as of April 6, 2021, and Amendment No. 3, dated as of July 9, 2021, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "ABL Credit Facility"), by and among NBG Intermediate Holdings Inc., as holdings, NBG Acquisition Inc., as the initial borrower, which was merged with and into KNB Holdings Corporation, which survived the merger and became the administrative borrower, the lenders party thereto from time to time (the "ABL Lenders"), and Wells Fargo, as administrative agent and collateral agent for the ABL Lenders, the Debtors have access to an asset-based revolving credit facility in an aggregate principal amount of $75 million. The availability of funds under the ABL Credit Facility is subject to the size of the borrowing base and other customary limitations. The ABL Credit Facility matures on July 9, 2026, subject to a springing maturity of 90 days prior to the earlier of the maturity of the First Lien Term Loans or Second Lien Term Loans. As of the Petition Date, approximately $58.2 million in principal is drawn under the ABL Credit Facility.

(b)       **First Lien Initial Term Loan.**

On April 26, 2017, certain of the Debtors entered into that certain First Lien Credit Agreement (as amended by Amendment No. 1 to First Lien Credit Agreement, dated as of January 2, 2019, and Amendment No. 2 to First Lien Credit Agreement, dated as of April 6, 2020, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "First Lien Credit Agreement"), by and among NBG Intermediate Holdings Inc., as holdings, NBG Acquisition Inc., as the initial borrower, which was merged with and into KNB Holdings Corporation, which survived the merger and became the borrower, the lenders party thereto from time to time (the "First Lien Term Loan Lenders"), and Deutsche Bank AG New York Branch as administrative and collateral agent for the First Lien Term Loan Lenders. As of the Petition Date, term loans in an aggregate principal amount of approximately $282 million (the "First Lien Term Loans") remain outstanding under the First Lien Credit Agreement, with a maturity date of April 26, 2024. The First Lien Term Loans are secured by substantially all of the assets of the Debtors party to the First Lien Credit Agreement.

(c)       **Second Lien Term Loan.**

On April 26, 2017, certain of the Debtors entered into that certain Second Lien Credit Agreement (as amended by Amendment No. 1 to Second Lien Credit Agreement, dated as of April 6, 2002, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Second Lien Credit Agreement") by and among NBG Acquisition Inc., as initial borrower, NBG Intermediate Holdings Inc., as holdings, NBG Acquisition Inc., as the initial borrower, which was merged with and into KNB Holdings Corporation, which survived the merger and became the borrower, the lenders party thereto from time to time (the "Second Lien Term Loan Lenders"), and Cortland Capital Market Services LLC as administrative agent and collateral agent for the Second Lien Term Loan Lenders. As of the Petition Date, term loans in an aggregate principal amount of approximately $73 million (the "Second Lien Term Loans") remain outstanding under the Second Lien Credit Agreement, with a maturity date of October 26, 2024. The Second Lien Term Loans are subordinated to the First Lien Term Loans and are secured by substantially all of the assets of the Debtors party to the Second Lien Credit Agreement.

2.       *The Equity Interests in the Debtors.*

NBG Home is a privately-held company. As of the Petition Date, NBG Holdco LLC owns and controls 100% of the outstanding shares of NBG Topco Holdings Inc. common stock.

## VII. EVENTS LEADING TO THE DEBTORS' FINANCIAL DIFFICULTIES AND COMMENCEMENT OF THE CHAPTER 11 CASES

The home goods industry, like many others, was not spared by the COVID-19 pandemic. The pandemic affected demand for home goods in unprecedented ways and caused freight costs to rise exponentially. In addition, the continued trade war between the United States and China has negatively impacted the top line of the Company. These effects, combined with overall negative macroeconomic trends and the Debtors' burdensome capital structure, created a situation the Debtors could not resolve without an in-court restructuring.

A timeline setting forth the Debtors' numerous prepetition efforts to deleverage their balance sheet and offset increasing operating and financial pressures, as described above and in greater detail herein, is as follows:



### A. U.S.-China Trade War.

In July 2018, the United States initiated trade penalties against China as competition between the two nations intensified. The economic measures taken by the Trump administration resulted in tariffs on approximately $550 billion of Chinese goods and $185 billion of United States goods. These tariffs—with rates as high as 25%—affected operations of U.S.-based companies with production centers in China.

NBG Home, with approximately 95% of purchase orders coming from China, could not escape the economic impact of the trade war. The tariffs incurred by the shipping vendors were passed on to NBG Home as a function of the shipping agreements. The trade war directly affected Company revenues from 2018 to 2019. During that time period, EBITDA decreased from $69 million in 2018 to $25 million in 2019. The impact of the trade war continues to create increased costs for the company today.

### B. Disruption Stemming from COVID-19.

The Debtors experienced three long-lasting side effects as a result of COVID-19. *First*, region-wide quarantines, the shuttering of physical stores, and the general closure of public spaces slowed the demand for the Debtors' goods from select retail partners in the home goods space. These business lines were slow to recover—in general, online spending simply did not compensate for onsite spending for these retail stores as end consumers sought goods from specialized online sellers. For brick-and-mortars retailers already navigating formidable obstacles in the digital age, the transition to a predominantly work-from-home environment exacerbated these issues. The Debtors experienced the "second wave" resulting from the reduced consumer demand due to inflationary pressure. As the Debtors' retail partners saw demand fall, they did not meet their expected sell-through of NBG Home product,

resulting in excess inventory on their shelves.  In turn, many customers, such as TJX and At Home, significantly reduced orders from the Company in order to sell through the excess inventory.

*Second*, a few months into the pandemic, the company saw fixed costs rise in dramatic fashion.  NBG Home sources most[4] goods internationally and ships them to the United States.[5]  The COVID-19 pandemic created unusually heightened freight costs in 2020 and 2021.  During this time, the average container price across all ports of entry increased nearly fourfold from approximately $5,000 per shipping container in January 2021 to a peak of approximately $19,500 in October 2021.



1)  Freight projections include both ocean and ancillary costs; average cost per container includes drayage cost per container.
2)  Represents average of Charleston and Memphis routes comprising $3.3k per container plus an additional $0.5k per container of ancillary costs.

*Third*, not only the did the price of shipping go up, but so did the arrival time of products.  The pandemic caused additional labor shortages and impacted nearly every component of Debtors' supply chain.  The delay led to a backlog of shipments later on when satisfying the pent-up demand.  The backlog meant the Debtors were not able to satisfy seasonal demand on time which severely affected sales.

The second half of 2022 saw a significant decline in freight costs nearing a normalized, pre-COVID cost environment.  The Debtors have been capitalizing on the new market conditions to secure better fixed freight rates on a short-term basis, and the Debtors anticipate a normalized freighting cost environment going forward.  With labor markets returning as well, the Debtors do not anticipate any further seasonal product delays.  Still, the damage caused by two years of frenzied freight costs and shipping delays has had lasting repercussions.  And while the Debtors focused on online retail to meet changing consumer purchasing habits, they are still establishing themselves in those spaces.  Combined with the slowdown in customer activity in 2022 caused by macroeconomic headwinds, the Debtors could not overcome the rising costs of doing business.

C.      **Shutdown of Account Purchase Facility.**

46.      Since November 28, 2018, the Debtors have maintained an account purchase agreement with Wells Fargo whereby Wells Fargo purchases accounts receivable of certain customers such as Walmart, Target, Costco, Home Depot, Amazon, and TJX.  Under those terms, the Debtors submit written credit requests with respect to certain customers' accounts receivable, upon which Wells Fargo, in its discretion, approves a credit line limited to that account.  In August 2022, Wells Fargo placed the receipts account under cash dominion.  Under cash dominion, daily

---

4      Approximately 95% of purchase orders are shipped in China and 5% are produced in Vietnam and Malaysia.

5      Approximately 60% of spending on goods is in China, and another 35% is spent in the United States.  Other sourcing costs are from Vietnam, India, Malaysia, and Latin America.

receipts to the account purchase facility are automatically swept to Wells Fargo with a portion of net receipts returned to the Debtors on Wednesdays and Fridays.  On January 12, 2023, Wells Fargo provided notice to the Debtors that, due to the company's credit profile risk, Wells Fargo would not purchase any additional accounts receivable and unwind its remaining balance over time, decreasing the Debtors' liquidity.

### D.      Operational Responses to Prolonged Downturn.

Since the beginning of the downturn, the Debtors took steps to reduce expenditures and increase operational efficiencies.  These efforts included:  (a) focusing on pure play eCommerce and strengthening relationships with online retailers; (b) reducing selling, administrative, sourcing, and manufacturing expenses; (c) optimizing the company's real estate footprint; and (d) securing freight contracts at normalized, pre-COVID levels.

As early as 2020, following the COVID-19 impact the Debtors recognized an opportunity for growth.  Because more and more end consumers' purchases were taking place online, the Company could pivot from its predominantly brick-and-mortar roots to partnering with online retailers.  The Debtors took this one step further; instead of selling wholesale customized lines to retailers, the Company capitalized on eCommerce partnerships with Amazon and Wayfair to offer goods for sale directly to end consumers without the need to invest heavily in an online platform.

While expansion into online spaces is the primary potential for topline growth, the Debtors continue to actively seek out cost rationalization efforts.  The Debtors are exploring alternative sourcing in India, Malaysia, and parts of Latin America, as well as expanding their current sourcing from Vietnam.  Relatedly, the Debtors intend to review their existing real estate footprint and find opportunities to further right-size and generate savings.

These cost reductions have had and will continue to have a significant positive impact on NBG Home's forecasted costs.  The Debtors believe that their turnaround plans and cost-cutting initiatives are the foundation of a strong, viable business but were unable to realize this outcome prior to the filing of the Chapter 11 Cases.

### E.      The Restructuring Negotiations.

In light of the Debtors' mounting cash flow challenges, the Debtors, with the assistance of its advisors, began outreach in August 2022 to lenders under the ABL Credit Facility, First Lien Credit Agreement, and Second Lien Credit Agreement to negotiate the terms of new-money financing or an amendment and extension of existing credit terms.  In late October 2022, the Debtors received a restructuring proposal from PJT Partners, Inc. ("PJT") on behalf of the Initial Plan Sponsors and, shortly thereafter, received correspondence from Milbank LLP ("Milbank"), counsel to the Initial Plan Sponsors, regarding the same.

Discussions have continued since then as the Debtors continued to engage Alvarez & Marsal North America LLP ("A&M") as restructuring advisor, and Kirkland & Ellis as restructuring counsel.  As part of this process, the Debtors provided the advisors to the Initial Plan Sponsors with substantial diligence, and the parties held numerous telephone conferences among both advisors and principals.  Concurrently with the due diligence process, the Debtors and the Initial Plan Sponsors began to engage in high-level discussions about potential transaction structures, which became progressively more detailed as the Initial Plan Sponsors refined their understanding of the Debtors' enterprise, including operations, liquidity needs, contractual obligations, and unencumbered assets.

Following the loss of the Wells Fargo account purchase facility in January 2023, the Debtors, the Initial Plan Sponsors, and the ABL Lenders negotiated the terms formalized in the Restructuring Support Agreement, the DIP Facility, and the Stalking Horse Bid put forward by the Initial Plan Sponsors.  The decision to enter into the Restructuring Support Agreement and commence the Chapter 11 Cases is the culmination of weeks of negotiations and strategic review, including regular meetings of the Debtors' independent directors, management, and advisors throughout that time.

The Debtors recognized that a consensual restructuring transaction with the Initial Plan Sponsors and the ABL Lenders was the only viable path forward.  The Debtors have faced mounting pressure from vendors due to outstanding inventory accounts payable in amounts upward of approximately $78 million.  Ultimately, given time constraints caused by these vendor payments, the board of each Debtor determined that the Restructuring Support Agreement and the Plan represent the most value-maximizing path forward to unlock the Debtors' potential for future

growth.  To that end, on February 8, 2023, the board authorized entry into the Restructuring Support Agreement, and on February 8, 2023, the board authorized commencement of the Chapter 11 Cases.

### F.  The Prepetition Marketing Process.

In parallel with these negotiations, the Debtors, with the assistance of Guggenheim Securities, undertook a prepetition marketing process and informally engaged potential third parties for a sale of all of the Debtors' assets, of which the Initial Plan Sponsors were aware.  As of the Petition Date, the Debtors, with the assistance of Guggenheim Securities, have been engaged in discussions with 91 potential purchasers, of which 21 entered into nondisclosure agreements with the Debtors and either received access to a data room or were sent requested documentation pursuant to a diligence request list.  Guggenheim Securities will continue to engage with these parties in order to procure binding bids prior to the bid deadline in the proposed auction process.

The Initial Plan Sponsors have committed to serve as a stalking horse pursuant to the Restructuring Support Agreement, serving as a floor for any forthcoming alternative proposals from a third party.  The marketing process proposed in the Chapter 11 Cases will ensure that the Debtors maximize the value of their estates.

## VIII.  EVENTS OF THE CHAPTER 11 CASES

### A.  Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly, consistent with the milestones set forth in the DIP Credit Agreement.  Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 within sixty days of the Petition Date, if not earlier.  **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

### B.  First Day Relief.

On the Petition Date, the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  The First Day Motions and any forthcoming orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://omniagentsolutions.com/NBGHome.

### C.  Retention Applications.

The Debtors have Filed a retention application for Omni Agent Solutions as Claims, Noticing, and Solicitation Agent and intend to File retention applications for various bankruptcy advisors, including Kirkland as legal counsel, Jackson Walker LLP, as co-counsel, A&M as restructuring advisor, and Guggenheim Securities, as financial advisor and investment banker.

### D.  The Bidding Procedures.[6]

In connection with the pursuit of a value-maximizing alternative to the Stalking Horse Bid, on the Petition Date, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Establishing Bidding Procedures, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, and (IV) Granting Related Relief* (the "Bidding Procedures Motion").  The proposed order establishing the Bidding Procedures will help facilitate the bidding process by establishing procedures, which are similar to those that would govern a traditional sale process outside the chapter 11 context and approving certain expenses to facilitate the marketing of the Debtors' assets and/or equity interests.  The Debtors and their other stakeholders believe such procedures provide transparency to creditors and the Court and will provide certainty to participants and the market as to the deadlines and requirements of the process.

---

[6]   Capitalized terms used but not defined in this section shall have the meanings set forth in the Bidding Procedures Motion (as defined below).

Pursuant to the Bidding Procedures Motion, the Marketing Process contemplates a robust marketing of the Debtors' equity interests through a sale of the whole Company, in accordance with the following general timeline:

- **Bid Deadline.** Bidders must submit a bid, in the form of an executed non-binding letter of intent, so that it is **actually received** by the Debtors no later than **5:00 p.m. (prevailing Central Time) on March 19, 2023**, unless otherwise extended by the Debtors.

- **Deadline to Notify of Highest Bidder.** Debtors must notify all Qualified Bidders (as defined in the Bidding Procedures) of the highest or otherwise best Qualified Bid and provide copies of the documents supporting such Bid to all Qualified Bidders and the Consultation Parties by no later than **5:00 p.m. (prevailing Central Time) on March 20, 2023**.

- **Auction.** If required, an Auction shall be conducted on **9:00 a.m. (prevailing Central Time) on March 21, 2023**.

- **Objections Deadline.** The deadline for objections to the approval of any Bid (including any credit bid), including objections based on the manner in which the Auction was conducted and the identity of the Winning Bidder, whether submitted prior to, on, or after the Bid Deadline shall be at **10:00 a.m. (prevailing Central Time) on March 22, 2023**.

The Debtors reserve their right to modify this timeline as necessary in their discretion and to maximize the value of their estates.

## IX.  RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A.  Risks Related to the Restructuring.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

> ### 1.  *The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors.*

If the Restructuring Transactions are not implemented, the Debtors will consider all other restructuring alternatives available at that time, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, commencement of section 363 sales of the Debtors' assets, or any other transaction that would maximize the value of the Debtors' estates. Any alternative transaction proposal may be on terms less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors. For example, it would also adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies; and

- the Debtors' enterprise value.

### 2.     *Certain Bankruptcy Law Considerations.*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### (a)     **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### (b)     **The Conditions Precedent to Confirmation and the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, Confirmation and the Effective Date are subject to a number of conditions precedent.  If such conditions precedent are not met or waived, Confirmation and/or the Effective Date will not take place.

### (c)     **Failure to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### (d)     **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or

whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.

Confirmation of the Plan is also subject to certain conditions precedent as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement (including the requirement that the Plan be in form and substance reasonably acceptable to the Initial Plan Sponsors), reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

(e)     **Nonconsensual Confirmation.**

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

(f)     **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(g)     **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

(h)     **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies could affect solutions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may

materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### (i)      Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations. However, all of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are important to the success of the Plan and have agreed to make further contributions, including by agreeing to massive reductions in the amounts of their claims against the Debtors' estates and facilitating a critical source of post-emergence liquidity, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

### 3.      The Restructuring Support Agreement May Be Terminated.

As more fully set forth in Section 11 of the Restructuring Support Agreement, the Restructuring Support Agreement may be terminated upon the occurrence of certain events, including, among others, the breaches by the Debtors and/or the Consenting Parties of their respective obligations under the Restructuring Support Agreement.  For example, the Restructuring Support Agreement is subject to termination by the Consenting Parties if an "Event of Default under (and as defined in) the DIP Credit Agreement or the DIP Orders has occurred for which the DIP Lenders have not provided a forbearance or that has not been cured (if susceptible to cure) or waived in accordance with the terms thereof.  In the event that the Restructuring Support Agreement is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

### 4.      Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks.

The Restructuring Transactions are generally designed to reduce the amount of the Debtors' cash interest expense and improve the Debtors' liquidity and financial and operational flexibility to generate long-term growth. Even if the Restructuring Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, changes in the Debtors' industry, and changes in commodity prices.  As a result of these risks and others, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

### B.      Risks Related to Recoveries Under the Plan.

### 1.      Estimated Valuations of the Debtors, the New Common Stock, and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values.

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the market value of the Debtors' securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including:  (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to maintain adequate liquidity to fund operations; and (d) the assumption that capital and equity markets remain consistent with current conditions. In addition, there can be no guarantee that the Reorganized Debtors will have adequate liquidity to fund the New Organizational Documents.

### 2.      Holders of Claims or Interests That Acquire the New Common Stock Will Assert Significant Control Over the Reorganized Debtors.

Upon Consummation of the Plan, the Plan Sponsor will become Holders of the New Common Stock pursuant to the Plan and will hold all common stock in TopCo and the Reorganized Debtors. As a result, following Consummation, the Plan Sponsor will exercise substantial influence over the Reorganized Debtors and their affairs.

### 3. The Tax Implications of the Debtors' Bankruptcy and Reorganization Are Highly Complex.

Holders of Allowed Claims should carefully review Section XIII of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors, the Reorganized Debtors, and certain Holders of Claims.

### C. Risks Related to the Business Operations of the Debtors and Reorganized Debtors.

### 1. The Debtors Are Subject to the Risks and Uncertainties Associated with Any Chapter 11 Restructuring.

For the duration of the Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include, among other things:

- the Debtors' ability to obtain approval of the Bankruptcy Court with respect to pleadings Filed in the Chapter 11 Cases from time to time;

- the Debtors' ability to confirm and consummate the Restructuring Transactions;

- the Debtors' ability to obtain creditor and Bankruptcy Court approval for, and then to Consummate, the Plan to emerge from bankruptcy;

- the occurrence of any event, change, or other circumstance that could give rise to the termination of the Restructuring Support Agreement;

- the Debtors' ability to obtain and maintain normal trade terms and relationships with service providers and maintain contracts that are critical to their operations;

- the Debtors' ability to attract, motivate, and retain key employees;

- the Debtors' ability to attract and retain customers; and

- the Debtors' ability to fund and execute their business plan.

The Debtors will also be subject to risks and uncertainties with respect to the actions and decisions of creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Plan.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events or publicity associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with their customers, as well as their suppliers and employees, which, in turn, could adversely affect the Debtors' operations and financial condition. Also, pursuant to the Bankruptcy Code, the Debtors need Bankruptcy Court approval for transactions outside the ordinary course of business, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot predict or quantify the ultimate effect that events occurring during the Chapter 11 Cases will have on their businesses, financial condition, and results of operations.

As a result of the Chapter 11 Cases, the realization of assets and the satisfaction of liabilities are subject to uncertainty. While operating as debtors in possession, and subject to approval of the Bankruptcy Court, or otherwise as permitted in the normal course of business or Bankruptcy Court order, subject to the Debtors obligations under the Restructuring Support Agreement, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities. Further, the Plan could materially change the amounts and classifications of assets and liabilities reported in the

historical consolidated financial statements. The historical consolidated financial statements do not include any adjustments to the reported amounts of assets or liabilities that might be necessary as a result of Confirmation.

### 2. *Potential for the Loss of Key Members of the Executive Management Team.*

If the Debtors were to lose key members of their senior management team on account of the Chapter 11 Cases or otherwise, the Debtors' business, financial condition, liquidity, and results of operations could be adversely affected.

### 3. *If the Debtors Do Not Obtain Additional Capital to Fund Their Operations and Obligations, the Debtors' Growth May Be Limited.*

The Debtors may require additional capital to fund their operations and obligations, which will depend on several factors, including:

- the Debtors' ability to enter into new customer agreements or to extend the duration of the Debtors' existing agreements, and the terms of such agreements;

- the success rate of the Debtors' sales efforts;

- costs of recruiting and retaining qualified personnel;

- expenditures and investments to implement the Debtors' business strategy;

- the identification and successful completion of acquisitions.

If the Debtors cannot raise additional capital, the Debtors may be required to curtail internal growth initiatives and/or forgo the pursuit of acquisitions. The Debtors do not know whether additional financing will be available on commercially acceptable terms, if at all, when needed. If sufficient funding is not available or is not available on commercially acceptable terms, the Debtors' ability to fund their operations, support the growth of their business, or otherwise respond to competitive pressures could be significantly delayed or limited, which could materially adversely affect the Debtors' business, financial condition, or results of operations.

### 4. *Contract Counterparty Performance Issues that May Result in Additional Costs to the Debtors, Reductions in Revenues, or the Payment of Liquidated Damages.*

The Debtors may encounter difficulties as a result of delays in materials provided by suppliers or third parties, delays, or difficulties in equipment and material delivery, schedule changes, delays from a supplier's failure to timely obtain permits or rights-of-way or meet other regulatory requirements, weather-related delays, and other factors, some of which are beyond the Debtors' control, that impact the Debtors' ability to complete a project in accordance with the original delivery schedule. Further, the Debtors contract with third-party subcontractors to assist them with the completion of contracts, and such subcontractors may be unavailable or delayed in performing services for the Debtors or other parties. Any delay or failure by these third parties in the completion of their portion of the project may result in delays in the overall progress of the project or may cause the Debtors to incur additional costs, or both. If the Debtors' suppliers fail to satisfy their obligations to the Debtors, the Debtors may be unable to maintain the timely delivery of products to retail partners or may be required to expend significant additional costs. Delays and additional costs may be substantial and, in some cases, the Debtors may be required to compensate the retail partner for such delays.

### 5. *Employee and Labor Risks.*

At times of low unemployment rates of skilled laborers in the management expertise areas the Debtors may require, it can be difficult for the Debtors to find qualified and affordable personnel. The Debtors may be unable to hire and retain a sufficient skilled labor force necessary to support the Debtors' operating requirements and growth strategy. The Debtors' labor expenses may increase as a result of a shortage in the supply of skilled personnel. Additionally, the Debtors may also be forced to incur significant training expenses if they are unable to hire employees

with the requisite skills.  Accordingly, labor shortages or increased labor or training costs could materially adversely affect the Debtors' business, financial condition, or results of operations.

Further, approximately 22% of the Debtors' employees are represented by a union and covered under a collective bargaining agreement, which is subject to periodic negotiation and renewal.  Failure to reach agreement with this union in the future negotiations regarding the terms of their collective bargaining agreement or certain other labor disputes may result in a labor strike, work stoppage, or slowdown.  A labor strike, work stoppage, or slowdown by, or other significant labor dispute with, the Debtors' employees could result in a significant disruption to the Debtors' operations and higher ongoing labor costs.  In addition, the Debtors' ability to make adjustments to control compensation and benefits costs, or otherwise adapt to changing business needs, may be limited by the terms and duration of their collective bargaining agreement.

### 6. *Pension Plan and Other Benefit Plan Risks.*

Nielsen & Bainbridge, LLC is the contributing sponsor of, and the other Debtors are alleged by the Pension Benefit Guaranty Corporation ("PBGC") to be members of the contributing sponsor's controlled group (as defined in 29 U.S.C. § 1301(a)(14)) for the Nielsen & Bainbridge Employees' Retirement Income Plan (the "Pension Plan"). The Pension Plan is covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  29 U.S.C. §§ 1301-1461.  Upon confirmation of the Plan, the Reorganized Debtors will continue the Pension Plan in accordance with and subject to its terms (as such terms may be amended from time to time) and applicable non-bankruptcy law (and the Reorganized Debtors reserve all rights thereunder).

### 7. *Competitive Risks.*

The Debtors generate profit by providing a one-stop-shop solution for mass retailers requiring flexible logistics and wide arrays of home décor products.  While the Debtors are currently the only business in the industry that operates on such an aggregated basis, it is possible that competitors may enter similar levels in the industry.  This competition may reduce the Debtors' market share.

### 8. *Volatile Shipping and Production Prices.*

Because the Debtors rely on short-contract orders from retail partners, it is not guaranteed any rate of return on its capital investments.  Rather, its financial condition, results of operations and cash flows will depend, in large part, upon prevailing market prices for affordable home products and associated fixed shipping and logistics costs. Purchases from retailer partners are subject to significant price fluctuations over relatively short periods of time and can be unpredictable.  Such factors that may materially impact the affordable home décor markets and the Company's financial results include:

- economic conditions;

- the effectiveness of demand-side management;

- political impacts on shipping pricing (current or future), particularly the imposition of increased tariffs;

- an increase in market competitors;

- freight cost volatility; and

- price volatility caused by shifting consumer demands.

Given the volatility of home goods prices, and given that the Debtors operate on short-term inventory orders from its retail partners, revenues and profitability will be subject to increased volatility, and the Debtors' financial condition, results of operations and cash flows could be materially adversely affected.

### D. **Miscellaneous Risk Factors and Disclaimers.**

1. ***The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.***

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

2. ***No Legal or Tax Advice Is Provided By This Disclosure Statement.***

This Disclosure Statement is not legal advice to any person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

3. ***No Admissions Made.***

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

4. ***Failure to Identify Litigation Claims or Projected Objections.***

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Cause of Action is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, File, and prosecute Claims or Causes of Action and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

5. ***Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.***

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

6. ***No Representations Outside This Disclosure Statement Are Authorized.***

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION. VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF TEXAS.**

X.     **SOLICITATION AND VOTING PROCEDURES**

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The

procedures and instructions for voting and related deadlines are set forth in the Disclosure Statement Order[7] attached hereto as **Exhibit F**.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

A.      **Holders of Claims Entitled to Vote on the Plan.**

Under the provisions of the Bankruptcy Code, not all Holders of Claims against a Debtor are entitled to vote on a chapter 11 plan.  The table in Article IV.C of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 3, 4, and 5 (collectively, the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are not soliciting votes from Holders of Claims and Interests in Classes 1, 2, 6, 7, 8, 9, or 10. Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

B.      **Voting Record Date.**

**The Voting Record Date is February 23, 2023**.  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

C.      **Voting Deadline.**

**The Voting Deadline is March 17, 2023, at 4:00 p.m. (prevailing Central Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are actually received by the Debtors' solicitation agent (the "Solicitation Agent") on or before the Voting Deadline.

D.      **Solicitation Procedures.**

1.      *Solicitation Agent.*

The Debtors have retained Omni Agent Solutions, to act, among other things, as the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.  The Solicitation Agent will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will File the Voting Report as soon as practicable after the Voting Deadline.

---

[7]     Capitalized terms used but not otherwise defined in this Article X of the Disclosure Statement have the meaning ascribed to such terms in the Disclosure Statement Order.

### 2. Claim Holder Solicitation Package.

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims and Interests in the Voting Classes:

- the Disclosure Statement Order (without exhibits, except for the Solicitation and Voting Procedures);

- the Confirmation Hearing Notice;

- the Debtors' cover letter in support of the Plan;

- the appropriate Ballot and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto.

### 3. Distribution of the Solicitation Package and Plan Supplement.

The Debtors anticipate that the Solicitation Agent will distribute the Solicitation Package to Holders of Claims in the Voting Classes as of the Voting Record Date on February 23, 2023, which is 22 days before the Voting Deadline (a total of 16 business days).

The Solicitation Package (except the Ballots) may also be obtained from the Solicitation Agent by: (1) calling the Debtors' restructuring hotline at 888-729-6693 (U.S. & Canada) or 747-263-0139 (International); or (2) emailing the Solicitation Agent at NBGHomeInquiries@OmniAgnt.com with a reference to "NBG" in the subject line. You may also obtain copies of any pleadings Filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://omniagentsolutions.com/NBGHome, or for a fee at https://ecf.txsb.uscourts.gov/.

Any party that receives the materials in electronic format but would prefer paper format may contact the Solicitation Agent by: (a) writing to Nielsen & Bainbridge, LLC Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367; (b) emailing NBGHomeInquiries@OmniAgnt.com and requesting paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense); or (c) calling the Debtors' restructuring hotline at (888) 729-6693 (US toll free) or 747-263-0139 (international).

No later than seven (7) calendar days prior to the Confirmation Objection Deadline, the Debtors intend to File the Plan Supplement in accordance with the terms of the Plan. As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve paper or CD ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement at no cost from the Solicitation Agent by: (a) calling the Solicitation Agent at one of the telephone numbers set forth above; (b) visiting the Debtors' restructuring website https://omniagentsolutions.com/NBGHome; or (c) emailing the Debtors' email address set forth above.

### E. Voting Procedures.

The Voting Record Date is the date that was used for determining which Holders of Claims and Interests are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Classes to have such Holder's Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered according to the instructions received with such Ballot. A Ballot should be returned to the Solicitation Agent so that it is **actually received** by the Solicitation Agent before the Voting Deadline.

<div style="border:1px solid">

**DELIVERY OF BALLOTS**

**Ballots should be sent to the Solicitation Agent via (i) paper ballot or (ii) via ballot portal at https://omniagentsolutions.com/NBG-ballots and must be received by the Solicitation Agent before the Voting Deadline.**

If you have any questions on the procedures for voting on the Plan, please contact the Solicitation Agent at the following telephone numbers or email address:

**888-729-6693 (U.S. & Canada)**
**or**
**747-263-0139 (international)**

**NBGHomeInquiries@OmniAgnt.com**
with a reference to "NBG" in the subject line

</div>

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

F.      **Voting Tabulation.**

The Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim.  Only Holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims.

Ballots received after the Voting Deadline may not be counted.  A Ballot will be deemed delivered only when the Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions.  No Ballot should be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to confirmation of the Plan.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will File with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the Voting Report prepared by the Solicitation Agent.  The Voting Report shall, among other things, delineate every Ballot that

does not conform to the voting instructions or that contains any form of irregularity (each an "<u>Irregular Ballot</u>"), including those Ballots that are late or or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

G.     **Ballots Not Counted.**

**No ballot will be counted toward Confirmation if, among other things:** (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), an indenture trustee, or the Debtors' financial or legal advisors instead of the Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION
OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT
TOLL-FREE 888-729-6693 (U.S. & CANADA) OR 747-263-0139 (INTERNATIONAL).
ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE
NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

---

XI.    **CONFIRMATION OF THE PLAN**

A.     **Requirements of Section 1129(a) of the Bankruptcy Code.**

Among the requirements for Confirmation are the following: (a) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims or Interests has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (b) the Plan is feasible; and (c) the Plan is in the "best interests" of Holders of Impaired Claims (*i.e.*, Holders of Class 3 ABL Claims, Holders of Class 4 First Lien Term Loan Claims, and Holders of Class 5 Second Lien Term Loan Claims).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment: (a) made before Confirmation will be reasonable or (b) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property

of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent such Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

### B.  The Debtor Release, Third-Party Release, Exculpation, and Injunction Provisions.

Article VIII of the Plan provides for releases of certain claims and Causes of Action the Debtors may hold against the Released Parties.  The Released Parties are:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Initial Plan Sponsors; (d) the Consenting Parties; (e) the DIP Lenders; (f) the respective Agents under the First Lien Credit Agreement, Second Lien Credit Agreement, ABL Credit Agreement, and DIP Credit Agreement; (g) all Holders of Claims; (h) all Holders of Interests; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clause (a) through this clause (j); ***provided, however, that in each case, an Entity shall not be a Released Party if it:  (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release and such objection is not withdrawn before Confirmation.***

Article VIII of the Plan also provides for releases of certain claims and Causes of Action that Holders of Claims or Interests may hold against the Released Parties in exchange for the good and valuable consideration and the valuable compromises made by the Released Parties (the "Third-Party Release").  The Holders of Claims and Interests who are releasing certain claims and Causes of Action against non-Debtors under the Third-Party Release include: (a) the Debtors; (b) the Reorganized Debtors; (c) the Initial Plan Sponsors; (d) the Consenting Parties; (e) the DIP Lenders; (f) the respective Agents under the First Lien Credit Agreement, Second Lien Credit Agreement, ABL Credit Agreement, and DIP Credit Agreement; (g) all Holders of Claims; (h) all Holders of Interests; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clause (a) through this clause (j); ***provided, however, that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the release contained in the Plan; or (y) timely objects to the Third Party Release and such objection is not withdrawn before Confirmation.***

Article VIII of the Plan provides for the exculpation of each Exculpated Party for certain acts or omissions taken in connection with the Chapter 11 Cases.  The released and exculpated claims are limited to those claims or Causes of Action that may have arisen in connection with, related to, or arising out of the Plan, this Disclosure Statement, or the Chapter 11 Cases.  The Exculpated Parties are: (a) the Debtors and Reorganized Debtors; (b) the independent directors or managers of any Debtors; and (c) any official committee of unsecured creditors appointed in the Chapter 11 Cases.

Article VIII of the Plan permanently enjoins Entities who have held, hold, or may hold Claims, Interests, or Liens that have been discharged or released pursuant to the Plan or are subject to exculpation pursuant to the Plan from asserting such Claims, Interests, or Liens against each Debtor, the Reorganized Debtors, and the Released Parties.

Under applicable law, a debtor release of the Released Parties is appropriate where the release is: (a) "fair and equitable" and (b) "in the best interests of the estate." *Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006). The "fair and equitable" prong is generally interpreted, consistent with that term's usage in section 1129(b) of the Bankruptcy Code, to require compliance with the Bankruptcy Code's absolute priority rule. *Id.* Further, a chapter 11 plan may provide for a release of third-party claims against non-debtors, such as the Third-Party Release, where parties were provided the opportunity to opt out of the third-party release. *See In re Pilgrim's Pride Corp.*, No. 08-45664, 2010 WL 200000, at *5 (Bankr. N.D. Tex. Jan. 14, 2010). In addition, the Fifth Circuit carves out an exception in favor of exculpatory relief for non-debtor parties where such parties owe duties in favor of the debtors or their estates and act within the scope of those duties (*i.e.*, excluding acts of fraud or gross negligence).*See Bank of New York Trust Co., v. Official Unsecured Creditors' Comm. (In re The Pac. Lumber Co.)*, 584 F.3d 229, 253 (5th Cir. 2009) (extending exculpatory relief to members of the unsecured creditors' committee). Finally, an injunction is appropriate where it is necessary to the reorganization and fair. *See In re Camp Arrowhead Ltd.*, 451 B.R. 678, 701–2 (Bankr. W.D. Tex. 2011).

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, the releases are narrowly tailored to the Debtors' restructuring proceedings, and each of the Released Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue Confirmation of the Plan. The Debtors believe that each of the Released Parties has played an integral role in formulating the Plan and Restructuring Support Agreement and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure and business needs. The Debtors further believe that such releases, exculpations, and injunctions are a necessary part of the Plan and a key inducement for each Released Party's and each Exculpated Party's support for the Debtors' restructuring. In addition, the Debtors believe that the Third-Party Release is entirely consensual under the established case law in the United States Bankruptcy Court for the Southern District of Texas. *See Pilgrim's Pride Corp.*, 2010 WL 200000, at *5. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of Confirmation of the Plan.

### C.      Best Interests of Creditors—Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit E**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation. Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

### D.      Feasibility/Financial Projections

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan of reorganization is not likely to be followed by the liquidation of the reorganized debtor or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the chapter 11 plan). The Plan contemplates and effectuates a sale of the Debtors' operations. As such, the only risk to the Debtors is their ability to close such sale transaction and distribute the available proceeds. The Bidding Procedures require that any bidder satisfy certain requirements, including providing evidence of their ability to close the proposed transaction. Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 11129(a)(11) of the Bankruptcy Code. The Plan Sponsor will assume all risks associated with the new business.

### E.      Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is

deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

**F.      Confirmation Without Acceptance by All Impaired Classes.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan, consistent with the consent rights set forth in the Restructuring Support Agreement, to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

*1.      No Unfair Discrimination.*

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. Accordingly, the Debtors believe that the Plan meets the standard to demonstrate that the Plan does not unfairly discriminate and the Debtors will be prepared to meet their burden to establish that there is no unfair discrimination as part of Confirmation of the Plan.

*2.      Fair and Equitable Test.*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.  There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

(a)      **Secured Claims.**

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the claimant's liens.

(b)      **Unsecured Claims.**

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (b) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

(c)      **Interests.**

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either:  (a) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of:  (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (b) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

G.      **Valuation of the Debtors.**

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors.  Accordingly, the Debtors' investment banker, Guggenheim Securities, has prepared an independent valuation analysis, which is attached to this Disclosure Statement as **Exhibit D** and incorporated into this Disclosure Statement by reference (the "Valuation Analysis").  The Valuation Analysis is based on data and information as of that date.  The Holders of Claims and Interests should carefully review the information in **Exhibit D** in its entirety.

From time to time, Guggenheim Securities and its affiliates have provided, and may in the future provide, investment banking, financial advisory and other services to the Debtors and their affiliates for which services they have received, and may in the future receive, customary fees and other compensation.  *Guggenheim Securities takes no position and makes no recommendation as to whether or not you should vote to accept the Plan.*

XII.      **IMPORTANT SECURITIES LAWS DISCLOSURES**

A.      **Plan Securities.**

The Plan provides for the Reorganized Debtors to distribute the New Common Stock.  The Debtors believe that the class of New Common Stock may constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and all applicable state Blue Sky Laws.  The offering, issuance and distribution of the New Common Stock will be exempt from registration under the Securities Act and any other applicable

securities laws pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act or Regulation D thereunder.

**B.      Section 1145 of the Bankruptcy Code Exemption; Issuance and Resale of New Common Stock; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code.**

*1.      Section 1145 of the Bankruptcy Code Exemption; Issuance and Resale of New Common Stock*

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if three principal requirements are satisfied:  (x) the offer or sale occurs under a plan of reorganization; (y) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (z) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.  In reliance upon these exemptions, the offer, issuance, and distribution of any New Common Stock issued under the Plan pursuant to section 1145 of the Bankruptcy Code will not be registered under the Securities Act or any applicable state Blue Sky Laws.

To the extent that the offering, issuance and distribution of the New Common Stock is covered by section 1145 of the Bankruptcy Code, the Debtors believe that such New Common Stock may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 1145 of the Bankruptcy Code or an affiliate of the Reorganized Debtors.  The Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption.  In addition, such New Common Stock issued pursuant to section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable state Blue Sky Laws by a Holder that is not an underwriter or an affiliate of the Reorganized Debtors pursuant to various exemptions provided by the respective Blue Sky Laws of those states.  However, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.

**RECIPIENTS OF THE NEW COMMON STOCK ARE ADVISED TO CONSULT WITH THEIR OWN LEGAL ADVISORS AS TO THE AVAILABILITY AND APPLICABILITY OF ANY EXEMPTION FROM REGISTRATION UNDER THE BANKRUPTCY CODE, INCLUDING SECTION 1145, AND ANY OTHER POTENTIAL EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OR APPLICABLE STATE BLUE SKY LAWS IN ANY GIVEN INSTANCE AND AS TO ANY APPLICABLE REQUIREMENTS OR CONDITIONS TO SUCH AVAILABILITY.**

*2.      Resales of the New Common Stock by Underwriters or Affiliates; Definition of Underwriter.*

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions of an entity that is not an issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (1) with a view to distribution of such securities and (2) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer," for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of

voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code may suggest that a creditor who owns 10 percent or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to any New Common Stock to be issued under the Plan pursuant to section 1145 of the Bankruptcy Code, would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such New Common Stock and, in turn, whether any Person may freely resell such New Common Stock. The Debtors recommend that potential recipients of such New Common Stock consult their own counsel concerning their ability to freely trade such securities without registration under the federal securities laws and applicable state Blue Sky Laws.

Resales of shares of New Common Stock issued to the Plan Sponsor with respect to Allowed Claims by Entities deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, Holders of such New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer, if volume limitations and manner of sale requirements are met.

## C. Section 4(a)(2) of the Securities Act Exemption and Subsequent Transfers.

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering is exempt from the registration requirements under the Securities Act. Regulation D is a non-exclusive safe harbor from the registration requirements promulgated by the SEC under section 4(a)(2) of the Securities Act. In reliance upon this exemption, New Common Stock issued under the Plan pursuant to section 4(a)(2) of the Securities Act and Regulation D thereunder will be exempt from registration under the Securities Act. Such securities will be considered "restricted securities" (within the meaning of Rule 144 under the Securities Act), will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 under the Securities Act. Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer (Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer").

****

*Legend.* To the extent certificated or issued by way of direct registration on the records of the issuer's transfer agent, certificates and book entry notations evidencing (i) shares of New Common Stock held by holders of 10% or more of the outstanding shares of New Common Stock or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, and (ii) all New Common Stock issued pursuant to section 4(a)(2) of the Securities Act and Regulation D thereunder, will bear a legend substantially in the form below:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATION PURPOSES. THE**

**DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

**XIII.     CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN**

      **A.     Introduction.**

      The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders of Claims.  The following summary does not address the U.S. federal income tax consequences to Holders of Claims not entitled to vote to accept or reject the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.  This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances.  This discussion does not address tax issues with respect to such Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax exempt organizations, small business investment companies, foreign taxpayers, controlled foreign corporations, passive foreign investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, the New Common Stock, or any other consideration to be received under the Plan, as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the IRC).  This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any ramifications such arrangements may have on the treatment of a Holder under the Plan).  This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

      For purposes of this discussion, a "U.S. Holder" is a Holder that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons has authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors.**

*1.      In General.*

The tax consequences of the implementation of the Plan to the Debtors will differ depending on whether the Restructuring Transactions are structured as a taxable sale of the assets and/or stock of any Debtor or subsidiary thereof (a "Taxable Transaction") or as a recapitalization of the Debtors (a "Recapitalization Transaction"). It has not yet been determined how the Restructuring Transactions will be structured under applicable tax law. Such decision will depend on, among other things, whether assets being sold (or deemed to be sold) pursuant to any Taxable Transaction have an aggregate fair market value in excess of their aggregate tax basis (i.e., a "built-in gain") or an aggregate fair market value less than their aggregate tax basis (i.e., a "built-in loss"), the amount of the expected reduction in the aggregate tax basis of such assets by excluded cancellation of indebtedness income ("COD Income"), whether sufficient tax attributes are available to offset any such built-in gain, future tax benefits associated with a step-up (if any) in the tax basis of the assets sold pursuant to a Taxable Transaction, and the amount and character of any losses with respect to the stock of any applicable Debtor or subsidiary thereof, in each case for U.S. federal, state, and local income tax purposes. In the event of a Taxable Transaction, the New Common Stock may be (or include) stock or other equity interests of a newly-created entity, rather than stock in NBG or its parent, and the Reorganized Debtors would receive the Debtors' assets. By contrast, in a Recapitalization Transaction, the New Common Stock may be stock issued by NBG or its parent (or, potentially, stock or other equity interests in a newly formed entity treated as a successor to NBG or its parent under the applicable reorganization provisions of the IRC).

If the transactions undertaken pursuant to the Plan are structured in whole or in part as a Taxable Transaction involving the transfer (or deemed transfer) of the Debtors' assets, the Debtors generally would realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (which generally should equal the fair market value of the assets transferred (or deemed to be transferred) by the Debtors) and the Debtors' tax basis in such assets. Realized gains, if any, may be offset by current-year losses and deductions and certain other tax attributes, which may include interest deductions that may be (or become) available under section 163(j) of the IRC ("163(j) Carryforwards"), and NOLs from prior years; provided that any such gain that is ordinary in nature may not be offset by capital losses. If the Reorganized Debtors purchase (or are deemed to purchase) assets or stock of any Debtor pursuant to a Taxable Transaction, such Reorganized Debtor will take a fair market value basis in the transferred assets or stock. However, if a Taxable Transaction involves a purchase of stock, the Debtor whose stock is transferred will retain its basis in its assets, unless the Debtors and/or Reorganized Debtors timely make certain elections provided for under the IRC to treat such stock purchase as the purchase of the Debtors' assets.

As of December 31, 2021, the end of the most recent taxable year for which U.S. federal income tax returns have been filed, the Debtors estimate that they had approximately $18.4 million of federal NOLs, $61.5 million of capital losses (the "Capital Losses"), $70.4 million of 163(j) Carryforwards, and $4.1 million of foreign tax credits (together with the NOLs, Capital Losses, 163(j) Carryforwards, and certain other tax attributes, collectively, the "Tax Attributes"). In general, NOLs arising in taxable years starting in 2018 may be carried forward indefinitely. The Debtors are expected to have generated significant additional Tax Attributes during the 2022 taxable year and to generate significant additional Tax Attributes during the 2023 taxable year prior to the Effective Date. Any Tax Attributes remaining upon implementation of the Plan may be available to offset taxable income or directly offset U.S. federal income tax liability in future years, thereby reducing the Debtors' future aggregate tax obligations,

subject to the discussion below regarding certain provisions such as section 382 of the IRC.  As discussed below, the Debtors' Tax Attributes are expected to be significantly reduced upon implementation of the Plan.

For U.S. federal income tax purposes, the Debtors are currently members of an affiliated group of corporations, of which NBG TopCo Holdings, Inc. is the common parent.  The remainder of this Article XIII assumes that, upon Consummation of the Plan, Reorganized NBG will be organized and treated as a C corporation (within the meaning of section 1361 of the IRC) for U.S. federal income tax purposes.  If Reorganized NBG were instead organized and treated for U.S. federal income tax purposes as a partnership, disregarded entity or other flow-through entity (each, a "Flow-Through Entity"), then the tax consequences of the Consummation of the Plan to the Debtors, Reorganized Debtors, and applicable Holders of Claims would be materially different than those described below.  As a Flow-Through Entity, Reorganized NBG would not be subject to U.S. federal income tax.  Instead, each U.S. Holder of New Common Stock would be required to report on its U.S. federal income tax return and would be subject to tax with respect to (whether or not distributed), its distributive share of each item of income, gain, loss, deduction and credit of Reorganized NBG (which may include the income, gain, loss, deduction and credit of any Flow-Through Entities in which Reorganized NBG holds an interest).

## 2.    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such satisfied indebtedness at the time of the exchange.

Under section 108 of the IRC, a debtor is not, however, required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  In general, tax attributes will be reduced in the following order:  (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  163(j) Carryforwards are not subject to reduction under these rules.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.  The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize significant COD Income, which may substantially reduce the Debtors' tax attributes.  The amount of the tax attributes required to be reduced will depend on whether the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction.  The amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend, in part, on the issue price of the New ABL Credit Facility and Exit Facility (if any), and the value of the overall business, none of which cannot be known with certainty at this time.

### (a)    Limitation of NOL Carryforwards and Other Tax Attributes.

After giving effect to the reduction in tax attributes pursuant to excluded COD Income and the worthless stock deduction rules described above, to the extent the Reorganized Debtors succeed to the Debtors' tax attributes (*i.e.*, if the Restructuring Transactions are not structured as a Taxable Transaction pursuant to which the Debtors' assets, and not stock of corporate entities, are treated as being transferred to the Reorganized Debtors for U.S. federal income tax purposes), the Reorganized Debtors' ability to use any remaining Tax Attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

### (i)    General Section 382 Annual Limitation.

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and, if the corporation has an overall "net unrealized built in loss" in its assets, and certain other Tax Attributes of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation.  This discussion refers to the limitation determined under section 382 of the IRC in the case of an "ownership change" as the "Section 382 Limitation."  The rules of section 382 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock would result in an "ownership change" of the Reorganized Debtors for these purposes if the Restructuring Transactions are structured as a Recapitalization, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

In general, the annual Section 382 Limitation on the use of Pre Change Losses in any "post-change year" is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, approximately 3.29 percent for ownership changes occurring in February 2023).  If the corporation has an overall "net unrealized built-in gain" as determined pursuant to IRS Notice 2003-65, the Section 382 Limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change (or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65).  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

### (ii)  Special Bankruptcy Exception.

An exception to the foregoing annual limitation rules generally applies when so called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, together with existing shareholders with respect to their stock, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(*l*)(5) Exception").  Under the 382(*l*)(5) Exception, the Reorganized Debtors' Pre Change Losses are not limited on an annual basis but, instead, the Debtors' NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of all debt converted into stock in the reorganization.  If the 382(*l*)(5) Exception applies and the Reorganized Debtors undergoes another ownership change within two years after consummation, then the Reorganized Debtors' Pre Change Losses are eliminated in their entirety.

Where the 382(*l*)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(*l*)(5) Exception), a second special rule may apply (the "382(*l*)(6) Exception").  When the 382(*l*)(6) Exception applies, the annual limitation will be calculated by reference to the lesser of (a) the value of the New Common Stock (with certain adjustments) immediately after the ownership change or (b) the value of the Debtors' assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(*l*)(6) Exception differs from the 382(*l*)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre Change Losses.

The Debtors have not determined whether they will be eligible for the 382(l)(5) Exception and, if eligible, whether the Reorganized Debtors will decide to affirmatively elect out of the 382(*l*)(5) Exception so that the 382(*l*)(6) Exception instead applies.

**C.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims.**

     *1.      General Considerations.*

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

As described above, the U.S. federal income tax consequences to a U.S. Holder of a Claim will depend, in part, on whether the transactions undertaken pursuant to the Plan constitute, for U.S. federal income tax purposes, (a) a Taxable Transaction, or (b) a Recapitalization Transaction.  The U.S. federal income tax consequences to U.S. Holders of certain Claims may further depend on (x) whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes, and (y) whether the Debtor against which such Claims are asserted is the same entity that is issuing the consideration under the Plan (or, otherwise, an entity that is a "party to a reorganization" with the Debtor against which such Claims were asserted).

Neither the IRC nor the Treasury Regulations promulgated thereunder defines the term "security." Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of their Claims as "securities" for U.S. federal income tax purposes.

The character of any gain or loss recognized by a U.S. Holder as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long term capital gain if the Holder held its Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.

     *2.      Consequences to Holders of Class 3 Claims.*

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release and discharge of the Class 3 ABL Claims, each U.S. Holder thereof will receive its pro rata share of the New ABL Credit Facility.

If (a) the Restructuring Transactions are structured as a Recapitalization Transaction with respect to a U.S. Holder of ABL Claims, (b) the ABL Claims qualify as a "security" of the Reorganized Debtor entity that issues the New ABL Credit Facility (or a "party to the reorganization," in a tax sense, with such issuer), and (c) the New ABL Credit Facility qualifies as a "security," then a U.S. Holder of ABL Claims should be treated as receiving its distribution under the Plan in a "recapitalization" for U.S. federal income tax purposes pursuant to section 368(a)(1)(E) of the IRC.  The U.S. Holder should generally obtain a tax basis, apart from amounts allocable to accrued but untaxed interest, in the New ABL Credit Facility received equal to the tax basis of the ABL Claim surrendered by such U.S.

Holder.  Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the New ABL Credit Facility received should include the holding period for the ABL Claim exchanged.

If either an ABL Claim or the New ABL Credit Facility does not qualify as a "security" of the Reorganized Debtor entity that issues the New ABL Credit Facility (or a "party to the reorganization," in a tax sense, with such issuer) or the Restructuring Transactions are structured to be treated as a Taxable Transaction with respect to the U.S. Holder of ABL Claims, then the U.S. Holder of such ABL Claim should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the IRC. In that event, subject to the rules regarding accrued but untaxed interest, a U.S. Holder of an ABL Claim should recognize gain or loss equal to (a) the issue price of the New ABL Credit Facility received, minus (b) the U.S. Holder's adjusted tax basis in its ABL Claim.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but untaxed interest, OID or market discount, see the sections entitled "Accrued Interest (and OID)" and "Market Discount" below.

### 3.    Consequences to Holders of Class 4 Claims and Class 5 Claims.

Pursuant to the Plan, each Holder of a Class 4 Claim or a Class 5 Claim will receive its Pro Rata share of Additional Value, if any.  Although it cannot be known with certainty at this time what type of assets or other value the Additional Value, if any, will take, if a U.S. Holder of Class 4 Claims and/or Class 5 Claims receives Additional Value as part of  a taxable exchange pursuant to Section 1001 of the IRC, such  U.S. Holder should recognize gain or loss equal to the difference between (a) (i) if the Additional Value is in the form of cash, the amount of such cash, or (ii) if the Additional Value is in the form of non-cash property, the fair market value or issue price, as applicable, of such non-cash property and (b) the Holder's adjusted tax basis in its Class 4 Claim or Class 5 Claim.  For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but untaxed interest (or OID), see below.  If a U.S. Holder of Class 4 or Class 5 Claims does not receive any consideration pursuant to the Plan, such holder should generally be entitled to recognize a loss with respect to their Claim.

### 4.    Accrued Interest (and OID).

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but untaxed interest (or OID), such amount should be taxable to the U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes.  Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.  The tax basis of any non-cash consideration treated as received in satisfaction of accrued but untaxed interest (or OID) should equal the amount of such accrued but untaxed interest (or OID).  The holding period for such non-cash consideration should begin on the day following the receipt of such property.

The extent to which the consideration received by a U.S. Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear.  Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.  The Plan provides that amounts paid to Holders of Claims will be allocated first to unpaid principal and then to unpaid interest.  The IRS could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan. Holders of Claims should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan and the U.S. federal income tax treatment of accrued but untaxed interest.

**U.S. HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE PROPER ALLOCATION OF THE CONSIDERATION RECEIVED BY THEM UNDER THE PLAN AND THE U.S. FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNTAXED INTEREST.**

#### 5. *Market Discount.*

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (b) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by more than a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of a Claim that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the surrendered Claims that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such Claims but was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

**U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

#### 6. *U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the New ABL Credit Facility.*

##### (a) Payments of Qualified Stated Interest

Payments or accruals of "qualified stated interest" (as defined below) on the New ABL Credit Facility will be includible in the U.S. Holder's gross income as ordinary interest income and taxable at the time that such payments are accrued or are received in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the New ABL Credit Facility, at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.

##### (b) Issue Price, Original Issue Discount

The issue price of the New ABL Credit Facility would generally be expected to be its stated principal amount (assuming that it is not treated as publicly traded under the tax rules and provided, that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS). In general, a U.S. Holder of Claims must follow the Debtors' determination of issue price with respect to each debt instrument issued under the Plan, unless such U.S. Holder specifically discloses its disagreement with such determination on the U.S. Holder's own tax return. A debt instrument, such as the New ABL Credit Facility, is treated as issued with original issue discount ("OID") for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest payable at a fixed rate is "qualified stated interest" if it is unconditionally payable in cash at least annually.

For purposes of determining whether there is OID, the *de minimis* amount is generally equal to ¼ of 1 percent of the principal amount of the New ABL Credit Facility multiplied by the remaining number of complete years to maturity from their original issue date, or if the New ABL Credit Facility provide for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under

applicable Treasury Regulations). If the New ABL Credit Facility is issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the New ABL Credit Facility, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any Cash payment on the New ABL Credit Facility that is attributable to previously accrued OID that has been included in its income.  If the amount of OID on the New ABL Credit Facility is *de minimis*, rather than being characterized as interest, any payment attributable to the *de minimis* OID will be treated as gain from the sale of the New Term Loan, and a pro rata amount of such *de minimis* OID must be included in income as principal payments are received on the New ABL Credit Facility.

### (c)        Sale, Taxable Exchange or other Taxable Disposition of New ABL Credit Facility

Upon the disposition of a portion of the New ABL Credit Facility by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (i) the amount realized on the disposition (other than amounts attributable to accrued but untaxed interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (ii) the U.S. Holder's adjusted tax basis in the transferred portion of the New ABL Credit Facility, as applicable.  A U.S. Holder's adjusted tax basis in their interest in the transferred portion New ABL Credit Facility will be determined in the manner set forth above.  A U.S. Holder's adjusted tax basis will generally be increased by any accrued OID previously included in such U.S. Holder's gross income.  A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such New ABL Credit Facility for longer than one year.  Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains.  The deductibility of capital losses is subject to certain limitations.

### 7.        *U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Common Stock.*

### (a)        Dividends on New Common Stock.

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles.  To the extent that a Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Holder's basis in its shares.  Any such distributions in excess of the Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

### (b)        Sale, Redemption, or Repurchase of New Common Stock

Unless a non-recognition provision applies, Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Common Stock received pursuant to the Plan.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the Holder held the applicable New Common Stock consideration for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described below.

### 8.     Matters Related to Disputed Ownership Funds.

With respect to any property deposited into any Claim distribution accounts described in the Plan (including any Disputed Claims Reserves), the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).  To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred.  Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

### 9.     Limitations on Use of Capital Losses.

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (1) $3,000 annually ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate Holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 10.     Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, dividends and gains from the sale or other disposition of capital assets.  U.S. holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of stock.

### D.     Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims.

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions and Consummation of the Plan to Non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the Consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of non-Cash consideration.

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

### 1.     Gain Recognition on Exchange of Claims.

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable

income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide properly executed original copies of IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

     **2.**     ***U.S. Federal Income Tax Consequences to Non-U.S. Holders of Payments of Interest and Owning and Disposing of the New ABL Credit Facility.***

     **(a)**     **Interest Payments; Accrued Interest (and OID)**

Subject to the discussion of backup withholding and FATCA below, payments to a Non-U.S. Holder that are attributable to either (a) interest on (or OID accruals with respect to) debt received under the Plan, or (b) accrued but untaxed interest on their Allowed Claim generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E or such successor forms as the IRS designates) establishing that the Non-U.S. Holder is not a U.S. person, unless:

- the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Debtor obligor on a Claim (in the case of consideration received in respect of accrued but unpaid interest) or the Reorganized Debtor obligor on the debt received under the Plan (in the case of interest payments with respect thereto);

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" (each, within the meaning of the IRC) with respect to the Debtor obligor on a Claim (in the case of consideration received in respect of accrued but unpaid interest) or the Reorganized Debtor obligor on the debt received under the Plan (in the case of interest payments with respect thereto);

- the Non-U.S. Holder is not a bank receiving interested described in section 881(c)(3)(A) of the IRC; or

- such interest (or OID) is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (i) generally will not be subject to withholding tax, but (ii) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on (a) interest on debt received under the Plan and (b) payments that are attributable to accrued but untaxed interest on such Non-U.S. Holder's Allowed Claim.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail, the aggregate consideration to be distributed to holders of Claims in each Class will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

If interest on the New ABL Credit Facility or interest paid to a Non-U.S. Holder pursuant to the Plan is treated as ECI to the Non-U.S. Holder, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest

on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply), provided the appropriate statement is provided to the Reorganized Debtors (or, with respect to interest received pursuant to the Plan, the Debtors) or  Reorganized Debtors' (or, as applicable, the Debtors') paying agent unless an applicable income tax treaty provides otherwise.  To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).  If a Non-U.S. Holder is eligible for the benefits of any applicable income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the applicable income tax treaty if the Non-U.S. Holder claims the benefit of the applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.  In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional branch profits tax at a 30 percent rate, or, if applicable, a lower applicable income tax treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically.  Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

**(b)** **Sale, Taxable Exchange, or Other Disposition of the New ABL Credit Facility**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of its pro rata share of the New ABL Credit Facility received under the Plan unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; or

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the individual Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). To claim a reduced rate or exemption from tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or suitable substitute or successor form or such other form as the IRS may prescribe).

*3.* *U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock.*

**(a)** **Dividends on New Common Stock**

Any distributions made with respect to New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the issuer's current or accumulated earnings and profits as determined under U.S. federal income tax principles.  To the extent that a Non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its shares.  Any such distributions in excess of a Non-U.S. Holder's basis in its shares (determined on a share-by-share

basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange). Except as described below, dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to withholding at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). Distributions to a Non-U.S. Holder treated as capital gain from a sale or exchange may also be subject to taxation under FIRPTA (as discussed below).

> **(b)**      **Sale, Redemption, or Repurchase of New Common Stock of Reorganized NBG**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock of Reorganized NBG unless:

> (1)    such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

> (2)    such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

> (3)    the issuer of such New Common Stock is or has been during a specified testing period a "U.S. real property holding corporation" (a "<u>USRPHC</u>") under the FIRPTA rules (as defined and discussed below).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Stock under the Foreign Investment in Real Property Tax Act ("<u>FIRPTA</u>"). Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will constitute effectively connected income. Further, the buyer of the New Common Stock will be required to withhold a tax equal to 15 percent of the amount realized on the sale. The amount of any such withholding would be allowed as a credit against the Non-U.S. Holder's federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS. In general, the FIRPTA provisions will not apply if (a) the Non-U.S. Holder does not directly or indirectly own more than 5 percent of the value of such interest during a specified testing period, and (b) such interest is regularly traded on an established securities market.

The Debtors do not believe it is likely that Reorganized NBG will be a USRPHC for U.S. federal income tax purposes upon the Consummation of the Plan. In general, a corporation is a USRPHC as to a Non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds 50 percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held such interest.

### 4.    FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of New Common Stock), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include the New ABL Credit Facility and the New Common Stock). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019 that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S.-source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

### 5.    Withholding and Reporting.

The Debtors, the Reorganized Debtors, and other applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan. The Debtors and Reorganized Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. Additionally, backup withholding, currently at a rate of 24 percent, will generally apply to such payments unless a Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO**

**THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIV.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Interests than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

<div style="text-align:right">

Nielsen & Bainbridge, LLC on behalf of itself and each of the other Debtors

</div>

By:      /s/ _____
Name:
Title:

Prepared By:

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
J. Machir Stull (TX Bar No. 24070697)
Victoria Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:      mcavenaugh@jw.com
        jwertz@jw.com
        mstull@jw.com
        vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      joshua.sussberg@kirkland.com
        steven.serajeddini@kirkland.com

-and-

Joshua M. Altman (*pro hac* vice pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:      josh.altman@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**Exhibit A**

**Plan of Reorganization**

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NIELSEN & BAINBRIDGE, LLC, *et al.*,[1] | ) | Case No. 23-90071 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

**JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF NIELSEN & BAINBRIDGE, LLC AND ITS DEBTOR AFFILIATES**

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
J. Machir Stull (TX Bar No. 24070697)
Victoria Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221

Email:     mcavenaugh@jw.com
           jwertz@jw.com
           mstull@jw.com
           vargeroplos@jw.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

-and-

Joshua M. Altman (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  February 8, 2023

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/NBGHome.  The Debtors' service address in these chapter 11 cases is:  12303 Technology Boulevard, Suite 950, Austin, TX 78727.

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................................... 1

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
     GOVERNING LAW, AND OTHER REFERENCES ......................................................................... 1
      *A.*     *Defined Terms.* ................................................................................................................ 1
      *B.*     *Rules of Interpretation.* ................................................................................................ 13
      *C.*     *Computation of Time.* ................................................................................................... 14
      *D.*     *Governing Law.* ............................................................................................................ 14
      *E.*     *Reference to Monetary Figures.* ................................................................................... 14
      *F.*     *Reference to the Debtors or the Reorganized Debtors.* ............................................... 14
      *G.*     *Controlling Document.* ................................................................................................. 14

ARTICLE II ADMINISTRATIVE AND PRIORITY CLAIMS ............................................................... 14
      *A.*     *Administrative Claims.* ................................................................................................. 15
      *B.*     *Professional Fee Claims.* .............................................................................................. 15
      *C.*     *DIP Claims.* .................................................................................................................. 16
      *D.*     *Priority Tax Claims.* ..................................................................................................... 17
      *E.*     *Payment of Certain Fees and Expenses.* ...................................................................... 17
      *F.*     *Statutory Fees.* ............................................................................................................. 17

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................... 17
      *A.*     *Summary of Classification.* ........................................................................................... 17
      *B.*     *Treatment of Classes of Claims and Interests.* ............................................................. 18
      *C.*     *Special Provision Governing Unimpaired Claims.* ....................................................... 21
      *D.*     *Elimination of Vacant Classes.* ..................................................................................... 21
      *E.*     *Voting Classes; Presumed Acceptance by Non-Voting Classes.* ................................... 21
      *F.*     *Subordinated Claims.* ................................................................................................... 21
      *G.*     *Controversy Concerning Impairment.* .......................................................................... 21
      *H.*     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b)) of the Bankruptcy Code.* ................ 21

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN ........................................................ 22
      *A.*     *Restructuring Transactions.* .......................................................................................... 22
      *B.*     *Commitment of the Sponsor.* ........................................................................................ 22
      *C.*     *Purchase of New Common Stock.* ................................................................................. 22
      *D.*     *Plan Distributions.* ....................................................................................................... 22
      *E.*     *Corporate Existence.* .................................................................................................... 24
      *F.*     *Vesting of Assets in the Reorganized Debtors.* ............................................................. 24
      *G.*     *Cancellation of Notes, Instruments, Certificates, and Other Documents.* ................... 24
      *H.*     *Corporate Action.* ........................................................................................................ 24
      *I.*     *New Organizational Documents.* .................................................................................. 25
      *J.*     *Directors and Officers.* ................................................................................................ 25
      *K.*     *Effectuating Documents; Further Transactions.* .......................................................... 25
      *L.*     *Section 1146 Exemption.* .............................................................................................. 25
      *M.*     *Preservation of Causes of Action.* ............................................................................... 26
      *N.*     *Director, Officer, Manager, and Employee Liability Insurance.* .................................. 26
      *O.*     *Management Incentive Plan.* ......................................................................................... 27
      *P.*     *Employee and Retiree Obligations.* .............................................................................. 27
      *Q.*     *Exemption from Registration Requirements.* ................................................................. 27

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................ 28
      *A.*     *Assumption and Rejection of Executory Contracts and Unexpired Leases.* ................. 28

B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases. .....................29
C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. .................29
D.    Insurance Policies. ...........................................................................................................30
E.    Collective Bargaining Agreements. ...................................................................................30
F.    Indemnification Obligations. ...........................................................................................30
G.    Modifications, Amendments, Supplements, Restatements, or Other Agreements. ...........30
H.    Reservation of Rights. .......................................................................................................30
I.    Nonoccurrence of Effective Date. ...................................................................................30
J.    Contracts and Leases Entered into After the Petition Date. ...........................................31

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS** ...............................................**31**
A.    Timing and Calculation of Amounts to Be Distributed. ...................................................31
B.    Distribution Agent. ...........................................................................................................31
C.    Rights and Powers of Distribution Agent. ........................................................................31
D.    Delivery of Distributions. .................................................................................................31
E.    Manner of Payment. .........................................................................................................32
F.    Compliance with HSR Act. ...............................................................................................32
G.    Compliance with Tax Requirements. ................................................................................33
H.    Allocations. .......................................................................................................................33
I.    No Postpetition or Default Interest on Claims. ...............................................................33
J.    Setoffs and Recoupment. ..................................................................................................33
K.    Claims Paid or Payable by Third Parties. ........................................................................34

**ARTICLE VII PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS**......................**34**
A.    Allowance of Claims and Interests. ..................................................................................34
B.    Claims and Interests Administration Responsibilities. .....................................................34
C.    Estimation of Claims and Interests. .................................................................................35
D.    Claims Reserve .................................................................................................................35
E.    Adjustment to Claims Without Objection. ........................................................................35
F.    Time to File Objections to Claims. ...................................................................................35
G.    Disallowance of Claims. ...................................................................................................36
H.    Amendments to Claims; Additional Claims. .....................................................................36
I.    No Distributions Pending Allowance. ..............................................................................36
J.    Distributions After Allowance. .........................................................................................36
K.    No Interest. .......................................................................................................................36

**ARTICLE VIII SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ......................**36**
A.    Compromise and Settlement of Claims, Interests, and Controversies. ...........................36
B.    Releases by Holders of Claims and Interests. ..................................................................37
C.    Discharge of Claims. ........................................................................................................37
D.    Term of Injunctions or Stays. ...........................................................................................37
E.    Release of Liens. ...............................................................................................................37
F.    Debtor Release. .................................................................................................................38
G.    Third-Party Release. .........................................................................................................39
H.    Exculpation. ......................................................................................................................40
I.    Injunction. .........................................................................................................................41
J.    Protections Against Discriminatory Treatment. ...............................................................41
K.    Reimbursement or Contribution. ......................................................................................42
L.    Document Retention. .........................................................................................................42

**ARTICLE IX CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**..............................................**42**
A.    Conditions Precedent to Confirmation of the Plan. .........................................................42
B.    Conditions Precedent to the Effective Date. .....................................................................43
C.    Waiver of Conditions Precedent. ......................................................................................44
D.    Substantial Consummation. ..............................................................................................44

  *E.*  *Effect of Non-Occurrence of Conditions to Consummation.* ...........................................................44

**ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ...............................**44**
  *A.*  *Modification of Plan.* ............................................................................................................44
  *B.*  *Effect of Confirmation on Modifications.* ...............................................................................44
  *C.*  *Revocation or Withdrawal of the Plan.* ...................................................................................44

**ARTICLE XI RETENTION OF JURISDICTION** ................................................................................................**45**

**ARTICLE XII MISCELLANEOUS PROVISIONS** ............................................................................................**46**
  *A.*  *Immediate Binding Effect.* ....................................................................................................46
  *B.*  *Additional Documents.* .........................................................................................................47
  *C.*  *Reservation of Rights.* ..........................................................................................................47
  *D.*  *Successors and Assigns.* ........................................................................................................47
  *E.*  *Service of Documents.* ..........................................................................................................47
  *F.*  *Term of Injunctions or Stays.* ...............................................................................................48
  *G.*  *Entire Agreement.* ...............................................................................................................48
  *H.*  *Plan Supplement.* .................................................................................................................48
  *I.*  *Nonseverability of Plan Provisions.* .......................................................................................49
  *J.*  *Votes Solicited in Good Faith.* ..............................................................................................49
  *K.*  *Waiver or Estoppel.* .............................................................................................................49
  *L.*  *Closing of Chapter 11 Cases.* ...............................................................................................49

## INTRODUCTION

Nielsen & Bainbridge, LLC, and its debtor affiliates, as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors") propose this joint plan of reorganization (together with the documents comprising the Plan Supplement, the "Plan") for the resolution of outstanding Claims against, and Interests in, the Debtors. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan constitutes a separate plan of reorganization for each of the Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

A.     *Defined Terms.*

1.     "*2018 Incremental First Lien Term Loan*" means the secured loans issued in 2018 pursuant to the First Lien Credit Agreement in the aggregate principal amount of $35 million.

2.     "*2020 Incremental First Lien Term Loan*" means the secured loans issued in 2020 pursuant to the First Lien Credit Agreement in the aggregate principal amount of $25 million.

3.     "*ABL Claim*" means any claim on account of the ABL Facility.

4.     "*ABL Credit Agreement*" means that certain credit agreement, dated as of April 26, 2017 (as amended by Amendment No. 1, dated as of July 1, 2019, Amendment No. 2, dated as of April 6, 2021, and Amendment No. 3, dated as of July 9, 2021, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among NBG Intermediate Holdings Inc., as holdings, NBG Acquisition Inc., as the initial borrower, which was merged with and into KNB Holdings Corporation, which survived the merger and became the administrative borrower, the lenders party thereto from time to time, and Wells Fargo, as administrative agent and collateral agent for the ABL Lenders.

5.     "*ABL Facility*" means the secured loans issued in 2017 pursuant to the ABL Credit Agreement in the aggregate principal amount of $75 million.

6.     "*ABL Lenders*" means banks, financial institutions, and other lenders party to the ABL Credit Agreement from time to time.

7.     "*Additional Cash Amount*" means, on account of Allowed DIP Roll-Up Claims attributable to interest (including capitalized interest), fees, and other charges as of the Effective Date and Allowed DIP New Money Claims, the Cash portion elected to be received by each holder of an Allowed DIP Claim, of the *Pro Rata* share of an equal amount of the Exit Term Loans and/or Cash on the Effective Date at the election of the Required DIP Lenders.

8.     "*Additional Value*" means any additional consideration for the New Common Stock over the value provided by the Stalking Horse Bid Consideration, including any such additional consideration for the New Common Stock that may result from the Auction, which shall be distributed as set forth in the Plan.

9.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date and before the Effective Date of preserving

the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of the Judicial Code.

10.    "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than Professional Fee Claims), which shall be the later of (a) the deadline established by the Bankruptcy Court and (b) the first Business Day that is 30 days following the Effective Date; *provided* that the Administrative Claims Bar Date shall not apply to claims entitled to administrative priority that arise on or after the Petition Date in the ordinary course of the Debtors' businesses.

11.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

12.    "*Allowed*" means with respect to any Claim, except as otherwise provided herein:  (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Bar Date (or for which a Proof of Claim is not required to be Filed under the Plan, the Bankruptcy Code, or a Final Order of the Court); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) a Claim allowed pursuant to the Plan, any stipulation approved by the Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been Filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or if such an objection is so Filed, such Claim is Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is timely Filed, is not Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court.  Notwithstanding anything to the contrary herein, no Claim of any Person or Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Person or Entity pays in full the amount that it owes the applicable Debtor or Reorganized Debtor, as applicable.  For the avoidance of doubt, a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

13.    "*Assumed Executory Contract and Unexpired Lease List*" means the list of Executory Contracts and Unexpired Leases (with proposed cure amounts) that will be assumed by the Reorganized Debtors, subject to the consent of the Plan Sponsor, which list shall be included in the Plan Supplement.

14.    "*Assumed Executory Contracts and Unexpired Leases*" means those Executory Contracts and Unexpired Leases to be assumed by the applicable Reorganized Debtors, subject to the consent of the Plan Sponsor, as set forth on the Assumed Executory Contract and Unexpired Lease List.

15.    "*Auction*" means the auction held pursuant to the Bidding Procedures.

16.    "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims and Causes of Actions that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

17.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, as applicable to the Chapter 11 Cases.

18.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas or another court having jurisdiction over the Chapter 11 Cases.

19.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of the Judicial Code, 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 11 Cases.

20.     "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be Filed in the Chapter 11 Cases.

21.     "*Bidding Procedures*" means the bidding procedures attached as <u>Exhibit 1</u> to the Bidding Procedures Order, to be agreed by the Debtors and the Initial Plan Sponsors.

22.     "*Bidding Procedures Motion*" means the motion seeking approval of the Bidding Procedures.

23.     "*Bidding Procedures Order*" means the order of the Bankruptcy Court approving the Bidding Procedures and establishing deadlines for the submission of bids and conducting an auction in accordance therewith.

24.     "*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

25.     "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

26.     "*Causes of Action*" means any action, claim, Claim, cause of action, controversy, demand, right, action, Lien, indemnity, Interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

27.     "*Chapter 11 Cases*" means, when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

28.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors, whether or not asserted or Allowed.

29.     "*Claims Objection Deadline*" means the deadline for objecting to a Claim, which shall be the date that is the later of (a) one hundred and eighty (180) days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court.

30.     "*Claims Register*" means the official register of Claims maintained by the Solicitation Agent.

31.     "*Class*" means a category of Claims or Interests under section 1122(a) of the Bankruptcy Code.

32.     "*Company Parties*" means NBG Intermediate Holdings Inc., a company incorporated under the laws of the State of Delaware, and each of its Affiliates listed on <u>Exhibit A</u> to the Restructuring Support Agreement, each of which has executed and delivered counterpart signature pages to the Restructuring Support Agreement to counsel to the Consenting Parties.

33.     "*Collective Bargaining Agreement*" means the Collective Bargaining Agreement by and between Dwell & Decor Outdoor, LLC (or its successor), on the one hand, and the Mid-South RWDSU Council, AFL-CIO (or its successors), on the other hand, as the same may have been amended from time to time.

34.     "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in this Plan, the Restructuring Term Sheet, and the Restructuring Support Agreement.

35.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

36.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and section 1128 of the Bankruptcy Code, including any adjournments thereof, at which the Bankruptcy Court will consider confirmation of the Plan.

37.     "*Confirmation Objection Deadline*" means the date that is seven (7) days prior to the date first set by the Bankruptcy Court for the Confirmation Hearing.

38.     "*Confirmation Order*" means the order of the Bankruptcy Court, consistent with the Restructuring Support Agreement, confirming the Plan under section 1129 of the Bankruptcy Code.

39.     "*Consenting ABL Lenders*" means the holders of, or investment advisors, sub-advisors, or managers of accounts that hold, ABL Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a joinder, or a transfer agreement to counsel to the Company Parties.

40.     "*Consenting First Lien Term Loan Lenders*" means the holders of, or investment advisors, sub-advisors, or managers of accounts that hold, First Lien Term Loan Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a joinder, or a transfer agreement to counsel to the other Consenting Parties.

41.     "*Consenting Parties*" means, collectively, and as applicable in context, the Sponsor, the Initial Plan Sponsors, the Consenting First Lien Term Loan Lenders, the Consenting Second Lien Term Loan Lenders, and/or the Consenting ABL Lenders.

42.     "*Consenting Second Lien Term Loan Lenders*" means the holders of, or investment advisors, sub-advisors, or managers of accounts that hold, Second Lien Term Loan Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a joinder, and/or a transfer agreement to counsel to the Company Parties.

43.     "*Consummation*" means the occurrence of the Effective Date.

44.     "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease to be assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

45.     "*Cure Notice*" means, with respect to an Executory Contract or Unexpired Lease to be assumed under the Plan, a notice that (a) sets forth the proposed amount of the Cure Claim to be paid in connection with the assumption of such Executory Contract or Unexpired Lease; (b) notifies the counterparty to such Executory Contract or Unexpired Lease that such party's Executory Contract or Unexpired Lease may be assumed under the Plan; (c) sets forth the procedures for objecting to the proposed assumption or assumption and assignment of Executory Contracts and Unexpired Leases or the proposed amount of the Cure Claim, including the proposed objection deadline, and for the resolution of any such objection by the Bankruptcy Court; and (d) represents that the proposed assignee (if applicable) has demonstrated its ability to comply with the requirements of adequate assurance of future performance, including the assignee's financial wherewithal and willingness to perform under such Executory Contract or Unexpired Lease.

46.     "*Cure/Assumption Objection Deadline*" means the date that is 14 days after Filing of the Assumed Executory Contracts and Unexpired Leases List and service of the Cure Notice; *provided* that if any Executory Contract or Unexpired Lease is added to the Assumed Executory Contracts and Unexpired Leases List or proposed to

be assigned to a third party, in each case, after the Filing of the initial Assumed Executory Contracts and Unexpired Leases List, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be the earlier of (a) 14 days after service of the amended Assumed Executory Contracts and Unexpired Leases List with such modification and (b) the date of the Confirmation Hearing.

47.      "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article VIII.E of the Plan.

48.      "*Definitive Documents*" means:  (a) the Restructuring Support Agreement; (b) the Restructuring Term Sheet; (c) the DIP Credit Agreement Documents; (d) the DIP Motion; (e) the DIP Orders; (f) the Bidding Procedures; (g) the Bidding Procedures Motion; (h) the Bidding Procedures Order; (i) the Exit Financing Documents; (j) the solicitation materials; (k) the Plan; (l) the Disclosure Statement; (m) the Disclosure Statement Motion; (n) the Disclosure Statement Order; (o) the New Organizational Documents; (p) all pleadings Filed by the Debtors in the Chapter 11 Cases (and related orders), including the First Day Pleadings (as defined in the Restructuring Support Agreement); (q) the Plan Supplement; (r) the Confirmation Order; (s) any and all filings with or requests for approvals by any Governmental Body; (t) the Restructuring Transactions Memorandum; and (u) any agreements, instruments, and documents as may be necessary or reasonably desirable to consummate and document the Restructuring Transactions agreed to by the Debtors and the Plan Sponsor.

49.      "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") maintained by or for the benefit of the Debtors for liabilities against any of the Debtors' current or former directors, managers, and officers, and all agreements, documents or instruments relating thereto.

50.      "*DIP Agent*" means KKR Loan Administration Services LLC, in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

51.      "*DIP Claim*" means any and all Claims arising under, derived from, or based upon the DIP Credit Agreement Documents, the DIP Facility, and the DIP Orders, including all Claims for principal amounts outstanding, interest, fees, expenses, costs, indemnification obligations, reimbursement obligations, and other charges of the DIP Agent and the DIP Lenders arising under or related to the DIP Credit Agreement Documents, the DIP Facility, or the DIP Orders, including the DIP New Money Claims and the DIP Roll-Up Claims.

52.      "*DIP Credit Agreement*" means that certain senior secured superpriority debtor in possession credit agreement that governs the DIP Facility among KNB Holdings Corporation, as borrower, guarantors party thereto, the DIP Agent, and the DIP Lenders (as it may be amended, supplemented, or otherwise modified from time to time), which shall be consistent in all material respects with the Restructuring Support Agreement and otherwise in form and substance satisfactory to the Initial Plan Sponsors.

53.      "*DIP Credit Agreement Documents*" means the DIP Credit Agreement and any related documents or agreements governing the DIP Facility, which shall be consistent in all material respects with the Restructuring Support Agreement and the DIP Orders and otherwise in form and substance satisfactory to the Initial Plan Sponsors.

54.      "*DIP Facility*" means that certain $60 million senior secured, superpriority debtor-in-possession credit facility, including the DIP New Money Loans and the DIP Roll-Up Loans, provided by the DIP Lenders on the terms of, and subject to the conditions set forth in, the DIP Credit Agreement Documents, approved by the DIP Orders, and consistent in all material respects with the Restructuring Support Agreement.

55.      "*DIP Lenders*" means the lenders party to the DIP Credit Agreement from time to time.

56.      "*DIP Motion*" means the motion seeking approval of the DIP Facility.

57.      "*DIP New Money Claim*" means any Claim derived from or based upon the DIP New Money Loans.

58. "*DIP New Money Loans*" means the $30 million in new money term loans extended to the Debtors pursuant to the DIP Credit Agreement and DIP Orders.

59. "*DIP Orders*" means the interim and final orders of the Bankruptcy Court approving the DIP Facility and setting forth the terms on which the Debtors are authorized to use cash collateral, which shall be consistent with the Restructuring Support Agreement and otherwise in form and substance satisfactory to the Initial Plan Sponsors.

60. "*DIP Roll-Up Claim*" means any Claim derived from or based upon the DIP Roll Up Loans.

61. "*DIP Roll-Up Loans*" means the $30 million of the portion of the First Lien Term Loan (from a tranche of the First Lien Term Loan to be determined by the Required DIP Lenders) rolled-up pursuant to the DIP Credit Agreement and the DIP Orders.

62. "*Disallowed*" means any Claim that is not Allowed.

63. "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or modified from time to time in accordance with the Restructuring Support Agreement, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law, as approved by the Disclosure Statement Order.

64. "*Disclosure Statement Motion*" means the motion seeking approval of the Disclosure Statement, the procedures for the solicitation of votes in connection with the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code and the forms of ballots and notices and related relief, together with all exhibits, appendices, supplements, and related documents.

65. "*Disclosure Statement Order*" means the order approving the Disclosure Statement.

66. "*Disputed*" means, with respect to any Claim, a Claim that is not Allowed or Disallowed.

67. "*Disputed Claims Reserve*" means a reserve for Plan distributions funded pursuant to **Error! Reference source not found.** hereof.

68. "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select to make or facilitate distributions in accordance with the Plan.

69. "*Distribution Record Date*" means the date for determining which Holders of Allowed Claims are eligible to receive distributions pursuant to the Plan, which shall be the date that the Confirmation Order is entered by the Bankruptcy Court, or such other date as specified in the Confirmation Order.

70. "*DTC*" means The Depository Trust Company.

71. "*Effective Date*" means the date that is the first Business Day on which (a) the Confirmation Order is in effect and not subject to stay, (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.B of the Plan have been satisfied or waived in accordance with Article X.C of the Plan, and (c) the Debtors declare the Plan effective.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

72. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

73. "*ERISA*" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, and any final regulations promulgated and the rulings issued thereunder.

74. "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

75.     "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors and Reorganized Debtors; (b) the independent directors or managers of any Debtor; and (c) any official committee of unsecured creditors appointed in the Chapter 11 Cases.

76.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

77.     "*Exit Financing*" means the debt instruments to be issued or executed as part of the Exit Term Loan Facility (if any) and the New ABL Credit Facility and any additional exit financing that may be obtained by the Reorganized Debtors, as determined by the Plan Sponsor.

78.     "*Exit Financing Documents*" means (a) if the Initial Plan Sponsors are the Plan Sponsor, collectively, all agreements, documents, and instruments entered into in connection with the Exit Financing, including the Exit Term Loan Documents (if any) and the New ABL Credit Facility Documents, or (b) if any party other than the Initial Plan Sponsor is the Plan Sponsor, collectively, all agreements, documents, and instruments as are required by the Winning Bidder and necessary to effectuate the Restructuring Transactions in accordance with the Plan and the Restructuring Transactions Memorandum.

79.     "*Exit Financing Parties*" means the New ABL Credit Facility Lender Parties, the Exit Term Loan Facility Lender Parties, and any other lenders that provide any portion of the Exit Financing.

80.     "*Exit Term Loan Credit Agreement*" means the definitive credit agreement governing the Exit Term Loan Facility (if any), a form of which shall be included in the Plan Supplement, which shall be in form and substance acceptable to the Company Parties and the Required DIP Lenders.

81.     "*Exit Term Loan Documents*" means, collectively, the Exit Term Loan Credit Agreement (if any) and any and all other documents related thereto, which shall be in form and substance acceptable to the Company Parties and the Required DIP Lenders.

82.     "*Exit Term Loan Facility*" means the exit term loan facility that may be provided by the DIP Lenders at their election on terms and conditions acceptable to the Debtors and the Required DIP Lenders.

83.     "*Exit Term Loan Facility Lender Parties*" means the DIP Lenders that may provide the Exit Term Loan Facility.

84.     "*Exit Term Loans*" means the term loans under the Exit Term Loan Facility that may be extended to the Reorganized Debtors pursuant to the Exit Term Loan Documents.

85.     "*File*", "*Filed*", or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

86.     "*First Lien Credit Agreement*" means the credit agreement dated as of April 26, 2017, as amended by Amendment No. 1 to First Lien Credit Agreement, dated as of January 2, 2019, and Amendment No. 2 to First Lien Credit Agreement, dated as of April 6, 2020, by and among NBG Acquisition Inc., as initial borrower, NBG Intermediate Holdings Inc., as holdings, the First Lien Term Loan Lenders, and Deutsche Bank AG New York Branch as administrative and collateral agent.

87.     "*First Lien Term Loan Lenders*" means those banks, financial institutions, and other lenders party to the First Lien Credit Agreement from time to time.

88.     "*First Lien Term Loans*" means, collectively, the Initial First Lien Term Loan, the 2018 Incremental First Lien Term Loan, and the 2020 Incremental First Lien Term Loan.

89.     "*First Lien Term Loan Claims*" means any Claim on account of First Lien Term Loans or otherwise arising under the First Lien Credit Agreement.

90.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

91.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

92.     "*General Unsecured Claim*" means any Claim that is not:  (a) paid in full prior to the Effective Date; (b) a DIP Claim; (c) an Administrative Claim; (d) a Professional Fee Claim; (e) a Priority Tax Claim; (f) an Other Secured Claim; (g) an Other Priority Claim; (h) an ABL Claim; (i) a First Lien Term Loan Claim; (j) a Second Lien Term Loan Claim; (k) an Intercompany Claim; or (l) a Section 510(b) Claim.

93.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

94.     "*Holder*" means a Person or an Entity holding a Claim or an Interest, as applicable.

95.     "*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

96.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

97.     "*Indemnification Obligations*" means each Debtor's indemnification obligations in place as of the Effective Date, set forth in any of: (a) the organizational documents of the Debtors (including by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, or board resolutions); (b) employment contracts; or (c) an engagement or retention letter as to professional or advisory services.

98.     "*Initial First Lien Term Loan*" means the secured loans issued in 2017 pursuant to the First Lien Credit Agreement in the aggregate principal amount of $260 million.

99.     "*Initial Plan Sponsors*" means the Entities affiliated with Silver Point Capital, L.P. and KKR Credit Advisors (US) LLC that have executed and delivered counterpart signature pages to the Restructuring Support Agreement.

100.     "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

101.     "*Intercompany Interest*" means any Interest in a Debtor other than NBG.

102.     "*Interest*" means any equity security (as defined in Section 101(16) of the Bankruptcy Code) of a Debtor, including any issued, unissued, authorized or outstanding share of common stock, preferred stock, limited liability company interest, any other equity, ownership, or profits interest,  option, warrant, rights, or an agreement to acquire any of the foregoing that existed immediately prior to the Effective Date (whether or not arising under or in connection with any employment agreement).

103.     "*Internal Revenue Code*" means title 26 of the United States Code, 26 U.S.C. §§ 1-9834, as amended from time to time.

104.     "*Investment Amount*" means, as of the Effective Date, an amount of Cash at least equal to the total amount of Allowed DIP Roll-Up Claims attributable to the initial principal amount of the DIP Roll-Up Loans *plus* any Additional Cash Amount.

105.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

106.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

107.    "*Management Incentive Plan*" means the management incentive plan, if any, implemented on or after the Effective Date by the Reorganized Debtors' Board in its sole discretion (including through the issuance of New Common Stock) for certain of the Debtors' directors, officers, and employees.

108.    "*NBG*" means NBG Topco Holdings Inc. or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

109.    "*New ABL Credit Agreement*" means the definitive credit agreement governing the New ABL Credit Facility, a form of which shall be included in the Plan Supplement.

110.    "*New ABL Credit Facility*" means the asset-based revolving credit facility to be provided by the New ABL Credit Facility Lender Parties on or prior to the Effective Date on terms and conditions acceptable to the Debtors, the Consenting ABL Lenders, and the Plan Sponsor.

111.    "*New ABL Credit Facility Documents*" means, collectively, the New ABL Credit Agreement and any and all other documents related thereto, which shall be in form and substance acceptable to the Company Parties, the Initial Plan Sponsors and the Consenting ABL Lenders.

112.    "*New ABL Credit Facility Lender Parties*" means one or more commercial lending institutions or such other entities that will provide the New ABL Credit Facility.

113.    "*New Board*" means the board of directors of Reorganized NBG on and after the Effective Date.

114.    "*New Common Stock*" means the equity interests in Reorganized NBG, which may be in the form of common stock, preferred stock, limited liability interests, or other ownership interests and may be issued in one or more classes of each of the foregoing, in each case, as determined by the Debtors and the Plan Sponsor.

115.    "*New Organizational Documents*" means the forms of the certificates or articles of incorporation, bylaws, shareholder agreements, or other formation or governance documents of Reorganized NBG, which shall be in form and substance consistent with the approval rights set forth in the Restructuring Support Agreement.

116.    "*Non-Debtor Subsidiaries*" means all direct and indirect subsidiaries of any Debtor that are not Debtors in these Chapter 11 Cases.

117.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

118.    "*Other Secured Claim*" means any Secured Claim that is not a DIP Claim, ABL Claim, First Lien Term Loan Claim, or Second Lien Term Loan Claim.

119.    "*Pension Plans*" means the legacy pension plan or any other pension plan subject to Title IV of ERISA or the minimum funding standards of section 302 of ERISA or section 412 of the Internal Revenue Code, in each case, that is sponsored, maintained, contributed to, or required to be contributed to, by Nielsen & Bainbridge, LLC and its subsidiaries and affiliates, or under which there may be obligations with respect to current or former employees of Nielsen & Bainbridge, LLC and its subsidiaries and affiliates.

120.    "*Person*" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated association, governmental entity, or political subdivision thereof, or any other entity.

121.    "*Petition Date*" means the date on which each Debtor commenced its Chapter 11 Case.

122.    "*Plan*" means this plan of reorganization for the Debtors, including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto, as it may be amended or supplemented from time to time, consistent with the approval rights set forth in the Restructuring Support Agreement.

123.    "*Plan Sponsor*" means the Initial Plan Sponsors or any Winning Bidder pursuant to the Bidding Procedures.

124.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and the Restructuring Support Agreement and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors prior to the Confirmation Hearing to the extent available, and any additional documents Filed prior to the Effective Date, including the following, as applicable:  (a) New Organizational Documents; (b) Exit Financing Documents; (c) the Assumed Executory Contracts and Unexpired Leases List; (d) the  Rejected Executory Contracts and Unexpired Leases List; (e) the Schedule of Retained Causes of Action; (f) a document listing the members of the New Board; and (g) the Restructuring Transactions Memorandum.

125.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

126.    "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in all Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interests under the Plan.

127.    "*Professional*" means a Person or an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

128.    "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been previously paid.

129.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors on the Effective Date in an amount equal to the Professional Fee Escrow Amount.

130.    "*Professional Fee Escrow Amount*" means the amount equal to the total estimated amount of Professional Fee Claims.

131.    "*Proof of Claim*" means a proof of Claim Filed in the Chapter 11 Cases by the applicable Bar Date.

132.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to a Class of Claims or Interests, that the Claims or Interests in such Class shall be rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

133.    "*Rejected Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Plan Sponsor, of Executory Contracts and Unexpired Leases that will be rejected pursuant to the Plan, which list shall be included in the Plan Supplement.

134.    "*Related Party*" means, with respect to any Person or Entity, each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners,

limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors of such Person or Entity and any such Person's or Entity's respective heirs, executors, estates, and nominees.  For the avoidance of doubt, the members of each Governing Body are Related Parties of the Debtors.

135.    "*Released Party*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Initial Plan Sponsors; (d) the Consenting Parties; (e) the DIP Lenders; (f) the respective agents under the First Lien Credit Agreement, Second Lien Credit Agreement, ABL Credit Agreement, and DIP Credit Agreement; (g) all Holders of Claims; (h) all Holders of Interests; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clause (a) through this clause (j); *provided*, *however*, that in each case, an Entity shall not be a Released Party if it:  (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release and such objection is not withdrawn before Confirmation.

136.    "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Initial Plan Sponsors; (d) the Consenting Parties; (e) the DIP Lenders; (f) the respective Agents under the First Lien Credit Agreement, Second Lien Credit Agreement, ABL Credit Agreement, and DIP Credit Agreement; (g) all Holders of Claims; (h) all Holders of Interests; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clause (a) through this clause (j); *provided*, *however*, that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the release contained in the Plan; or (y) timely objects to the Third Party Release and such objection is not withdrawn before Confirmation.

137.    "*Reorganized Debtor*" means a Debtor on and after the Effective Date (or any successor thereto, by merger, consolidation, or otherwise).

138.    "*Reorganized NBG*" means NBG, as reorganized pursuant to the Plan, or one or more new entities as determined by the Company Parties and the Plan Sponsor.

139.    "*Required Consenting ABL Lenders*" means, as of the relevant date, Consenting ABL Lenders holding at least 50.01% of the aggregate outstanding principal amount of ABL Loans that are held by Consenting ABL Lenders.

140.    "*Required Consenting First Lien Term Loan Lenders*" means, as of the relevant date, each Initial Plan Sponsor that holds First Lien Term Loans.

141.    "*Required Consenting Second Lien Term Loan Lenders*" means, as of the relevant date, Consenting Second Lien Term Loan Lenders holding at least 50.01% of the aggregate outstanding principal amount of Second Lien Term Loans that are held by Consenting Second Lien Term Loan Lenders.

142.    "*Required DIP Lenders*" has the meaning set forth in the DIP Credit Agreement.

143.    "*Restructuring*" means the restructuring of the Debtors under chapter 11 of the Bankruptcy Code in accordance with the Restructuring Support Agreement.

144.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, by and among the Debtors and certain Holders of Claims and Interests, including all exhibits and schedules attached thereto, as may be amended in accordance with its terms.

145.    "*Restructuring Term Sheet*" means that certain restructuring term sheet, attached as <u>Exhibit B</u> to the Restructuring Support Agreement.

146. "*Restructuring Transactions*" means, collectively, those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions, that the Debtors and the Plan Sponsor reasonably determine to be necessary to implement the Plan in a manner consistent with the Restructuring Support Agreement, the Restructuring Term Sheet, and the Restructuring Transactions Memorandum, and which shall include the Sponsor causing NBG Topco Holdings Inc. and NBG PropCo LLC to take all actions necessary to effectuate the Restructuring Transactions in accordance with the Plan and the Restructuring Transactions Memorandum.

147. "*Restructuring Transactions Memorandum*" means one or more written documents (which may be in the form of a written memorandum or a powerpoint or similar presentation format) illustrating the various Restructuring Transactions used to effect the Tax Structure, which documents may be amended from time to time prior to the Effective Date in accordance with the Restructuring Support Agreement.

148. "*Schedule of Retained Causes of Action*" means a schedule of Causes of Action retained by the Reorganized Debtors filed as part of the Plan Supplement.

149. "*SEC*" means the Securities and Exchange Commission.

150. "*Second Lien Credit Agreement*" means the credit agreement dated as of April 26, 2017(as amended by Amendment No. 1 to Second Lien Credit Agreement, dated as of April 6, 2020, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof) by and among NBG Acquisition Inc., as initial borrower, NBG Intermediate Holdings Inc., as holdings, the Second Lien Term Loan Lenders, and Cortland Capital Market Services LLC as administrative agent and collateral agent.

151. "*Second Lien Term Loans*" means the secured loans issued pursuant to the Second Lien Credit Agreement in the aggregate principal amount of $70,000,000.

152. "*Second Lien Term Loan Claim*" means any Claim on account of the Second Lien Term Loans or otherwise arising under the Second Lien Credit Agreement.

153. "*Second Lien Term Loan Lenders*" means those banks, financial institutions, and other lenders party to the Second Lien Credit Agreement from time to time

154. "*Section 510(b) Claim*" means any Claim arising from:  (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

155. "*Secured*" means, when referring to a Claim, a Claim:  (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, enforceable, and non-avoidable pursuant to applicable law or by reason of a Bankruptcy Court order, or (b) that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

156. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

157. "*Security*" or "*Securities*" has the meaning set forth in section 2(a)(1) of the Securities Act.

158. "*Solicitation Agent*" means Omni Agent Solutions, the noticing, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

159. "*Sponsor*" means, collectively, Sycamore Partners Management, L.P. and its affiliated investment funds and affiliates and portfolio companies of the foregoing.

160.     "*Stalking Horse Bid*" means the bid of the Initial Plan Sponsors, pursuant to which, among other things, the Initial Plan Sponsors shall purchase 100% of the New Common Stock in exchange for the Investment Amount.

161.     "*Stalking Horse Bid Consideration*" means the total amount of Allowed DIP Claims as of the Effective Date *plus* the total amount outstanding under the ABL Facility as of the Effective Date.

162.     "*State and Local Income Returns*" means any and all state and local income or franchise tax returns that include NBG or any of its subsidiaries that utilize federal taxable income as the basis for calculation of tax due.

163.     "*Tail Coverage*" means liability insurance policy coverage for the six-year period following the Effective Date for the benefit of the Debtors' current and former directors, officers, managers, and employees.

164.     "*Tax Law*" means U.S. federal income tax law.

165.     "*Tax Structure*" means the structure of the Restructuring Transactions to provide for a tax-efficient implementation acceptable to the Company Parties and the Plan Sponsor.

166.     "*Third-Party Release*" means the release given by the Releasing Parties to the Released Parties as set forth in Article VIII.E and Article VIII.F of the Plan.

167.     "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

168.     "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash.

169.     "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

170.     "*Winning Bidder*" has the set forth in the Bidding Procedures Order.

B.     *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations,

orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15) references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (18) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## ARTICLE II
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Except with respect to Administrative Claims that are Professional Fee Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of such Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on:  (a) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim;

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party by the Claims Objection Deadline.

B.      *Professional Fee Claims.*

1.      <u>Final Fee Applications and Payment of Professional Fee Claims.</u>

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred before the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

2.      <u>Professional Fee Escrow Account.</u>

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount, which shall be funded by the Reorganized Debtors.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.  If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be paid by the Debtors or the Reorganized Debtors.

3.      <u>Professional Fee Reserve Amount.</u>

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than five (5) days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request

for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.      Post-Confirmation Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and Reorganized Debtors, as applicable, shall pay, within ten business days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the Professionals of the Debtors or the Reorganized Debtors, as applicable. If the Debtors or the Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or the Reorganized Debtors, as applicable, or the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

C.      *DIP Claims*.

As of the Effective Date, the DIP Claims shall be Allowed in the full amount outstanding under the DIP Credit Agreement Documents on such date.

Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for all Allowed DIP Claims, each Holder of an Allowed DIP Claim (which shall include fees and interest) shall receive: (i) where the Initial Plan Sponsors are the Plan Sponsor, (a) on account of Allowed DIP Roll-Up Claims attributable to the initial principal amount of DIP Roll-Up Loans, payment in full, in Cash, on the Effective Date; and (b) on account of Allowed DIP Roll-Up Claims attributable to interest (including capitalized interest), fees, and other charges as of the Effective Date and Allowed DIP New Money Claims, its *Pro Rata* share of an equal amount of the Exit Term Loans and a $3,322,851.52 unsecured promissory note[2] and/or Cash on the Effective Date at the election of the Required DIP Lenders, or, in each case of clauses (a) and (b), such other terms as agreed by the Required DIP Lenders; or (ii) where any other party is the Plan Sponsor, payment in full, in Cash, on the Effective Date or such other terms agreed by the Required DIP Lenders.

Upon the satisfaction of the Allowed DIP Claims in accordance with the terms of the Plan, all Liens and security interests securing the DIP Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Person or Entity.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the DIP Facility and the DIP Credit Agreement Documents shall continue in full force and effect (other than, for the avoidance of doubt, any Liens or other security interests terminated pursuant to this section) after the Effective Date with respect to any unsatisfied obligations thereunder, as applicable, including, but not limited to, those provisions relating to the rights of the DIP Agent and the DIP Lenders to expense reimbursement, indemnification, and other similar amounts from

---

[2] The unsecured promissory note shall mature six months after the stated maturity of any Exit Term Loans and shall not bear any interest. The DIP New Money Loan funding amount and Exit Financing instrument allocation are set forth on the schedule attached as Annex 2 to the Restructuring Term Sheet.

the Debtors (which rights shall be fully enforceable against the Reorganized Debtors) and any provisions that may survive termination or maturity of the DIP Facility in accordance with the terms thereof.

D.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

E.      *Payment of Certain Fees and Expenses.*

The Debtors and Reorganized Debtors (as applicable) shall pay in Cash all reasonable and documented fees and expenses of the advisors to the Initial Plan Sponsors, DIP Lenders, and ABL Lenders, in each case in accordance with the terms and conditions of any applicable agreement with the Debtors, including the DIP Credit Agreement Documents and the Restructuring Support Agreement, and the DIP Orders, and if any such fee and/or expense is unpaid as of the Effective Date such fee and/or expense shall be paid on the Effective Date without application to or approval of the Bankruptcy Court.

F.      *Statutory Fees.*

All fees due and payable by the Debtors pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.

**ARTICLE III**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.      *Summary of Classification.*

Claims and Interests, except for DIP Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims, are classified as set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim and has not been paid, released, or otherwise satisfied before the Effective Date.

1.      <u>Class Identification.</u>

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | ABL Claims | Impaired | Entitled to Vote |
| 4 | First Lien Term Loan Claims | Impaired | Entitled to Vote |
| 5 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |

| Class | Claim or Interest | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 6 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Interests in NBG | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Classes of Claims and Interests.*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

1.      Class 1 – Other Secured Claims

(a)      *Classification*:  Class 1 consists of all Other Secured Claims.

(b)      *Treatment*:  On the Effective Date, each holder of an Allowed Other Secured Claim shall receive:

(i)      payment in full in Cash in an amount equal to its Allowed Other Secured Claim;

(ii)     the collateral securing its Allowed Other Secured Claim;

(iii)    reinstatement of its Allowed Other Secured Claim; or

(iv)     such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.      Class 2 – Other Priority Claims

(a)      *Classification*:  Class 2 consists of all Other Priority Claims.

(b)      *Treatment*:  On the Effective Date, each holder of an Allowed Other Priority Claim shall be paid in full in Cash on the Effective Date or in the ordinary course of business (by the Reorganized Debtors) as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code.

(c)      *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.      Class 3 – ABL Claims

      (a)      *Classification*:  Class 3 consists of all ABL Claims.

      (b)      *Allowance*:  On the Effective Date, the ABL Claims shall be Allowed in the aggregate principal amount of $57.7 million, *plus* accrued and unpaid interest on such principal amount through the Effective Date and other amounts due and owing under the ABL Credit Agreement.

      (c)      *Treatment:*  On the Effective Date, each Holder of an Allowed ABL Claim shall receive (i) where the Initial Plan Sponsors are the Plan Sponsor, (a) its *Pro Rata* share of the New ABL Credit Facility, on such terms as agreed among the Debtors, the ABL Lenders, and the Plan Sponsor, or (b) with the consent of the Debtors and the Plan Sponsor, payment in full, in Cash, on the Effective Date, or (ii) where any party other than the Initial Plan Sponsor is the Plan Sponsor, payment in full, in Cash, on the Effective Date.

      (d)      *Voting*:  Class 3 is Impaired under the Plan.  Holders of Allowed ABL Claims are entitled to vote to accept or reject the Plan.

4.      Class 4 – First Lien Term Loan Claims

      (a)      *Classification*:  Class 4 consists of all First Lien Term Loan Claims.

      (b)      *Allowance*:  On the Effective Date, the First Lien Term Loan Claims shall be Allowed in the aggregate principal amount of $282 million, *plus* accrued and unpaid interest on such principal amount through the Effective Date and other amounts due and owing under the First Lien Term Loan Credit Agreement.

      (c)      *Treatment*:  On the Effective Date, each Holder of an Allowed First Lien Term Loan Claim shall receive its *Pro Rata* share of Additional Value, if any, after all Allowed Claims in Class 3 have been satisfied in full; *provided*, *however*, that in no event shall any Holder of a First Lien Term Loan Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim.

      (d)      *Voting*:  Class 4 is Impaired under the Plan.  Holders of First Lien Term Loan Claims are entitled to vote to accept or reject the Plan.

5.      Class 5 – Second Lien Term Loan Claims

      (a)      *Classification*:  Class 5 consists of all Second Lien Term Loan Claims.

      *(b)*      *Allowance:*  On the Effective Date, the Second Lien Term Loan Claims shall be Allowed in the aggregate principal amount of $73 million, *plus* accrued and unpaid interest on such principal amount through the Effective Date and other amounts due and owing under the Second Lien Term Loan Credit Agreement.

      (c)      *Treatment*:  On the Effective Date, each Holder of an Allowed Second Lien Term Loan Claim shall receive its *Pro Rata* share of Additional Value, if any, after all Allowed Claims in Class 4 have been paid in full; *provided*, *however*, that in no event shall any Holder of a Second Lien Term Loan Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim.

      (d)      *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed Second Lien Term Loan Claims are entitled to vote to accept or reject the Plan.

6.      Class 6 – General Unsecured Claims

(a)      *Classification*:  Class 6 consists of all General Unsecured Claims against any Debtor.

(b)      *Treatment*:  On the Effective Date, each holder of a General Unsecured Claim shall receive its *Pro Rata* share of Additional Value (if any), after all Class 5 Claims have been paid in full; *provided*, *however*, that in no event shall any Holder of a General Unsecured Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim.

(c)      *Voting*:  Class 6 is Impaired under the Plan.  Holders of General Unsecured Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

7.      Class 7 – Intercompany Claims

(a)      *Classification*:  Class 7 consists of all Intercompany Claims.

(b)      *Treatment*:  On the Effective Date, Intercompany Claims shall be Reinstated, set off, settled, distributed, contributed, cancelled, released, or otherwise addressed at the option of the Reorganized Debtors, subject to the consent of the Plan Sponsor.

(c)      *Voting*:  Holders of Intercompany Claims are either Unimpaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

8.      Class 8 – Intercompany Interests

(a)      *Classification*:  Class 8 consists of all Intercompany Interests.

(b)      *Treatment*:  On the Effective Date, Intercompany Interests shall be Reinstated, set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Reorganized Debtors, subject to the consent of the Plan Sponsor.

(c)      *Voting*:  Holders of Intercompany Interests are either Unimpaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

9.      Class 9 – Section 510(b) Claims

(a)      *Classification*:  Class 9 consists of all Section 510(b) Claims.

(b)      *Treatment*:  On the Effective Date, Holders of Section 510(b) Claims shall not receive or retain any distribution, property, or other value on account of their Section 510(b) Claims, and all Section 510(b) Claims shall be discharged.

(c)      *Voting*:  Class 9 is Impaired.  Holders of Section 510(b) Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

10.    <u>Class 10 – Interests in NBG</u>

(a)    *Classification*:  Class 10 consists of all Interests in NBG.

(b)    *Treatment*:  On the Effective Date, all Interests in NBG shall be cancelled, released, extinguished, and discharged and will be of no further force or effect.  Holders of Interests in NBG shall receive no recovery or distribution on account of their Interests in NBG.

(c)    *Voting*:  Class 10 is Impaired.  Holders of Interests in NBG are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders of Interests in NBG are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the Holders of such Claims or Interests in such Class.

F.    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, and subject to the Restructuring Support Agreement, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

G.    *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

H.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b)) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

# ARTICLE IV
# MEANS FOR IMPLEMENTATION OF THE PLAN

*A.*      *Restructuring Transactions.*

On or after the Confirmation Date, the Debtors and the Reorganized Debtors, in each case with the consent of the Plan Sponsor, may take all actions and enter into any transactions as may be necessary or appropriate to effect any Restructuring Transactions, including those set forth in the Restructuring Transaction Memorandum and including:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (1), pursuant to applicable state law; (4) all transactions necessary to provide for the purchase  or other acquisition of substantially all of the assets or Interests of any of the Debtors, which purchase or acquisition, for the avoidance of doubt, may be structured as a taxable sale of the assets of the Debtors for United States federal income tax purposes; (5) the adoption of a Management Incentive Plan, if applicable, on the terms and conditions set by the New Board after the Effective Date; (6) the execution and delivery of the Exit Financing Documents (which includes the New ABL Credit Facility Documents); and (7) all other actions that the applicable Entities determine, with the consent of the Plan Sponsor, to be necessary or appropriate, including making Filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.  Additionally, prior to the Effective Date, the Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to effectuate transactions that are intended to be implemented prior to the Effective Date in accordance with the Restructuring Support Agreement.

*B.*      *Commitment of the Sponsor.*

The Sponsor shall cooperate to cause NBG Topco Holdings Inc. and NBG PropCo LLC to take all actions necessary to effectuate the Restructuring Transactions in accordance with the Plan and the Restructuring Transactions Memorandum.

*C.*      *Purchase of New Common Stock.*

On the Effective Date, the Winning Bidder shall purchase 100% of the New Common Stock in exchange for: (i) if there is no Auction, the Investment Amount; or (ii) if there is an Auction, the Purchase Price (as defined in the Bidding Procedures) committed in the Winning Bid.

*D.*      *Plan Distributions.*

Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Person or Entity receiving such distribution or issuance.

     1.      <u>Cash for Distribution.</u>

The Reorganized Debtors shall use (i) Cash on hand, (ii) Cash from the Exit Financing, and (iii) the Stalking Horse Bid Consideration or any Additional Value, as applicable, to fund distributions to Holders of Allowed DIP Claims, Allowed ABL Claims, Allowed First Lien Term Loan Claims, and Allowed Second Lien Term Loan Claims, as set forth in Articles II and III of the Plan.

2.      Issuance and Distribution of the New Common Stock.

The issuance of Securities under the Plan, including the shares of the New Common Stock and options or other equity awards, if any, reserved under the Management Incentive Plan (if any), shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

All of the shares of New Common Stock issued pursuant to the Plan, as well as any options for the purchase thereof and equity awards associated therewith, shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

At the election of the Plan Sponsor, the New Common Stock may be subject to a stockholders' agreement and/or the holders of New Common Stock will be provided with registration rights, in each case, on the terms and conditions that are mutually acceptable to the Reorganized Debtors and the Plan Sponsor.

3.      Exit Financing.

On the Effective Date, the Reorganized Debtors, any Non-Debtor Subsidiaries agreed to by the Debtors, the Plan Sponsor, and the New ABL Credit Facility Lender Parties, and the New ABL Credit Facility Lender Parties shall consummate the New ABL Credit Facility on the terms, and subject to the conditions, acceptable to the Reorganized Debtors, the New ABL Credit Facility Lender Parties, and the Plan Sponsor.

The aggregate principal amount of the New ABL Credit Facility shall be determined by the Debtors, the Exit New ABL Credit Facility Lender Parties, and the Plan Sponsor as reasonably necessary to fund the Debtors' obligations under the Plan and the working capital needs of the Reorganized Debtors.  On and after the Effective Date, the New ABL Credit Facility Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.

On the Effective Date, at the election of the Required DIP Lenders, the Reorganized Debtors, any Non-Debtor Subsidiaries agreed to by the Debtors, the Plan Sponsor, and the Exit Term Loan Facility Lender Parties, and the Exit Term Loan Facility Lender Parties shall consummate the Exit Term Loan Facility on the terms, and subject to the conditions, acceptable to the Reorganized Debtors and the Exit Term Loan Facility Lender Parties.  On and after the Effective Date, the Exit Term Loan Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors and be enforceable in accordance with their respective terms.

Confirmation shall be deemed approval of the Exit Financing and the Exit Financing Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors in connection therewith), to the extent not approved by the Bankruptcy Court previously, and the Reorganized Debtors are authorized to execute and deliver any and all documents necessary or appropriate to consummate the Exit Financing, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person.

On the Effective Date, or as soon as reasonably practicable thereafter, all of the Liens and security interests to be granted in accordance with the Exit Financing Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Financing Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Financing Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law. The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and

perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

E.      *Corporate Existence.*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Reorganized Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed pursuant to the New Organizational Documents.

F.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or contained in the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action (including, without limitation, all Causes of Action identified in the Schedule of Retained Causes of Action), and any property acquired by any of the Debtors, including Interests held by the Debtors in Non-Debtor Subsidiaries, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, Interests, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.      *Cancellation of Notes, Instruments, Certificates, and Other Documents.*

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, indentures, instruments, certificates, and other documents evidencing Claims and Interests in NBG, shall be cancelled, and the obligations of the Debtors or the Reorganized Debtors and any non-Debtor Affiliates thereunder or in any way related thereto shall be discharged and deemed satisfied in full; provided, that notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of, as applicable:  (a) enabling Holders of Allowed Claims under such agreements to receive distributions under the Plan as provided herein and (b) allowing and preserving the rights of any applicable paying agent to (i) make distributions in satisfaction of Allowed Claims under such agreements, (ii) maintain and exercise their respective charging liens against any such distributions, (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in making such distributions, (iv) maintain and enforce any right to indemnification, expense reimbursement, contribution, or subrogation or any other claim or entitlement, (v) exercise their rights and obligations relating to the interests of their holders, and (vi) appear and be heard in these Chapter 11 Cases.

H.      *Corporate Action.*

All actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable:  (1) the implementation of the Restructuring Transactions and all actions contemplated by Article IV.A; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the incurrence of the Exit Financing; (4) the adoption of a Management Incentive Plan, if any, by the New Board and grant of awards, if any, thereunder; (5) the issuance and distribution of New Common Stock, including on the Effective Date; and (6) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized NBG and the other Reorganized Debtors, and any corporate action required by the Debtors, Reorganized NBG, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, Reorganized NBG, or the other Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors,

Reorganized NBG, or the other Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan or the Restructuring Transactions Memorandum) in the name of and on behalf of Reorganized NBG and the other Reorganized Debtors, including the Exit Financing Documents, the New Common Stock, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I.     *New Organizational Documents.*

On or immediately before the Effective Date, the Debtors or Reorganized Debtors, as applicable, will file their New Organizational Documents with each applicable Secretary of State and/or other applicable authorities in their respective states of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. After the Effective Date, the Reorganized Debtors may amend and restate their New Organizational Documents as permitted by the laws of their respective jurisdiction of formation and the terms of such documents.

J.     *Directors and Officers.*

On the Effective Date, the New Board shall consist of the Chief Executive Officer of the Reorganized Debtors and such other members appointed by the Plan Sponsor. The number and identities of directors on the New Board shall be determined by the Plan Sponsor. On the Effective Date, the terms of the current members of the NBG board of directors shall expire, and the New Board will include those directors set forth in the list of directors of the Reorganized Debtors included in the Plan Supplement. To the extent that any such director or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors will disclose the nature of any compensation to be paid to such director or officer.

K.     *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Support Agreement, the Restructuring Transactions Memorandum, the Management Incentive Plan (if any), and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

L.     *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person or Entity) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt or equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the Restructuring Transactions Memorandum; (4) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (5) the making, assignment, or recording of any lease or sublease; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of

section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

M.     *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released or exculpated herein (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Person or Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.**  Unless any Cause of Action against a Person or Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Person or Entity shall vest in the Reorganized Debtors.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, Filing, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.M include any Claim or Cause of Action with respect to, or against, a Released Party or Exculpated Party.

N.     *Director, Officer, Manager, and Employee Liability Insurance.*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or before the Petition Date pursuant to section 365(a) of the Bankruptcy Code, Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be Filed.

On or before the Effective Date, to the extent not already obtained, the Debtors will obtain reasonably sufficient Tail Coverage with coverage on terms no less favorable than the Debtors' existing D&O Liability Insurance Policies and with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing D&O Liability Insurance Policies upon placement.

The Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including any policy providing the Tail Coverage) in effect and all members, managers, directors, and officers of the Debtors who served in such capacity at any time before the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

On and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

O.     *Management Incentive Plan.*

On or after the Effective Date, the Reorganized Debtors may adopt and implement a Management Incentive Plan (including through the issuance of New Common Stock) for certain of the Debtors' directors, officers, and employees.  The New Board, in its sole discretion, shall be authorized to institute such Management Incentive Plan and enact and enter into related policies and agreements.  For the avoidance of doubt, the terms and conditions of any Management Incentive Plan (including any related agreements, policies, programs, other arrangements, and Management Incentive Plan participants) shall be determined by the New Board in its sole discretion on or after the Effective Date.

P.     *Employee and Retiree Obligations.*

The Debtors may, with the consent of the Plan Sponsor, approve, assume, and adopt the Debtors' written contracts, agreements, policies, programs and plans for, among other things, compensation, bonuses, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the Debtors' current and former employees, directors, officers, and managers, including the executive compensation programs and all existing compensation arrangements for the employees of the Debtors.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date all retiree benefits under any plan, fund, or program maintained or established by the Debtors prior to the Petition Date, if any, shall continue to be paid in accordance with applicable law.

Upon confirmation of the Plan, the Reorganized Debtors shall continue the Pension Plans in accordance with and subject to its terms (as such terms may be amended from time to time) and applicable non-bankruptcy law (and the Reorganized Debtors reserve all rights thereunder).

Q.     *Exemption from Registration Requirements.*

Pursuant to section 1145 of the Bankruptcy Code or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act and Regulation D thereunder, the offering, issuance and distribution of the New Common Stock as contemplated hereof will be exempt from the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local laws requiring registration.

The shares of New Common Stock to be issued under the Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

The shares of New Common Stock that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder or, solely to the extent section 4(a)(2) of the Securities Act or Regulation D thereunder is not available, any other available exemption from registration under the Securities Act, will be considered "restricted securities", will bear customary legends and transfer restrictions, and

may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

Should the Reorganized Debtors elect to reflect any ownership of the New Common Stock to be issued under the Plan through the facilities of DTC, DTC is authorized to rely solely on the Confirmation Order and the Reorganized Debtors need not provide any further evidence other than the Plan and the Confirmation Order with respect to the treatment of such New Common Stock under applicable securities laws.  DTC and all other Persons and Entities shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock to be issued under the Plan is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.*     *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the earlier of ninety (90) days after (i) the Effective Date or (ii) the date on which the Debtors or Reorganized Debtors, as applicable, file the Assumed Executory Contracts and Unexpired Leases List, each Executory Contract and Unexpired Lease, not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is identified on the Assumed Executory Contracts and Unexpired Leases List; (2) is the subject of a motion to assume (or assume and assign) such Executory Contract or Unexpired Lease that is pending on the Confirmation Date; (3) is a contract, release, or other agreement or document entered into in connection with the Plan; (4) is a directors and officers insurance policy; or (5) is an Executory Contract or Unexpired Lease assumed and assigned to the Winning Bidder.

Notwithstanding anything to the contrary in the Plan, the Debtors and the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases List with the consent of the Plan Sponsor (i) to add or remove any Executory Contract or Unexpired Lease to or from the Assumed Executory Contracts and Unexpired Leases List at any time prior to the Confirmation Date, and (ii) to remove any Executory Contract or Unexpired Lease from the Assumed Executory Contracts and Unexpired Leases List at any time through and including ninety (90) days after the Effective Date, which removal shall constitute rejection of the applicable Executory Contract or Unexpired Lease; *provided* that, subject to Article V.C hereof, at any time during such ninety (90)-day period after the Effective Date, the Reorganized Debtors shall remain liable for any and all amounts incurred under any such Executory Contracts and Unexpired Leases on the Schedule of Assumed Executory Contracts and Unexpired Leases in the ordinary course of business; *provided further*, that, subject to Article V.C hereof, on the first Business Day that follows such ninety (90)-day period, (i) to the extent any Executory Contracts and Unexpired Leases remain on the Assumed Executory Contracts and Unexpired Leases List, such Executory Contracts and Unexpired Leases shall be deemed Assumed Executory Contracts and Unexpired Leases and the Reorganized Debtors shall pay any and all Cure Claims owing under such Assumed Executory Contracts and Unexpired Leases pursuant to section 365 of the Bankruptcy Code or (ii) to the extent the Reorganized Debtors have filed an amended or otherwise modified Assumed Executory Contracts and Unexpired Leases List, removing any Executory Contract or Unexpired Lease, such Executory Contracts and Unexpired Leases shall be deemed rejected pursuant to section 365 of the Bankruptcy Code.  The Debtors shall provide notice of any amendments to the Assumed Executory Contracts and Unexpired Leases List to the counterparties to the Executory Contracts or Unexpired Leases affected thereby.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.        *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Counterparties to Executory Contracts or Unexpired Leases listed on the Rejected Executory Contracts and Unexpired Leases List shall be served with a notice of rejection of their Executory Contracts and Unexpired Leases substantially in the form approved by the Disclosure Statement Order as soon as reasonably practicable following entry of such order.  Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within the earliest to occur of (1) thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection or (2) thirty (30) days after notice of any rejection that occurs after the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C.        *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under an Assumed Executory Contract or Unexpired Lease, as reflected on the Cure Notice, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree, with the consent of the Plan Sponsor.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

At least fourteen (14) days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption or assumption and assignment and proposed amounts of Cure Claims to the applicable third parties.  **Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related cure amount must be Filed, served, and <u>actually</u> <u>received</u> by the Debtors at least seven days before the Confirmation Hearing.**  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment or cure amount will be deemed to have assented to such assumption or assumption and assignment and cure amount.  Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is removed from the Schedule of Rejected Executory Contracts and Unexpired Leases after such 14-day deadline, a Cure Notice of proposed assumption or assumption and assignment and proposed amounts of Cure Claims with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such Executory Contract or Unexpired Lease can be assumed or assumed and assigned.

If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, may, with the consent of the Plan Sponsor, add such Executory Contract or Unexpired Lease to the Rejected Executory Contracts and Unexpired Leases List, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or

Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

E.      *Collective Bargaining Agreements.*

The Collective Bargaining Agreement and any agreements, documents, or instruments relating thereto, is treated as and deemed to be an Executory Contract under the Plan.  On the Effective Date, the Reorganized Debtors shall be deemed to have assumed the Collective Bargaining Agreement and any agreements, documents, and instruments related thereto.  All Proofs of Claim Filed for amounts due under the Collective Bargaining Agreement shall be considered satisfied by the agreement and obligation to assume and cure in the ordinary course as provided herein.  On the Effective Date, any Proofs of Claim Filed with respect to the Collective Bargaining Agreement shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Indemnification Obligations.*

The Debtors and Reorganized Debtors shall assume the Indemnification Obligations for the Debtors' current and former directors, officers, managers, and employees, and current attorneys, accountants, investment bankers, and other professionals of the Debtors, to the extent consistent with applicable law, and such Indemnification Obligations shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

G.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contracts and Unexpired Leases List, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

I.      *Nonoccurrence of Effective Date.*

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

J.      *Contracts and Leases Entered into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor.

## ARTICLE VI
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such Claim becomes an Allowed Claim or Interest) each Holder of an Allowed Claim and Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class and in the manner provided in the Plan.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Interests, distributions on account of any such Disputed Claims or Interests shall be made pursuant to the provisions set forth in Article VII.  Except as otherwise provided in the Plan, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

B.      *Distribution Agent.*

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Distribution Agent on the Effective Date.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.      *Rights and Powers of Distribution Agent.*

1.      Powers of the Distribution Agent.

The Distribution Agent or its designee shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      <u>Expenses Incurred On or After the Effective Date</u>.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Distribution Agent or its designee on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the Distribution Agent or its designee shall be paid promptly in Cash by the Reorganized Debtors.

D.      *Delivery of Distributions.*

1.      <u>Delivery of Distributions in General</u>.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or the Distribution Agent, as appropriate:  (a) to the signatory set forth on any Proof of Claim or Proof of Interest Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Proof of Interest

is Filed or if the Debtors have not been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Distribution Agent, as appropriate, after the date of any related Proof of Claim or Proof of Interest; or (c) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Reorganized Debtors, and the Distribution Agent, and any applicable paying agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

       2.      <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any Holder is returned as undeliverable, no further distribution to such Holder shall be made unless and until the Reorganized Debtors have determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

       3.      <u>Minimum Distributions</u>.

No fractional shares of New Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows:  (a) fractions of one half or greater shall be rounded to the next higher whole number and (b) fractions of less than one half shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

Holders of Allowed Claims entitled to distributions of $50 or less shall not receive distributions, and each such Claim to which this limitation applies shall be discharged pursuant to Article VIII and its Holder is forever barred pursuant to Article VIII from asserting that Claim against the Reorganized Debtors or their property.

E.     *Manner of Payment.*

Except as otherwise set forth herein, all distributions of New Common Stock to Holders of the applicable Allowed Claims under the Plan shall be made by the Distribution Agent on behalf of the Debtors or Reorganized Debtors, as applicable.  All distributions of Cash to the Holders of the applicable Allowed Claims under the Plan shall be made by the Distribution Agent on behalf of the applicable Debtor or Reorganized Debtor.  At the option of the Distribution Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.     *Compliance with HSR Act.*

To the extent that any Holder will hold New Common Stock valued in excess of the relevant reporting thresholds under the HSR Act as a result of distributions to be made on the Effective Date and the acquisition of New Common Stock by such Holder either (i) is not eligible for an exemption under the HSR Act or (ii) is required to be notified to the US antitrust agencies pursuant to the HSR Act and the relevant waiting period associated therewith has not expired or been terminated as of the Effective Date, then such Holder shall sell a sufficient amount of New Common Stock such that by the end of the day on the Distribution Record Date, such holder will hold New Common Stock valued at or below the relevant reporting threshold under the HSR Act.

G.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, Distribution Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

Property deposited into any Claim distribution accounts described elsewhere in the Plan (including any Disputed Claims Reserves) will be subject to disputed ownership fund treatment under section 1.468B-9 of the United States Treasury Regulations. All corresponding elections with respect to such accounts shall be made, and such treatment shall be applied to the extent possible for state, local, and non-U.S. tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS with respect to such accounts, any taxes (including with respect to interest, if any, or appreciation in property between the Effective Date and date of distribution) imposed on such accounts shall be paid out of the assets of such accounts (and reductions shall be made to amounts disbursed from such accounts to account for the need to pay such taxes).

H.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

I.      *No Postpetition or Default Interest on Claims.*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

J.      *Setoffs and Recoupment.*

Unless otherwise provided in the Plan, the DIP Orders, or the Confirmation Order, pursuant to section 553 of the Bankruptcy Code, applicable non-bankruptcy law, or as may be agreed to by the Holder of the Allowed Claim, each Debtor and each Reorganized Debtor may set off or recoup any Allowed Claim against the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.      *Claims Paid or Payable by Third Parties.*

     1.      <u>Claims Paid by Third Parties</u>.

The Debtors, or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution from the Debtors or Reorganized Debtors on account of such Claim and also receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14)-day grace period specified above until the amount is repaid.

     2.      <u>Claims Payable by Third Parties</u>.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Solicitation Agent without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

     3.      <u>Applicability of Insurance Policies</u>.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Notwithstanding anything herein to the contrary (including Article VIII), nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS**

A.      *Allowance of Claims and Interests.*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B.      *Claims and Interests Administration Responsibilities.*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors and the Initial Plan Sponsors shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors shall have the exclusive authority to (1) File, withdraw, or litigate to judgment any objections to Claims; (2) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of

whether such Claims are in a Class or otherwise; (3) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (4) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.M of the Plan.

C.      *Estimation of Claims and Interests.*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  If the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Claims Reserve*

On or before the Effective Date, the Debtors, with the consent of the Plan Sponsor, shall be authorized, but not directed, to establish one or more Disputed Claims Reserves for any Disputed Claims, which Disputed Claims Reserve shall be administered by the Reorganized Debtors.

After the Effective Date, the Reorganized Debtors may, in their sole discretion, hold any property to be distributed pursuant to the Plan, in the same proportions and amounts as provided for in the Plan, in the Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed after the Effective Date.  The Reorganized Debtors shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III of the Plan solely to the extent of the amounts available in the applicable Disputed Claims Reserves.

E.      *Adjustment to Claims Without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the Claims Objection Deadline.

G.      *Disallowance of Claims.*

Except as otherwise provided herein or in the Confirmation Order, any Claims held by an Entity from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f),  522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed  pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that  Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all  sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the  Reorganized Debtors. All Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors, any and all Claims for which Proofs of Claim have not been Filed or were Filed after the Bar Date, except for Holders of Claims not required to File Proofs of Claim under the Bar Date Order, shall be deemed Disallowed and such Proofs of Claim expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless a late Proof of Claim is been deemed timely Filed by a Final Order.**

H.      *Amendments to Claims; Additional Claims.*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

I.      *No Distributions Pending Allowance.*

Notwithstanding any other provision hereof, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

J.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

K.      *No Interest.*

Interest shall not accrue or be paid on any Disputed Claim during the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE VIII
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith

compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims, Interests, and Causes of Action.

B.      *Releases by Holders of Claims and Interests.*

Nothing in the Plan, the Confirmation Order, or Section 1141 of the Bankruptcy Code shall be construed as discharging, releasing, or relieving the Reorganized Debtors, or their successors, from any liability imposed under ERISA or the Internal Revenue Code with respect to the Pension Plans solely as a result of the Debtors' reorganization proceedings or confirmation of the Plan.

C.      *Discharge of Claims.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors (or Affiliates of a Debtor as such default or "event of default" applies to a Debtor) with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

D.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

E.      *Release of Liens.*

**Except (1) with respect to the Liens securing the Exit Financing, including the New ABL Credit Agreement and the Exit Term Loan Credit Agreement, and any other financing created pursuant to the Exit Financing Documents, and (2) as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates and, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, and the Holders (and the applicable agents of such Holders) of such mortgages, deeds of trust,**

Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has Filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

F.      *Debtor Release.*

Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, their Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors by Released Parties other than the Consenting Parties), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, and related prepetition transactions, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, any other Definitive Document, or any Restructuring Transactions, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), any other Definitive Document, or any Restructuring Transactions, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions,

or the distribution of property pursuant to the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause, the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any Causes of Action identified in the Schedule of Retained Causes of Action, and (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or Agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Financing Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

G.     *Third-Party Release.*

Notwithstanding anything contained in this Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permitted under applicable law, each Released Party (other than the Debtors or the Reorganized Debtors) is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each and all of the Releasing Parties (other than the Debtors or the Reorganized Debtors), from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the foregoing Entities, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, or their Estates or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before and during the Chapter 11 Cases, any other Definitive Document, or any Restructuring Transactions, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or

the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documentation, the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, any other Definitive Document, or any Restructuring Transactions, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property pursuant to the Restructuring Transactions and/or the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Facility, the Exit Financing Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

H.    *Exculpation.*

Notwithstanding anything contained in this Plan to the contrary, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or Third-Party Release, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), any other Definitive Document, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Exit Financing, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

**The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

I.      *Injunction.*

**Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests or Causes of Action or liabilities that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities released or settled pursuant to the Plan.**

**By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth above.**

**The injunctions set forth above shall extend to any successors of the Debtors, the Reorganized Debtors, the Released Parties, and the Exculpated Parties and their respective property and interests in property.  No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.E, Article VIII.F, and Article VIII.G hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.**

**The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.**

J.      *Protections Against Discriminatory Treatment.*

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement

of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

K.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent, or (2) the relevant Holder of a Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

L.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

## ARTICLE IX
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.      *Conditions Precedent to Confirmation of the Plan.*

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to Article IX.C of the Plan:

1.      the Bankruptcy Court shall have entered the Disclosure Statement Order;

2.      the Bankruptcy Court shall have entered the Confirmation Order; and

3.      the Confirmation Order shall:

   (a)   authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

   (b)   decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

   (c)   authorize the Debtors and Reorganized Debtors, as applicable/necessary, to, among other things: (i) implement the Restructuring Transactions; (ii) issue and distribute the New Common Stock, including on account of any Management Incentive Plan, pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act and Regulation D thereunder, or other exemption from such registration or pursuant to one or more registration statements; (iii) make all distributions and issuances as required under the Plan, including the New Common Stock; (iv) execute and deliver the Exit Financing Documents and to perform their obligations thereunder; and (v) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement;

   (d)   provide that, pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, if applicable, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan,

shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

(e)     contain the release, injunction, and exculpation provisions contained in this Plan.

B.     *Conditions Precedent to the Effective Date.*

Except to the extent agreed by the Debtors and the Plan Sponsor, it shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.C of the Plan:

1.     the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

2.     the Bankruptcy Court shall have entered the DIP Orders, which shall be in full force and effect;

3.     the Definitive Documents shall (i) be consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights set forth therein and (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties;

4.     the Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall not have been reversed, stayed, modified, or vacated on appeal;

5.     all actions, documents, and agreements necessary to implement and consummate the Plan as mutually agreed to by the Debtors and the Plan Sponsor shall have been effected and executed;

6.     all Exit Financing Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the required parties to the Restructuring Support Agreement), other than such conditions that relate to the effectiveness of the Plan and related transactions;

7.     the New Organizational Documents shall be adopted on terms consistent with the Restructuring Support Agreement and the Restructuring Term Sheet;

8.     all Allowed Professional Fee Claims of Professionals approved by the Bankruptcy Court shall have been paid in full and the Professional Fee Escrow Account shall have been established and funded pending approval by the Bankruptcy Court;

9.     all invoiced professional fees, expenses, and other amounts required to be paid pursuant to the Restructuring Support Agreement, in any Definitive Document, or in any order of the Bankruptcy Court shall have been paid in full in Cash in accordance with Article II.E of the Plan;

10.    the Winning Bidder shall deliver the Purchase Price to the Debtors in exchange for the Reorganized Debtors' distribution of the New Common Stock;

11.    the Debtors shall have entered into new or amended terms with vendors in a sufficient number and on terms and conditions reasonably necessary to support the Reorganized Debtors' go-forward business, in each case, that are acceptable to the Debtors and the Plan Sponsor; and

12.    any and all requisite governmental, regulatory, and third party approvals and consents shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired or terminated without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on the Restructuring Transactions, the financial benefits of such Restructuring

Transactions to the Plan Sponsor, or the ability of the Plan Sponsor to participate in the governance of the Reorganized Debtors.

C.      *Waiver of Conditions Precedent.*

The Debtors, with the consent of the Plan Sponsor, solely to the extent consistent with the approval rights set forth in the Restructuring Support Agreement, and except for the conditions set forth in Articles IX.B.8 and IX B.9 may waive any of the conditions to Confirmation or the Effective Date set forth in Article IX.A or Article IX.B of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

D.      *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

E.      *Effect of Non-Occurrence of Conditions to Consummation.*

If the Effective Date does not occur with respect to any of Debtors, the Plan shall be null and void with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (2) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification of Plan.*

Subject to the limitations contained in the Plan and consistent with the approval rights set forth in the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the Restructuring Support Agreement, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall constitute approval of all permitted modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date with the consent of the Plan Sponsor.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or

any other Entity, including the Holders of Claims; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Confirmation Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to any Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

12.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

14.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII hereof;

15.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

17.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

18.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

22.     enforce all orders previously entered by the Bankruptcy Court;

23.     hear any other matter not inconsistent with the Bankruptcy Code;

24.     enter an order or Final Decree concluding or closing the Chapter 11 Cases; and

25.     enforce the injunction, release, and exculpation provisions set forth in Article VIII hereof.

**ARTICLE XII**
**MISCELLANEOUS PROVISIONS**

A.     *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents.*

On or before the Effective Date, and with the consent of the Plan Sponsor, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

D.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E.      *Service of Documents.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Nielsen & Bainbridge, LLC<br>12303 Technology Boulevard<br>Suite 950<br>Austin, Texas 78727<br>Attention:  Hope Margala<br>Email:  hmargala@nbg-home.com | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Facsimile:  (212) 446-4900<br>Attention:  Joshua A. Sussberg, P.C. and Steven N. Serajeddini, P.C.<br>Email:  joshua.sussberg@kirkland.com, steven.serajeddini@kirkland.com<br><br>and<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Facsimile:  (312) 862-2200<br>Attention:  Joshua M. Altman<br>Email:  josh.altman@kirkland.com |

| United States Trustee | Counsel to the First Lien Term Loan Lenders |
|---|---|
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001<br>Attention: Dennis F. Dunne and Matthew L. Brod<br>E-mail: ddunne@milbank.com<br>mbrod@milbank.com |
| **Counsel to the Initial Plan Sponsors** | **Counsel to the Second Lien Term Loan Lenders** |
| Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001<br>Attention: Dennis F. Dunne and Matthew L. Brod<br>E-mail: ddunne@milbank.com<br>mbrod@milbank.com | Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001<br>Attention: Dennis F. Dunne and Matthew L. Brod<br>E-mail: ddunne@milbank.com<br>mbrod@milbank.com |

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to Entities that continue to receive documents pursuant to Bankruptcy Rule 2002 requiring such Entity to File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

G.      *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

H.      *Plan Supplement.*

All documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the Plan Supplement has been Filed, copies of the documents contained therein shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from https://omniagentsolutions.com/NBGHome or the Bankruptcy Court's website at www.txsb.uscourts.gov/bankruptcy. Unless otherwise ordered by the Bankruptcy Court, to the extent any document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

I.      *Nonseverability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors', as applicable and the Plan Sponsor's consent, *provided*, that any such deletion or modification must be consistent with the Restructuring Support Agreement; and (3) nonseverable and mutually dependent.

J.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, no such parties, individuals, or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

K.      *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

L.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

Dated:  February 8, 2023

NIELSEN & BAINBRIDGE, LLC

By: _/s/_____
Name:  [●]
Title:   [●]

**Exhibit B**

**Corporate Structure of the Debtors**



NBG Holdco LLC (Delaware)
NBG Topco Holdings Inc. (Delaware)
NBG Intermediate Holdings Inc. (Delaware)
NBG Propco LLC (Delaware)
KNB Holdings Corporation (Delaware)
N&B Industries, Inc. (Delaware)
Nielsen & Bainbridge, LLC (Delaware)
NBGroup, LLC (Delaware)
99.9% LP interest
0.1% LP interest
NBH C.V. (Netherlands)
Design Solutions International, Inc. (Florida S Corporation)
Dwell & Decor Outdoor LLC (f/k/a Plantation Patterns, LLC) (Delaware)
Home Decor Holding Company (Ohio)
Quoizel, LLC (New York)
Dwelling & Decor LLC (Texas)
Nielsen & Bainbridge Holland B.V. (Netherlands)
Cheyenne Products LLC (Delaware)
Patton Picture Company (Ohio)
The Home Décor Companies (Hong Kong) Limited (Hong Kong)
Jimco Lamp & Manufacturing Company (Ohio)
The Home Décor Companies (Dongguan) Limited (China WFOE)
The Home Décor Companies (Congguan) Limited Shanghai Branch (China)

NBG HOME

**Exhibit C**

**Restructuring Support Agreement**

**NBG INTERMEDIATE HOLDINGS INC.**

**RESTRUCTURING TERM SHEET**

**February 8, 2023**

This term sheet (the "**Restructuring Term Sheet**") contains certain material terms and conditions of the proposed restructuring (the "**Restructuring**," and the transactions contemplated thereunder, the "**Restructuring Transactions**") of NBG Topco Holdings Inc. ("**NBG**") and certain of its direct and indirect subsidiaries (together with NBG, each, a "**Company Party**," and collectively, the "**Company Parties**" or the "**Debtors**"). This Restructuring Term Sheet does not address all terms, conditions, or other provisions that would be required in connection with the Restructuring or that will be set forth in the Definitive Documents, which are subject to agreement in accordance with the restructuring support agreement to which this Restructuring Term Sheet is attached (the "**Restructuring Support Agreement**").[1]

**THIS RESTRUCTURING TERM SHEET IS NOT (NOR SHALL BE CONSTRUED AS) AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE, OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

**NOTHING CONTAINED IN THIS RESTRUCTURING TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THE RESTRUCTURING SUPPORT AGREEMENT.**

**THIS RESTRUCTURING TERM SHEET IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS RESTRUCTURING TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND MAY NOT BE SHARED WITH ANY PERSON OTHER THAN THE COMPANY PARTIES AND THE CONSENTING STAKEHOLDERS AND THEIR RESPECTIVE ADVISORS OR EXCEPT AS SET FORTH IN ANY CONFIDENTIALITY AGREEMENT BETWEEN THE COMPANY PARTIES AND THE APPLICABLE CONSENTING STAKEHOLDERS OR THEIR RESPECTIVE ADVISORS.**

---

[1] Capitalized terms used but not immediately defined herein have the meaning given to them in the Restructuring Support Agreement.

| OVERVIEW OF RESTRUCTURING TRANSACTIONS | |
|---|---|
| **Implementation** | The Restructuring Support Agreement contemplates that the Restructuring Transactions will be consummated through the Chapter 11 Cases under the Bankruptcy Code in the Bankruptcy Court pursuant to the Plan on the terms and subject to the conditions set forth in the Restructuring Support Agreement and this Restructuring Term Sheet. |
| | Pursuant to the Plan, the Initial Plan Sponsors shall purchase 100% of the New Common Stock issued as of the Plan Effective Date for an amount of cash at least equal to the total amount of Allowed DIP Roll-Up Claims attributable to the initial principal amount of DIP Roll-Up Loans *plus* any Additional Cash Amount (as defined below) (the "**Investment Amount**").[2]  The "**Stalking Horse Bid Consideration**" shall equal the total amount of Allowed DIP Claims as of the Plan Effective Date, *plus* the total amount outstanding under the ABL Facility of the Plan Effective Date. |
| | The Plan shall be subject to higher or better bids pursuant to bidding procedures (the "**Bidding Procedures**") to be agreed by the Debtors and the Initial Plan Sponsors.  In the event of a higher or better bid, the additional value (the "**Additional Value**") provided by the winning bidder shall be distributed as set forth in the Plan. |
| **DIP Facility** | Certain funds affiliated with Silver Point Capital, L.P. and KKR Credit Advisors (US) LLC (such funds, the "**DIP Lenders**") shall commit to fund the DIP Facility in the aggregate amount of $60 million, consisting of (a) $30 million in new money term loans (the "**DIP New Money Loans**") and (b) a roll-up of $30 million of the DIP Lenders' loans under the First Lien Term Loan (the "**DIP Roll-Up Loans**"), on the terms and conditions set forth in the DIP Credit Agreement and DIP Orders attached to the Restructuring Support Agreement as Exhibits D and E, respectively.  The DIP Orders shall provide for the Debtors' consensual use of the cash collateral of the prepetition secured parties. |
| **Plan Sponsor** | The Plan Sponsor shall be determined as set forth in the Bidding Procedures.  The Initial Plan Sponsors shall be the Plan Sponsor on account of the Stalking Horse Bid and such proposal shall be subject to higher or otherwise better proposals as set forth in the Bidding Procedures.  In the event any bidder other than the Initial Plan Sponsor submits a bid that is designated the winning bid pursuant to the Bidding Procedures, then that winning bidder shall replace the Initial Plan Sponsor as the Plan Sponsor. |

---

[2]   The Investment Amount and New Common Stock shall be allocated between each Initial Plan Sponsor in accordance with the schedule attached as **Annex 1** hereto.

| TREATMENT OF CLAIMS AND INTERESTS |
|---|

On the Plan Effective Date, or as soon as is reasonably practicable thereafter, each holder of an Allowed[3] Claim or Interest, as applicable, shall receive under the Plan the treatment described in this Restructuring Term Sheet in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest, except to the extent different treatment is agreed to by the Debtors or the reorganized Debtors (the "**Reorganized Debtors**"), as applicable, the Plan Sponsor, and the holder of such Allowed Claim or Interest.

| Unclassified Non-Voting Claims | |
|---|---|
| **DIP Claims** | On the Plan Effective Date, each holder of an Allowed DIP Claim (which shall include fees and interest) shall receive:<br><br>• (i) where the Initial Plan Sponsors are the Plan Sponsor, (a) on account of Allowed DIP Roll-Up Claims attributable to the initial principal amount of DIP Roll-Up Loans, payment in full, in cash, on the Plan Effective Date, and (b) on account of Allowed DIP Roll-Up Claims attributable to interest (including capitalized interest), fees, and other charges as of the Plan Effective Date and Allowed DIP New Money Claims, its *pro rata* share of an equal amount of the Exit Term Loans and a $3,322,851.52 unsecured promissory note[4] and/or cash on the Plan Effective Date at the election of the Required DIP Lenders (the amount elected to be received in cash, the "**Additional Cash Amount**"), or, in each case of clauses (a) and (b), such other terms as agreed by the Required DIP Lenders; or<br><br>• (ii) where any other party is the Plan Sponsor, payment in full, in cash on the Plan Effective Date or such other terms agreed by the Required DIP Lenders. |
| **Administrative Claims** | On the Plan Effective Date, each holder of an Allowed Administrative Claim[5] shall be paid in full in cash on the Plan Effective Date: (a) if such Administrative Claim is Allowed on or prior to the Plan Effective Date, on the Plan Effective Date (or, if not then due, when such Allowed Administrative Claim is due); (b) if such Administrative Claim is not |

---

[3]   For purposes of this Restructuring Term Sheet, "Allowed" means, with respect to any Claim or Interest, any Claim or Interest (or portion thereof) against any Debtors that: (a) is deemed allowed under the Bankruptcy Code; (b) is allowed, compromised, settled, or otherwise resolved pursuant to the terms of the Plan, in any stipulation that is approved by a Final Order of the Bankruptcy Court, or pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection therewith; or (c) has been allowed by a Final Order of the Bankruptcy Court.

[4]   The unsecured promissory note shall mature six (6) months after the stated maturity of any Exit Term Loans and shall not bear any interest.  The DIP New Money Loan funding amount and exit debt instrument allocation are set forth on the schedule attached as **Annex 2** hereto.

[5]   For purposes of this Restructuring Term Sheet, "Administrative Claim" shall mean a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Claims (as defined in the Plan); and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

| | | |
|---|---|---|
| | Allowed as of the Plan Effective Date, no later than thirty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holder of such Allowed Administrative Claim. | |
| **Priority Tax Claims** | On the Plan Effective Date, each holder of an Allowed Priority Tax Claim[6] shall receive cash in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | |
| **Classified Claims and Interests of the Debtors** | | |
| **Class 1 – Other Secured Claims** | On the Plan Effective Date, each holder of an Allowed Other Secured Claim[7] shall receive: (i) payment in full in cash in an amount equal to its Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, (iii) Reinstatement[8] of its Allowed Other Secured Claim, or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired[9] in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Presumed to Accept |
| **Class 2 – Other Priority Claims** | Each holder of an Allowed Other Priority Claim[10] shall be paid in full in cash on the Plan Effective Date or in the ordinary course of business (by the Reorganized Debtors) as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code. | Unimpaired / Presumed to Accept |

---

[6]   For purposes of this Restructuring Term Sheet, "Priority Tax Claim" shall mean any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

[7]   For purposes of this Restructuring Term Sheet, "Other Secured Claim" shall mean any Secured Claim that is not a DIP Claim, ABL Claim, First Lien Term Loan Claim, or Second Lien Term Loan Claim.

[8]   For purposes of this Restructuring Term Sheet, "Reinstate," "Reinstated," or "Reinstatement" shall mean with respect to a Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

[9]   For purposes of this Restructuring Term Sheet, "Unimpaired" shall mean means with respect to a class of Claims or Interests, a class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

[10]   For purposes of this Restructuring Term Sheet, "Other Priority Claim" shall mean any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

| | | |
|---|---|---|
| **Class 3 – ABL Claims** | On the Plan Effective Date, each holder of an Allowed ABL Claim shall receive:<br><br>• (i) where the Initial Plan Sponsors are the Plan Sponsor, (a) its *pro rata* share of the New ABL Credit Facility, on such terms as agreed among the Debtors, the ABL Lenders, and the Plan Sponsor, or (b) with the consent of the Debtors and the Plan Sponsor, payment in full, in cash on the Plan Effective Date; or<br><br>• (ii) where any party other than the Initial Plan Sponsor is the Plan Sponsor, payment in full, in cash on the Plan Effective Date. | Impaired / Entitled to Vote |
| **Class 4 – First Lien Term Loan Claims** | On the Plan Effective Date, each holder of an Allowed First Lien Term Loan Claim shall receive its pro rata share of Additional Value, if any, after all Allowed Claims in Class 3 have been satisfied in full; *provided*, *however*, that in no event shall any holder of a First Lien Term Loan Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. | Impaired / Entitled to Vote |
| **Class 5 – Second Lien Term Loan Claims** | On the Plan Effective Date, each holder of an Allowed Second Lien Term Loan Claim shall receive its Pro Rata share of Additional Value, if any, after all Allowed Claims in Class 4 have been paid in full; *provided*, *however*, that in no event shall any holder of a Second Lien Term Loan Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. | Impaired / Entitled to Vote |
| **Class 6 – General Unsecured Claims** | On the Plan Effective Date, each holder of a General Unsecured Claim[11] shall receive its Pro Rata share of Additional Value, if any, after all Class 5 Claims have been paid in full; *provided*, *however*, that in no event shall any holder of a General Unsecured Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. | Impaired / Deemed to Reject |

---

[11] For purposes of this Restructuring Term Sheet, "General Unsecured Claim" means any Claim that is not:  (a) paid in full prior to the Plan Effective Date; (b) a DIP Claim; (c) an Administrative Claim; (d) a Professional Fee Claim; (e) a Priority Tax Claim; (f) an Other Secured Claim; (g) an Other Priority Claim; (h) an ABL Claim; (i) a First Lien Term Loan Claim; (j) a Second Lien Term Loan Claim; (k) an Intercompany Claim; or (l) a Section 510(b) Claim.

| **Class 7 – Intercompany Claims** | On the Plan Effective Date, Intercompany Claims[12] shall be reinstated, set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Reorganized Debtors, subject to the consent of the Plan Sponsor. | Impaired / Deemed to Reject or Unimpaired / Presumed to Accept |
|---|---|---|
| **Class 8 – Intercompany Interests** | On the Plan Effective Date, Intercompany Interests[13] shall be reinstated, set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Reorganized Debtors, subject to the consent of the Plan Sponsor. | Impaired / Deemed to Reject or Unimpaired / Presumed to Accept |
| **Class 9 – Section 510(b) Claims** | On the Plan Effective Date, holders of Section 510(b) Claims[14] shall not receive or retain any distribution, property, or other value on account of their Section 510(b) Claims, and all Section 510(b) Claims shall be discharged. | Impaired / Deemed to Reject |
| **Class 10 – Interests in NBG** | On the Plan Effective Date, all Interests in NBG shall be cancelled, released, extinguished, and discharged and will be of no further force or effect. Each holder of an Interest shall receive no recovery or distribution on account of their Interests in NBG. | Impaired / Deemed to Reject |
| **OTHER KEY TERMS** | | |
| **New ABL Credit Facility** | The asset-based revolving credit facility to be provided by the New ABL Credit Facility Lender Parties on or prior to the Plan Effective Date on terms and conditions acceptable to the Debtors, the Consenting ABL Lenders, and the Plan Sponsor. | |
| **Exit Term Loan Facility** | At the election of the Required DIP Lenders, the Exit Term Loan Facility will be provided by the DIP Lenders on terms and conditions acceptable to the Debtors and the Required DIP Lenders. | |
| **New Common Stock** | The equity interests in Reorganized NBG, which may be in the form of common stock, preferred stock, limited liability interests, or other ownership interests and may be issued in one or more classes of each of the foregoing, in each case, as determined by the Debtors and the Plan | |

---

[12]   For purposes of this Restructuring Term Sheet, "Intercompany Claim" shall mean any Claim against a Company Entity held by another Company Entity.

[13]   For purposes of this Restructuring Term Sheet, "Intercompany Interest" shall mean any Interest in a Company Entity held by another Company Entity.

[14]   For purposes of this Restructuring Term Sheet, "Section 510(b) Claim" means any Claim arising from: (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

| | |
|---|---|
| | Sponsor. |
| **Executory Contracts and Unexpired Leases** | The treatment (*e.g.*, assumption, assumption and assignment, and/or rejection) of all executory contracts and unexpired leases to which the any Company Party is a party, including any employment agreements, shall be subject to the consent of the Plan Sponsor. |
| **Securities Laws Matters** | To extent applicable, on the Effective Date, the Reorganized Debtors shall issue New Common Stock in accordance with the terms of the Plan, the New Organizational Documents, and applicable Law (including applicable securities laws). |
| | The New Common Stock will be issued pursuant to section 1145 of the Bankruptcy Code (the "**Section 1145 Exemption**") or, to the extent that the Section 1145 Exemption is either not permitted or not applicable, section 4(a)(2) of the Securities Act or another exemption thereunder. Any New Common Stock issued pursuant to the Section 1145 Exemption will be freely transferrable under applicable securities laws without further registration, subject to certain restrictions on affiliates and underwriters under applicable securities laws. |
| **Governance** | The new board of directors or managers of the Reorganized Debtors (as applicable) (the "**New Board**") shall consist of the Chief Executive Officer of the Reorganized Debtors and such other members appointed by the Plan Sponsor.  The number and identities of directors on the New Board shall be determined by the Plan Sponsor and set forth in the Plan Supplement to the extent known at the time of filing. |
| | In connection with the Plan Effective Date, and consistent with section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtors shall adopt the applicable New Organizational Documents as determined by the Debtors and the Plan Sponsor. |
| | At the election of the Plan Sponsor, the New Common Stock will be subject to a stockholders' agreement and/or the holders of New Common Stock will be provided with registration rights, in each case, on terms and conditions that are mutually acceptable to the Company Parties and the Plan Sponsor. |
| **Reorganized NBG** | NBG, as reorganized pursuant to the Plan, or one or more new entities as determined by the Company Parties and the Plan Sponsor. |
| **Tax Structure** | The Restructuring will be effectuated and structured in a tax-efficient manner acceptable to the Company Parties and the Plan Sponsor. |
| **Discharge, Release, Injunction, and Exculpation** | The Plan will provide for customary release, discharge, injunction, and exculpation provisions. |
| **Retained Causes of Action** | The Reorganized Debtors shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action that the Debtors have released pursuant to the release and exculpation provisions. |

| | |
|---|---|
| **Conditions Precedent to the Plan Effective Date** | The occurrence of the Plan Effective Date shall be subject to the following additional conditions precedent unless otherwise agreed by the Debtors and the Plan Sponsor:<br><br>• the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;<br><br>• the Bankruptcy Court shall have entered the DIP Orders, which shall be in full force and effect;<br><br>• the Definitive Documents shall (i) be consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights set forth therein and (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties;<br><br>• the Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall not have been reversed, stayed, modified, or vacated on appeal;<br><br>• all actions, documents, and agreements necessary to implement and consummate the Plan as mutually agreed to by the Debtors and the Plan Sponsor shall have been effected and executed;<br><br>• all Exit Financing Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the required parties to the Restructuring Support Agreement), other than such conditions that relate to the effectiveness of the Plan and related transactions;<br><br>• the New Organizational Documents shall be adopted on terms consistent with the Restructuring Support Agreement and this Restructuring Term Sheet;<br><br>• all Allowed Professional Fee Claims of Professionals approved by the Bankruptcy Court shall have been paid in full and the Professional Fee Escrow Account shall have been established and funded pending approval by the Bankruptcy Court;<br><br>• all invoiced professional fees, expenses, and other amounts required to be paid pursuant to the Restructuring Support Agreement, in any Definitive Document, or in any order of the Bankruptcy Court shall have been paid in full in Cash in accordance with Article II.E of the Plan;<br><br>• the Winning Bidder shall deliver the Purchase Price to the Debtors in exchange for the Reorganized Debtors' distribution of the New Common Stock;<br><br>• the Debtors shall have entered into new or amended terms with vendors in a sufficient number and on terms and conditions reasonably necessary to support the Reorganized Debtors' |

| | go-forward business, in each case, that are acceptable to the Debtors and the Plan Sponsor; and<br><br>• any and all requisite governmental, regulatory, and third party approvals and consents shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired or terminated without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on the Restructuring Transactions, the financial benefits of such Restructuring Transactions to the Plan Sponsor, or the ability of the Plan Sponsor to participate in the governance of the Reorganized Debtors. |
|---|---|
| **Other Customary Plan Provisions** | The Plan will provide for other standard and customary provisions, including in respect of the cancellation of existing Company Claims/Interests, the vesting of assets, release of liens, the compromise and settlement of claims, the retention of jurisdiction by the Bankruptcy Court, and the resolution of disputed claims. |
| **Amendments** | This Restructuring Term Sheet may be amended only as permitted by the Restructuring Support Agreement. |

# **EXHIBIT C**

**Plan of Reorganization**

**[Filed on Docket]**

# **EXHIBIT D**

**DIP Credit Agreement**

**[Filed on Docket]**

## EXHIBIT E

**Interim DIP Order**

**[Filed on Docket]**

## EXHIBIT F

### Form of Joinder

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of February 8, 2023 (the "**Agreement**")[1] by and among NBG Intermediate Holdings Inc. and the other Company Parties and the Consenting Parties and agrees to be bound by the terms and conditions of the Agreement as a Consenting Party, and shall be deemed a "**Consenting Party**" and a "**Party**" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement as of the date of this Joinder and any further date specified in the Agreement.

This Joinder shall be governed by the governing law set forth in the Agreement.

Date Executed:

**[JOINDER PARTY]**

_____
Name:
Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| ABL Loans | |
| First Lien Term Loan | |
| Second Lien Term Loan | |
| Interests | |

---

[1]   Capitalized terms not used but not otherwise defined in this Joinder shall have the meanings ascribed to such terms in the Agreement.

## <u>EXHIBIT G</u>

**Form of Transfer Agreement**

The undersigned ("**<u>Transferee</u>**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of February 8, 2023 (the "**<u>Agreement</u>**"),[1] by and among NBG Intermediate Holdings Inc. and the other Company Parties and the Consenting Parties, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**<u>Transferor</u>**"), and agrees to be bound by the terms and conditions of the Agreement to the extent the Transferor was bound, and shall be deemed a "**<u>Consenting Party</u>**" and a "**<u>Party</u>**" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed in this Transfer Agreement.

This Transfer Agreement shall be governed by the governing law set forth in the Agreement.

Date Executed:

**[TRANSFEREE]**

_____
Name:
Title:

Address:

E-mail address(es):


| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| ABL Loans | |
| First Lien Term Loan | |
| Second Lien Term Loan | |
| Interests | |

---

[1]    Capitalized terms not used but not otherwise defined in this Transfer Agreement shall have the meanings ascribed to such terms in the Agreement.

**<u>Exhibit D</u>**

**Valuation Analysis**

[To come]

**Exhibit E**

**Liquidation Analysis**

[To come]

**<u>Exhibit F</u>**

**Disclosure Statement Order**

[Filed at Docket No. 20-1]