**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NIELSEN & BAINBRIDGE, LLC, *et al.*,[1] | ) | Case No. 23-90071 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**NIELSEN & BAINBRIDGE, LLC AND ITS DEBTOR AFFILIATES (TECHNICAL MODIFICATIONS)**

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
J. Machir Stull (TX Bar No. 24070697)
Victoria Argeroplos (TX Bar No. 24105799)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:     (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                jwertz@jw.com
                mstull@jw.com
                vargeroplos@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Brian Schartz, P.C. (TX Bar No. 24099361)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                steven.serajeddini@kirkland.com
                bschartz@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated: June 29, 2023

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/NBGHome.  The Debtors' service address in these chapter 11 cases is: 12303 Technology Boulevard, Suite 950, Austin, TX 78727.

## <u>TABLE OF CONTENTS</u>

Page

**INTRODUCTION** ...................................................................................................................... 1

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES** ............................................................. 1
  A.     *Defined Terms.* .......................................................................................................... 1
  B.     *Rules of Interpretation.* ........................................................................................... 15
  C.     *Computation of Time.* ............................................................................................. 15
  D.     *Governing Law.* ...................................................................................................... 16
  E.     *Reference to Monetary Figures.* ............................................................................. 16
  F.     *Reference to the Debtor or Reorganized Debtors.* .................................................. 16
  G.     *Controlling Document.* ........................................................................................... 16

**ARTICLE II ADMINISTRATIVE AND PRIORITY CLAIMS** ............................................. 16
  A.     *Administrative Claims.* ............................................................................................ 16
  B.     *Professional Fee Claims.* ........................................................................................ 17
  C.     *DIP Claims.* ............................................................................................................ 18
  D.     *Priority Tax Claims.* ............................................................................................... 18
  E.     *Payment of Certain Fees and Expenses.* ................................................................. 18
  F.     *Statutory Fees.* ....................................................................................................... 19

**ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ........................... 19
  A.     *Summary of Classification.* ..................................................................................... 19
  B.     *Treatment of Classes of Claims and Interests.* ...................................................... 20
  C.     *Special Provision Governing Unimpaired Claims.* ................................................ 23
  D.     *Elimination of Vacant Classes.* .............................................................................. 23
  E.     *Voting Classes; Presumed Acceptance by Non-Voting Classes.* ............................. 24
  F.     *Subordinated Claims.* ............................................................................................. 24
  G.     *Controversy Concerning Impairment.* .................................................................... 24
  H.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b)) of the Bankruptcy Code.* ............. 24

**ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN** ..................................... 24
  A.     *Restructuring Transactions.* ................................................................................... 24
  B.     *Commitment of the Sponsor.* ................................................................................... 25
  C.     *[Reserved].* ............................................................................................................ 25
  D.     *Plan Distributions.* ................................................................................................. 25
  E.     *Corporate Existence.* .............................................................................................. 26
  F.     *Vesting of Assets in the Reorganized Debtors.* ....................................................... 26
  G.     *Plan Administrator and the Wind-Down Debtors.* .................................................. 26
  H.     *Cancellation of Notes, Instruments, Certificates, and Other Documents.* .............. 28
  I.     *Corporate Action.* ................................................................................................... 28
  J.     *New Organizational Documents.* ............................................................................ 28
  K.     *Directors and Officers.* ........................................................................................... 29
  L.     *Effectuating Documents; Further Transactions.* .................................................... 29
  M.     *Section 1146 Exemption.* ........................................................................................ 29
  N.     *Preservation of Causes of Action.* ......................................................................... 29
  O.     *Director, Officer, Manager, and Employee Liability Insurance.* ............................ 30
  P.     *[Reserved.]* ........................................................................................................... 31
  Q.     *Employee and Retiree Obligations.* ........................................................................ 31
  R.     *Exemption from Registration Requirements.* .......................................................... 31

**ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ..................... 32
  A.     *Assumption and Rejection of Executory Contracts and Unexpired Leases.* ............ 32

|   |   |   |   |
|---|---|---|---|
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | .................................... | 32 |
| C. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | ............................... | 33 |
| D. | Insurance Policies. | ................................................ | 33 |
| E. | Collective Bargaining Agreement. | .............................................. | 34 |
| F. | Indemnification Obligations. | ................................................ | 34 |
| G. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | ......................... | 34 |
| H. | Reservation of Rights. | ................................................ | 34 |
| I. | Nonoccurrence of Effective Date. | .............................................. | 34 |
| J. | Contracts and Leases Entered into After the Petition Date. | ................................. | 34 |

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS** ................................................ **35**
| | | | |
|---|---|---|---|
| A. | Timing and Calculation of Amounts to Be Distributed. | ....................... | 35 |
| B. | Distribution Agent. | ................................................ | 35 |
| C. | Rights and Powers of Distribution Agent. | ...................................... | 35 |
| D. | Delivery of Distributions. | ........................................ | 35 |
| E. | Manner of Payment. | ................................................ | 36 |
| F. | Compliance with HSR Act. | ...................................... | 36 |
| G. | [Reserved.] | ................................................ | 37 |
| H. | Compliance with Tax Requirements. | ............................. | 37 |
| I. | Allocations. | ................................................ | 37 |
| J. | No Postpetition or Default Interest on Claims. | ................. | 37 |
| K. | Setoffs and Recoupment. | ....................................... | 37 |
| L. | Claims Paid or Payable by Third Parties. | ...................... | 37 |

**ARTICLE VII THE PLAN ADMINISTRATOR** ................................................ **38**
| | | | |
|---|---|---|---|
| A. | The Plan Administrator. | ......................................... | 38 |
| B. | Wind Down. | ................................................ | 39 |
| C. | Exculpation, Indemnification, Insurance & Liability Limitation. | ............................... | 40 |
| D. | Tax Returns. | ................................................ | 40 |

**ARTICLE VIII RESERVES AND ACCOUNTS ADMINISTERED BY THE PLAN ADMINISTRATOR.** ................................................ **40**
| | | | |
|---|---|---|---|
| A. | Establishment of Reserves and Accounts. | ..................... | 40 |
| B. | Undeliverable Distribution Reserve. | .......................... | 41 |
| C. | Wind-Down Account. | ............................................. | 41 |
| D. | Administrative and Priority Claims Reserve. | .................. | 42 |

**ARTICLE IX PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS** .................... **42**
| | | | |
|---|---|---|---|
| A. | Allowance of Claims and Interests. | ............................. | 42 |
| B. | Claims and Interests Administration Responsibilities. | .......... | 42 |
| C. | Estimation of Claims and Interests. | ............................ | 43 |
| D. | [Reserved.] | ................................................ | 43 |
| E. | Adjustment to Claims Without Objection. | ...................... | 43 |
| F. | Time to File Objections to Claims. | ............................. | 43 |
| G. | Disallowance of Claims. | ........................................ | 43 |
| H. | Amendments to Claims; Additional Claims. | .................... | 44 |
| I. | No Distributions Pending Allowance. | .......................... | 44 |
| J. | Distributions After Allowance. | ................................. | 44 |
| K. | No Interest. | ................................................ | 44 |

**ARTICLE X SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ..................... **44**
| | | | |
|---|---|---|---|
| A. | Compromise and Settlement of Claims, Interests, and Controversies. | ................... | 44 |
| B. | Discharge of Claims. | ............................................ | 44 |
| C. | Term of Injunctions or Stays. | .................................. | 45 |
| D. | Release of Liens. | ............................................... | 45 |
| E. | Debtor Release. | ................................................ | 45 |

F.      *Third-Party Release.* .......................................................................................... 47
G.      *Exculpation.* ....................................................................................................... 48
H.      *Injunction.* .......................................................................................................... 48
I.      *Protections Against Discriminatory Treatment.* ............................................... 49
J.      *Reimbursement or Contribution.* ....................................................................... 49
K.      *Document Retention.* .......................................................................................... 50

**ARTICLE XI CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** ................................. **50**
A.      *Conditions Precedent to Confirmation of the Plan.* .......................................... 50
B.      *Conditions Precedent to the Effective Date.* ..................................................... 50
C.      *Waiver of Conditions Precedent.* ....................................................................... 51
D.      *Substantial Consummation.* ............................................................................... 51
E.      *Effect of Non-Occurrence of Conditions to Consummation.* ............................ 52

**ARTICLE XII MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ........... **52**
A.      *Modification of Plan.* ......................................................................................... 52
B.      *Effect of Confirmation on Modifications.* .......................................................... 52
C.      *Revocation or Withdrawal of the Plan.* ............................................................. 52

**ARTICLE XIII RETENTION OF JURISDICTION** ...................................................................... **52**

**ARTICLE XIV MISCELLANEOUS PROVISIONS** ..................................................................... **54**
A.      *Immediate Binding Effect.* ................................................................................. 54
B.      *Additional Documents.* ....................................................................................... 54
C.      *Reservation of Rights.* ........................................................................................ 55
D.      *Successors and Assigns.* ..................................................................................... 55
E.      *Service of Documents.* ........................................................................................ 55
F.      *Term of Injunctions or Stays.* ............................................................................ 56
G.      *Entire Agreement.* .............................................................................................. 56
H.      *Plan Supplement.* ............................................................................................... 56
I.      *Nonseverability of Plan Provisions.* .................................................................. 56
J.      *Votes Solicited in Good Faith.* ........................................................................... 56
K.      *Waiver or Estoppel.* ........................................................................................... 57
L.      *Closing of Chapter 11 Cases.* ........................................................................... 57
M.      *Statutory Committee and Cessation of Fee and Expense Payment* .................... 57

## INTRODUCTION

Nielsen & Bainbridge, LLC, and its debtor affiliates, as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors") propose this joint chapter 11 plan (together with the documents comprising the Plan Supplement, the "Plan") for the resolution of outstanding Claims against, and Interests in, the Debtors. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan constitutes a separate plan for each of the Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

### ARTICLE I
### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

A.    *Defined Terms.*

1.    "*2018 Incremental First Lien Term Loan*" means the secured loans issued in 2018 pursuant to the First Lien Credit Agreement in the aggregate principal amount of $35 million.

2.    "*2020 Incremental First Lien Term Loan*" means the secured loans issued in 2020 pursuant to the First Lien Credit Agreement in the aggregate principal amount of $25 million.

3.    "*ABL Agent*" means Wells Fargo Bank, National Association, in its capacity as administrative agent and collateral agent under the ABL Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the ABL Credit Agreement.

4.    "*ABL Claim*" means any Claim on account of the ABL Facility, including any Prepetition ABL Obligations and ABL Adequate Protection Fees and Expenses (each as defined in the DIP Orders).

5.    "*ABL Credit Agreement*" means that certain credit agreement, dated as of April 26, 2017 (as amended by Amendment No. 1, dated as of July 1, 2019, Amendment No. 2, dated as of April 6, 2021, and Amendment No. 3, dated as of July 9, 2021, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among NBG Intermediate Holdings Inc., as holdings, NBG Acquisition Inc., as the initial borrower, which was merged with and into KNB Holdings Corporation, which survived the merger and became the administrative borrower, the lenders party thereto from time to time, and the ABL Agent.

6.    "*ABL Facility*" means the secured loans issued in 2017 pursuant to the ABL Credit Agreement in the aggregate principal amount of $75 million.

7.    "*ABL Intercreditor Agreement*" means that certain ABL Intercreditor Agreement, dated as of April 27, 2017, among Wells Fargo Bank, National Association, as ABL agent, Deutsche Bank AG New York Branch, as first lien term loan agent, Cortland Capital Market Services LLC, as second lien term loan agent, and each additional term loan debt agent from time to time party thereto (as amended, supplemented, or otherwise modified from time to time).

8.    "*ABL Lenders*" means banks, financial institutions, and other lenders party to the ABL Credit Agreement from time to time.

9.    "*ABL Priority Collateral Net Sale Proceeds*" means the ABL Priority Collateral Sale Proceeds less the amount of Allowed Professional Fee Claims and the operating expenses (including any taxes) of the Wind-Down Debtors, in each case, that are incurred during the Wind Down (or in respect of taxes, for any period incurred).

10.       "*ABL Priority Collateral Sale Proceeds*" means the sum of Cash and Cash equivalents received in connection with the Wind Down of the Wind-Down Debtors' Estates that constitute "ABL Priority Collateral" under the ABL Intercreditor Agreement; *provided* that, for the avoidance of doubt, the ABL Priority Collateral Sale Proceeds shall not include any Cash and Cash equivalents received in connection with the sale of the Debtors' manufacturing and distribution facility in Selma, Alabama, the proceeds of the SKYX Settlement Agreement, or any Retained Causes of Action.

11.       "*Administrative and Priority Claims Reserve*" means a segregated account to be established by the Plan Administrator and funded with the Administrative and Priority Claims Reserve Amount in accordance with Article VIII.D.

12.       "*Administrative and Priority Claims Reserve Amount*" means Cash in the amount of $2.0 million *plus* such additional amounts as may be necessary to satisfy in full all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims that are not otherwise expressly contemplated for satisfaction pursuant to the Wind-Down Budget, which aggregate amount shall be funded into the Administrative and Priority Claims Reserve.

13.       "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date and before the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of the Judicial Code.  For the avoidance of doubt, an Administrative Claim shall not include any Claim for adequate protection for any Holder of an Allowed First Lien Term Loan Claim or an Allowed Second Lien Term Loan Claim.

14.       "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than Professional Fee Claims), which shall be the later of (a) the deadline established by the Bankruptcy Court and (b) the first Business Day that is 30 days following the Effective Date; *provided* that the Administrative Claims Bar Date shall not apply to claims entitled to administrative priority that arise on or after the Petition Date in the ordinary course of the Debtors' businesses.

15.       "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

16.       "*Agent Fees and Expenses*" means, collectively, the First Lien Credit Agreement Agent Fees and Expenses and the Second Lien Credit Agreement Agent Fees and Expenses.

17.       "*Allowed*" means with respect to any Claim, except as otherwise provided herein:  (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Bar Date (or for which a Proof of Claim is not required to be Filed under the Plan, the Bankruptcy Code, or a Final Order of the Court); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) a Claim allowed pursuant to the Plan, any stipulation approved by the Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been Filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or if such an objection is so Filed, such Claim is Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is timely Filed, is not Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court.  Notwithstanding anything to the contrary herein, no Claim of any Person or Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Person or Entity pays in full the amount that it owes the applicable Debtor, Reorganized Debtor, or Wind-Down Debtor, as applicable.  For the avoidance of doubt, a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

2

18.      "*Assumed Executory Contract and Unexpired Lease List*" means the list of Executory Contracts and Unexpired Leases (with proposed cure amounts) that will be either (a) assumed by Reorganized Quoizel, or (b) assumed by the Reorganized Debtors, subject to the consent of the Initial Plan Sponsors, which list shall be included in the Plan Supplement.

19.      "*Assumed Executory Contracts and Unexpired Leases*" means those Executory Contracts and Unexpired Leases to be either (a) assumed by Reorganized Quoizel, or (b) assumed by the Reorganized Debtors, subject to the consent of the Initial Plan Sponsors, as set forth on the Assumed Executory Contract and Unexpired Lease List.

20.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims and Causes of Actions that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

21.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, as applicable to the Chapter 11 Cases.

22.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas or another court having jurisdiction over the Chapter 11 Cases.

23.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of the Judicial Code, 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 11 Cases.

24.      "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be Filed in the Chapter 11 Cases.

25.      "*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

26.      "Carve-Out" means the "Carve-Out" as defined in the DIP Orders.

27.      "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

28.      "*Causes of Action*" means any action, claim, Claim, cause of action, controversy, demand, right, action, Lien, indemnity, Interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

29.      "*Chapter 11 Cases*" means, when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

30.      "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors, whether or not asserted or Allowed.

31.     "*Claims Objection Deadline*" means the deadline for objecting to a Claim, which shall be the date that is the later of (a) one hundred and eighty (180) days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, or by an order of the Bankruptcy Court.

32.     "*Claims Register*" means the official register of Claims maintained by the Solicitation Agent.

33.     "*Class*" means a category of Claims or Interests under section 1122(a) of the Bankruptcy Code.

34.     "*Collective Bargaining Agreement*" means the Collective Bargaining Agreement by and between Dwell & Decor Outdoor, LLC (or its successor), on the one hand, and the Mid-South RWDSU Council, AFL-CIO (or its successors), on the other hand, as the same may have been amended from time to time.

35.     "*Committee*" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases by the U.S. Trustee, pursuant to the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 123], on February 18, 2023.

36.     "*Company Parties*" means NBG Intermediate Holdings Inc., a company incorporated under the laws of the State of Delaware, and each of its Affiliates listed on <u>Exhibit A</u> to the Restructuring Support Agreement, each of which has executed and delivered counterpart signature pages to the Restructuring Support Agreement to counsel to the Consenting Parties.

37.     "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in this Plan, the Restructuring Term Sheet, and the Restructuring Support Agreement.

38.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

39.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and section 1128 of the Bankruptcy Code, including any adjournments thereof, at which the Bankruptcy Court will consider confirmation of the Plan.

40.     "*Confirmation Objection Deadline*" means the date that is seven (7) days prior to the date first set by the Bankruptcy Court for the Confirmation Hearing.

41.     "*Confirmation Order*" means the order of the Bankruptcy Court, consistent with the Restructuring Support Agreement, confirming the Plan under section 1129 of the Bankruptcy Code.

42.     "*Consenting ABL Lenders*" means the holders of, or investment advisors, sub-advisors, or managers of accounts that hold, ABL Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a joinder, or a transfer agreement to counsel to the Company Parties.

43.     "*Consenting First Lien Term Loan Lenders*" means the Holders of, or investment advisors, sub-advisors, or managers of accounts that hold, First Lien Term Loan Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a joinder, or a transfer agreement to counsel to the other Consenting Parties.

44.     "*Consenting Parties*" means, collectively, and as applicable in context, the Sponsor, the Initial Plan Sponsors, the Consenting First Lien Term Loan Lenders, the Consenting Second Lien Term Loan Lenders, and/or the Consenting ABL Lenders.

45.     "*Consenting Second Lien Term Loan Lenders*" means the Holders of, or investment advisors, sub-advisors, or managers of accounts that hold, Second Lien Term Loan Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a joinder, and/or a transfer agreement to counsel to the Company Parties.

46.     "*Consultant*" means, collectively, Hilco Wholesale Solutions, LLC and Hilco Receivables, LLC.

47.     "*Consulting Agreement*" means that certain consulting agreement by and between the Consultant and Nielsen & Bainbridge, LLC and its subsidiaries, as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

48.     "*Consummation*" means the occurrence of the Effective Date.

49.     "*Covered Claims*" means any Claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the DIP Credit Agreement Documents, the DIP Orders, the solicitation of votes on the Plan, the prepetition negotiation and settlement of claims, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place prior to the Effective Date.

50.     "*Covered Party*" means, with respect to, (a) each Related Party of each Debtor or (b) the Committee and its members, each such Entity's current and former Affiliates, including each such Entity's financial advisors, partners, attorneys, accountants, investment bankers, consultants, and other professionals, each in their capacity as such.

51.     "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease to be assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

52.     "*Cure Notice*" means, with respect to an Executory Contract or Unexpired Lease to be assumed under the Plan, a notice that (a) sets forth the proposed amount of the Cure Claim to be paid in connection with the assumption of such Executory Contract or Unexpired Lease; (b) notifies the counterparty to such Executory Contract or Unexpired Lease that such party's Executory Contract or Unexpired Lease may be assumed under the Plan; (c) sets forth the procedures for objecting to the proposed assumption or assumption and assignment of Executory Contracts and Unexpired Leases or the proposed amount of the Cure Claim, including the proposed objection deadline, and for the resolution of any such objection by the Bankruptcy Court; and (d) represents that the proposed assignee (if applicable) has demonstrated its ability to comply with the requirements of adequate assurance of future performance, including the assignee's financial wherewithal and willingness to perform under such Executory Contract or Unexpired Lease.

53.     "*Cure/Assumption Objection Deadline*" means the date that is fourteen (14) days after Filing of the Assumed Executory Contracts and Unexpired Leases List and service of the Cure Notice; *provided* that if any Executory Contract or Unexpired Lease is added to the Assumed Executory Contracts and Unexpired Leases List or proposed to be assigned to a third party, in each case, after the Filing of the initial Assumed Executory Contracts and Unexpired Leases List, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be fourteen (14) days after service of the amended Assumed Executory Contracts and Unexpired Leases List with such modification.

54.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") maintained by or for the benefit of the Debtors for liabilities against any of the Debtors' current or former directors, managers, and officers, and all agreements, documents or instruments relating thereto.

55.     "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article X.F of the Plan.

56.     "*Definitive Documents*" means:  (a) the Restructuring Support Agreement; (b) the Restructuring Term Sheet; (c) the DIP Credit Agreement Documents; (d) the DIP Motion; (e) the DIP Orders; (f) the Exit Financing Documents; (g) the solicitation materials; (h) the Plan; (i) the Disclosure Statement; (j) the Disclosure Statement Motion; (k) the Disclosure Statement Order; (l) the New Organizational Documents; (m) all pleadings Filed by the Debtors in the Chapter 11 Cases (and related orders), including the First Day Pleadings (as defined in the Restructuring Support Agreement); (n) the Plan Supplement; (o) the Confirmation Order; (p) any and all filings with or requests for approvals by any Governmental Body; (q) the Restructuring Transactions Memorandum; and (r) any agreements, instruments, and documents as may be necessary or reasonably desirable to consummate and document the Restructuring Transactions agreed to by the Debtors and the Initial Plan Sponsors.

57.     "*DIP Agent*" means KKR Loan Administration Services LLC, in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

58.     "*DIP Claim*" means any and all Claims arising under, derived from, or based upon the DIP Credit Agreement Documents, the DIP Facility, or the DIP Orders, including all Claims for principal amounts outstanding, interest, fees, expenses, costs, indemnification obligations, reimbursement obligations, and other charges of the DIP Agent and the DIP Lenders arising under or related to the DIP Credit Agreement Documents, the DIP Facility, or the DIP Orders.

59.     "*DIP Credit Agreement*" means that certain senior secured superpriority debtor in possession credit agreement that governs the DIP Facility among KNB Holdings Corporation, as borrower, guarantors party thereto, the DIP Agent, and the DIP Lenders (as it may be amended, supplemented, or otherwise modified from time to time), which shall be consistent in all material respects with the Restructuring Support Agreement and otherwise in form and substance satisfactory to the Initial Plan Sponsors.

60.     "*DIP Credit Agreement Documents*" means the DIP Credit Agreement and any related documents or agreements governing the DIP Facility, which shall be consistent in all material respects with the Restructuring Support Agreement and the DIP Orders and otherwise in form and substance satisfactory to the Initial Plan Sponsors.

61.     "*DIP Facility*" means that certain senior secured, superpriority debtor-in-possession credit facility provided by the DIP Lenders on the terms of, and subject to the conditions set forth in, the DIP Credit Agreement Documents, approved by the DIP Orders, and consistent in all material respects with the Restructuring Support Agreement.

62.     "*DIP Lenders*" means the lenders party to the DIP Credit Agreement from time to time.

63.     "*DIP Motion*" means the motion seeking approval of the DIP Facility.

64.     "*DIP Orders*" means the interim and final orders of the Bankruptcy Court approving the DIP Facility and setting forth the terms on which the Debtors are authorized to use cash collateral [Docket Nos. 67 and 249].

65.     "*Disallowed*" means any Claim that is not Allowed.

66.     "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or modified from time to time in accordance with the Restructuring Support Agreement, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law, as approved by the Disclosure Statement Order [Docket No. 207].

67.     "*Disclosure Statement Motion*" means the motion seeking approval of the Disclosure Statement, the procedures for the solicitation of votes in connection with the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code and the forms of ballots and notices and related relief, together with all exhibits, appendices, supplements, and related documents [Docket No. 70].

68. "*Disclosure Statement Order*" means the order approving the Disclosure Statement [Docket No. 250].

69. "*Disputed*" means, with respect to any Claim, a Claim that is not Allowed or Disallowed.

70. "*Distribution Agent*" means, as applicable, the Reorganized Debtors or the Plan Administrator, or any Entity the Reorganized Debtors or the Plan Administrator, as applicable, select to make or facilitate distributions in accordance with the Plan.

71. "*Distribution Record Date*" means the date for determining which Holders of Allowed Claims are eligible to receive distributions pursuant to the Plan, which shall be the date that the Confirmation Order is entered by the Bankruptcy Court, or such other date as specified in the Confirmation Order.

72. "*DTC*" means The Depository Trust Company.

73. "*Effective Date*" means the date that is the first Business Day on which (a) the Confirmation Order is in effect and not subject to stay, (b) all conditions precedent to the occurrence of the Effective Date set forth in Article XI.B of the Plan have been satisfied or waived in accordance with Article XI.C of the Plan, and (c) the Debtors declare the Plan effective. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

74. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

75. "*ERISA*" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, and any final regulations promulgated and the rulings issued thereunder.

76. "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

77. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; and (b) the Committee and each of its members.

78. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

79. "*Exit Financing*" means the debt instruments to be issued or executed as part of the Exit First Lien Term Loan Facility, the Exit Second Lien Term Loan Facility, and any additional exit financing that may be obtained by Reorganized Quoizel, as determined by the Initial Plan Sponsors.

80. "*Exit Financing Documents*" means, collectively, all agreements, documents, and instruments entered into in connection with the Exit Financing, including the Exit First Lien Term Loan Documents and the Exit Second Lien Term Loan Documents.

81. "*Exit Financing Parties*" means the Exit First Lien Term Loan Facility Lender Parties, the Exit Second Lien Term Loan Facility Lender Parties, and any other lenders that provide any portion of the Exit Financing.

82. "*Exit First Lien Term Loan Credit Agreement*" means the definitive credit agreement governing the Exit First Lien Term Loan Facility, which shall be in form and substance acceptable to Quoizel, the Exit First Lien Term Loan Facility Lender Parties, and the Initial Plan Sponsors.

83. "*Exit First Lien Term Loan Documents*" means, collectively, the Exit First Lien Term Loan Credit Agreement and any and all other documents related thereto, which shall be in form and substance acceptable to Quoizel, the Exit First Lien Term Loan Facility Lender Parties, and the Initial Plan Sponsors.

84.     "*Exit First Lien Term Loan Facility*" means that certain $15 million first priority secured term loan facility to be provided by the Exit First Lien Term Loan Lender Parties to Reorganized Quoizel, in exchange for a like amount of ABL Claims, on terms and conditions acceptable to Quoizel, the Exit First Lien Term Loan Lender Parties, and the Initial Plan Sponsors; *provided* that, to the extent the remaining ABL Claims are not satisfied in full from the Upfront Cash Repayment and the ABL Priority Collateral Net Sale Proceeds by October 31, 2023, then the principal amount of the Exit First Lien Term Loans may be increased by up to $3.75 million at the election of the Exit First Lien Term Loan Facility Lender Parties.

85.     "*Exit First Lien Term Loan Facility Lender Parties*" means the ABL Lenders.

86.     "*Exit First Lien Term Loans*" means the term loans under the Exit First Lien Term Loan Facility provided to Reorganized Quoizel or its designated affiliate pursuant to the Exit First Lien Term Loan Documents.

87.     "*Exit Second Lien Term Loan Credit Agreement*" means the definitive credit agreement governing the Exit Second Lien Term Loan Facility, which shall be in form and substance acceptable to Quoizel and the Required DIP Lenders.

88.     "*Exit Second Lien Term Loan Documents*" means, collectively, the Exit Second Lien Term Loan Credit Agreement and any and all other documents related thereto, which shall be in form and substance acceptable to Quoizel and the Required DIP Lenders.

89.     "*Exit Second Lien Term Loan Facility*" means that certain up to $30 million second priority secured term loan facility to be provided by the Exit Second Lien Term Loan Lender Parties to Reorganized Quoizel or its designated affiliate on terms and conditions acceptable to Quoizel and the Required DIP Lenders, consisting of (a) up to $16.452 million of new money loans and (b) $13.548 million in exchange for a like amount of Allowed DIP Claims (the "*Exit Second Lien Term Loan Facility Exchange Amount*").

90.     "*Exit Second Lien Term Loan Facility Lender Parties*" means the DIP Lenders (or their designated affiliates, managed funds or accounts, or other designees).

91.     "*Exit Second Lien Term Loans*" means the term loans under the Exit Second Lien Term Loan Facility provided to Reorganized Quoizel or its designated affiliate pursuant to the Exit Second Lien Term Loan Documents.

92.     "*Exit Term Loans*" means, collectively, the Exit First Lien Term Loans and the Exit Second Lien Term Loans.

93.     "*File*", "*Filed*", or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

94.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

95.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

96.     "*First Lien Credit Agreement*" means the credit agreement dated as of April 26, 2017, as amended by Amendment No. 1 to First Lien Credit Agreement, dated as of January 2, 2019, and Amendment No. 2 to First Lien Credit Agreement, dated as of April 6, 2020, by and among NBG Acquisition Inc., as initial borrower, NBG Intermediate Holdings Inc., as holdings, the First Lien Term Loan Lenders, and Deutsche Bank AG New York Branch as administrative and collateral agent.

97.      "*First Lien Credit Agreement Agent*" means Deutsche Bank AG New York Branch, in its capacity as administrative and collateral agent under the First Lien Credit Agreement.

98.      "*First Lien Credit Agreement Agent Fees and Expenses*" means all unpaid reasonable and documented fees and out-of-pocket expenses (regardless of whether such fees and expenses were incurred before or after the Petition Date) of the First Lien Credit Agreement Agent, including, without limitation, the reasonable fees and expenses of attorneys or other professionals retained by the First Lien Credit Agreement Agent, in each case that are payable in accordance with the terms of the First Lien Credit Agreement.

99.      "*First Lien Term Loan Claims*" means any Claim on account of First Lien Term Loans or otherwise arising under the First Lien Credit Agreement.

100.     "*First Lien Term Loan Lenders*" means those banks, financial institutions, and other lenders party to the First Lien Credit Agreement from time to time.

101.     "*First Lien Term Loans*" means, collectively, the Initial First Lien Term Loan, the 2018 Incremental First Lien Term Loan, and the 2020 Incremental First Lien Term Loan.

102.     "*General Unsecured Claim*" means any Claim that is not: (a) paid in full prior to the Effective Date; (b) a DIP Claim; (c) an Administrative Claim; (d) a Professional Fee Claim; (e) a Priority Tax Claim; (f) an Other Secured Claim; (g) an Other Priority Claim; (h) an ABL Claim; (i) a First Lien Term Loan Claim; (j) a Second Lien Term Loan Claim; (k) an Intercompany Claim; or (l) a Section 510(b) Claim.

103.     "*General Unsecured Claims Recovery Amount*" means Cash in the amount of $300,000 to be funded into the Wind-Down Account on the Effective Date.

104.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

105.     "*Holder*" means a Person or an Entity holding a Claim or an Interest, as applicable.

106.     "*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

107.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

108.     "*Indemnification Obligations*" means each Debtor's indemnification obligations in place as of the Effective Date, set forth in any of: (a) the organizational documents of the Debtors (including by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, or board resolutions); (b) employment contracts; or (c) an engagement or retention letter as to professional or advisory services.

109.     "*Initial First Lien Term Loan*" means the secured loans issued in 2017 pursuant to the First Lien Credit Agreement in the aggregate principal amount of $260 million.

110.     "*Initial Plan Sponsors*" means the Entities affiliated with Silver Point Capital, L.P. and KKR Credit Advisors (US) LLC that have executed and delivered counterpart signature pages to the Restructuring Support Agreement.

111.     "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

112.     "*Intercompany Interest*" means any Interest in a Debtor other than NBG Topco.

113.     "*Interest*" means any equity security (as defined in Section 101(16) of the Bankruptcy Code) of a Debtor, including any issued, unissued, authorized or outstanding share of common stock, preferred stock, limited

liability company interest, any other equity, ownership, or profits interest, option, warrant, rights, or an agreement to acquire any of the foregoing that existed immediately prior to the Effective Date (whether or not arising under or in connection with any employment agreement).

114.    "*Internal Revenue Code*" means title 26 of the United States Code, 26 U.S.C. §§ 1-9834, as amended from time to time.

115.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

116.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

117.    "*NBG Topco*" means NBG Topco Holdings Inc. or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

118.    "*Net Sale Proceeds*" means the ABL Priority Collateral Net Sale Proceeds and the Non-ABL Priority Collateral Sale Proceeds.

119.    "*New Board*" means the board of directors, board of managers, managing member, general partner, or other governing body of Reorganized Quoizel on and after the Effective Date.

120.    "*New Common Stock*" means the equity interests in Reorganized Quoizel, which may be in the form of common stock, preferred stock, limited liability interests, or other ownership interests and may be issued in one or more classes of each of the foregoing, in each case, as determined by the Debtors and the Initial Plan Sponsors.

121.    "*New Organizational Documents*" means the forms of the certificates or articles of incorporation, limited liability company agreements, bylaws, shareholder agreements, or other formation or governance documents of the Reorganized Debtor, which shall be in form and substance consistent with the approval rights set forth in the Restructuring Support Agreement.

122.    "*Non-ABL Priority Collateral Sale Proceeds*" means the sum of Cash and Cash equivalents received in connection with the Wind Down of the Wind-Down Debtors' Estates that do not constitute "ABL Priority Collateral" under the ABL Intercreditor Agreement, including any Cash and Cash equivalents received in connection with the sale of the Debtors' manufacturing and distribution facility in Selma, Alabama, the proceeds of the SKYX Settlement Agreement, and the Retained Causes of Action.

123.    "*Non-Debtor Subsidiaries*" means all direct and indirect subsidiaries of any Debtor that are not Debtors in these Chapter 11 Cases.

124.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

125.    "*Other Secured Claim*" means any Secured Claim that is not a DIP Claim, ABL Claim, First Lien Term Loan Claim, or Second Lien Term Loan Claim.

126.    "*Paid in Full*" means, with respect to the ABL Claims, the indefeasible repayment in full in Cash of all obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted) under the ABL Facility or the DIP Orders, the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing or cash collateralization of letters of credit, in each case in accordance with the terms of the application ABL Facility loan documents or the DIP Orders.

127.    "*Pension Plan*" means the legacy pension plan or any other pension plan subject to Title IV of ERISA or the minimum funding standards of section 302 of ERISA or section 412 of the Internal Revenue Code, in each case, that is sponsored, maintained, contributed to, or required to be contributed to, by Nielsen &

Bainbridge, LLC and its subsidiaries and affiliates, or under which there may be obligations with respect to current or former employees of Nielsen & Bainbridge, LLC and its subsidiaries and affiliates.

128.    "*Pension Plan Assumption and Assignment Agreement*" means that certain assumption and assignment agreement, by and between Nielsen & Bainbridge, LLC and Belk, Inc., assigning and transferring the Pension Plan to Belk, Inc.

129.    "*Person*" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated association, governmental entity, or political subdivision thereof, or any other entity.

130.    "*Petition Date*" means the date on which each Debtor commenced its Chapter 11 Case.

131.    "*Plan*" means this plan for the Debtors, including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto, as it may be amended or supplemented from time to time, consistent with the approval rights set forth in the Restructuring Support Agreement.

132.    "*Plan Administrator*" means the person or persons acceptable to the Debtors, the Initial Plan Sponsors, and the ABL Agent, to be appointed on the Effective Date, and who will serve as the trustee and administrator for the Wind-Down Debtors as set forth in Article VII of the Plan.

133.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and the Restructuring Support Agreement and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors prior to the Confirmation Hearing to the extent available, and any additional documents Filed prior to the Effective Date, including the following, as applicable:  (a) New Organizational Documents; (b) Exit Financing Documents; (c) the Assumed Executory Contracts and Unexpired Leases List; (d) the  Rejected Executory Contracts and Unexpired Leases List; (e) the Schedule of Retained Causes of Action; (f) a document listing the members of the New Board; (g) the form of Promissory Note; (h) the Restructuring Transactions Memorandum; and (i) the Pension Plan Assumption and Assignment Agreement.

134.    "*Preference Waiver*" means a complete waiver and release of any and all claims, Causes of Action, and other rights against the Holders of Allowed General Unsecured Claims based on claims pursuant to chapter 5 of the Bankruptcy Code, or under similar or related state or federal statutes and common law including fraudulent transfer laws from the Debtors, the Wind-Down Debtors, the Reorganized Debtor, and the Plan Administrator, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities.

135.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

136.    "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in all Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interests under the Plan.

137.    "*Professional*" means a Person or an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

138.    "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been previously paid.

139.     "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors on the Effective Date in an amount equal to the Professional Fee Escrow Amount.

140.     "*Professional Fee Escrow Amount*" means the amount equal to the total estimated amount of Professional Fee Claims.

141.     "*Promissory Note*" means that certain unsecured promissory note issued by Reorganized Quoizel or its designated affiliate in an amount equal to $3,322,851.52 that shall not bear any interest and shall mature six months after the stated maturity of the Exit Second Lien Term Loans.

142.     "*Proof of Claim*" means a proof of Claim Filed in the Chapter 11 Cases by the applicable Bar Date.

143.     "*Quoizel*" means Debtor Quoizel, LLC.

144.     "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to a Class of Claims or Interests, that the Claims or Interests in such Class shall be rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

145.     "*Rejected Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Initial Plan Sponsors, of Executory Contracts and Unexpired Leases that will be rejected pursuant to the Plan, which list shall be included in the Plan Supplement.

146.     "*Related Party*" means, with respect to any Person or Entity, each of, and in each case in its capacity as such, current and former directors, managers, officers, members of the Committee, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors of such Person or Entity and any such Person's or Entity's respective heirs, executors, estates, and nominees. For the avoidance of doubt, the members of each Governing Body are Related Parties of the Debtors.

147.     "*Released Party*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors, (c) the Plan Administrator; (d) the Reorganized Debtor; (e) the Initial Plan Sponsors; (f) the Consenting Parties; (g) the DIP Lenders and the ABL Lenders; (h) the respective agents under the First Lien Credit Agreement, Second Lien Credit Agreement, ABL Credit Agreement, and DIP Credit Agreement; (i) all Holders of Claims; (j) all Holders of Interests; (k) each current and former Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clause (a) through this clause (l); *provided*, *however*, that in each case, an Entity shall not be a Released Party if it:  (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release and such objection is not withdrawn before Confirmation.

148.     "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Plan Administrator; (d) the Reorganized Debtor; (e) the Initial Plan Sponsors; (f) the Consenting Parties; (g) the DIP Lenders and the ABL Lenders; (h) the respective Agents under the First Lien Credit Agreement, Second Lien Credit Agreement, ABL Credit Agreement, and DIP Credit Agreement; (i) all Holders of Claims; (j) all Holders of Interests; (k) each current and former Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clause (a) through this clause (l); *provided*, *however*, that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the release contained in the Plan; or (y) timely objects to the Third Party Release and such objection is not withdrawn before Confirmation.

149.     "*Reorganized Debtors*" means Reorganized Quoizel and the Wind-Down Debtors.

150.     "*Reorganized Quoizel*" means Quoizel, as reorganized pursuant to the Plan, or one or more new entities as determined by the Initial Plan Sponsors.

151.     "*Required DIP Lenders*" means "Required Lenders" as defined in the DIP Credit Agreement.

152.     "*Restructuring*" means the restructuring of the Debtors under chapter 11 of the Bankruptcy Code in accordance with the Restructuring Support Agreement.

153.     "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, by and among the Debtors and certain Holders of Claims and Interests, including all exhibits and schedules attached thereto, as may be amended in accordance with its terms.

154.     "*Restructuring Term Sheet*" means that certain restructuring term sheet, attached as Exhibit B to the Restructuring Support Agreement.

155.     "*Restructuring Transactions*" means, collectively, those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions, that the Debtors, the Initial Plan Sponsors, and the ABL Agent reasonably determine to be necessary to implement the Plan in a manner consistent with the Restructuring Support Agreement, the Restructuring Term Sheet, and the Restructuring Transactions Memorandum, and which shall include the Sponsor causing NBG Topco and NBG PropCo LLC to take all actions necessary to effectuate the Restructuring Transactions in accordance with the Plan and the Restructuring Transactions Memorandum.

156.     "*Restructuring Transactions Memorandum*" means one or more written documents (which may be in the form of a written memorandum or a PowerPoint or similar presentation format) illustrating the various Restructuring Transactions used to effect the Tax Structure, which documents may be amended from time to time prior to the Effective Date in accordance with the Restructuring Support Agreement.

157.     "*Sale Proceeds*" means the ABL Priority Collateral Sale Proceeds and the Non-ABL Priority Collateral Sale Proceeds.

158.     "*Schedule of Retained Causes of Action*" means a schedule of Causes of Action retained by the Debtors, and/or the Reorganized Debtors, as applicable, and filed as part of the Plan Supplement.

159.     "*Second Lien Credit Agreement*" means the credit agreement dated as of April 26, 2017(as amended by Amendment No. 1 to Second Lien Credit Agreement, dated as of April 6, 2020, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof) by and among NBG Acquisition Inc., as initial borrower, NBG Intermediate Holdings Inc., as holdings, the Second Lien Term Loan Lenders, and Cortland Capital Market Services LLC as administrative agent and collateral agent.

160.     "*Second Lien Credit Agreement Agent*" means Cortland Capital Market Services LLC, in its capacity as administrative and collateral agent under the Second Lien Credit Agreement.

161.     "*Second Lien Credit Agreement Agent Fees and Expenses*" means all unpaid reasonable and documented fees and out-of-pocket expenses (regardless of whether such fees and expenses were incurred before or after the Petition Date) of the Second Lien Credit Agreement Agent, including, without limitation, the reasonable fees and expenses of attorneys or other professionals retained by the Second Lien Credit Agreement Agent, in each case that are payable in accordance with the terms of the Second Lien Credit Agreement.

162.     "*Second Lien Term Loan Claim*" means any Claim on account of the Second Lien Term Loans or otherwise arising under the Second Lien Credit Agreement.

163.     "*Second Lien Term Loan Lenders*" means those banks, financial institutions, and other lenders party to the Second Lien Credit Agreement from time to time

164.     "*Second Lien Term Loans*" means the secured loans issued pursuant to the Second Lien Credit Agreement in the aggregate principal amount of $70.0 million.

165.     "*Section 510(b) Claim*" means any Claim arising from:  (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

166.     "*Secured*" means, when referring to a Claim, a Claim:  (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, enforceable, and non-avoidable pursuant to applicable law or by reason of a Bankruptcy Court order, or (b) that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

167.     "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

168.     "*Security*" or "*Securities*" has the meaning set forth in section 2(a)(1) of the Securities Act.

169.     "*SKYX Settlement Agreement*" means that certain letter agreement, dated as of April 20, 2023, between SKYX Platforms Corp. (formerly SQL Technologies Corp.) and Nielsen & Bainbridge, LLC, approved by the Bankruptcy Court on April 27, 2023 [Docket No. 411].

170.     "*Solicitation Agent*" means Omni Agent Solutions, Inc., the noticing, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

171.     "*Sponsor*" means, collectively, Sycamore Partners Management, L.P. and its affiliated investment funds and affiliates and portfolio companies of the foregoing.

172.     "*State and Local Income Returns*" means any and all state and local income or franchise tax returns that include NBG or any of its subsidiaries that utilize federal taxable income as the basis for calculation of tax due.

173.     "*Tail Coverage*" means liability insurance policy coverage for the six-year period following the Effective Date for the benefit of the Debtors' current and former directors, officers, managers, and employees.

174.     "*Tax Law*" means U.S. federal income tax law.

175.     "*Tax Structure*" means the structure of the Restructuring Transactions to provide for a tax-efficient implementation acceptable to the Company Parties and the Initial Plan Sponsor.

176.     "*Third-Party Release*" means the release given by the Releasing Parties to the Released Parties as set forth in Article X.G of the Plan.

177.     "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

178.     "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash.

179.     "*Upfront Cash Repayment*" means an amount of Cash equal to $12.5 million to be distributed to the ABL Lenders pursuant to this Plan.

180.     "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

181.     "*Wind Down*" means the process to wind down, dissolve, and liquidate the Wind-Down Debtors and distribute any remaining assets in accordance with the Plan.

182.    "*Wind-Down Account*" means one or more segregated accounts established by the Plan Administrator in accordance with Article VIII.C.

183.    "*Wind-Down Assets*" means the assets of the Wind-Down Debtors.

184.    "*Wind-Down Budget*" means the budget, attached hereto as **Exhibit A**, in connection with the Wind Down which shall include line items for distributions, fees, and expenses, and shall be in form and substance acceptable to the Initial Plan Sponsors and the ABL Agent.

185.    "*Wind-Down Debtors*" means all the Debtors, or any successor thereto, by merger, consolidation, or otherwise, other than Quoizel or Reorganized Quoizel, on or after the Effective Date.

B.      *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15) references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (18) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however,* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America unless otherwise expressly provided herein.

F.      *Reference to the Debtor or Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## ARTICLE II
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of such Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on: (a) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim.

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Plan Administrator, as applicable, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative

Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors or the Plan Administrator, as applicable, and the requesting party by the Claims Objection Deadline.

B.     *Professional Fee Claims.*

    1.    <u>Final Fee Applications and Payment of Professional Fee Claims</u>.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred before the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. The Plan Administrator shall pay Allowed Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and the Plan Administrator shall fund with Cash equal to the Professional Fee Escrow Amount on the Effective Date.

    2.    <u>Professional Fee Escrow Account</u>.

On the Effective Date, the Plan Administrator shall fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount, which shall be funded by the Wind-Down Debtors, *provided, however,* that to the extent the Wind-Down Debtors do not have sufficient Cash as of the Effective Date to fund the Professional Fee Escrow Account in an amount equal to the Professional Fee Escrow Amount, the Carve-Out shall remain in effect, solely with respect to the Wind-Down Debtors, until such time the Professional Fee Escrow Account is fully funded with the Professional Fee Escrow Amount. The Carve-Out shall not remain in effect with respect to Reorganized Quoizel. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. All funds in the Professional Fee Escrow Account or required to be deposited into the Professional Fee Escrow Account shall not be property of the Estates of the Debtors or of the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Plan Administrator from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors without any further action or order of the Bankruptcy Court. If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be paid by the Debtors or the Wind-Down Debtors.

    3.    <u>Professional Fee Escrow Amount</u>.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than five (5) days before the Effective Date; *provided, however,* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Wind-Down Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

    4.    <u>Post-Confirmation Date Fees and Expenses</u>.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and the Reorganized Debtors, as applicable, shall pay, within ten (10) business days after submission of a detailed invoice to the Debtors or the Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the Professionals of the Debtors or the Reorganized Debtors, as applicable.  If the Debtors or the Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or the Reorganized Debtors, as applicable, or the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

C.    *DIP Claims.*

As of the Effective Date, the DIP Claims shall be Allowed in the full amount outstanding under the DIP Credit Agreement Documents on such date.

Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for all Allowed DIP Claims on the Effective Date (but solely to the extent such Allowed DIP Claim is paid in full on the Effective Date, alternatively such final satisfaction, compromise, settlement, release, and discharge shall occur upon completion of the Wind-Down (or such earlier time as determined by the Plan Administrator if applicable pursuant to clause (ii)), each Holder of an Allowed DIP Claim (which shall include fees and interest) shall receive its *pro rata* share of:  (i) on account of $28.548 million of Allowed DIP Claims, (a) the New Common Stock, (b) the Exit Second Lien Term Loan Facility Exchange Amount, and (c) the Promissory Note; and (ii) on account of the remaining Allowed DIP Claims, following the Effective Date and subject to the completion of the Wind Down (or such earlier time as determined by the Plan Administrator in his or her discretion): (a) the ABL Priority Collateral Net Sale Proceeds (after the remaining ABL Claims have been Paid in Full and the Holders of Allowed General Unsecured Claims receive the General Unsecured Claims Recovery Amount); and (b) the Non-ABL Priority Collateral Sale Proceeds (on a first-priority basis) or, in each case, such other terms as agreed by the Required DIP Lenders.

Upon the satisfaction of the Allowed DIP Claims in accordance with the terms of the Plan, all Liens and security interests securing the DIP Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Person or Entity.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the DIP Facility and the DIP Credit Agreement Documents shall continue in full force and effect (other than, for the avoidance of doubt, any Liens or other security interests terminated pursuant to this section) after the Effective Date with respect to any unsatisfied obligations thereunder, as applicable, including, but not limited to, those provisions relating to the rights of the DIP Agent and the DIP Lenders to expense reimbursement, indemnification, and other similar amounts from the Debtors (which rights shall be fully enforceable against the Reorganized Debtors) and any provisions that may survive termination or maturity of the DIP Facility in accordance with the terms thereof.

D.    *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash from the Administrative and Priority Claims Reserve in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

E.    *Payment of Certain Fees and Expenses.*

The Plan Administrator shall pay in Cash all reasonable and documented fees and expenses of the advisors to the Initial Plan Sponsors, DIP Lenders, ABL Agent, and ABL Lenders, in each case in accordance with the terms and conditions of any applicable agreement with the Debtors, including the DIP Credit Agreement Documents, the Restructuring Support Agreement, and the DIP Orders, without the need for application to or approval of the Bankruptcy Court.

The Debtors and the Wind-Down Debtors (as applicable) shall, in accordance with the Wind-Down Budget, pay the Agent Fees and Expenses (whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise; *provided*, *however*, if the Debtors or the Plan Administrator and the First Lien Credit Agreement Agent or the Second Lien Credit Agreement Agent, as applicable, cannot agree with respect to the reasonableness of the respective Agent Fees and Expenses to be paid to each such party, the reasonableness of any such Fees and Expenses shall be determined by the Bankruptcy Court (with any undisputed amounts to be paid by the Debtors and the Plan Administrator (as applicable) on the Effective Date and any disputed amounts to be escrowed by the Debtors and the Plan Administrator (as applicable)).

F.       *Statutory Fees.*

All monthly reports shall be Filed and all fees due and payable pursuant to section 1930(a) of Title 28 of the United States Code before or after the Effective Date shall be paid by the Debtors, the Plan Administrator, or the Reorganized Debtors, as applicable. Following the Effective Date, the Plan Administrator or the Reorganized Debtors, as applicable, shall pay such fees as they are assessed and come due for each quarter (including any fraction thereof) from the Wind-Down Account and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. The Reorganized Debtors shall remain obligated to pay such quarterly fees to the U.S. Trustee and to File quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.       *Summary of Classification.*

Claims and Interests, except for DIP Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims, are classified as set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim and has not been paid, released, or otherwise satisfied before the Effective Date.

1.       Class Identification.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | ABL Claims | Impaired | Entitled to Vote |
| 4 | First Lien Term Loan Claims | Impaired | Entitled to Vote |
| 5 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| | | | (Presumed to Accept or Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote<br>(Presumed to Accept or Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote<br>(Deemed to Reject) |
| 10 | Interests in NBG Topco | Impaired | Not Entitled to Vote<br>(Deemed to Reject) |

B.      *Treatment of Classes of Claims and Interests.*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

1.      <u>Class 1 – Other Secured Claims</u>

(a)      *Classification*:  Class 1 consists of all Other Secured Claims.

(b)      *Treatment*:  On the Effective Date, each Holder of an Allowed Other Secured Claim shall receive:

(i)      payment in full in Cash in an amount equal to its Allowed Other Secured Claim;

(ii)      the collateral securing its Allowed Other Secured Claim;

(iii)      reinstatement of its Allowed Other Secured Claim; or

(iv)      such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.      <u>Class 2 – Other Priority Claims</u>

(a)      *Classification*:  Class 2 consists of all Other Priority Claims.

(b)      *Treatment*:  On the Effective Date, each Holder of an Allowed Other Priority Claim shall be paid in full in Cash on the Effective Date or in the ordinary course of business with funds from the Administrative and Priority Claims Reserve as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code.

(c)      *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.      Class 3 – ABL Claims

    (a)      *Classification*:  Class 3 consists of all ABL Claims.

    (b)      *Allowance*:  On the Effective Date, the ABL Claims shall be Allowed in the aggregate principal amount of $52.2 million, *plus* accrued and unpaid interest on such principal amount, issued and outstanding letters of credit (in the amount of $3,885,786) and any interest and fees thereon, and other amounts due and owing under the ABL Credit Agreement and the DIP Orders until such time as the ABL Claims are Paid in Full.

    (c)      *Treatment:*  (i) On the Effective Date, each Holder of an Allowed ABL Claim shall receive its *Pro Rata* share of (a) the Upfront Cash Repayment and (b) the Exit First Lien Term Loans, and (ii) on and following the Effective Date, including in accordance with the Wind-Down Budget, each Holder of an Allowed ABL Claim shall receive in respect of its remaining Allowed ABL Claim its *Pro Rata* share of the Net Sale Proceeds; *provided, however*, that in no event shall any Holder of an ABL Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim.

    (d)      *Voting*:  Class 3 is Impaired under the Plan.  Holders of Allowed ABL Claims are entitled to vote to accept or reject the Plan.

4.      Class 4 – First Lien Term Loan Claims

    (a)      *Classification*:  Class 4 consists of all First Lien Term Loan Claims.

    (b)      *Allowance*:  On the Effective Date, the First Lien Term Loan Claims shall be Allowed in the aggregate principal amount of $282 million, *plus* accrued and unpaid interest on such principal amount through the Effective Date and other amounts due and owing under the First Lien Term Loan Credit Agreement, subject to the terms of the DIP Orders, which for the avoidance of doubt does not include adequate protection claims to any Holder of an Allowed First Lien Term Loan Claim.

    (c)      *Treatment*:  Following the Effective Date, each Holder of an Allowed First Lien Term Loan Claim shall receive its *Pro Rata* share of (i) the ABL Priority Collateral Net Sale Proceeds (after the Holders of Allowed General Unsecured Claims receive the General Unsecured Claims Recovery Amount and the Allowed ABL Claims have been Paid in Full and the Allowed DIP Claims have been paid in full) and (ii) the Non-ABL Priority Collateral Sale Proceeds (after the Allowed DIP Claims have been paid in full); *provided, however*, that in no event shall any Holder of a First Lien Term Loan Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim.

    (d)      *Voting*:  Class 4 is Impaired under the Plan.  Holders of First Lien Term Loan Claims are entitled to vote to accept or reject the Plan.

5.      Class 5 – Second Lien Term Loan Claims

    (a)      *Classification*:  Class 5 consists of all Second Lien Term Loan Claims.

    (b)      *Allowance:*  On the Effective Date, the Second Lien Term Loan Claims shall be Allowed in the aggregate principal amount of $73 million, *plus* accrued and unpaid interest on such principal amount through the Effective Date and other amounts due and owing under the Second Lien Term Loan Credit Agreement, subject to the terms of the DIP Orders, which for the avoidance of doubt does not include adequate protection claims to any Holder of an Allowed Second Lien Term Loan Claim.

21

(c)     *Treatment*:  Following the Effective Date, each Holder of an Allowed Second First Lien Term Loan Claim shall receive its *Pro Rata* share of (i) the ABL Priority Collateral Net Sale Proceeds (after the Holders of Allowed General Unsecured Claims receive the General Unsecured Claims Recovery Amount and the Allowed ABL Claims, Allowed DIP Claims, and Allowed First Lien Term Loan Claims have been satisfied in full) and (ii) the Non-ABL Priority Collateral Sale Proceeds (after the Allowed DIP Claims and Allowed First Lien Term Loan Claims have been satisfied in full); *provided*, *however*, that in no event shall any Holder of a Second Lien Term Loan Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim.

(d)     *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed Second Lien Term Loan Claims are entitled to vote to accept or reject the Plan.

6.     <u>Class 6 – General Unsecured Claims</u>

(a)     *Classification*:  Class 6 consists of all General Unsecured Claims against any Debtor.

(b)     *Treatment*:  (i) On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive the Preference Waiver; and (ii) following the Effective Date and after the ABL Claims have been Paid in Full, each Holder of an Allowed General Unsecured Claim shall receive its *Pro Rata* share of the Net Sale Proceeds up to the General Unsecured Claims Recovery Amount (on a first-priority basis).

Each Holder of an Allowed General Unsecured Claim at any of the Wind-Down Debtors shall also receive its *Pro Rata* share of the Net Sale Proceeds after the Allowed ABL Claims are Paid in Full and Allowed DIP Claims, Allowed First Lien Term Loan Claims, and Allowed Second Lien Term Loan Claims are paid in full.

(c)     *Voting*:  Class 6 is Impaired under the Plan.  Holders of General Unsecured Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

7.     <u>Class 7 – Intercompany Claims</u>

(a)     *Classification*:  Class 7 consists of all Intercompany Claims.

(b)     *Treatment*:  On the Effective Date, Intercompany Claims shall be Reinstated, set off, settled, distributed, contributed, cancelled, released, or otherwise addressed at the option of the Reorganized Debtors or the Plan Administrator, as applicable, subject to the consent of the Initial Plan Sponsors.

(c)     *Voting*:  Holders of Intercompany Claims are either Unimpaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

8.     <u>Class 8 – Intercompany Interests</u>

(a)     *Classification*:  Class 8 consists of all Intercompany Interests.

(b)     *Treatment*:  On the Effective Date, Intercompany Interests shall be Reinstated, set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Reorganized Debtors or the Plan Administrator, as applicable, subject to the consent of the Initial Plan Sponsors.

(c) *Voting*:  Holders of Intercompany Interests are either Unimpaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Interests are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

9. <u>Class 9 – Section 510(b) Claims</u>

(a) *Classification*:  Class 9 consists of all Section 510(b) Claims.

(b) *Treatment*:  Following the Effective Date, each Holder of an Allowed Section 510(b) Claim shall receive its *Pro Rata* share of (i) the ABL Priority Collateral Net Sale Proceeds (after the Holders of Allowed General Unsecured Claims receive the General Unsecured Claims Recovery Amount and the Allowed ABL Claims, Allowed DIP Claims, Allowed First Lien Term Loan Claims, and Allowed Second Lien Term Loan Claims have been paid in full) and (ii) the Non-ABL Priority Collateral Sale Proceeds (after the Allowed DIP Claims, Allowed First Lien Term Loan Claims, and Allowed Second Lien Term Loan Claims have been paid in full and Allowed ABL Claims have been Paid in Full); *provided*, *however*, that in no event shall any Holder of a Section 510(b) Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim.

(c) *Voting*:  Class 9 is Impaired.  Holders of Section 510(b) Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

10. <u>Class 10 – Interests in NBG Topco</u>

(a) *Classification*:  Class 10 consists of all Interests in NBG Topco.

(b) *Treatment*:  Following the Effective Date, each Holder of an Allowed Interest in NBG Topco shall receive its *Pro Rata* share of (i) the ABL Priority Collateral Net Sale Proceeds (after the Holders of Allowed General Unsecured Claims receive the General Unsecured Claims Recovery Amount, the Allowed ABL Claims have been paid in full, and the Allowed DIP Claims, Allowed First Lien Term Loan Claims, Allowed Second Lien Term Loan Claims, and Allowed Section 510(b) Claims have been paid in full) and (ii) the Non-ABL Priority Collateral Sale Proceeds (after the Allowed DIP Claims, Allowed First Lien Term Loan Claims, Allowed Second Lien Term Loan Claims, and Allowed Section 510(b) Claims have been paid in full and the Allowed ABL Claims have been Paid in Full).

(c) *Voting*:  Class 10 is Impaired.  Holders of Interests in NBG Topco are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders of Interests in NBG Topco are not entitled to vote to accept or reject the Plan.

C. *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors', the Reorganized Debtors', or the Plan Administrator's rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D. *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.       *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the Holders of such Claims or Interests in such Class.

F.       *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, and subject to the Restructuring Support Agreement and the consent of the Initial Plan Sponsors, the Plan Administrator and the Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

G.       *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

H.       *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b)) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XII hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**ARTICLE IV**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.       *Restructuring Transactions.*

On or after the Confirmation Date, the Debtors and the Reorganized Debtors, in each case with the consent of the Initial Plan Sponsors and the ABL Agent, may take all actions and enter into any transactions as may be necessary or appropriate to effect any Restructuring Transactions, including those set forth in the Restructuring Transaction Memorandum and including:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (1), pursuant to applicable state law; (4) the execution and delivery of the Exit Financing Documents; and (5) all other actions that the applicable Entities determine, with the consent of the Initial Plan Sponsors, to be necessary or appropriate, including making Filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.  Additionally, prior to the Effective Date, the Debtors may take all actions as may be necessary or appropriate to effectuate transactions that are intended to be implemented prior to the Effective Date in accordance with the Restructuring Support Agreement.

B.      *Commitment of the Sponsor.*

The Sponsor shall cooperate to cause NBG Topco and NBG PropCo LLC to take all actions necessary to effectuate the Restructuring Transactions in accordance with the Plan and the Restructuring Transactions Memorandum.

C.      *[Reserved].*

D.      *Plan Distributions.*

Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Person or Entity receiving such distribution or issuance.

    1.      Cash for Distribution.

The Reorganized Debtors shall use (i) the Administrative and Priority Claims Reserve and (ii) the Net Sale Proceeds, as applicable, to fund distributions to Holders of Allowed Claims.

    2.      Issuance and Distribution of the New Common Stock.

The issuance of Securities under the Plan, including the shares of the New Common Stock, shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Quoizel, as applicable, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

At the election of the Initial Plan Sponsors, the New Common Stock may be subject to a stockholders' agreement and/or the holders of New Common Stock may be provided with registration rights, in each case, on the terms and conditions that are mutually acceptable to Reorganized Quoizel and the Initial Plan Sponsors.

    3.      Exit Financing.

On the Effective Date, Reorganized Quoizel and/or its designated affiliate and the Exit First Lien Term Loan Facility Lender Parties shall consummate the Exit First Lien Term Loan Facility on the terms, and subject to the conditions, set forth herein and otherwise acceptable to Reorganized Quoizel and the Exit First Lien Term Loan Facility Lender Parties. On and after the Effective Date, the Exit First Lien Term Loan Documents shall constitute legal, valid, and binding obligations of Reorganized Quoizel and be enforceable in accordance with their respective terms.

On the Effective Date, Reorganized Quoizel and/or its designated affiliate and the Exit Second Lien Term Loan Facility Lender Parties shall consummate the Exit Second Lien Term Loan Facility on the terms, and subject to the conditions, set forth herein and otherwise acceptable to Reorganized Quoizel and the Exit Second Lien Term Loan Facility Lender Parties. On and after the Effective Date, the Exit Second Lien Term Loan Documents shall constitute legal, valid, and binding obligations of Reorganized Quoizel and be enforceable in accordance with their respective terms.

Confirmation shall be deemed approval of the Exit Financing and the Exit Financing Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by Quoizel or Reorganized Quoizel in connection therewith), to the extent not approved by the

Bankruptcy Court previously, and Reorganized Quoizel is authorized to execute and deliver any and all documents necessary or appropriate to consummate the Exit Financing, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person.

On the Effective Date, or as soon as reasonably practicable thereafter, all of the Liens and security interests to be granted in accordance with the Exit Financing Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Financing Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Financing Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law. Reorganized Quoizel and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

E.      *Corporate Existence.*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Reorganized Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed.

F.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or contained in the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action (including, without limitation, all Causes of Action identified in the Schedule of Retained Causes of Action), and any property acquired by any of the Debtors, including Interests held by the Debtors in Non-Debtor Subsidiaries, shall vest in each respective Reorganized Debtor (other than the intellectual property of Design Solutions International, Inc., which shall vest in Reorganized Quoizel), free and clear of all Liens, Claims, Interests, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.      *Plan Administrator and the Wind-Down Debtors.*

1.      <u>Wind-Down Debtors</u>.

On and after the Effective Date, the Wind-Down Debtors shall continue in existence for purposes of (a) liquidating the Wind-Down Assets, (b) making distributions on account of Allowed Claims as provided hereunder, (c) establishing and funding the Administrative and Priority Claims Reserve and the Wind-Down Account, (d) enforcing and prosecuting Claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action that are not the property of the Reorganized Debtors in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (e) filing appropriate tax returns, (f) resolving Disputed Claims, and (g) otherwise administering the Plan.

The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the applicable Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and

(ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

       2.     <u>Plan Administrator</u>.

As set forth below, the Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan and the Confirmation Order.  On the Effective Date, the authority, power, and incumbency of the Persons acting as managers, directors, and officers of the Debtors that will constitute Wind-Down Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors, and shall succeed to the powers of the applicable Debtors' managers, directors, and officers.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors as further described in Article VII hereof.  The Plan Administrator shall have the authority to sell, liquidate, or otherwise dispose of any and all of the Wind-Down Assets without any additional notice to or approval from the Bankruptcy Court, but subject to the Wind-Down Budget and the consent of the ABL Agent and the Initial Plan Sponsors.

       3.     <u>Board of the Wind-Down Debtors</u>.

As of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors that will constitute Wind-Down Debtors shall be dissolved without any further action required on the part of the applicable Debtors or the applicable Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor that will constitute a Wind-Down Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders or members of any such Debtor, or the officers, directors, or managers, as applicable, of any such Debtor.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Wind-Down Debtors with respect to their affairs.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind-down and dissolve any of the Wind-Down Debtors and shall:  (a) File a certificate of dissolution for any of the Wind-Down Debtors, together with all other necessary corporate and company documents, to effect the dissolution of any of the Wind-Down Debtors under the applicable laws of each applicable Wind-Down Debtor's state of formation; (b) complete and File all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Wind-Down Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Wind-Down Debtors or their Estates for any tax incurred during the administration of such Wind-Down Debtor's Chapter 11 Case, as determined under applicable tax laws; and (c) represent the interests of the Wind-Down Debtors before any taxing authority in all tax matters, including any action, suit, proceeding, or audit.

The Filing by the Plan Administrator of any of the Wind-Down Debtors' certificates of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of the Debtors that will constitute Wind-Down Debtors or any of their Affiliates.

       4.     <u>Tax Returns</u>.

After the Effective Date, the Plan Administrator shall complete and file, or cause to be completed and filed, all final or otherwise required federal, state, provincial, and local tax returns for each of the Wind-Down Debtors.

5.      Dissolution of the Wind-Down Debtors.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all his or her duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which the Debtors are formed or any other jurisdiction.  Notwithstanding the foregoing, the Plan Administrator shall retain the authority to take all necessary actions to dissolve the Wind-Down Debtors in, and withdraw the Wind-Down Debtors from, applicable states and provinces to the extent required by applicable law.

H.      *Cancellation of Notes, Instruments, Certificates, and Other Documents.*

On the Effective Date, solely to the extent such Claims and Interests are paid in full, or alternatively upon completion of the Wind-Down, except to the extent otherwise provided in the Plan, all notes, indentures, instruments, certificates, and other documents evidencing Claims and Interests in the Debtors, shall be cancelled, and the obligations of the Debtors or the Reorganized Debtors, and any non-Debtor Affiliates thereunder or in any way related thereto shall be discharged and deemed satisfied in full; *provided*, that notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of, as applicable:  (a) enabling Holders of Allowed Claims under such agreements to receive distributions under the Plan as provided herein and (b) allowing and preserving the rights of any applicable paying agent to (i) make distributions in satisfaction of Allowed Claims under such agreements, (ii) maintain and exercise their respective charging liens against any such distributions, (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in making such distributions, (iv) maintain and enforce any right to indemnification, expense reimbursement, contribution, or subrogation or any other claim or entitlement, (v) exercise their rights and obligations relating to the interests of their holders, and (vi) appear and be heard in these Chapter 11 Cases.

I.      *Corporate Action.*

All actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable:  (1) the implementation of the Restructuring Transactions and all actions contemplated by Article IV.A; (2) the selection of the directors, managers, and/or officers for Reorganized Quoizel; (3) the incurrence of the Exit Financing; (4) [reserved]; (5) the issuance and distribution of New Common Stock, including on the Effective Date; (6) the selection of the Plan Administrator; and (7) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors and the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan or the Restructuring Transactions Memorandum) in the name of and on behalf of the Debtors or the Reorganized Debtors, as applicable, including the Exit Financing Documents, the New Common Stock, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Article IV.I shall be effective notwithstanding any requirements under non-bankruptcy law.

J.      *New Organizational Documents.*

On or immediately before the Effective Date, Quoizel will file the New Organizational Documents with the Secretary of State and/or other applicable authority in its state of incorporation or formation in accordance with the applicable laws of such state of incorporation or formation.  After the Effective Date, Reorganized Quoizel may amend and restate the New Organizational Documents as permitted by the laws of the jurisdiction of formation and the terms of such documents.  The New Organizational Documents will prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.

K.      *Directors and Officers.*

On the Effective Date, the New Board shall consist of such members appointed by the Initial Plan Sponsors. The number and identities of directors or managers on the New Board shall be determined by the Initial Plan Sponsors. On the Effective Date, the terms of the current members of the Debtors' respective boards of directors or managers shall expire, and the New Board will include those directors or managers set forth in the list of directors or managers of Reorganized Quoizel included in the Plan Supplement.  To the extent that any such director, manager, or officer of Reorganized Quoizel is an "insider" under the Bankruptcy Code, the Debtors will disclose the nature of any compensation to be paid to such director, manager, or officer.

L.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Support Agreement, the Restructuring Transactions Memorandum, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, as applicable, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

M.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person or Entity) of property under the Plan or pursuant to:  (1) the sale and liquidation of the Wind-Down Assets, (2) the issuance, distribution, transfer, or exchange of any debt or equity Security, or other interest in the Debtors or Reorganized Debtors; (3) the Restructuring Transactions;  (4) the Restructuring Transactions Memorandum;  (5) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (6) the making, assignment, or recording of any lease or sublease; or (7) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

N.      *Preservation of Causes of Action.*

Subject in all respects to the Preference Waiver, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue any and all respective Causes of Action held by such Entity, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights, as applicable, to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released or exculpated herein (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in Article X of the Plan, which shall be deemed released and waived by the Debtors as of the Effective Date.

The Reorganized Debtors, as applicable, may pursue such Causes of Action in accordance with the best interests of the Reorganized Debtors, as applicable. **No Person or Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.** Unless any Cause of Action against a Person or Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Person or Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.N include any Claim or Cause of Action with respect to, or against, a Released Party or each of the Exculpated Parties.

O.       *Director, Officer, Manager, and Employee Liability Insurance.*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed and assigned to the applicable Reorganized Debtor, all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or before the Petition Date pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors, as applicable, under the Plan as to which no Proof of Claim need be Filed.

On or before the Effective Date, to the extent not already obtained, the Debtors will obtain reasonably sufficient Tail Coverage with coverage on terms no less favorable than the Debtors' existing D&O Liability Insurance Policies and with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing D&O Liability Insurance Policies upon placement.

The Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including any policy providing the Tail Coverage) in effect and all members, managers, directors, and officers of the Debtors who served in such capacity at any time before the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

On and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of its directors, managers, members, trustees, and/or officers in the ordinary course of business.

P.       [Reserved.]

Q.       *Employee and Retiree Obligations.*

The Debtors may, with the consent of the Initial Plan Sponsors, approve, assume, and adopt the Debtors' written contracts, agreements, policies, programs and plans for, among other things, compensation, bonuses, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the Debtors' current and former employees, directors, officers, and managers, including the executive compensation programs and all existing compensation arrangements for the employees of the Debtors.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date all retiree benefits under any plan, fund, or program maintained or established by the Debtors prior to the Petition Date, if any, shall continue to be paid in accordance with applicable law.

On the Effective Date, Debtor Nielsen & Bainbridge, LLC shall be deemed to have assumed and assigned the Pension Plan and any agreements, documents, and instruments related thereto to Belk, Inc. pursuant to the Pension Plan Assumption and Assignment Agreement.

R.       *Exemption from Registration Requirements.*

Pursuant to section 1145 of the Bankruptcy Code or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act and Regulation D thereunder, the offering, issuance and distribution of the New Common Stock as contemplated hereof will be exempt from the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local laws requiring registration.

The shares of New Common Stock to be issued under the Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

The shares of New Common Stock that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder or, solely to the extent section 4(a)(2) of the Securities Act or Regulation D thereunder is not available, any other available exemption from registration under the Securities Act, will be considered "restricted securities", will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

Should Reorganized Quoizel elect to reflect any ownership of the New Common Stock to be issued under the Plan through the facilities of DTC, DTC is authorized to rely solely on the Confirmation Order, and Reorganized Quoizel need not provide any further evidence other than the Plan and the Confirmation Order with respect to the treatment of such New Common Stock under applicable securities laws.  DTC and all other Persons and Entities shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock to be issued under the Plan is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the earlier of ninety (90) days after (i) the Effective Date or (ii) the date on which the Debtors or Reorganized Debtors, as applicable, file the Assumed Executory Contracts and Unexpired Leases List, each Executory Contract and Unexpired Lease, not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is identified on the Assumed Executory Contracts and Unexpired Leases List; (2) is the subject of a motion to assume (or assume and assign) such Executory Contract or Unexpired Lease that is pending on the Confirmation Date; (3) is a contract, release, or other agreement or document entered into in connection with the Plan; or (4) is a directors and officers insurance policy.

Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases List with the consent of the Initial Plan Sponsors or the Plan Administrator, as applicable, (i) to add or remove any Executory Contract or Unexpired Lease to or from the Assumed Executory Contracts and Unexpired Leases List at any time prior to the Confirmation Date, and (ii) to remove any Executory Contract or Unexpired Lease from the Assumed Executory Contracts and Unexpired Leases List at any time through and including ninety (90) days after the Effective Date, which removal shall constitute rejection of the applicable Executory Contract or Unexpired Lease; *provided* that, subject to Article V.C hereof, at any time during such ninety (90)-day period after the Effective Date, the Reorganized Debtors shall remain liable for any and all amounts incurred under any such Executory Contracts and Unexpired Leases on the Assumed Executory Contracts and Unexpired Leases List in the ordinary course of business; *provided further*, that, subject to Article V.C hereof, on the first Business Day that follows such ninety (90)-day period, (i) to the extent any Executory Contracts and Unexpired Leases remain on the Assumed Executory Contracts and Unexpired Leases List, such Executory Contracts and Unexpired Leases shall be deemed Assumed Executory Contracts and Unexpired Leases and the Reorganized Debtors shall pay any and all Cure Claims owing under such Assumed Executory Contracts and Unexpired Leases pursuant to section 365 of the Bankruptcy Code or (ii) to the extent the Reorganized Debtors have filed an amended or otherwise modified Assumed Executory Contracts and Unexpired Leases List, removing any Executory Contract or Unexpired Lease, such Executory Contracts and Unexpired Leases shall be deemed rejected pursuant to section 365 of the Bankruptcy Code. The Debtors and the Reorganized Debtors, as applicable, shall provide notice of any amendments to the Assumed Executory Contracts and Unexpired Leases List to the counterparties to the Executory Contracts or Unexpired Leases affected thereby.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Counterparties to Executory Contracts or Unexpired Leases listed on the Rejected Executory Contracts and Unexpired Leases List shall be served with a notice of rejection of their Executory Contracts and Unexpired Leases substantially in the form approved by the Disclosure Statement Order as soon as reasonably practicable following entry of such order. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within the earliest to occur of (1) thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection or (2) thirty (30) days after notice of any rejection that occurs after the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract**

**or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under an Assumed Executory Contract or Unexpired Lease, as reflected on the Cure Notice, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree, with the consent of the Initial Plan Sponsors.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

Upon the filing of any Plan Supplement containing an amended Assumed Executory Contracts and Unexpired Leases List , theDebtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption or assumption and assignment and proposed amounts of Cure Claims to the applicable third parties.  **Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related cure amount must be Filed, served, and <u>actually</u> <u>received</u> by the Debtors fourteen (14) days following receipt of such Cure Notices.**  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment or cure amount will be deemed to have assented to such assumption or assumption and assignment and cure amount.  Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is removed from the Rejected Executory Contracts and Unexpired Leases List after such 14-day deadline, a Cure Notice of proposed assumption or assumption and assignment and proposed amounts of Cure Claims with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such Executory Contract or Unexpired Lease can be assumed or assumed and assigned.

If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or the Reorganized Debtors, as applicable, may, with the consent of the Initial Plan Sponsors, add such Executory Contract or Unexpired Lease to the Rejected Executory Contracts and Unexpired Leases List, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court**.**

D.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

E.      *Collective Bargaining Agreement.*

The Collective Bargaining Agreement and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, the Reorganized Debtors, as applicable, shall be deemed to have assumed the Collective Bargaining Agreement and any agreements, documents, and instruments related thereto.  All Proofs of Claim Filed for amounts due under the Collective Bargaining Agreement shall be considered satisfied by the agreement and obligation to assume and cure in the ordinary course as provided herein.  On the Effective Date, any Proofs of Claim Filed with respect to the Collective Bargaining Agreement shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Indemnification Obligations.*

The Debtors, Reorganized Quoizel, and the Wind-Down Debtors, as applicable, shall assume the Indemnification Obligations for the Debtors' current and former directors, officers, managers, and employees, and current attorneys, accountants, investment bankers, and other professionals of the Debtors, to the extent consistent with applicable law, and such Indemnification Obligations shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

G.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contracts and Unexpired Leases List, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

I.      *Nonoccurrence of Effective Date.*

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

J.      *Contracts and Leases Entered into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor will be performed by Reorganized Quoizel.

# ARTICLE VI
# PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such Claim becomes an Allowed Claim or Interest) each Holder of an Allowed Claim and Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class and in the manner provided in the Plan.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Interests, distributions on account of any such Disputed Claims or Interests shall be made pursuant to the provisions set forth in Article IX.  Except as otherwise provided in the Plan, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  The Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

B.      *Distribution Agent.*

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Distribution Agent on the Effective Date.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  If the Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Wind-Down Debtors.

C.      *Rights and Powers of Distribution Agent.*

1.      <u>Powers of the Distribution Agent</u>.

The Distribution Agent or its designee shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      <u>Expenses Incurred On or After the Effective Date</u>.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Distribution Agent or its designee on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the Distribution Agent or its designee shall be paid promptly in Cash by the Reorganized Debtors.

D.      *Delivery of Distributions.*

1.      <u>Delivery of Distributions in General</u>.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Distribution Agent: (a) to the signatory set forth on any Proof of Claim or Proof of Interest Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Proof of Interest is Filed or if the Debtors have not been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the applicable Distribution Agent, as appropriate, after the date of any related Proof of Claim or Proof of Interest; or (c) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Subject to this Article VI,

distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Reorganized Debtors, and the Distribution Agent, and any applicable paying agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

The ABL Agent shall be deemed to be the Holders of all ABL Claims for purpose of distributions to be made hereunder, and all distributions on account of such ABL Claims shall be made to the ABL Agent to be distributed in accordance with the terms of the ABL Credit Agreement.

      2.    <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any Holder is returned as undeliverable, no further distribution to such Holder shall be made unless and until the applicable Distribution Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

      3.    <u>Minimum Distributions</u>.

No fractional shares of New Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows:  (a) fractions of one half or greater shall be rounded to the next higher whole number and (b) fractions of less than one half shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

Holders of Allowed Claims entitled to distributions of $25 or less shall not receive distributions, and each such Claim to which this limitation applies shall be discharged pursuant to Article VIII and its Holder is forever barred pursuant to Article X from asserting that Claim against the Reorganized Debtors or their property.

*E.*    *Manner of Payment.*

Except as otherwise set forth herein, all distributions of New Common Stock to Holders of the applicable Allowed Claims under the Plan shall be made by the Distribution Agent on behalf of the Debtors or Reorganized Quoizel, as applicable.  All distributions of Cash to the Holders of the applicable Allowed Claims under the Plan shall be made by the Distribution Agent on behalf of the applicable Debtor or the Reorganized Debtors.  At the option of the Distribution Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

*F.*    *Compliance with HSR Act.*

Any New Common Stock to be distributed under the Plan to an entity required to file a premerger notification and report form under the HSR Act, shall not be distributed until the notification and waiting periods applicable under such Act to such entity have expired or been terminated.

G.      [Reserved.]

H.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, the Distribution Agent, the Plan Administrator, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent, and the Plan Administrator shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Distribution Agent and the Plan Administrator reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

I.      *Allocations.*

Except as otherwise provided herein or in the Wind-Down Budget, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

J.      *No Postpetition or Default Interest on Claims.*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the DIP Orders, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

K.      *Setoffs and Recoupment.*

Unless otherwise provided in the Plan, the DIP Orders, or the Confirmation Order, pursuant to section 553 of the Bankruptcy Code, applicable non-bankruptcy law, or as may be agreed to by the Holder of the Allowed Claim, each Debtor and Reorganized Debtor, as applicable, may set off or recoup any Allowed Claim against the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

L.      *Claims Paid or Payable by Third Parties.*

        1.      <u>Claims Paid by Third Parties.</u>

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim

from a party that is not a Debtor or Reorganized Debtor. To the extent a Holder of a Claim receives a distribution from the Debtors or Reorganized Debtors on account of such Claim and also receives payment from a party that is not a Debtor or Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14)-day grace period specified above until the amount is repaid.

2. _Claims Payable by Third Parties_.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Solicitation Agent without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3. _Applicability of Insurance Policies_.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything herein to the contrary (including Article X), nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII
## THE PLAN ADMINISTRATOR

A.    _The Plan Administrator._

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the amounts set forth in the Administrative and Priority Claims Reserve and the Wind-Down Account in accordance with the Plan, and wind-down the business and affairs of the Debtors (other than Quoizel) and the Wind-Down Debtors, including (all without further order of the Bankruptcy Court): (1) liquidating, receiving, holding, investing, supervising, and protecting the Wind-Down Assets, the Administrative and Priority Claims Reserve, and the Wind-Down Account; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Administrative and Priority Claims Reserve and the Wind-Down Account; (3) making distributions from the Administrative and Priority Claims Reserve and the Wind-Down Account as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (7) administering and paying taxes of the Wind-Down Debtors, including filing or causing to be filed tax returns; (8) representing the interests of the Wind-Down Debtors or their Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (9) complying with the Debtors' (other than Quoizel) and the Wind-Down Debtors' continuing obligations under the Confirmation Order; and (10) exercising such other powers as may be vested in it pursuant to order(s) of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out his or her responsibilities under this Plan and as otherwise provided in the Confirmation Order.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Wind-Down Debtors and the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator, to be chosen by the Initial Plan Sponsors with

the consent of the ABL Agent.  Upon any other vacancy of the Plan Administrator, a permanent or interim successor Plan Administrator shall be chosen by the Initial Plan Sponsors.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor, and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

        1.      Plan Administrator Rights and Powers.

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan and as otherwise provided in the Confirmation Order.  The Plan Administrator shall be the exclusive trustee of the Wind-Down Assets for the purposes of 31 U.S.C. § 3713(b) and  26 U.S.C. § 6012(b)(3), as well as the representative of the Wind-Down Debtors' Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

        2.      Retention of Professionals.

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  On the Effective Date, the Consulting Agreement shall be deemed to have been assigned to, and assumed by, the Wind-Down Debtors, and any modification to the Consulting Agreement shall require the prior written consent of the ABL Agent and the Initial Plan Sponsors.  The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors from the Wind-Down Account upon the monthly submission of statements to the Plan Administrator.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business from the Wind-Down Account (but not subject to the approval of the Bankruptcy Court).

        3.      Compensation of the Plan Administrator.

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement and paid out of the Wind-Down Account.  Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Account if such amounts relate to any actions taken hereunder.

        4.      Plan Administrator Expenses.

All costs, expenses, and obligations incurred by the Plan Administrator in administering this Plan, the Wind-Down Debtors, or in any manner connected, incidental, or related thereto, in effecting distributions from the Wind-Down Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid from the Wind-Down Account.

The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  However, if the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Account.

*B.*     *Wind Down.*

On and after the Effective Date, the Plan Administrator will be authorized to carry out his or her responsibilities under this Plan and any applicable orders of the Bankruptcy Court, including the power and authority to take any action necessary to wind down and dissolve the Wind-Down Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall: (1) cause the Wind-Down Debtors to comply with, and abide by, the terms of the Plan, Confirmation Order, and any other documents contemplated thereby (including the Consulting Agreement); (2) to the extent applicable, File a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Wind-Down Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan (but subject to the Wind-Down Budget). Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders or board of directors or managers of any Wind-Down Debtor.

The Wind Down Budget shall include a 13-week statement of the Wind-Down Debtors' anticipated cash receipts and disbursements for the first 13 weeks following the Confirmation Date, set forth on a weekly basis, including the anticipated uses and distributions from the cash receipts. No later than two weeks after the Effective Date, the Plan Administrator shall provide the Initial Plan Sponsors and the ABL Agent an updated 13-week statement for the subsequent 13-week period, which proposed budget shall modify and supersede any prior Wind-Down Budget upon the approval of the Initial Plan Sponsors and the ABL Agent. No later than the Wednesday of each week after the Confirmation Date, the Plan Administrator shall deliver to the Initial Plan Sponsors and the ABL Agent a report which shall include: (i) a detailed listing of disbursements from the prior week, (ii) actual cash flow results from the prior week and variance form forecasting (standard summary on cash receipts and disbursements) with an explanation of the variances, and (iii) an accounts payable aging report.

C.     *Exculpation, Indemnification, Insurance & Liability Limitation.*

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors. The Plan Administrator may obtain, at the expense of the Wind-Down Debtors and with funds from the Wind-Down Account, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

D.     *Tax Returns.*

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Wind-Down Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Wind-Down Debtor or its Estate for any tax incurred during the administration of such Wind-Down Debtor's Chapter 11 Case, as determined under applicable tax laws.

**ARTICLE VIII**
**RESERVES AND ACCOUNTS ADMINISTERED BY THE PLAN ADMINISTRATOR**

A.     *Establishment of Reserves and Accounts.*

The Plan Administrator shall establish the Administrative and Priority Claims Reserve and the Wind-Down Account (which may be effected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the Plan Administrator). The Administrative and Priority Claims Reserve shall be funded in the amount of the Administrative and Priority Claims Reserve Amount. The Wind-Down Account shall be funded with the Sale Proceeds as the Plan Administrator liquidates the Wind-Down Debtors.

B.      *Undeliverable Distribution Reserve.*

1.      <u>Deposits</u>.

If a distribution to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed, such distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Article VIII.B.2 of this Plan.

2.      <u>Forfeiture</u>.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an undeliverable or unclaimed distribution within three (3) months after the first distribution is made to such Holder shall be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such Claim for the undeliverable or unclaimed distribution against any Debtor, any Estate, the Plan Administrator, the Wind-Down Debtors, Reorganized Quoizel, or their respective properties or assets.  In such cases, any Cash or other property held by the Plan Administrator in the Undeliverable Distribution Reserve for distribution on account of such Claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, shall become the property of the applicable Wind-Down Debtor, or Reorganized Quoizel notwithstanding any federal or state escheat laws to the contrary, without any further action or order of the Court.

3.      <u>Disclaimer</u>.

The Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to attempt to locate any Claim Holder; *provided* that in his or her sole discretion, the Plan Administrator may periodically publish notice of unclaimed distributions.

4.      <u>Distribution from Reserve</u>.

Within fifteen (15) Business Days after the Holder of an Allowed Claim satisfies the requirements of this Plan, such that the distribution(s) attributable to its Claim is no longer an undeliverable or unclaimed distribution (provided that satisfaction occurs within the time limits set forth in this Article VIII.B), the Plan Administrator shall distribute out of the Undeliverable Distribution Reserve the amount of the undeliverable or unclaimed distribution attributable to such Claim.

C.      *Wind-Down Account.*

On the Effective Date, the Plan Administrator shall establish the Wind-Down Account.  As the Plan Administrator administers the Wind Down of the Wind-Down Debtors, he or she shall deposit all ABL Priority Collateral Sale Proceeds, Non-ABL Priority Collateral Sale Proceeds, and any other proceeds from the Wind Down of the Wind-Down Debtors into the Wind-Down Account as and when such proceeds are obtained, subject to the Carve-Out.  The Wind-Down Account shall be used by the Plan Administrator to satisfy the expenses of the Wind-Down Debtors and the Plan Administrator and fund distributions to Holders of Claims as set forth in the Plan and the Wind-Down Budget; *provided* that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents of the Wind-Down Debtors shall constitute expenses of the Wind-Down Debtors and shall be paid from the Wind-Down Account.  Any amount remaining in the Wind-Down Account after the payment of all expenses of the Wind-Down Debtors and the Plan Administrator, including all professional fees (including Professional Fee Claims), and the dissolution of the Wind-Down Debtors shall constitute Net Sale Proceeds and be distributed to Holders of Claims pursuant to the terms of the Plan; *provided*, *however*, that to the extent the Plan Administrator determines that the value of the remaining assets in the Wind-Down Account is insufficient to justify the administrative cost of effecting such distribution, the Plan Administrator may distribute such assets to a charity of his or her selection..  In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

D.       *Administrative and Priority Claims Reserve.*

On the Effective Date, the Plan Administrator shall establish the Administrative and Priority Claims Reserve by depositing Cash in the amount of the Administrative and Priority Claims Reserve Amount into the Administrative and Priority Claims Reserve (and the Plan Administrator shall deposit Cash into the Administrative and Priority Claims Reserve from the Wind-Down Account or withdraw Cash from the Administrative and Priority Claims Reserve and deposit into the Wind-Down Account if the Administrative and Priority Claims Reserve Amount changes at any time). The Administrative and Priority Claims Reserve Amount shall be used to pay Holders of Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Administrative Claims (other than Professional Fee Claims or DIP Claims), and Allowed Other Secured Claims in full. To the extent any of the foregoing Allowed Claims to be paid pursuant to the Administrative and Priority Claims Reserve are expressly contemplated for payment by the Wind-Down Budget, such amounts shall not be deposited in the Administrative and Priority Claims Reserve and shall be paid as contemplated by the Wind-Down Budget.

If all or any portion of any such Claim shall become a Claim that is not Allowed, then the amount on deposit in the Administrative and Priority Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Administrative and Priority Claims Reserve, shall remain in the Administrative and Priority Claims Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Administrative and Priority Claims Reserve is sufficient to ensure that all Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Administrative Claims, or other Allowed Other Secured Claims will be paid in accordance with the Plan, without any further action or order of the Court. Any amounts remaining in the Administrative and Priority Claims Reserve after payment of all Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Administrative Claims, or other Allowed Other Secured Claims (or any amount in excess of that reasonably needed to be reserved for any Disputed Claims) shall promptly be transferred to the Wind-Down Account until such time as the Wind-Down Debtors are dissolved in accordance with the provisions herein.

## ARTICLE IX
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

A.       *Allowance of Claims and Interests.*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B.       *Claims and Interests Administration Responsibilities.*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors, as applicable, shall have the exclusive authority to (1) File, withdraw, or litigate to judgment any objections to Claims; (2) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (3) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (4) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, the Reorganized Debtors, as applicable, shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Claim or Interest, including the Causes of Action retained pursuant to Article IV.N of the Plan.

C.        *Estimation of Claims and Interests.*

Before or after the Effective Date, the Debtors, Reorganized Quoizel, and the Wind-Down Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  If the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Wind-Down Debtor or Reorganized Quoizel, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.        *[Reserved.]*

E.        *Adjustment to Claims Without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors, as applicable, without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.        *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the Claims Objection Deadline.

G.        *Disallowance of Claims.*

Except as otherwise provided herein or in the Confirmation Order, any Claims held by an Entity from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f),  522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable.  All Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein or as agreed to by Reorganized Quoizel or the Plan Administrator, any and all Claims for which Proofs of Claim have not been Filed or were Filed after the Bar Date, except for Holders of Claims not required to File Proofs of Claim under the Bar Date Order, shall be deemed Disallowed and such Proofs of Claim expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any**

**distributions on account of such Claims, unless a late Proof of Claim is been deemed timely Filed by a Final Order.**

H.      *Amendments to Claims; Additional Claims.*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or Reorganized Quoizel or the Plan Administrator, as applicable, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

I.      *No Distributions Pending Allowance.*

Notwithstanding any other provision hereof, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

J.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

K.      *No Interest.*

Interest shall not accrue or be paid on any Disputed Claim during the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE X
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, Reorganized Quoizel or the Plan Administrator, as applicable, may compromise and settle Claims, Interests, and Causes of Action.

B.      *Discharge of Claims.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (solely to the extent such Claims are paid in full or, alternatively, upon completion of the Wind-Down), Interests (solely to the extent such Interests are satisfied in full or, alternatively, upon completion

of the Wind-Down), and Causes of Action of any nature whatsoever, including any interest accrued from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors (or Affiliates of a Debtor as such default or "event of default" applies to a Debtor) with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

D.      *Release of Liens.*

**Subject in all instances to the Wind Down and except (1) with respect to the Liens securing the Exit Financing, including the Exit First Lien Term Loan Credit Agreement and the Exit Second Lien Term Loan Credit Agreement, and any other financing created pursuant to the Exit Financing Documents, and (2) as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates and, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, and the Holders (and the applicable agents of such Holders) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Wind-Down Debtor or Reorganized Quoizel, as applicable, and their successors and assigns.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has Filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and Reorganized Quoizel and the Plan Administrator,  as applicable, shall be entitled to make any such filings or recordings on such Holder's behalf.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

E.      *Debtor Release.*

**Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors**

under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, Reorganized Quoizel, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of the Debtors, Reorganized Quoizel, the Wind-Down Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, Reorganized Quoizel, the Wind-Down Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, Reorganized Quoizel, the Wind-Down Debtor, their Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors, Reorganized Quoizel, or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors by Released Parties other than the Consenting Parties), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, and related prepetition transactions, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, any other Definitive Document, or any Restructuring Transactions, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), any other Definitive Document, or any Restructuring Transactions, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions, or the distribution of property pursuant to the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause, the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any Causes of Action identified in the Schedule of Retained Causes of Action, and (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or Agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Financing Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to

any of the Debtors, Reorganized Quoizel, the Wind-Down Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

F.    *Third-Party Release.*

Notwithstanding anything contained in this Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permitted under applicable law, each Released Party (other than the Debtors, Reorganized Quoizel, or the Wind-Down Debtors) is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each and all of the Releasing Parties (other than the Debtors, Reorganized Quoizel, or the Wind-Down Debtors), from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the foregoing Entities, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, Reorganized Quoizel, the Wind-Down Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, Reorganized Quoizel, the Wind-Down Debtors, or their Estates or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors, Reorganized Quoizel, or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before and during the Chapter 11 Cases, any other Definitive Document, or any Restructuring Transactions, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documentation, the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, any other Definitive Document, or any Restructuring Transactions, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property pursuant to the Restructuring Transactions and/or the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to

implement the Plan, including the Exit Financing, the Exit Financing Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

G.     Exculpation.

Notwithstanding anything contained in this Plan to the contrary, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or Third-Party Release, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), any other Definitive Document, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Exit Financing, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

H.     Injunction.

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests or Causes of Action or liabilities that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, Reorganized Quoizel, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties:  (i) commencing or continuing in any manner any action or

other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities released or settled pursuant to the Plan.

By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth above.

The injunctions set forth above shall extend to any successors of the Debtors, Reorganized Quoizel, or the Wind-Down Debtors, the Released Parties, and the Exculpated Parties and their respective property and interests in property. No Person or Entity may commence or pursue a Claim or Cause of Action or Covered Claim, as applicable, of any kind against the Debtors, Reorganized Quoizel, the Wind-Down Debtors, the Exculpated Parties, the Released Parties, or the Covered Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action or Covered Claim, as applicable, subject to Article X.E, Article X.F, and Article X.G hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action or Covered Claim, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Quoizel, Wind-Down Debtor, Exculpated Party, Released Party, or Covered Party, as applicable.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.

I.      *Protections Against Discriminatory Treatment.*

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor or any Entity with which any Reorganized Debtor has been or is associated, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom the Reorganized Debtors have been associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

J.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent, or (2) the relevant Holder of a Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

K.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the applicable Reorganized Debtor.

## ARTICLE XI
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A.      *Conditions Precedent to Confirmation of the Plan.*

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to Article XI.C of the Plan:

1.      the Bankruptcy Court shall have entered the Disclosure Statement Order;

2.      the Bankruptcy Court shall have entered the Confirmation Order; and

3.      the Confirmation Order shall:

(a)      authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(b)      decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(c)      authorize the Debtors, Reorganized Quoizel, the Wind-Down Debtors, and the Plan Administrator, as applicable/necessary, to, among other things: (i) implement the Restructuring Transactions; (ii) issue and distribute the New Common Stock pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act and Regulation D thereunder, or other exemption from such registration or pursuant to one or more registration statements; (iii) make all distributions and issuances as required under the Plan, including the New Common Stock; (iv) execute and deliver the Exit Financing Documents and to perform their obligations thereunder; and (v) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement;

(d)      provide that, pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, if applicable, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

(e)      contain the release, injunction, and exculpation provisions contained in this Plan.

B.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article XI.C of the Plan:

1.      the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

2.      the Bankruptcy Court shall have entered the DIP Orders, which shall be in full force and effect;

3.   the Definitive Documents shall (i) be consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights set forth therein and (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties;

4.   the Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall not have been reversed, stayed, modified, or vacated on appeal;

5.   all actions, documents, and agreements necessary to implement and consummate the Plan, as mutually agreed to by the Debtors and the Initial Plan Sponsors shall have been effected and executed;

6.   all Exit Financing Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the required parties to the Restructuring Support Agreement), other than such conditions that relate to the effectiveness of the Plan and related transactions;

7.   the Upfront Cash Repayment shall have been distributed to the ABL Agent;

8.   the New Organizational Documents shall be adopted on terms consistent with the Restructuring Support Agreement and the Restructuring Term Sheet;

9.   Debtor Nielsen & Bainbridge, LLC shall have assumed and assigned the Pension Plan and any agreements, documents, and instruments related thereto to Belk, Inc. pursuant to the Pension Plan Assumption and Assignment Agreement;

10.  all Allowed Professional Fee Claims of Professionals approved by the Bankruptcy Court shall have been paid in full and the Professional Fee Escrow Account shall have been established and funded pending approval by the Bankruptcy Court in accordance with the Plan; and

11.  any and all requisite governmental, regulatory, and third party approvals and consents shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired or terminated without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on the Restructuring Transactions, the financial benefits of such Restructuring Transactions to the Initial Plan Sponsors, or the ability of the Initial Plan Sponsors to participate in the governance of the Reorganized Quoizel.

C.   *Waiver of Conditions Precedent.*

The Debtors, with the consent of the Initial Plan Sponsors, solely to the extent consistent with the approval rights set forth in the Restructuring Support Agreement, and except for the condition set forth in Articles IX.B.8, may waive any of the conditions to Confirmation or the Effective Date set forth in Article XI.A or Article XI.B of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan; *provided*, *however*, that any waiver with respect to the conditions set forth in Article XI.B(6)–(7) or any modification to the Wind-Down Budget or Wind Down shall be subject to the consent of the ABL Agent.

D.   *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

E.      *Effect of Non-Occurrence of Conditions to Consummation.*

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (2) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

## ARTICLE XII
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification of Plan.*

Subject to the limitations contained in the Plan and consistent with the approval rights set forth in the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the Restructuring Support Agreement, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall constitute approval of all permitted modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date with the consent of the Initial Plan Sponsors.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XIII
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Confirmation Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to any Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, 1141(c), or 1146(a) of the Bankruptcy Code;

10.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

12.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

13.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article X hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

14.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article IX hereof;

15.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

17.       adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

18.       consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.       determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.       hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.       hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

22.       enforce all orders previously entered by the Bankruptcy Court;

23.       hear any other matter not inconsistent with the Bankruptcy Code;

24.       enter an order or Final Decree concluding or closing the Chapter 11 Cases; and

25.       enforce the injunction, release, and exculpation provisions set forth in Article X hereof.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

A.       *Immediate Binding Effect.*

Subject to Article XI.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.       *Additional Documents.*

On or before the Effective Date, and with the consent of the Initial Plan Sponsors, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement.  The Debtors and the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

D.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E.      *Service of Documents.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Nielsen & Bainbridge, LLC<br>12303 Technology Boulevard<br>Suite 950<br>Austin, Texas 78727<br>Attention: Hope Margala<br>Email: hmargala@nbg-home.com | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Facsimile: (212) 446-4900<br>Attention: Joshua A. Sussberg, P.C., Steven N. Serajeddini, P.C., and Brian Schartz, P.C.<br>Email: joshua.sussberg@kirkland.com,<br>steven.serajeddini@kirkland.com<br>bschartz@kirkland.com |
| **United States Trustee** | **Counsel to the First Lien Term Loan Lenders** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001<br>Attention: Dennis F. Dunne and Matthew L. Brod<br>E-mail: ddunne@milbank.com<br>mbrod@milbank.com |
| **Counsel to the Initial Plan Sponsors** | **Counsel to the Second Lien Term Loan Lenders** |
| Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001<br>Attention: Dennis F. Dunne and Matthew L. Brod<br>E-mail: ddunne@milbank.com<br>mbrod@milbank.com | Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001<br>Attention: Dennis F. Dunne and Matthew L. Brod<br>E-mail: ddunne@milbank.com<br>mbrod@milbank.com |

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to Entities that continue to receive documents pursuant to Bankruptcy Rule 2002 requiring such Entity to File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.       *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

G.       *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

H.       *Plan Supplement.*

All documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the Plan Supplement has been Filed, copies of the documents contained therein shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from https://omniagentsolutions.com/NBGHome or the Bankruptcy Court's website at www.txsb.uscourts.gov/bankruptcy. Unless otherwise ordered by the Bankruptcy Court, to the extent any document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

I.       *Nonseverability of Plan Provisions.*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or the Reorganized Debtors', as applicable, and the Initial Plan Sponsors' consent, *provided*, that any such deletion or modification must be consistent with the Restructuring Support Agreement; and (3) nonseverable and mutually dependent.

J.       *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, no such parties, individuals, or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

K.      *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

L.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M.      *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, the Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred, other than fees incurred on or after the Effective Date, by the Committee and its Professionals.  The Reorganized Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committee after the Effective Date.

Dated:  June 29, 2023

NIELSEN & BAINBRIDGE, LLC

By: *Amy Lee*
Name:  Amy Lee
Title:   Chief Transformation Officer

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NIELSEN & BAINBRIDGE, LLC, *et al.*,[1] | ) Case  No.  23-90071 |
| | ) (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**~~OF~~ NIELSEN & BAINBRIDGE, LLC AND ITS DEBTOR AFFILIATES (TECHNICAL MODIFICATIONS)**

| | |
|---|---|
| **JACKSON WALKER LLP** | **KIRKLAND & ELLIS LLP** |
| Matthew D. Cavenaugh (TX Bar No. 24062656) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Jennifer F. Wertz (TX Bar No. 24072822) | Joshua A. Sussberg, P.C. (admitted *pro hac vice*) |
| J. Machir Stull (TX Bar No. 24070697) | Steven N. Serajeddini, P.C. (admitted *pro hac vice*) |
| Victoria Argeroplos (TX Bar No. 24105799) | Brian Schartz, P.C. (TX Bar No. 24099361) |
| 1401 McKinney Street, Suite 1900 | 601 Lexington Avenue |
| Houston, TX 77010 | New York, New York 10022 |
| Telephone: (713) 752-4200 | Telephone: (212) 446-4800 |
| Facsimile: (713) 752-4221 | Facsimile: (212) 446-4900 |
| Email: mcavenaugh@jw.com | Email: joshua.sussberg@kirkland.com |
| jwertz@jw.com | steven.serajeddini@kirkland.com |
| mstull@jw.com | ~~brian.b~~schartz@kirkland.com |
| vargeroplos@jw.com | |

*Co-Counsel to the Debtors*
*and Debtors in Possession*

*Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated:  June 2~~09~~, 2023

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/NBGHome.  The Debtors' service address in these chapter 11 cases is:  12303 Technology Boulevard, Suite 950, Austin, TX 78727.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................................ **1**

**ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES** .................................................. **1**
A.   *Defined Terms.* ........................................................................................................ 1
B.   *Rules of Interpretation.* ......................................................................................... 15
C.   *Computation of Time.* ........................................................................................... 15
D.   *Governing Law.* ...................................................................................................... 15~~6~~
E.   *Reference to Monetary Figures.* ........................................................................... 16
F.   *Reference to the Debtor or Reorganized Debtors.* ............................................. 16
G.   *Controlling Document.* .......................................................................................... 16

**ARTICLE II ADMINISTRATIVE AND PRIORITY CLAIMS** .......................................... **16**
A.   *Administrative Claims.* .......................................................................................... 16
B.   *Professional Fee Claims.* ....................................................................................... 17
C.   *DIP Claims.* ............................................................................................................. 18
D.   *Priority Tax Claims.* .............................................................................................. 18
E.   *Payment of Certain Fees and Expenses.* .............................................................. 18
F.   *Statutory Fees.* ........................................................................................................ 19

**ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** .... **19**
A.   *Summary of Classification.* .................................................................................... 19
B.   *Treatment of Classes of Claims and Interests.* .................................................... 20
C.   *Special Provision Governing Unimpaired Claims.* ............................................. 23
D.   *Elimination of Vacant Classes.* ............................................................................ 23
E.   *Voting Classes; Presumed Acceptance by Non-Voting Classes.* ....................... 23~~4~~
F.   *Subordinated Claims.* ............................................................................................ 24
G.   *Controversy Concerning Impairment.* ................................................................. 24
H.   *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b)) of the Bankruptcy Code.* .... 24

**ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN** .................................. **24**
A.   *Restructuring Transactions.* .................................................................................. 24
B.   *Commitment of the Sponsor.* ................................................................................. 24~~5~~
C.   *[Reserved].* .............................................................................................................. 25
D.   *Plan Distributions.* ................................................................................................. 25
E.   *Corporate Existence.* ............................................................................................. 26
F.   *Vesting of Assets in the Reorganized Debtors.* .................................................... 26
G.   *Plan Administrator and the Wind-Down Debtors.* .............................................. 26
H.   *Cancellation of Notes, Instruments, Certificates, and Other Documents.* ........ 28
I.   *Corporate Action.* .................................................................................................. 28
J.   *New Organizational Documents.* .......................................................................... 28
K.   *Directors and Officers.* .......................................................................................... 28~~9~~
L.   *Effectuating Documents; Further Transactions.* ................................................. 29
M.   *Section 1146 Exemption.* ....................................................................................... 29
N.   *Preservation of Causes of Action.* ........................................................................ 29
O.   *Director, Officer, Manager, and Employee Liability Insurance.* ....................... 30
P.   *[Reserved.]* .............................................................................................................. 30~~1~~
Q.   *Employee and Retiree Obligations.* ...................................................................... 30~~1~~
R.   *Exemption from Registration Requirements.* ....................................................... 31

**ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .......... **3~1~2**
    A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases.* .......... 3~1~2
    B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases.* .......... 32
    C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.* .......... 3~2~3
    D.    *Insurance Policies.* .......... 33
    E.    *Collective Bargaining Agreement.* .......... 33~4~
    F.    *Indemnification Obligations.* .......... 33~4~
    G.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.* .......... 33~4~
    H.    *Reservation of Rights.* .......... 34
    I.    *Nonoccurrence of Effective Date.* .......... 34
    J.    *Contracts and Leases Entered into After the Petition Date.* .......... 34

**ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS** .......... **3~4~5**
    A.    *Timing and Calculation of Amounts to Be Distributed.* .......... 3~4~5
    B.    *Distribution Agent.* .......... 3~4~5
    C.    *Rights and Powers of Distribution Agent.* .......... 3~4~5
    D.    *Delivery of Distributions.* .......... 35
    E.    *Manner of Payment.* .......... 36
    F.    *Compliance with HSR Act.* .......... 36
    G.    *[Reserved.]* .......... 36~7~
    H.    *Compliance with Tax Requirements.* .......... 36~7~
    I.    *Allocations.* .......... 36~7~
    J.    *No Postpetition or Default Interest on Claims.* .......... 36~7~
    K.    *Setoffs and Recoupment.* .......... 36~7~
    L.    *Claims Paid or Payable by Third Parties.* .......... 37

**ARTICLE VII THE PLAN ADMINISTRATOR** .......... **3~7~8**
    A.    *The Plan Administrator.* .......... 3~7~8
    B.    *Wind Down.* .......... 39
    C.    *Exculpation, Indemnification, Insurance & Liability Limitation.* .......... ~39~40
    D.    *Tax Returns.* .......... 40

**ARTICLE VIII RESERVES AND ACCOUNTS ADMINISTERED BY THE PLAN ADMINISTRATOR** .......... **40**
    A.    *Establishment of Reserves and Accounts.* .......... 40
    B.    *Undeliverable Distribution Reserve.* .......... 40~1~
    C.    *Wind-Down Account.* .......... 41
    D.    *Administrative and Priority Claims Reserve.* .......... 4~1~2

**ARTICLE IX PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS** .......... **4~1~2**
    A.    *Allowance of Claims and Interests.* .......... 4~1~2
    B.    *Claims and Interests Administration Responsibilities.* .......... 42
    C.    *Estimation of Claims and Interests.* .......... 4~2~3
    D.    *[Reserved.]* .......... 4~2~3
    E.    *Adjustment to Claims Without Objection.* .......... 4~2~3
    F.    *Time to File Objections to Claims.* .......... 4~2~3
    G.    *Disallowance of Claims.* .......... 43
    H.    *Amendments to Claims; Additional Claims.* .......... 43~4~
    I.    *No Distributions Pending Allowance.* .......... 43~4~
    J.    *Distributions After Allowance.* .......... 43~4~
    K.    *No Interest.* .......... 43~4~

**ARTICLE X SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** .......... **44**
    A.    *Compromise and Settlement of Claims, Interests, and Controversies.* .......... 44
    B.    *Discharge of Claims.* .......... 44

C.      *Term of Injunctions or Stays.* ........................................................................... 44~~5~~

D.      *Release of Liens.* ............................................................................................... 44~~5~~

E.      *Debtor Release.* ................................................................................................ 45

F.      *Third-Party Release.* ......................................................................................... 46~~7~~

G.      *Exculpation.* ..................................................................................................... 47~~8~~

H.      *Injunction.* ........................................................................................................ 48

I.      *Protections Against Discriminatory Treatment.* ................................................ 49

J.      *Reimbursement or Contribution.* ....................................................................... 49

K.      *Document Retention.* .......................................................................................... ~~49~~50

**ARTICLE XI CONDITIONS PRECEDENT TO THE EFFECTIVE DATE** ........................... ~~49~~50

A.      *Conditions Precedent to Confirmation of the Plan.* ......................................... ~~49~~50

B.      *Conditions Precedent to the Effective Date.* ..................................................... 50

C.      *Waiver of Conditions Precedent.* ....................................................................... 51

D.      *Substantial Consummation.* ............................................................................... 51

E.      *Effect of Non-Occurrence of Conditions to Consummation.* ............................ 51~~2~~

**ARTICLE XII MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ...... 51~~2~~

A.      *Modification of Plan.* ......................................................................................... 51~~2~~

B.      *Effect of Confirmation on Modifications.* .......................................................... 51~~2~~

C.      *Revocation or Withdrawal of the Plan.* ............................................................. 51~~2~~

**ARTICLE XIII RETENTION OF JURISDICTION** ................................................................. 52

**ARTICLE XIV MISCELLANEOUS PROVISIONS** ............................................................... 53~~4~~

A.      *Immediate Binding Effect.* .................................................................................. 53~~4~~

B.      *Additional Documents.* ....................................................................................... 54

C.      *Reservation of Rights.* ....................................................................................... 54~~5~~

D.      *Successors and Assigns.* ..................................................................................... 54~~5~~

E.      *Service of Documents.* ........................................................................................ 54~~5~~

F.      *Term of Injunctions or Stays.* ............................................................................ 55~~6~~

G.      *Entire Agreement.* .............................................................................................. 55~~6~~

H.      *Plan Supplement.* ............................................................................................... 55~~6~~

I.      *Nonseverability of Plan Provisions.* .................................................................. 56

J.      *Votes Solicited in Good Faith.* ........................................................................... 56

K.      *Waiver or Estoppel.* ........................................................................................... 56~~7~~

L.      *Closing of Chapter 11 Cases.* ........................................................................... 56~~7~~

M.      *Statutory Committee and Cessation of Fee and Expense Payment* .................... 56~~7~~

iv

## INTRODUCTION

Nielsen & Bainbridge, LLC, and its debtor affiliates, as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors") propose this joint chapter 11 plan (together with the documents comprising the Plan Supplement, the "Plan") for the resolution of outstanding Claims against, and Interests in, the Debtors. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan constitutes a separate plan for each of the Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

### ARTICLE I
### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

A.     *Defined Terms.*

1.     "*2018 Incremental First Lien Term Loan*" means the secured loans issued in 2018 pursuant to the First Lien Credit Agreement in the aggregate principal amount of $35 million.

2.     "*2020 Incremental First Lien Term Loan*" means the secured loans issued in 2020 pursuant to the First Lien Credit Agreement in the aggregate principal amount of $25 million.

3.     "*ABL Agent*" means Wells Fargo Bank, National Association, in its capacity as administrative agent and collateral agent under the ABL Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the ABL Credit Agreement.

4.     "*ABL Claim*" means any Claim on account of the ABL Facility, including any Prepetition ABL Obligations and ABL Adequate Protection Fees and Expenses (each as defined in the DIP Orders).

5.     "*ABL Credit Agreement*" means that certain credit agreement, dated as of April 26, 2017 (as amended by Amendment No. 1, dated as of July 1, 2019, Amendment No. 2, dated as of April 6, 2021, and Amendment No. 3, dated as of July 9, 2021, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among NBG Intermediate Holdings Inc., as holdings, NBG Acquisition Inc., as the initial borrower, which was merged with and into KNB Holdings Corporation, which survived the merger and became the administrative borrower, the lenders party thereto from time to time, and the ABL Agent.

6.     "*ABL Facility*" means the secured loans issued in 2017 pursuant to the ABL Credit Agreement in the aggregate principal amount of $75 million.

7.     "*ABL Intercreditor Agreement*" means that certain ABL Intercreditor Agreement, dated as of April 27, 2017, among Wells Fargo Bank, National Association, as ABL agent, Deutsche Bank AG New York Branch, as first lien term loan agent, Cortland Capital Market Services LLC, as second lien term loan agent, and each additional term loan debt agent from time to time party thereto (as amended, supplemented, or otherwise modified from time to time).

8.     "*ABL Lenders*" means banks, financial institutions, and other lenders party to the ABL Credit Agreement from time to time.

9.      "*ABL Priority Collateral Net Sale Proceeds*" means the ABL Priority Collateral Sale Proceeds less the amount of Allowed Professional Fee Claims and the operating expenses (including any taxes) of the Wind-Down Debtors, in each case, that are incurred during the Wind Down (or in respect of taxes, for any period incurred).

10.      "*ABL Priority Collateral Sale Proceeds*" means the sum of Cash and Cash equivalents received in connection with the Wind Down of the Wind-Down Debtors' Estates that constitute "ABL Priority Collateral" under the ABL Intercreditor Agreement; *provided* that, for the avoidance of doubt, the ABL Priority Collateral Sale Proceeds shall not include any Cash and Cash equivalents received in connection with the sale of the Debtors' manufacturing and distribution facility in Selma, Alabama, the proceeds of the SKYX Settlement Agreement, or any Retained Causes of Action.

11.      "*Administrative and Priority Claims Reserve*" means a segregated account to be established by the Plan Administrator and funded with the Administrative and Priority Claims Reserve Amount in accordance with Article VIII.D.

12.      "*Administrative and Priority Claims Reserve Amount*" means Cash in the amount of $2.0 million *plus* such additional amounts as may be necessary to satisfy in full all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims that are not otherwise expressly contemplated for satisfaction pursuant to the Wind-Down Budget, which aggregate amount shall be funded into the Administrative and Priority Claims Reserve.

13.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date and before the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of the Judicial Code. For the avoidance of doubt, an Administrative Claim shall not include any Claim for adequate protection for any Holder of an Allowed First Lien Term Loan Claim or an Allowed Second Lien Term Loan Claim.

14.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than Professional Fee Claims), which shall be the later of (a) the deadline established by the Bankruptcy Court and (b) the first Business Day that is 30 days following the Effective Date; *provided* that the Administrative Claims Bar Date shall not apply to claims entitled to administrative priority that arise on or after the Petition Date in the ordinary course of the Debtors' businesses.

15.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

16.      "*Agent Fees and Expenses*" means, collectively, the First Lien Credit Agreement Agent Fees and Expenses and the Second Lien Credit Agreement Agent Fees and Expenses.

17.      "*Allowed*" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Bar Date (or for which a Proof of Claim is not required to be Filed under the Plan, the Bankruptcy Code, or a Final Order of the Court); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) a Claim allowed pursuant to the Plan, any stipulation approved by the Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been Filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or if such an objection is so Filed, such Claim is Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is timely Filed, is not Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court. Notwithstanding anything to the contrary herein, no Claim of any Person

or Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Person or Entity pays in full the amount that it owes the applicable Debtor, Reorganized Debtor, or Wind-Down Debtor, as applicable.  For the avoidance of doubt, a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

18.     "*Assumed Executory Contract and Unexpired Lease List*" means the list of Executory Contracts and Unexpired Leases (with proposed cure amounts) that will be either (a) assumed by Reorganized Quoizel, or (b) assumed by the Reorganized Debtors, subject to the consent of the Initial Plan Sponsors, which list shall be included in the Plan Supplement.

19.     "*Assumed Executory Contracts and Unexpired Leases*" means those Executory Contracts and Unexpired Leases to be either (a) assumed by Reorganized Quoizel, or (b) assumed by the Reorganized Debtors, subject to the consent of the Initial Plan Sponsors, as set forth on the Assumed Executory Contract and Unexpired Lease List.

20.     "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims and Causes of Actions that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

21.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, as applicable to the Chapter 11 Cases.

22.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas or another court having jurisdiction over the Chapter 11 Cases.

23.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of the Judicial Code, 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 11 Cases.

24.     "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be Filed in the Chapter 11 Cases.

25.     "*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

26.     "Carve-Out" means the "Carve-Out" as defined in the DIP Orders.

27.     "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

28.     "*Causes of Action*" means any action, claim, Claim, cause of action, controversy, demand, right, action, Lien, indemnity, Interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

3

29.     "*Chapter 11 Cases*" means, when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

30.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors, whether or not asserted or Allowed.

31.     "*Claims Objection Deadline*" means the deadline for objecting to a Claim, which shall be the date that is the later of (a) one hundred and eighty (180) days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, or by an order of the Bankruptcy Court.

32.     "*Claims Register*" means the official register of Claims maintained by the Solicitation Agent.

33.     "*Class*" means a category of Claims or Interests under section 1122(a) of the Bankruptcy Code.

34.     "*Collective Bargaining Agreement*" means the Collective Bargaining Agreement by and between Dwell & Decor Outdoor, LLC (or its successor), on the one hand, and the Mid-South RWDSU Council, AFL-CIO (or its successors), on the other hand, as the same may have been amended from time to time.

35.     "*Committee*" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases by the U.S. Trustee, pursuant to the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 123], on February 18, 2023.

36.     "*Company Parties*" means NBG Intermediate Holdings Inc., a company incorporated under the laws of the State of Delaware, and each of its Affiliates listed on Exhibit A to the Restructuring Support Agreement, each of which has executed and delivered counterpart signature pages to the Restructuring Support Agreement to counsel to the Consenting Parties.

37.     "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in this Plan, the Restructuring Term Sheet, and the Restructuring Support Agreement.

38.     "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

39.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and section 1128 of the Bankruptcy Code, including any adjournments thereof, at which the Bankruptcy Court will consider confirmation of the Plan.

40.     "*Confirmation Objection Deadline*" means the date that is seven (7) days prior to the date first set by the Bankruptcy Court for the Confirmation Hearing.

41.     "*Confirmation Order*" means the order of the Bankruptcy Court, consistent with the Restructuring Support Agreement, confirming the Plan under section 1129 of the Bankruptcy Code.

42.     "*Consenting ABL Lenders*" means the holders of, or investment advisors, sub-advisors, or managers of accounts that hold, ABL Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a joinder, or a transfer agreement to counsel to the Company Parties.

43.     "*Consenting First Lien Term Loan Lenders*" means the Holders of, or investment advisors, sub-advisors, or managers of accounts that hold, First Lien Term Loan Claims that have executed and delivered

counterpart signature pages to the Restructuring Support Agreement, a joinder, or a transfer agreement to counsel to the other Consenting Parties.

44.     "*Consenting Parties*" means, collectively, and as applicable in context, the Sponsor, the Initial Plan Sponsors, the Consenting First Lien Term Loan Lenders, the Consenting Second Lien Term Loan Lenders, and/or the Consenting ABL Lenders.

45.     "*Consenting Second Lien Term Loan Lenders*" means the hHolders of, or investment advisors, sub-advisors, or managers of accounts that hold, Second Lien Term Loan Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a joinder, and/or a transfer agreement to counsel to the Company Parties.

46.     "*Consultant*" means, collectively, Hilco Wholesale Solutions, LLC and Hilco Receivables, LLC.

47.     "*Consulting Agreement*" means that certain consulting agreement by and between the Consultant and Nielsen & Bainbridge, LLC and its subsidiaries, as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

48.     "*Consummation*" means the occurrence of the Effective Date.

49.     "*Covered Claims*" means any Claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the DIP Credit Agreement Documents, the DIP Orders, the solicitation of votes on the Plan, the prepetition negotiation and settlement of claims, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place prior to the Effective Date.

50.     "*Covered Party*" means, with respect to, (a) each Related Party of each Debtor or (b) the Committee and its members, each such Entity's current and former Affiliates, including each such Entity's financial advisors, partners, attorneys, accountants, investment bankers, consultants, and other professionals, each in their capacity as such.

51.     "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease to be assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

52.     "*Cure Notice*" means, with respect to an Executory Contract or Unexpired Lease to be assumed under the Plan, a notice that (a) sets forth the proposed amount of the Cure Claim to be paid in connection with the assumption of such Executory Contract or Unexpired Lease; (b) notifies the counterparty to such Executory Contract or Unexpired Lease that such party's Executory Contract or Unexpired Lease may be assumed under the Plan; (c) sets forth the procedures for objecting to the proposed assumption or assumption and assignment of Executory Contracts and Unexpired Leases or the proposed amount of the Cure Claim, including the proposed objection deadline, and for the resolution of any such objection by the Bankruptcy Court; and (d) represents that the proposed assignee (if applicable) has demonstrated its ability to comply with the requirements of adequate assurance of future performance, including the assignee's financial wherewithal and willingness to perform under such Executory Contract or Unexpired Lease.

53.     "*Cure/Assumption Objection Deadline*" means the date that is fourteen (14) days after Filing of the Assumed Executory Contracts and Unexpired Leases List and service of the Cure Notice; *provided* that if any

5

Executory Contract or Unexpired Lease is added to the Assumed Executory Contracts and Unexpired Leases List or proposed to be assigned to a third party, in each case, after the Filing of the initial Assumed Executory Contracts and Unexpired Leases List, then the Cure/Assumption Objection Deadline with respect to such Executory Contract or Unexpired Lease shall be ~~the earlier of~~fourteen ~~(a)~~ 14) days after service of the amended Assumed Executory Contracts and Unexpired Leases List with such modification ~~and (b) the date of the Confirmation Hearing~~.

54.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") maintained by or for the benefit of the Debtors for liabilities against any of the Debtors' current or former directors, managers, and officers, and all agreements, documents or instruments relating thereto.

55.     "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article X.F of the Plan.

56.     "*Definitive Documents*" means:  (a) the Restructuring Support Agreement; (b) the Restructuring Term Sheet; (c) the DIP Credit Agreement Documents; (d) the DIP Motion; (e) the DIP Orders; (f) the Exit Financing Documents; (g) the solicitation materials; (h) the Plan; (i) the Disclosure Statement; (j) the Disclosure Statement Motion; (k) the Disclosure Statement Order; (l) the New Organizational Documents; (m) all pleadings Filed by the Debtors in the Chapter 11 Cases (and related orders), including the First Day Pleadings (as defined in the Restructuring Support Agreement); (n) the Plan Supplement; (o) the Confirmation Order; (p) any and all filings with or requests for approvals by any Governmental Body; (q) the Restructuring Transactions Memorandum; and (r) any agreements, instruments, and documents as may be necessary or reasonably desirable to consummate and document the Restructuring Transactions agreed to by the Debtors and the Initial Plan Sponsors.

57.     "*DIP Agent*" means KKR Loan Administration Services LLC, in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

58.     "*DIP Claim*" means any and all Claims arising under, derived from, or based upon the DIP Credit Agreement Documents, the DIP Facility, or the DIP Orders, including all Claims for principal amounts outstanding, interest, fees, expenses, costs, indemnification obligations, reimbursement obligations, and other charges of the DIP Agent and the DIP Lenders arising under or related to the DIP Credit Agreement Documents, the DIP Facility, or the DIP Orders.

59.     "*DIP Credit Agreement*" means that certain senior secured superpriority debtor in possession credit agreement that governs the DIP Facility among KNB Holdings Corporation, as borrower, guarantors party thereto, the DIP Agent, and the DIP Lenders (as it may be amended, supplemented, or otherwise modified from time to time), which shall be consistent in all material respects with the Restructuring Support Agreement and otherwise in form and substance satisfactory to the Initial Plan Sponsors.

60.     "*DIP Credit Agreement Documents*" means the DIP Credit Agreement and any related documents or agreements governing the DIP Facility, which shall be consistent in all material respects with the Restructuring Support Agreement and the DIP Orders and otherwise in form and substance satisfactory to the Initial Plan Sponsors.

61.     "*DIP Facility*" means that certain senior secured, superpriority debtor-in-possession credit facility provided by the DIP Lenders on the terms of, and subject to the conditions set forth in, the DIP Credit Agreement Documents, approved by the DIP Orders, and consistent in all material respects with the Restructuring Support Agreement.

62.     "*DIP Lenders*" means the lenders party to the DIP Credit Agreement from time to time.

63.     "*DIP Motion*" means the motion seeking approval of the DIP Facility.

64.     "*DIP Orders*" means the interim and final orders of the Bankruptcy Court approving the DIP Facility and setting forth the terms on which the Debtors are authorized to use cash collateral, ~~which shall be consistent with the Restructuring Support Agreement and otherwise in form and substance satisfactory to the Initial Plan Sponsors~~ [Docket Nos. 67 and 249].

65.     "*Disallowed*" means any Claim that is not Allowed.

66.     "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or modified from time to time in accordance with the Restructuring Support Agreement, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law, as approved by the Disclosure Statement Order [Docket No. 207].

67.     "*Disclosure Statement Motion*" means the motion seeking approval of the Disclosure Statement, the procedures for the solicitation of votes in connection with the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code and the forms of ballots and notices and related relief, together with all exhibits, appendices, supplements, and related documents [Docket No. 70].

68.     "*Disclosure Statement Order*" means the order approving the Disclosure Statement [Docket No. 250].

69.     "*Disputed*" means, with respect to any Claim, a Claim that is not Allowed or Disallowed.

70.     "*Distribution Agent*" means, as applicable, the Reorganized Debtors or the Plan Administrator, or any Entity the Reorganized Debtors or the Plan Administrator, as applicable, select to make or facilitate distributions in accordance with the Plan.

71.     "*Distribution Record Date*" means the date for determining which Holders of Allowed Claims are eligible to receive distributions pursuant to the Plan, which shall be the date that the Confirmation Order is entered by the Bankruptcy Court, or such other date as specified in the Confirmation Order.

72.     "*DTC*" means The Depository Trust Company.

73.     "*Effective Date*" means the date that is the first Business Day on which (a) the Confirmation Order is in effect and not subject to stay, (b) all conditions precedent to the occurrence of the Effective Date set forth in Article XI.B of the Plan have been satisfied or waived in accordance with Article XI.C of the Plan, and (c) the Debtors declare the Plan effective.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

74.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

75.     "*ERISA*" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, and any final regulations promulgated and the rulings issued thereunder.

76.     "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

77.     "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors ~~and the Reorganized Debtor; (b) the independent directors or managers of any Debtor~~; and (eb) the Committee and each of its members.

78.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

79. "*Exit Financing*" means the debt instruments to be issued or executed as part of the Exit First Lien Term Loan Facility, the Exit Second Lien Term Loan Facility, and any additional exit financing that may be obtained by ~~the~~ Reorganized ~~Debtor~~Quoizel, as determined by the Initial Plan Sponsors.

80. "*Exit Financing Documents*" means, collectively, all agreements, documents, and instruments entered into in connection with the Exit Financing, including the Exit First Lien Term Loan Documents and the Exit Second Lien Term Loan Documents.

81. "*Exit Financing Parties*" means the Exit First Lien Term Loan Facility Lender Parties, the Exit Second Lien Term Loan Facility Lender Parties, and any other lenders that provide any portion of the Exit Financing.

82. "*Exit First Lien Term Loan Credit Agreement*" means the definitive credit agreement governing the Exit First Lien Term Loan Facility, which shall be in form and substance acceptable to Quoizel, the Exit First Lien Term Loan Facility Lender Parties, and the Initial Plan Sponsors.

83. "*Exit First Lien Term Loan Documents*" means, collectively, the Exit First Lien Term Loan Credit Agreement and any and all other documents related thereto, which shall be in form and substance acceptable to Quoizel, the Exit First Lien Term Loan Facility Lender Parties, and the Initial Plan Sponsors.

84. "*Exit First Lien Term Loan Facility*" means that certain $15 million first priority secured term loan facility to be provided by the Exit First Lien Term Loan Lender Parties to Reorganized Quoizel, in exchange for a like amount of ABL Claims, on terms and conditions acceptable to Quoizel, the Exit First Lien Term Loan Lender Parties, and the Initial Plan Sponsors; *provided* that, to the extent the remaining ABL Claims are not satisfied in full from the Upfront Cash Repayment and the ABL Priority Collateral Net Sale Proceeds by October 31, 2023, then the principal amount of the Exit First Lien Term Loans may be increased by up to $3.75 million at the election of the Exit First Lien Term Loan Facility Lender Parties.

85. "*Exit First Lien Term Loan Facility Lender Parties*" means the ABL Lenders.

86. "*Exit First Lien Term Loans*" means the term loans under the Exit First Lien Term Loan Facility provided to Reorganized Quoizel or its designated affiliate pursuant to the Exit First Lien Term Loan Documents.

87. "*Exit Second Lien Term Loan Credit Agreement*" means the definitive credit agreement governing the Exit Second Lien Term Loan Facility, which shall be in form and substance acceptable to Quoizel and the Required DIP Lenders.

88. "*Exit Second Lien Term Loan Documents*" means, collectively, the Exit Second Lien Term Loan Credit Agreement and any and all other documents related thereto, which shall be in form and substance acceptable to Quoizel and the Required DIP Lenders.

89. "*Exit Second Lien Term Loan Facility*" means that certain up to $30 million second priority secured term loan facility to be provided by the Exit Second Lien Term Loan Lender Parties to Reorganized Quoizel or its designated affiliate on terms and conditions acceptable to Quoizel and the Required DIP Lenders, consisting of (a) up to $16.452 million of new money loans and (b) $13.548 million in exchange for a like amount of Allowed DIP Claims (the "*Exit Second Lien Term Loan Facility Exchange Amount*").

90. "*Exit Second Lien Term Loan Facility Lender Parties*" means the DIP Lenders (or their designated affiliates, managed funds or accounts, or other designees).

91. "*Exit Second Lien Term Loans*" means the term loans under the Exit Second Lien Term Loan Facility provided to Reorganized Quoizel or its designated affiliate pursuant to the Exit Second Lien Term Loan Documents.

92.     "*Exit Term Loans*" means, collectively, the Exit First Lien Term Loans and the Exit Second Lien Term Loans.

93.     "*File*", "*Filed*", or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

94.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

95.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice.

96.     "*First Lien Credit Agreement*" means the credit agreement dated as of April 26, 2017, as amended by Amendment No. 1 to First Lien Credit Agreement, dated as of January 2, 2019, and Amendment No. 2 to First Lien Credit Agreement, dated as of April 6, 2020, by and among NBG Acquisition Inc., as initial borrower, NBG Intermediate Holdings Inc., as holdings, the First Lien Term Loan Lenders, and Deutsche Bank AG New York Branch as administrative and collateral agent.

97.     "*First Lien Credit Agreement Agent*" means Deutsche Bank AG New York Branch, in its capacity as administrative and collateral agent under the First Lien Credit Agreement.

98.     "*First Lien Credit Agreement Agent Fees and Expenses*" means all unpaid reasonable and documented fees and out-of-pocket expenses (regardless of whether such fees and expenses were incurred before or after the Petition Date) of the First Lien Credit Agreement Agent, including, without limitation, the reasonable fees and expenses of attorneys or other professionals retained by the First Lien Credit Agreement Agent, in each case that are payable in accordance with the terms of the First Lien Credit Agreement.

99.     "*First Lien Term Loan Claims*" means any Claim on account of First Lien Term Loans or otherwise arising under the First Lien Credit Agreement.

100.    "*First Lien Term Loan Lenders*" means those banks, financial institutions, and other lenders party to the First Lien Credit Agreement from time to time.

101.    "*First Lien Term Loans*" means, collectively, the Initial First Lien Term Loan, the 2018 Incremental First Lien Term Loan, and the 2020 Incremental First Lien Term Loan.

102.    "*General Unsecured Claim*" means any Claim that is not:  (a) paid in full prior to the Effective Date; (b) a DIP Claim; (c) an Administrative Claim; (d) a Professional Fee Claim; (e) a Priority Tax Claim; (f) an Other Secured Claim; (g) an Other Priority Claim; (h) an ABL Claim; (i) a First Lien Term Loan Claim; (j) a Second Lien Term Loan Claim; (k) an Intercompany Claim; or (l) a Section 510(b) Claim.

103.    "*General Unsecured Claims Recovery Amount*" means Cash in the amount of $300,000 to be funded into the Wind-Down Account ~~with~~on the ~~Net Sale Proceeds~~Effective Date.

104.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

105.    "*Holder*" means a Person or an Entity holding a Claim or an Interest, as applicable.

106.    "*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

107.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

108.     "*Indemnification Obligations*" means each Debtor's indemnification obligations in place as of the Effective Date, set forth in any of: (a) the organizational documents of the Debtors (including by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, or board resolutions); (b) employment contracts; or (c) an engagement or retention letter as to professional or advisory services.

109.     "*Initial First Lien Term Loan*" means the secured loans issued in 2017 pursuant to the First Lien Credit Agreement in the aggregate principal amount of $260 million.

110.     "*Initial Plan Sponsors*" means the Entities affiliated with Silver Point Capital, L.P. and KKR Credit Advisors (US) LLC that have executed and delivered counterpart signature pages to the Restructuring Support Agreement.

111.     "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

112.     "*Intercompany Interest*" means any Interest in a Debtor other than NBG Topco.

113.     "*Interest*" means any equity security (as defined in Section 101(16) of the Bankruptcy Code) of a Debtor, including any issued, unissued, authorized or outstanding share of common stock, preferred stock, limited liability company interest, any other equity, ownership, or profits interest,  option, warrant, rights, or an agreement to acquire any of the foregoing that existed immediately prior to the Effective Date (whether or not arising under or in connection with any employment agreement).

114.     "*Internal Revenue Code*" means title 26 of the United States Code, 26 U.S.C. §§ 1-9834, as amended from time to time.

115.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

116.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

117.     "*NBG Topco*" means NBG Topco Holdings Inc. or any successor or assign, by merger, consolidation, or otherwise, prior to the Effective Date.

118.     "*Net Sale Proceeds*" means the ABL Priority Collateral Net Sale Proceeds and the Non-ABL Priority Collateral Sale Proceeds.

119.     "*New Board*" means the board of directors, board of managers, managing member, general partner, or other governing body of Reorganized Quoizel on and after the Effective Date.

120.     "*New Common Stock*" means the equity interests in Reorganized Quoizel, which may be in the form of common stock, preferred stock, limited liability interests, or other ownership interests and may be issued in one or more classes of each of the foregoing, in each case, as determined by the Debtors and the Initial Plan Sponsors.

121.     "*New Organizational Documents*" means the forms of the certificates or articles of incorporation, limited liability company agreements, bylaws, shareholder agreements, or other formation or governance documents of the Reorganized Debtor, which shall be in form and substance consistent with the approval rights set forth in the Restructuring Support Agreement.

122.     "*Non-ABL Priority Collateral Sale Proceeds*" means the sum of Cash and Cash equivalents received in connection with the Wind Down of the Wind-Down Debtors' Estates that do not constitute "ABL

Priority Collateral" under the ABL Intercreditor Agreement, including any Cash and Cash equivalents received in connection with the sale of the Debtors' manufacturing and distribution facility in Selma, Alabama, the proceeds of the SKYX Settlement Agreement, and the Retained Causes of Action.

123.    "*Non-Debtor Subsidiaries*" means all direct and indirect subsidiaries of any Debtor that are not Debtors in these Chapter 11 Cases.

124.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

125.    "*Other Secured Claim*" means any Secured Claim that is not a DIP Claim, ABL Claim, First Lien Term Loan Claim, or Second Lien Term Loan Claim.

126.    "*Paid in Full*" means, with respect to the ABL Claims, the indefeasible repayment in full in Cash of all obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted) under the ABL Facility or the DIP Orders, the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing or cash collateralization of letters of credit, in each case in accordance with the terms of the application ABL Facility loan documents or the DIP Orders.

127.    "*Pension Plan*" means the legacy pension plan or any other pension plan subject to Title IV of ERISA or the minimum funding standards of section 302 of ERISA or section 412 of the Internal Revenue Code, in each case, that is sponsored, maintained, contributed to, or required to be contributed to, by Nielsen & Bainbridge, LLC and its subsidiaries and affiliates, or under which there may be obligations with respect to current or former employees of Nielsen & Bainbridge, LLC and its subsidiaries and affiliates.

128.    "*Pension Plan Assumption and Assignment Agreement*" means that certain assumption and assignment agreement, by and between Nielsen & Bainbridge, LLC and Belk, Inc., assigning and transferring the Pension Plan to Belk, Inc.

129.    ~~128.~~ "*Person*" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated association, governmental entity, or political subdivision thereof, or any other entity.

130.    ~~129.~~ "*Petition Date*" means the date on which each Debtor commenced its Chapter 11 Case.

131.    ~~130.~~ "*Plan*" means this plan for the Debtors, including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto, as it may be amended or supplemented from time to time, consistent with the approval rights set forth in the Restructuring Support Agreement.

132.    ~~131.~~ "*Plan Administrator*" means the person or persons ~~identified in the Plan Supplement, and~~ acceptable to the Debtors, the Initial Plan Sponsors, and the ABL Agent, to be appointed on the Effective Date, and who will serve as the trustee and administrator for the Wind-Down Debtors as set forth in Article VII of the Plan.

133.    ~~132.~~ "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and the Restructuring Support Agreement and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors prior to the Confirmation Hearing to the extent available, and any additional documents Filed prior to the Effective Date, including the following, as applicable:  (a) New Organizational Documents; (b) Exit Financing Documents; (c) the Assumed Executory Contracts and Unexpired Leases List; (d) the Rejected Executory Contracts and Unexpired Leases List; (e) the Schedule of Retained Causes of Action; (f) a document listing the members of the New Board; (g) the form of

Promissory Note; ~~and~~ (h) the Restructuring Transactions Memorandum; and (i) the Pension Plan Assumption and Assignment Agreement.

134. ~~133.~~ "*Preference Waiver*" means a complete waiver and release of any and all claims, Causes of Action, and other rights against the Holders of Allowed General Unsecured Claims based on claims pursuant to chapter 5 of the Bankruptcy Code, or under similar or related state or federal statutes and common law including fraudulent transfer laws from the Debtors, the Wind-Down Debtors, the Reorganized Debtor, and the Plan Administrator, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities.

135. ~~134.~~ "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

136. ~~135.~~ "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in all Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interests under the Plan.

137. ~~136.~~ "*Professional*" means a Person or an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

138. ~~137.~~ "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been previously paid.

139. ~~138.~~ "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors on the Effective Date in an amount equal to the Professional Fee Escrow Amount.

140. ~~139.~~ "*Professional Fee Escrow Amount*" means the amount equal to the total estimated amount of Professional Fee Claims.

141. ~~140.~~ "*Promissory Note*" means that certain unsecured promissory note issued by Reorganized Quoizel or its designated affiliate in an amount equal to $3,322,851.52 that shall not bear any interest and shall mature six months after the stated maturity of the Exit Second Lien Term Loans.

142. ~~141.~~ "*Proof of Claim*" means a proof of Claim Filed in the Chapter 11 Cases by the applicable Bar Date.

143. ~~142.~~ "*Quoizel*" means Debtor Quoizel, LLC.

144. ~~143.~~ "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to a Class of Claims or Interests, that the Claims or Interests in such Class shall be rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

145. ~~144.~~ "*Rejected Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Initial Plan Sponsors, of Executory Contracts and Unexpired Leases that will be rejected pursuant to the Plan, which list shall be included in the Plan Supplement.

146. ~~145.~~ "*Related Party*" means, with respect to any Person or Entity, each of, and in each case in its capacity as such, current and former directors, managers, officers, members of the Committee, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors of such Person or Entity and any such Person's or Entity's respective heirs, executors, estates, and nominees.  For the avoidance of doubt, the members of each Governing Body are Related Parties of the Debtors.

147. ~~146.~~ "*Released Party*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors, (c) the Plan Administrator; (d) the Reorganized Debtor; (e) the Initial Plan Sponsors; (f) the Consenting Parties; (g) the DIP Lenders and the ABL Lenders; (h) the respective agents under the First Lien Credit Agreement, Second Lien Credit Agreement, ABL Credit Agreement, and DIP Credit Agreement; (i) all Holders of Claims; (j) all Holders of Interests; (k) each current and former Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clause (a) through this clause (l); *provided*, *however*, that in each case, an Entity shall not be a Released Party if it:  (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release and such objection is not withdrawn before Confirmation.

148. ~~147.~~ "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) the Plan Administrator; (d) the Reorganized Debtor; (e) the Initial Plan Sponsors; (f) the Consenting Parties; (g) the DIP Lenders and the ABL Lenders; (h) the respective Agents under the First Lien Credit Agreement, Second Lien Credit Agreement, ABL Credit Agreement, and DIP Credit Agreement; (i) all Holders of Claims; (j) all Holders of Interests; (k) each current and former Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clause (a) through this clause (l); *provided*, *however*, that in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the release contained in the Plan; or (y) timely objects to the Third Party Release and such objection is not withdrawn before Confirmation.

149. ~~148.~~ "*Reorganized Debtors*" means Reorganized Quoizel and the Wind-Down Debtors.

150. ~~149.~~ "*Reorganized Quoizel*" means Quoizel, as reorganized pursuant to the Plan, or one or more new entities as determined by the Initial Plan Sponsors.

151. ~~150.~~ "*Required DIP Lenders*" means "Required Lenders" as defined in the DIP Credit Agreement.

152. ~~151.~~ "*Restructuring*" means the restructuring of the Debtors under chapter 11 of the Bankruptcy Code in accordance with the Restructuring Support Agreement.

153. ~~152.~~ "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, by and among the Debtors and certain Holders of Claims and Interests, including all exhibits and schedules attached thereto, as may be amended in accordance with its terms.

154. ~~153.~~ "*Restructuring Term Sheet*" means that certain restructuring term sheet, attached as Exhibit B to the Restructuring Support Agreement.

155. ~~154.~~ "*Restructuring Transactions*" means, collectively, those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions, that the Debtors, the Initial Plan Sponsors, and the ABL Agent reasonably determine to be necessary to implement the Plan in a manner consistent with the Restructuring Support Agreement, the Restructuring Term Sheet, and the Restructuring Transactions Memorandum, and which

shall include the Sponsor causing NBG Topco and NBG PropCo LLC to take all actions necessary to effectuate the Restructuring Transactions in accordance with the Plan and the Restructuring Transactions Memorandum.

156. 155. "*Restructuring Transactions Memorandum*" means one or more written documents (which may be in the form of a written memorandum or a powerpointPowerPoint or similar presentation format) illustrating the various Restructuring Transactions used to effect the Tax Structure, which documents may be amended from time to time prior to the Effective Date in accordance with the Restructuring Support Agreement.

157. 156. "*Sale Proceeds*" means the ABL Priority Collateral Sale Proceeds and the Non-ABL Priority Collateral Sale Proceeds.

158. 157. "*Schedule of Retained Causes of Action*" means a schedule of Causes of Action retained by the Debtors, and/or the Reorganized Debtors, as applicable, and filed as part of the Plan Supplement.

159. 158. "*Second Lien Credit Agreement*" means the credit agreement dated as of April 26, 2017(as amended by Amendment No. 1 to Second Lien Credit Agreement, dated as of April 6, 2020, and as may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof) by and among NBG Acquisition Inc., as initial borrower, NBG Intermediate Holdings Inc., as holdings, the Second Lien Term Loan Lenders, and Cortland Capital Market Services LLC as administrative agent and collateral agent.

160. 159. "*Second Lien Credit Agreement Agent*" means Cortland Capital Market Services LLC, in its capacity as administrative and collateral agent under the Second Lien Credit Agreement.

161. 160. "*Second Lien Credit Agreement Agent Fees and Expenses*" means all unpaid reasonable and documented fees and out-of-pocket expenses (regardless of whether such fees and expenses were incurred before or after the Petition Date) of the Second Lien Credit Agreement Agent, including, without limitation, the reasonable fees and expenses of attorneys or other professionals retained by the Second Lien Credit Agreement Agent, in each case that are payable in accordance with the terms of the Second Lien Credit Agreement.

162. 161. "*Second Lien Term Loan Claim*" means any Claim on account of the Second Lien Term Loans or otherwise arising under the Second Lien Credit Agreement.

163. 162. "*Second Lien Term Loan Lenders*" means those banks, financial institutions, and other lenders party to the Second Lien Credit Agreement from time to time

164. 163. "*Second Lien Term Loans*" means the secured loans issued pursuant to the Second Lien Credit Agreement in the aggregate principal amount of $70,000,00070.0 million.

165. 164. "*Section 510(b) Claim*" means any Claim arising from:  (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

166. 165. "*Secured*" means, when referring to a Claim, a Claim:  (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, enforceable, and non-avoidable pursuant to applicable law or by reason of a Bankruptcy Court order, or (b) that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

167. 166. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

168.   167. "*Security*" or "*Securities*" has the meaning set forth in section 2(a)(1) of the Securities Act.

169.   168. "*SKYX Settlement Agreement*" means that certain letter agreement, dated as of April 20, 2023, between SKYX Platforms Corp. (formerly SQL Technologies Corp.) and Nielsen & Bainbridge, LLC, approved by the Bankruptcy Court on April 27, 2023 [Docket No. 411].

170.   169. "*Solicitation Agent*" means Omni Agent Solutions, Inc., the noticing, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

171.   170. "*Sponsor*" means, collectively, Sycamore Partners Management, L.P. and its affiliated investment funds and affiliates and portfolio companies of the foregoing.

172.   171. "*State and Local Income Returns*" means any and all state and local income or franchise tax returns that include NBG or any of its subsidiaries that utilize federal taxable income as the basis for calculation of tax due.

173.   172. "*Tail Coverage*" means liability insurance policy coverage for the six-year period following the Effective Date for the benefit of the Debtors' current and former directors, officers, managers, and employees.

174.   173. "*Tax Law*" means U.S. federal income tax law.

175.   174. "*Tax Structure*" means the structure of the Restructuring Transactions to provide for a tax-efficient implementation acceptable to the Company Parties and the Initial Plan Sponsor.

176.   175. "*Third-Party Release*" means the release given by the Releasing Parties to the Released Parties as set forth in Article X.G of the Plan.

177.   176. "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

178.   177. "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash.

179.   178. "*Upfront Cash Repayment*" means an amount of Cash equal to $12.5 million to be distributed to the ABL Lenders pursuant to this Plan.

180.   179. "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

181.   180. "*Wind Down*" means the process to wind down, dissolve, and liquidate the Wind-Down Debtors and distribute any remaining assets in accordance with the Plan.

182.   181. "*Wind-Down Account*" means one or more segregated accounts established by the Plan Administrator in accordance with Article VIII.C.

183.   182. "*Wind-Down Assets*" means the assets of the Wind-Down Debtors.

184.   183. "*Wind-Down Budget*" means the budget, attached hereto as **Exhibit A**, in connection with the Wind Down which shall include line items for distributions, fees, and expenses, and shall be in form and substance acceptable to the Initial Plan Sponsors and the ABL Agent.

185.   184. "*Wind-Down Debtors*" means all the Debtors, or any successor thereto, by merger, consolidation, or otherwise, other than Quoizel or Reorganized Quoizel, on or after the Effective Date.

B.        *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15) references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (18) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws.

C.        *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.        *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized

Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America unless otherwise expressly provided herein.

F.      *Reference to the Debtor or Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## ARTICLE II
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of such Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on:  (a) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim.

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Plan Administrator, as applicable, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors or the Plan Administrator, as applicable, and the requesting party by the Claims Objection Deadline.

B.      *Professional Fee Claims.*

    1.      <u>Final Fee Applications and Payment of Professional Fee Claims</u>.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred before the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. The Plan Administrator shall pay Allowed Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and <u>the Plan Administrator shall</u> fund with Cash equal to the Professional Fee <u>Escrow</u> Amount on the Effective Date.

    2.      <u>Professional Fee Escrow Account</u>.

On the Effective Date, the Plan Administrator shall ~~establish and~~ fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount, which shall be funded by the Wind-Down Debtors, *provided*, *however*, that to the extent the Wind-Down Debtors do not have sufficient Cash as of the Effective Date to fund the Professional Fee Escrow Account in an amount equal to the Professional Fee <u>Escrow</u> Amount, the Carve-Out shall remain in effect, solely with respect to the Wind-Down Debtors, until such time the Professional Fee Escrow Account is <u>fully</u> funded with the Professional Fee Escrow Amount. The Carve-Out shall not remain in effect with respect to Reorganized Quoizel. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. ~~Such~~<u>All</u> funds ~~shall not be considered~~<u>in the Professional Fee Escrow Account or required to be deposited into the Professional Fee Escrow Account shall not be</u> property of the Estates of the Debtors or <u>of</u> the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Plan Administrator from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors without any further action or order of the Bankruptcy Court. If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be paid by the Debtors or the ~~Wind-Down~~<u>Wind-Down</u> Debtors.

    3.      <u>Professional Fee Escrow Amount</u>.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than five (5) days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors                                              or Wind-Down Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

    4.      <u>Post-Confirmation Date Fees and Expenses</u>.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and the Reorganized Debtors, as applicable, shall pay, within ten <u>(10)</u> business days after submission of a detailed invoice to the Debtors or the Reorganized Debtors, as applicable, such reasonable claims for compensation or

reimbursement of expenses incurred by the Professionals of the Debtors or the Reorganized Debtors, as applicable. If the Debtors or the Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or the Reorganized Debtors, as applicable, or the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

C.      *DIP Claims.*

As of the Effective Date, the DIP Claims shall be Allowed in the full amount outstanding under the DIP Credit Agreement Documents on such date.

Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for all Allowed DIP Claims on the Effective Date (but solely to the extent such Allowed DIP Claim is paid in full on the Effective Date, alternatively such final satisfaction, compromise, settlement, release, and discharge shall occur upon completion of the Wind-Down (or such earlier time as determined by the Plan Administrator if applicable pursuant to clause (ii)), each Holder of an Allowed DIP Claim (which shall include fees and interest) shall receive its *pro rata* share of:  (i) on account of $28.548 million of Allowed DIP Claims, (a) the ~~Reorganized Quoizel~~New Common Stock, (b) the Exit Second Lien Term Loan Facility Exchange Amount, and (c) the Promissory Note; and (ii) on account of the remaining Allowed DIP Claims, following the Effective Date and subject to the completion of the Wind Down (or such earlier time as determined by the Plan Administrator in his or her discretion):  (a) the ABL Priority Collateral Net Sale Proceeds (after the remaining ABL Claims have been Paid in Full and the Holders of Allowed General Unsecured Claims receive the General Unsecured Claims Recovery Amount); and (b) the Non-ABL Priority Collateral Sale Proceeds (on a first-priority basis) or, in each case, such other terms as agreed by the Required DIP Lenders.

Upon the satisfaction of the Allowed DIP Claims in accordance with the terms of the Plan, all Liens and security interests securing the DIP Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Person or Entity.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the DIP Facility and the DIP Credit Agreement Documents shall continue in full force and effect (other than, for the avoidance of doubt, any Liens or other security interests terminated pursuant to this section) after the Effective Date with respect to any unsatisfied obligations thereunder, as applicable, including, but not limited to, those provisions relating to the rights of the DIP Agent and the DIP Lenders to expense reimbursement, indemnification, and other similar amounts from the Debtors (which rights shall be fully enforceable against the Reorganized Debtors) and any provisions that may survive termination or maturity of the DIP Facility in accordance with the terms thereof.

D.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash from the Administrative and Priority Claims Reserve in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.

E.      *Payment of Certain Fees and Expenses.*

The Plan Administrator shall pay in Cash all reasonable and documented fees and expenses of the advisors to the Initial Plan Sponsors, DIP Lenders, ABL Agent, and ABL Lenders, in each case in accordance with the terms and conditions of any applicable agreement with the Debtors, including the DIP Credit Agreement Documents ~~and~~, the Restructuring Support Agreement, and the DIP Orders, without the need for application to or approval of the Bankruptcy Court.

The Debtors and the Wind-Down Debtors (as applicable) shall, in accordance with the Wind-Down Budget, pay the Agent Fees and Expenses (whether accrued prepetition or postpetition and to the extent not

otherwise paid during the Chapter 11 Cases), without application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise; *provided, however*, if the Debtors or the Plan Administrator and the First Lien Credit Agreement Agent or the Second Lien Credit Agreement Agent, as applicable, cannot agree with respect to the reasonableness of the respective Agent Fees and Expenses to be paid to each such party, the reasonableness of any such Fees and Expenses shall be determined by the Bankruptcy Court (with any undisputed amounts to be paid by the Debtors and the Plan Administrator (as applicable) on the Effective Date and any disputed amounts to be escrowed by the Debtors and the Plan Administrator (as applicable)).

F.      *Statutory Fees.*

        All monthly reports shall be Filed and all fees due and payable pursuant to section 1930(a) of Title 28 of the United States Code before or after the Effective Date shall be paid by the Debtors, the Plan Administrator, or the Reorganized Debtors, as applicable.  Following the Effective Date, the Plan Administrator or the Reorganized Debtors, as applicable, shall pay such fees as they are assessed and come due for each quarter (including any fraction thereof) from the Wind-Down Account and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  The Reorganized Debtors shall remain obligated to pay such quarterly fees to the U.S. Trustee and to File quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

# ARTICLE III
# CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Summary of Classification.*

        Claims and Interests, except for DIP Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims, are classified as set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim and has not been paid, released, or otherwise satisfied before the Effective Date.

        1.      Class Identification.

        The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | ABL Claims | Impaired | Entitled to Vote |
| 4 | First Lien Term Loan Claims | Impaired | Entitled to Vote |
| 5 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Interests in NBG Topco | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Classes of Claims and Interests.*

To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

1.      Class 1 – Other Secured Claims

(a)      *Classification*:  Class 1 consists of all Other Secured Claims.

(b)      *Treatment*:  On the Effective Date, each hHolder of an Allowed Other Secured Claim shall receive:

(i)      payment in full in Cash in an amount equal to its Allowed Other Secured Claim;

(ii)      the collateral securing its Allowed Other Secured Claim;

(iii)      reinstatement of its Allowed Other Secured Claim; or

(iv)      such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.      Class 2 – Other Priority Claims

(a)      *Classification*:  Class 2 consists of all Other Priority Claims.

(b)      *Treatment*:  On the Effective Date, each hHolder of an Allowed Other Priority Claim shall be paid in full in Cash on the Effective Date or in the ordinary course of business with funds from the Administrative and Priority Claims Reserve as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code.

(c)      *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.      <u>Class 3 – ABL Claims</u>

    (a)      *Classification*:  Class 3 consists of all ABL Claims.

    (b)      *Allowance*:  On the Effective Date, the ABL Claims shall be Allowed in the aggregate principal amount of $52.2 million, *plus* accrued and unpaid interest on such principal amount, issued and outstanding letters of credit (in the amount of $3,885,786) and any interest and fees thereon, and other amounts due and owing under the ABL Credit Agreement and the DIP Orders until such time as the ABL Claims are Paid in Full.

    (c)      *Treatment:*  (i) On the Effective Date, each Holder of an Allowed ABL Claim shall receive its *Pro Rata* share of (a) the Upfront Cash Repayment and (b) the Exit First Lien Term Loans, and (ii) on and following the Effective Date, including in accordance with the Wind-Down Budget, each Holder of an Allowed ABL Claim shall receive in respect of its remaining Allowed ABL Claim its *Pro Rata* share of the Net Sale Proceeds; *provided*, *however*, that in no event shall any Holder of an ABL Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim.

    (d)      *Voting*:  Class 3 is Impaired under the Plan.  Holders of Allowed ABL Claims are entitled to vote to accept or reject the Plan.

4.      <u>Class 4 – First Lien Term Loan Claims</u>

    (a)      *Classification*:  Class 4 consists of all First Lien Term Loan Claims.

    (b)      *Allowance*:  On the Effective Date, the First Lien Term Loan Claims shall be Allowed in the aggregate principal amount of $282 million, *plus* accrued and unpaid interest on such principal amount through the Effective Date and other amounts due and owing under the First Lien Term Loan Credit Agreement, subject to the terms of the DIP Orders, which for the avoidance of doubt does not include adequate protection claims to any Holder of an Allowed First Lien Term Loan Claim.

    (c)      *Treatment*:  Following the Effective Date, each Holder of an Allowed First Lien Term Loan Claim shall receive its *Pro Rata* share of (i) the ABL Priority Collateral Net Sale Proceeds (after the Holders of Allowed General Unsecured Claims receive the General Unsecured Claims Recovery Amount and the Allowed ABL Claims have been Paid in Full and the Allowed DIP Claims have been paid in full) and (ii) the Non-ABL Priority Collateral Sale Proceeds (after the Allowed DIP Claims have been paid in full); *provided*, *however*, that in no event shall any Holder of a First Lien Term Loan Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim.

    (d)      *Voting*:  Class 4 is Impaired under the Plan.  Holders of First Lien Term Loan Claims are entitled to vote to accept or reject the Plan.

5.      <u>Class 5 – Second Lien Term Loan Claims</u>

    (a)      *Classification*:  Class 5 consists of all Second Lien Term Loan Claims.

    *(b)*      *Allowance:*  On the Effective Date, the Second Lien Term Loan Claims shall be Allowed in the aggregate principal amount of $73 million, *plus* accrued and unpaid interest on such principal amount through the Effective Date and other amounts due and owing under the Second Lien Term Loan Credit Agreement, subject to the terms

of the DIP Orders, which for the avoidance of doubt does not include adequate protection claims to any Holder of an Allowed Second Lien Term Loan Claim.

(c)     *Treatment*:  Following the Effective Date, each Holder of an Allowed Second First Lien Term Loan Claim shall receive its *Pro Rata* share of (i) the ABL Priority Collateral Net Sale Proceeds (after the Holders of Allowed General Unsecured Claims receive the General Unsecured Claims Recovery Amount and the Allowed ABL Claims, Allowed DIP Claims, and Allowed First Lien Term Loan Claims have been satisfied in full) and (ii) the Non-ABL Priority Collateral Sale Proceeds (after the Allowed DIP Claims and Allowed First Lien Term Loan Claims have been satisfied in full); *provided*, *however*, that in no event shall any Holder of a Second Lien Term Loan Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim.

(d)     *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed Second Lien Term Loan Claims are entitled to vote to accept or reject the Plan.

6.     <u>Class 6 – General Unsecured Claims</u>

(a)     *Classification*:  Class 6 consists of all General Unsecured Claims against any Debtor.

(b)     *Treatment*:  (i) On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive ~~its *Pro Rata* share of~~ the Preference Waiver; and (ii) following the Effective Date and after the ABL Claims have been Paid in Full, each Holder of an Allowed General Unsecured Claim shall receive its *Pro Rata* share of the Net Sale Proceeds up to the General Unsecured Claims Recovery Amount (on a first-priority basis).

Each Holder of an Allowed General Unsecured Claim at any of the Wind-Down Debtors shall also receive its *Pro Rata* share of the Net Sale Proceeds after the Allowed ABL Claims are Paid in Full and Allowed DIP Claims, Allowed First Lien Term Loan Claims, and Allowed Second Lien Term Loan Claims are paid in full.

(c)     *Voting*:  Class 6 is Impaired under the Plan.  Holders of General Unsecured Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

7.     <u>Class 7 – Intercompany Claims</u>

(a)     *Classification*:  Class 7 consists of all Intercompany Claims.

(b)     *Treatment*:  On the Effective Date, Intercompany Claims shall be Reinstated, set off, settled, distributed, contributed, cancelled, released, or otherwise addressed at the option of the Reorganized Debtors or the Plan Administrator, as applicable, subject to the consent of the Initial Plan Sponsors.

(c)     *Voting*:  Holders of Intercompany Claims are either Unimpaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

8.      <u>Class 8 – Intercompany Interests</u>

     (a)     *Classification*:  Class 8 consists of all Intercompany Interests.

     (b)     *Treatment*:  On the Effective Date, Intercompany Interests shall be Reinstated, set off, settled, distributed, contributed, cancelled, or released or otherwise addressed at the option of the Reorganized Debtors or the Plan Administrator, as applicable, subject to the consent of the Initial Plan Sponsors.

     (c)     *Voting*:  Holders of Intercompany Interests are either Unimpaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Interests are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

9.      <u>Class 9 – Section 510(b) Claims</u>

     (a)     *Classification*:  Class 9 consists of all Section 510(b) Claims.

     (b)     *Treatment*:  Following the Effective Date, each Holder of an Allowed Section 510(b) Claim shall receive its *Pro Rata* share of (i) the ABL Priority Collateral Net Sale Proceeds (after the Holders of Allowed General Unsecured Claims receive the General Unsecured Claims Recovery Amount and the Allowed ABL Claims, Allowed DIP Claims, Allowed First Lien Term Loan Claims, and Allowed Second Lien Term Loan Claims have been paid in full) and (ii) the Non-ABL Priority Collateral Sale Proceeds (after the Allowed DIP Claims, Allowed First Lien Term Loan Claims, and Allowed Second Lien Term Loan Claims have been paid in full and Allowed ABL Claims have been Paid in Full); *provided, however*, that in no event shall any Holder of a Section 510(b) Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim.

     (c)     *Voting*:  Class 9 is Impaired.  Holders of Section 510(b) Claims are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

10.     <u>Class 10 – Interests in NBG Topco</u>

     (a)     *Classification*:  Class 10 consists of all Interests in NBG Topco.

     (b)     *Treatment*:  Following the Effective Date, each Holder of an Allowed Interest in NBG Topco shall receive its *Pro Rata* share of (i) the ABL Priority Collateral Net Sale Proceeds (after the Holders of Allowed General Unsecured Claims receive the General Unsecured Claims Recovery Amount, the Allowed ABL Claims have been paid in full, and the Allowed DIP Claims, Allowed First Lien Term Loan Claims, Allowed Second Lien Term Loan Claims, and Allowed Section 510(b) Claims have been paid in full) and (ii) the Non-ABL Priority Collateral Sale Proceeds (after the Allowed DIP Claims, Allowed First Lien Term Loan Claims, Allowed Second Lien Term Loan Claims, and Allowed Section 510(b) Claims have been paid in full and the Allowed ABL Claims have been Paid in Full).

     (c)     *Voting*:  Class 10 is Impaired.  Holders of Interests in NBG Topco are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Holders of Interests in NBG Topco are not entitled to vote to accept or reject the Plan.

C.      *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors', the Reorganized Debtors', or the Plan Administrator's rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.      *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.      *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request the Bankruptcy Court to deem the Plan accepted by the Holders of such Claims or Interests in such Class.

F.      *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, and subject to the Restructuring Support Agreement and the consent of the Initial Plan Sponsors, the Plan Administrator and the Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

G.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

H.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b)) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XII hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Restructuring Transactions.*

On or after the Confirmation Date, the Debtors and the Reorganized Debtors, in each case with the consent of the Initial Plan Sponsors and the ABL Agent, may take all actions and enter into any transactions as may be necessary or appropriate to effect any Restructuring Transactions, including those set forth in the

Restructuring Transaction Memorandum and including: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (1), pursuant to applicable state law; (4) the execution and delivery of the Exit Financing Documents; and (5) all other actions that the applicable Entities determine, with the consent of the Initial Plan Sponsors, to be necessary or appropriate, including making Filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.  Additionally, prior to the Effective Date, the Debtors may take all actions as may be necessary or appropriate to effectuate transactions that are intended to be implemented prior to the Effective Date in accordance with the Restructuring Support Agreement.

B.      *Commitment of the Sponsor.*

The Sponsor shall cooperate to cause NBG Topco and NBG PropCo LLC to take all actions necessary to effectuate the Restructuring Transactions in accordance with the Plan and the Restructuring Transactions Memorandum.

C.      *[Reserved].*

D.      *Plan Distributions.*

Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Person or Entity receiving such distribution or issuance.

1.      <u>Cash for Distribution.</u>

The Reorganized Debtors shall use (i) the Administrative and Priority Claims Reserve and (ii) the Net Sale Proceeds, as applicable, to fund distributions to Holders of Allowed Claims.

2.      <u>Issuance and Distribution of the New Common Stock.</u>

The issuance of Securities under the Plan, including the shares of the New Common Stock, shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Quoizel, as applicable, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

At the election of the Initial Plan Sponsors, the New Common Stock may be subject to a stockholders' agreement and/or the holders of New Common Stock may be provided with registration rights, in each case, on the terms and conditions that are mutually acceptable to Reorganized Quoizel and the Initial Plan Sponsors.

3.      Exit Financing.

On the Effective Date, Reorganized Quoizel and/or its designated affiliate and the Exit First Lien Term Loan Facility Lender Parties shall consummate the Exit First Lien Term Loan Facility on the terms, and subject to the conditions, set forth herein and otherwise acceptable to Reorganized Quoizel and the Exit First Lien Term Loan Facility Lender Parties.  On and after the Effective Date, the Exit First Lien Term Loan Documents shall constitute legal, valid, and binding obligations of Reorganized Quoizel and be enforceable in accordance with their respective terms.

On the Effective Date, Reorganized Quoizel and/or its designated affiliate and the Exit Second Lien Term Loan Facility Lender Parties shall consummate the Exit Second Lien Term Loan Facility on the terms, and subject to the conditions, set forth herein and otherwise acceptable to Reorganized Quoizel and the Exit Second Lien Term Loan Facility Lender Parties.  On and after the Effective Date, the Exit Second Lien Term Loan Documents shall constitute legal, valid, and binding obligations of Reorganized Quoizel and be enforceable in accordance with their respective terms.

Confirmation shall be deemed approval of the Exit Financing and the Exit Financing Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by Quoizel or Reorganized Quoizel in connection therewith), to the extent not approved by the Bankruptcy Court previously, and Reorganized Quoizel is authorized to execute and deliver any and all documents necessary or appropriate to consummate the Exit Financing, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person.

On the Effective Date, or as soon as reasonably practicable thereafter, all of the Liens and security interests to be granted in accordance with the Exit Financing Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Financing Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Financing Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.  Reorganized Quoizel and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

E.      Corporate Existence.

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Reorganized Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed.

F.      Vesting of Assets in the Reorganized Debtors.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or contained in the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action (including, without limitation, all Causes of Action identified in the Schedule of Retained Causes of Action), and any property acquired by any of the Debtors, including Interests held by the Debtors in Non-Debtor

Subsidiaries, shall vest in each respective Reorganized Debtor (other than the intellectual property of Design Solutions International, Inc., which shall vest in Reorganized Quoizel), free and clear of all Liens, Claims, Interests, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.    *Plan Administrator and the Wind-Down Debtors.*

1.    <u>Wind-Down Debtors</u>.

On and after the Effective Date, the Wind-Down Debtors shall continue in existence for purposes of (a) liquidating the Wind-Down Assets, (b) making distributions on account of Allowed Claims as provided hereunder, (c) establishing and funding the Administrative and Priority Claims Reserve and the Wind-Down Account, (d) enforcing and prosecuting Claims, interests, rights, and privileges under the Causes of Action on the Schedule of Retained Causes of Action that are not the property of the Reorganized Debtors in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (e) filing appropriate tax returns, (f) resolving Disputed Claims, and (g) otherwise administering the Plan.

The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the applicable Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

2.    <u>Plan Administrator</u>.

As set forth below, the Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan and the Confirmation Order.  On the Effective Date, the authority, power, and incumbency of the Persons acting as managers, directors, and officers of the Debtors that will constitute Wind-Down Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors, and shall succeed to the powers of the applicable Debtors′ managers, directors, and officers.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors as further described in Article VII hereof.  The Plan Administrator shall have the authority to sell, liquidate, or otherwise dispose of any and all of the Wind-Down Assets without any additional notice to or approval from the Bankruptcy Court, but subject to the Wind-Down Budget and the consent of the ABL Agent and the Initial Plan Sponsors.

3.    <u>Board of the Wind-Down Debtors</u>.

As of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors that will constitute Wind-Down Debtors shall be dissolved without any further action required on the part of the applicable Debtors or the applicable Debtors′ officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor that will constitute a Wind-Down Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders or members of any such Debtor, or the officers, directors, or managers, as applicable, of any such Debtor.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Wind-Down Debtors with respect to their affairs.  Subject in all respects to the terms of this

Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind-down and dissolve any of the Wind-Down Debtors and shall:  (a) fFile a certificate of dissolution for any of the Wind-Down Debtors, together with all other necessary corporate and company documents, to effect the dissolution of any of the Wind-Down Debtors under the applicable laws of each applicable Wind-Down Debtor's state of formation; (b) complete and fFile all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the ~~Wind-Down~~Wind-Down Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Wind-Down Debtors or their Estates for any tax incurred during the administration of such Wind-Down Debtor's Chapter 11 Case, as determined under applicable tax laws; and (c) represent the interests of the Wind-Down Debtors before any taxing authority in all tax matters, including any action, suit, proceeding, or audit.

The fFiling by the Plan Administrator of any of the Wind-Down Debtors' certificates of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of the Debtors that will constitute Wind-Down Debtors or any of their Affiliates.

4.       Tax Returns.

After the Effective Date, the Plan Administrator shall complete and file, or cause to be completed and filed, all final or otherwise required federal, state, provincial, and local tax returns for each of the Wind-Down Debtors.

5.       Dissolution of the Wind-Down Debtors.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all his or her duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which the Debtors are formed or any other jurisdiction.  Notwithstanding the foregoing, the Plan Administrator shall retain the authority to take all necessary actions to dissolve the Wind-Down Debtors in, and withdraw the Wind-Down Debtors from, applicable states and provinces to the extent required by applicable law.

H.       *Cancellation of Notes, Instruments, Certificates, and Other Documents.*

On the Effective Date, solely to the extent such Claims and Interests are paid in full, or alternatively upon completion of the Wind-Down, except to the extent otherwise provided in the Plan, all notes, indentures, instruments, certificates, and other documents evidencing Claims and Interests in the Debtors, shall be cancelled, and the obligations of the Debtors or the Reorganized Debtors, and any non-Debtor Affiliates thereunder or in any way related thereto shall be discharged and deemed satisfied in full; *provided*, that notwithstanding Confirmation or the occurrence of the Effective Date, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of, as applicable:  (a) enabling Holders of Allowed Claims under such agreements to receive distributions under the Plan as provided herein and (b) allowing and preserving the rights of any applicable paying agent to (i) make distributions in satisfaction of Allowed Claims under such agreements, (ii) maintain and exercise their respective charging liens against any such distributions, (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in making such distributions, (iv) maintain and enforce any right to indemnification, expense reimbursement, contribution, or subrogation or any other claim or entitlement, (v) exercise their rights and obligations relating to the interests of their holders, and (vi) appear and be heard in these Chapter 11 Cases.

I.       *Corporate Action.*

All actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable:  (1) the implementation of the Restructuring Transactions and all actions contemplated by Article IV.A; (2) the selection of the directors, managers, and/or officers for ~~the~~ Reorganized ~~Debtors~~Quoizel; (3) the incurrence of the Exit Financing; (4) [reserved]; (5) the issuance and distribution of New

Common Stock, including on the Effective Date; (6) the selection of the Plan Administrator; and (7) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors and the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan or the Restructuring Transactions Memorandum) in the name of and on behalf of the Debtors or the Reorganized Debtors, as applicable, including the Exit Financing Documents, the New Common Stock, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.I shall be effective notwithstanding any requirements under non-bankruptcy law.

J.     *New Organizational Documents.*

On or immediately before the Effective Date, Quoizel will file the New Organizational Documents with the Secretary of State and/or other applicable authority in its state of incorporation or formation in accordance with the applicable laws of such state of incorporation or formation. After the Effective Date, Reorganized Quoizel may amend and restate the New Organizational Documents as permitted by the laws of the jurisdiction of formation and the terms of such documents. The New Organizational Documents will prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.

K.     *Directors and Officers.*

On the Effective Date, the New Board shall consist of such members appointed by the Initial Plan Sponsors. The number and identities of directors or managers on the New Board shall be determined by the Initial Plan Sponsors. On the Effective Date, the terms of the current members of the Debtors' respective boards of directors or managers shall expire, and the New Board will include those directors or managers set forth in the list of directors or managers of Reorganized Quoizel included in the Plan Supplement. To the extent that any such director, manager, or officer of Reorganized Quoizel is an "insider" under the Bankruptcy Code, the Debtors will disclose the nature of any compensation to be paid to such director, manager, or officer.

L.     *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Support Agreement, the Restructuring Transactions Memorandum, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, as applicable, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

M.     *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person or Entity) of property under the Plan or pursuant to: (1) the sale and liquidation of the Wind-Down Assets, (2) the issuance, distribution, transfer, or exchange of any debt or equity Security, or other interest in the Debtors or Reorganized Debtors; (3) the Restructuring Transactions; (4) the Restructuring Transactions Memorandum; (5) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (6) the making, assignment, or recording of any lease or sublease; or (7) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other

instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146 of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

N.      *Preservation of Causes of Action.*

~~In~~Subject in all respects to the Preference Waiver, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue any and all respective Causes of Action held by such Entity, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights, as applicable, to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released or exculpated herein (including, without limitation, by the Debtors) pursuant to the releases and exculpations contained in the Plan, including in Article X of the Plan, which shall be deemed released and waived by the Debtors as of the Effective Date.

The Reorganized Debtors, as applicable, may pursue such Causes of Action in accordance with the best interests of the Reorganized Debtors, as applicable.  **No Person or Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.**  Unless any Cause of Action against a Person or Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Person or Entity shall vest in the Reorganized Debtors.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.~~M~~N include any Claim or Cause of Action with respect to, or against, a Released Party or each of the Exculpated ~~Party~~Parties.

O.      *Director, Officer, Manager, and Employee Liability Insurance.*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed and assigned to the applicable Reorganized Debtor, all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or before the Petition Date pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired

D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors, as applicable, under the Plan as to which no Proof of Claim need be Filed.

On or before the Effective Date, to the extent not already obtained, the Debtors will obtain reasonably sufficient Tail Coverage with coverage on terms no less favorable than the Debtors' existing D&O Liability Insurance Policies and with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing D&O Liability Insurance Policies upon placement.

The Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including any policy providing the Tail Coverage) in effect and all members, managers, directors, and officers of the Debtors who served in such capacity at any time before the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

On and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of its directors, managers, members, trustees, and/or officers in the ordinary course of business.

P.      [Reserved.]

Q.      Employee and Retiree Obligations.

The Debtors may, with the consent of the Initial Plan Sponsors, approve, assume, and adopt the Debtors' written contracts, agreements, policies, programs and plans for, among other things, compensation, bonuses, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the Debtors' current and former employees, directors, officers, and managers, including the executive compensation programs and all existing compensation arrangements for the employees of the Debtors. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date all retiree benefits under any plan, fund, or program maintained or established by the Debtors prior to the Petition Date, if any, shall continue to be paid in accordance with applicable law.

On the Effective Date, Debtor Nielsen & Bainbridge, LLC shall be deemed to have assumed and assigned the Pension Plan~~s~~ and any agreements, documents, and instruments related thereto to ~~an entity to be agreed by the Plan Administrator, the Initial Plan Sponsors, and the Sponsor~~<u>Belk, Inc. pursuant to the Pension Plan Assumption and Assignment Agreement</u>.

R.      Exemption from Registration Requirements.

Pursuant to section 1145 of the Bankruptcy Code or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act and Regulation D thereunder, the offering, issuance and distribution of the New Common Stock as contemplated hereof will be exempt from the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local laws requiring registration.

The shares of New Common Stock to be issued under the Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act,

(ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

The shares of New Common Stock that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder or, solely to the extent section 4(a)(2) of the Securities Act or Regulation D thereunder is not available, any other available exemption from registration under the Securities Act, will be considered "restricted securities", will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

Should Reorganized Quoizel elect to reflect any ownership of the New Common Stock to be issued under the Plan through the facilities of DTC, DTC is authorized to rely solely on the Confirmation Order, and Reorganized Quoizel need not provide any further evidence other than the Plan and the Confirmation Order with respect to the treatment of such New Common Stock under applicable securities laws.  DTC and all other Persons and Entities shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock to be issued under the Plan is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

**ARTICLE V**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the earlier of ninety (90) days after (i) the Effective Date or (ii) the date on which the Debtors or Reorganized Debtors, as applicable, file the Assumed Executory Contracts and Unexpired Leases List, each Executory Contract and Unexpired Lease, not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is identified on the Assumed Executory Contracts and Unexpired Leases List; (2) is the subject of a motion to assume (or assume and assign) such Executory Contract or Unexpired Lease that is pending on the Confirmation Date; (3) is a contract, release, or other agreement or document entered into in connection with the Plan; or (4) is a directors and officers insurance policy.

Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases List with the consent of the Initial Plan Sponsors or the Plan Administrator, as applicable, (i) to add or remove any Executory Contract or Unexpired Lease to or from the Assumed Executory Contracts and Unexpired Leases List at any time prior to the Confirmation Date, and (ii) to remove any Executory Contract or Unexpired Lease from the Assumed Executory Contracts and Unexpired Leases List at any time through and including ninety (90) days after the Effective Date, which removal shall constitute rejection of the applicable Executory Contract or Unexpired Lease; *provided* that, subject to Article V.C hereof, at any time during such ninety (90)-day period after the Effective Date, the Reorganized Debtors shall remain liable for any and all amounts incurred under any such Executory Contracts and Unexpired Leases on the Assumed Executory Contracts and Unexpired Leases List in the ordinary course of business; *provided further*, that, subject to Article V.C hereof, on the first Business Day that follows such ninety (90)-day period, (i) to the extent any Executory Contracts and Unexpired Leases remain on the Assumed Executory Contracts and Unexpired Leases List, such Executory Contracts and Unexpired Leases shall be deemed Assumed Executory Contracts and Unexpired Leases and the Reorganized Debtors shall pay any and all Cure Claims owing under such Assumed Executory Contracts and Unexpired Leases pursuant to section 365 of the Bankruptcy Code or (ii) to the extent the Reorganized Debtors have filed an amended or otherwise modified Assumed Executory Contracts and Unexpired Leases List, removing any Executory Contract or Unexpired Lease, such Executory Contracts and Unexpired Leases shall be deemed rejected pursuant to section 365 of the Bankruptcy Code.  The Debtors and the Reorganized Debtors, as applicable, shall provide notice of any amendments to the Assumed Executory Contracts and Unexpired Leases List to the counterparties to the Executory Contracts or Unexpired Leases affected thereby.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such

Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Counterparties to Executory Contracts or Unexpired Leases listed on the Rejected Executory Contracts and Unexpired Leases List shall be served with a notice of rejection of their Executory Contracts and Unexpired Leases substantially in the form approved by the Disclosure Statement Order as soon as reasonably practicable following entry of such order. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within the earliest to occur of (1) thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection or (2) thirty (30) days after notice of any rejection that occurs after the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under an Assumed Executory Contract or Unexpired Lease, as reflected on the Cure Notice, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree, with the consent of the Initial Plan Sponsors. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

~~At least fourteen (14) days before the Confirmation Hearing, the~~ <u>Upon the filing of any Plan Supplement containing an amended Assumed Executory Contracts and Unexpired Leases List , the</u>Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption or assumption and assignment and proposed amounts of Cure Claims to the applicable third parties. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related cure amount must be Filed, served, and <u>actually</u> received by the Debtors** ~~at least seven days before the Confirmation Hearing~~<u>fourteen (14) days following receipt of such Cure Notices</u>. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment or cure amount will be deemed to have assented to such assumption or assumption and assignment and cure amount. Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is removed from the Rejected Executory Contracts and Unexpired Leases List after such 14-day deadline, a Cure Notice of proposed assumption or assumption and assignment and proposed amounts of Cure Claims with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such Executory Contract or Unexpired Lease can be assumed or assumed and assigned.

If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or the Reorganized Debtors, as applicable, may, with the consent of the Initial Plan Sponsors, add such Executory

Contract or Unexpired Lease to the Rejected Executory Contracts and Unexpired Leases List, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court**.**

D.     *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

E.     *Collective Bargaining Agreement.*

The Collective Bargaining Agreement and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Reorganized Debtors, as applicable, shall be deemed to have assumed the Collective Bargaining Agreement and any agreements, documents, and instruments related thereto. All Proofs of Claim Filed for amounts due under the Collective Bargaining Agreement shall be considered satisfied by the agreement and obligation to assume and cure in the ordinary course as provided herein. On the Effective Date, any Proofs of Claim Filed with respect to the Collective Bargaining Agreement shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

F.     *Indemnification Obligations.*

The Debtors, Reorganized Quoizel, and the Wind-Down Debtors, as applicable, shall assume the Indemnification Obligations for the Debtors' current and former directors, officers, managers, and employees, and current attorneys, accountants, investment bankers, and other professionals of the Debtors, to the extent consistent with applicable law, and such Indemnification Obligations shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

G.     *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

*H.*       *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contracts and Unexpired Leases List, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

*I.*       *Nonoccurrence of Effective Date.*

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

*J.*       *Contracts and Leases Entered into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor will be performed by Reorganized Quoizel, as applicable.

**ARTICLE VI**
**PROVISIONS GOVERNING DISTRIBUTIONS**

*A.*       *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such Claim becomes an Allowed Claim or Interest) each Holder of an Allowed Claim and Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class and in the manner provided in the Plan.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Interests, distributions on account of any such Disputed Claims or Interests shall be made pursuant to the provisions set forth in Article IX.  Except as otherwise provided in the Plan, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  The Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

*B.*       *Distribution Agent.*

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Distribution Agent on the Effective Date.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  If the Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Wind-Down Debtors.

*C.*       *Rights and Powers of Distribution Agent.*

1.       Powers of the Distribution Agent.

The Distribution Agent or its designee shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court,

pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

        2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Distribution Agent or its designee on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the Distribution Agent or its designee shall be paid promptly in Cash by the Reorganized Debtors.

D.     *Delivery of Distributions.*

        1.      Delivery of Distributions in General.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Distribution Agent: (a) to the signatory set forth on any Proof of Claim or Proof of Interest Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Proof of Interest is Filed or if the Debtors have not been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the applicable Distribution Agent, as appropriate, after the date of any related Proof of Claim or Proof of Interest; or (c) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, and the Distribution Agent, and any applicable paying agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

The ABL Agent shall be deemed to be the Holders of all ABL Claims for purpose of distributions to be made hereunder, and all distributions on account of such ABL Claims shall be made to the ABL Agent to be distributed in accordance with the terms of the ABL Credit Agreement.

        2.      Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no further distribution to such Holder shall be made unless and until the applicable Distribution Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

        3.      Minimum Distributions.

No fractional shares of New Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one half or greater shall be rounded to the next higher whole number and (b) fractions of less than one half shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

Holders of Allowed Claims entitled to distributions of $250 or less shall not receive distributions, and each such Claim to which this limitation applies shall be discharged pursuant to Article VIII and its Holder is forever barred pursuant to Article X from asserting that Claim against the Reorganized Debtors or their property.

E.      *Manner of Payment.*

Except as otherwise set forth herein, all distributions of New Common Stock to Holders of the applicable Allowed Claims under the Plan shall be made by the Distribution Agent on behalf of the Debtors or Reorganized Quoizel, as applicable.  All distributions of Cash to the Holders of the applicable Allowed Claims under the Plan shall be made by the Distribution Agent on behalf of the applicable Debtor or the Reorganized Debtors.  At the option of the Distribution Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.      *Compliance with HSR Act.*

Any New Common Stock to be distributed under the Plan to an entity required to file a premerger notification and report form under the HSR Act, shall not be distributed until the notification and waiting periods applicable under such Act to such entity have expired or been terminated.

G.      *[Reserved.]*

H.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, the Distribution Agent, the Plan Administrator, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Distribution Agent, and the Plan Administrator shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Distribution Agent and the Plan Administrator reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

I.      *Allocations.*

Except as otherwise provided herein or in the Wind-Down Budget, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

J.      *No Postpetition or Default Interest on Claims.*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the DIP Orders, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

K.      *Setoffs and Recoupment.*

Unless otherwise provided in the Plan, the DIP Orders, or the Confirmation Order, pursuant to section 553 of the Bankruptcy Code, applicable non-bankruptcy law, or as may be agreed to by the Holder of the Allowed Claim, each Debtor and Reorganized Debtor, as applicable, may set off or recoup any Allowed Claim against the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any

distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

*L.*      *Claims Paid or Payable by Third Parties.*

1.      Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution from the Debtors or Reorganized Debtors on account of such Claim and also receives payment from a party that is not a Debtor or Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14)-day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Solicitation Agent without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Notwithstanding anything herein to the contrary (including Article X), nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII
## THE PLAN ADMINISTRATOR

A.     *The Plan Administrator.*

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the amounts set forth in the Administrative and Priority Claims Reserve and the ~~Wind-Down~~Wind-Down Account in accordance with the Plan, and wind-down the business and affairs of the Debtors (other than Quoizel) and the Wind-Down Debtors, including (all without further order of the Bankruptcy Court): (1) liquidating, receiving, holding, investing, supervising, and protecting the Wind-Down Assets, the Administrative and Priority Claims Reserve, and the Wind-Down Account; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Administrative and Priority Claims Reserve and the Wind-Down Account; (3) making distributions from the Administrative and Priority Claims Reserve and the ~~Wind-Down~~Wind-Down Account as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (7) administering and paying taxes of the Wind-Down Debtors, including filing or causing to be filed tax returns; (8) representing the interests of the Wind-Down Debtors or their Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (9) complying with the Debtors' (other than Quoizel) and the ~~Wind-Down~~Wind-Down Debtors' continuing obligations under the Confirmation Order; and (10) exercising such other powers as may be vested in it pursuant to order(s) of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out his or her responsibilities under this Plan and as otherwise provided in the Confirmation Order.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Wind-Down Debtors and the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator, to be chosen by the Initial Plan Sponsors with the consent of the ABL Agent. Upon any other vacancy of the Plan Administrator, a permanent or interim successor Plan Administrator shall be chosen by the Initial Plan Sponsors. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor, and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

1.     Plan Administrator Rights and Powers.

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan and as otherwise provided in the Confirmation Order. The Plan Administrator shall be the exclusive trustee of the Wind-Down Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Wind-Down Debtors' Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

2.     Retention of Professionals.

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. On the Effective Date, the Consulting Agreement shall be deemed to have been assigned to, and assumed by, the Wind-Down Debtors, and any modification to the Consulting Agreement shall require the prior written consent of the ABL Agent and the Initial Plan Sponsors. The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors from the Wind-Down Account upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of

the Plan Administrator's retained professionals shall be made in the ordinary course of business from the Wind-Down Account (but not subject to the approval of the Bankruptcy Court).

       3.       <u>Compensation of the Plan Administrator</u>.

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement and paid out of the Wind-Down Account. Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Account if such amounts relate to any actions taken hereunder.

       4.       <u>Plan Administrator Expenses</u>.

All costs, expenses, and obligations incurred by the Plan Administrator in administering this Plan, the Wind-Down Debtors, or in any manner connected, incidental, or related thereto, in effecting distributions from the Wind-Down Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid from the Wind-Down Account.

The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. However, if the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Account.

B.       *Wind Down*.

On and after the Effective Date, the Plan Administrator will be authorized to carry out his or her responsibilities under this Plan and any applicable orders of the Bankruptcy Court, including the power and authority to take any action necessary to wind down and dissolve the Wind-Down Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall: (1) cause the Wind-Down Debtors to comply with, and abide by, the terms of the Plan, Confirmation Order, and any other documents contemplated thereby (including the Consulting Agreement); (2) to the extent applicable, fFile a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Wind-Down Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan (but subject to the Wind-Down Budget). Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders or board of directors or managers of any Wind-Down Debtor.

The Wind Down <u>Budget</u> shall include a 13-week statement of the Wind-Down Debtors' anticipated cash receipts and disbursements for the first 13 weeks following the Confirmation Date, set forth on a weekly basis, including the anticipated uses and distributions from the cash receipts. No later than two weeks after the Effective Date, the Plan Administrator shall provide the Initial Plan Sponsors and the ABL Agent an updated 13-week statement for the subsequent 13-week period, which proposed budget shall modify and supersede any prior Wind-Down Budget upon the approval of the Initial Plan Sponsors and the ABL Agent. No later than the Wednesday of each week after the Confirmation Date, the Plan Administrator shall deliver to the Initial Plan Sponsors and the ABL Agent a report which shall include: (i) a detailed listing of disbursements from the prior week, (ii) actual cash flow results from the prior week and variance form forecasting (standard summary on cash receipts and disbursements) with an explanation of the variances, and (iii) an accounts payable aging report.

C.      *Exculpation, Indemnification, Insurance & Liability Limitation.*

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors.  The Plan Administrator may obtain, at the expense of the Wind-Down Debtors and with funds from the Wind-Down Account, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

D.      *Tax Returns.*

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Wind-Down Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Wind-Down Debtor or its Estate for any tax incurred during the administration of such Wind-Down Debtor's Chapter 11 Case, as determined under applicable tax laws.

**ARTICLE VIII**
**RESERVES AND ACCOUNTS ADMINISTERED BY THE PLAN ADMINISTRATOR**

A.      *Establishment of Reserves and Accounts.*

The Plan Administrator shall establish the Administrative and Priority Claims Reserve and the Wind-Down Account (which may be effected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the Plan Administrator).  The Administrative and Priority Claims Reserve shall be funded in the amount of the Administrative and Priority Claims Reserve Amount.  The Wind-Down Account shall be funded with the Sale Proceeds as the Plan Administrator liquidates the Wind-Down Debtors.

B.      *Undeliverable Distribution Reserve.*

1.      Deposits.

If a distribution to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed, such distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Article VIII.B.2 of this Plan.

2.      Forfeiture.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an undeliverable or unclaimed distribution within three (3) months after the first distribution is made to such Holder shall be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such Claim for the undeliverable or unclaimed distribution against any Debtor, any Estate, the Plan Administrator, the Wind-Down Debtors, Reorganized Quoizel, ~~Reorganized N&B,~~ or their respective properties or assets.  In such cases, any Cash or other property held by the Plan Administrator in the Undeliverable Distribution Reserve for distribution on account of such Claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, shall become the property of the applicable Wind-Down Debtor, <u>or</u>

42

Reorganized Quoizel~~, or Reorganized N&B,~~ notwithstanding any federal or state escheat laws to the contrary, without any further action or order of the Court.

        3.      <u>Disclaimer</u>.

The Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to attempt to locate any Claim Holder; *provided* that in his or her sole discretion, the Plan Administrator may periodically publish notice of unclaimed distributions.

        4.      <u>Distribution from Reserve</u>.

Within fifteen (15) Business Days after the Holder of an Allowed Claim satisfies the requirements of this Plan, such that the distribution(s) attributable to its Claim is no longer an undeliverable or unclaimed distribution (provided that satisfaction occurs within the time limits set forth in this Article VIII.B), the Plan Administrator shall distribute out of the Undeliverable Distribution Reserve the amount of the undeliverable or unclaimed distribution attributable to such Claim.

*C.*     *Wind-Down Account.*

On the Effective Date, the Plan Administrator shall establish the Wind-Down Account.  As the Plan Administrator administers the Wind Down of the Wind-Down Debtors, he or she shall deposit all ABL Priority Collateral Sale Proceeds, Non-ABL Priority Collateral Sale Proceeds, and any other proceeds from the Wind Down of the Wind-Down Debtors into the Wind-Down Account as and when such proceeds are obtained<u>, subject to the Carve-Out</u>.  The Wind-Down Account shall be used by the Plan Administrator to satisfy the expenses of the ~~Wind-Down~~<u>Wind-Down</u> Debtors and the Plan Administrator and fund distributions to Holders of Claims as set forth in the Plan and the Wind-Down Budget; *provided* that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents of the Wind-Down Debtors shall constitute expenses of the Wind-Down Debtors and shall be paid from the Wind-Down Account.  Any amount remaining in the Wind-Down Account after the payment of all expenses of the Wind-Down Debtors and the Plan Administrator, including all professional fees (including Professional Fee Claims), and the dissolution of the Wind-Down Debtors shall constitute Net Sale Proceeds and be distributed to Holders of Claims pursuant to the terms of the Plan; *provided, however*, that to the extent the Plan Administrator determines that the value of the remaining assets in the Wind-Down Account is insufficient to justify the administrative cost of effecting such distribution, the Plan Administrator may distribute such assets to a charity of his or her selection..  In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

*D.*     *Administrative and Priority Claims Reserve.*

On the Effective Date, the Plan Administrator shall establish the Administrative and Priority Claims Reserve by depositing Cash in the amount of the Administrative and Priority Claims Reserve Amount into the Administrative and Priority Claims Reserve (and the Plan Administrator shall deposit Cash into the Administrative and Priority Claims Reserve from the Wind-Down Account or withdraw Cash from the Administrative and Priority Claims Reserve and deposit into the Wind-Down Account if the Administrative and Priority Claims Reserve Amount changes at any time).  The Administrative and Priority Claims Reserve Amount shall be used to pay Holders of Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Administrative Claims (other than Professional Fee Claims or DIP Claims), and Allowed Other Secured Claims in full. <u>To the extent any of the foregoing Allowed Claims to be paid pursuant to the Administrative and Priority Claims Reserve are expressly contemplated for payment by the Wind-Down Budget, such amounts shall not be deposited in the Administrative and Priority Claims Reserve and shall be paid as contemplated by the Wind-Down Budget.</u>

If all or any portion of any such Claim shall become a Claim that is not Allowed, then the amount on deposit in the Administrative and Priority Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Administrative and Priority Claims Reserve, shall remain in the Administrative and Priority Claims Reserve to the extent that the Plan Administrator

determines necessary to ensure that the Cash remaining in the Administrative and Priority Claims Reserve is sufficient to ensure that all Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Administrative Claims, or other Allowed Other Secured Claims will be paid in accordance with the Plan, without any further action or order of the Court. Any amounts remaining in the Administrative and Priority Claims Reserve after payment of all Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Administrative Claims, or other Allowed Other Secured Claims (or any amount in excess of that reasonably needed to be reserved for any Disputed Claims) shall promptly be transferred to the Wind-Down Account until such time as the Wind-Down Debtors are dissolved in accordance with the provisions herein.

## ARTICLE IX
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

A.      *Allowance of Claims and Interests.*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B.      *Claims and Interests Administration Responsibilities.*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors, as applicable, shall have the exclusive authority to (1) File, withdraw, or litigate to judgment any objections to Claims; (2) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (3) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (4) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, the Reorganized Debtors, as applicable, shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Claim or Interest, including the Causes of Action retained pursuant to Article IV.MN of the Plan.

C.      *Estimation of Claims and Interests.*

Before or after the Effective Date, the Debtors, Reorganized Quoizel, and the Wind-Down Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. If the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Wind-Down Debtor or Reorganized Quoizel, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation,

and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      [Reserved.]

E.      *Adjustment to Claims Without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors, as applicable, without the Reorganized Debtors having to fFile an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed on or before the Claims Objection Deadline.

G.      *Disallowance of Claims.*

Except as otherwise provided herein or in the Confirmation Order, any Claims held by an Entity from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Reorganized Debtors, or the Wind-Down Debtors, as applicable. All Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein or as agreed to by Reorganized Quoizel or the Plan Administrator, any and all Claims for which Proofs of Claim have not been Filed or were Filed after the Bar Date, except for Holders of Claims not required to File Proofs of Claim under the Bar Date Order, shall be deemed Disallowed and such Proofs of Claim expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless a late Proof of Claim is been deemed timely Filed by a Final Order.**

H.      *Amendments to Claims; Additional Claims.*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or Reorganized Quoizel or the Plan Administrator, as applicable, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

I.      *No Distributions Pending Allowance.*

Notwithstanding any other provision hereof, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

J.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

K.      *No Interest.*

Interest shall not accrue or be paid on any Disputed Claim during the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

# ARTICLE X
# SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, Reorganized Quoizel or the Plan Administrator, as applicable, may compromise and settle Claims, Interests, and Causes of Action.

B.      *Discharge of Claims.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (solely to the extent such Claims are paid in full or, alternatively, upon completion of the Wind-Down), Interests (solely to the extent such Interests are satisfied in full or, alternatively, upon completion of the Wind-Down), and Causes of Action of any nature whatsoever, including any interest accrued from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors (or Affiliates of a Debtor as such default or "event of default" applies to a Debtor) with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The

46

Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

D.      *Release of Liens.*

**Subject in all instances to the Wind Down and E**e**xcept (1) with respect to the Liens securing the Exit Financing, including the Exit First Lien Term Loan Credit Agreement and the Exit Second Lien Term Loan Credit Agreement, and any other financing created pursuant to the Exit Financing Documents, and (2) as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates and, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, and the Holders (and the applicable agents of such Holders) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Wind-Down Debtor or Reorganized Quoizel, as applicable, and their successors and assigns.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has Filed or recorded publicly any Liens and/or security interests to secure such holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or the Plan Administrator, as applicable, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and Reorganized Quoizel and the Plan Administrator, as applicable, shall be entitled to make any such filings or recordings on such Holder's behalf.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

E.      *Debtor Release.*

**Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, Reorganized Quoizel, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of the Debtors, Reorganized Quoizel, the Wind-Down Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, Reorganized Quoizel, the Wind-Down Debtors, or their Estates would have been legally**

47

entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, Reorganized Quoizel, the Wind-Down Debtor, their Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors, Reorganized Quoizel, or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors by Released Parties other than the Consenting Parties), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, and related prepetition transactions, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, any other Definitive Document, or any Restructuring Transactions, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), any other Definitive Document, or any Restructuring Transactions, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions, or the distribution of property pursuant to the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause, the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any Causes of Action identified in the Schedule of Retained Causes of Action, and (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or Agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Financing Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, Reorganized Quoizel, the Wind-Down Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

F.      *Third-Party Release.*

Notwithstanding anything contained in this Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permitted under applicable law, each Released Party (other than the Debtors, Reorganized Quoizel,

or the Wind-Down Debtors) is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each and all of the Releasing Parties (other than the Debtors, Reorganized Quoizel, or the Wind-Down Debtors), from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the foregoing Entities, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, Reorganized Quoizel, the Wind-Down Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, Reorganized Quoizel, the Wind-Down Debtors, or their Estates or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors, Reorganized Quoizel, or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before and during the Chapter 11 Cases, any other Definitive Document, or any Restructuring Transactions, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documentation, the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, any other Definitive Document, or any Restructuring Transactions, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property pursuant to the Restructuring Transactions and/or the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Financing, the Exit Financing Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and

reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

G.    Exculpation.

        Notwithstanding anything contained in this Plan to the contrary, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or Third-Party Release, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the DIP Facility, the DIP Credit Agreement Documents, the Exit Financing, the Exit Financing Documents, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), any other Definitive Document, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Exit Financing, the Plan, the Plan Supplement, before or during the Chapter 11 Cases, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

        The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

H.    Injunction.

        Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests or Causes of Action or liabilities that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, Reorganized Quoizel, the Wind-Down                                             Debtors,
the Exculpated Parties, or the Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities unless such Entity has timely

asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities released or settled pursuant to the Plan.

By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth above.

The injunctions set forth above shall extend to any successors of the Debtors, Reorganized Quoizel, or the Wind-Down Debtors, the Released Parties, and the Exculpated Parties and their respective property and interests in property.  No Person or Entity may commence or pursue a Claim or Cause of Action or Covered Claim, as applicable, of any kind against the Debtors, Reorganized Quoizel, the Wind-Down Debtors, the Exculpated Parties, the Released Parties, or the Covered Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action or Covered Claim, as applicable, subject to Article X.E, Article X.F, and Article X.G hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action or Covered Claim, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Reorganized Quoizel, Wind-Down Debtor, Exculpated Party, Released Party, or Covered Party, as applicable.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.

I.      *Protections Against Discriminatory Treatment.*

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor or any Entity with which any Reorganized Debtor has been or is associated, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom the Reorganized Debtors have been associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

J.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent, or (2) the relevant Holder of a Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

K.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the applicable Reorganized Debtor.

**ARTICLE XI**
**CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

A.      *Conditions Precedent to Confirmation of the Plan.*

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to Article XI.C of the Plan:

1.      the Bankruptcy Court shall have entered the Disclosure Statement Order;

2.      the Bankruptcy Court shall have entered the Confirmation Order; and

3.      the Confirmation Order shall:

    (a)      authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

    (b)      decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

    (c)      authorize the Debtors, Reorganized Quoizel, the Wind-Down Debtors, and the Plan Administrator, as applicable/necessary, to, among other things: (i) implement the Restructuring Transactions; (ii) issue and distribute the New Common Stock pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act and Regulation D thereunder, or other exemption from such registration or pursuant to one or more registration statements; (iii) make all distributions and issuances as required under the Plan, including the New Common Stock; (iv) execute and deliver the Exit Financing Documents and to perform their obligations thereunder; and (v) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement;

    (d)      provide that, pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, if applicable, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

    (e)      contain the release, injunction, and exculpation provisions contained in this Plan.

B.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article XI.C of the Plan:

1.      the Restructuring Support Agreement shall not have been terminated and shall remain in full force and effect;

2.      the Bankruptcy Court shall have entered the DIP Orders, which shall be in full force and effect;

3.      the Definitive Documents shall (i) be consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights set forth therein and (ii) have been executed or deemed executed and delivered

by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties;

4.      the Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall not have been reversed, stayed, modified, or vacated on appeal;

5.      all actions, documents, and agreements necessary to implement and consummate the Plan, as mutually agreed to by the Debtors and the Initial Plan Sponsors shall have been effected and executed;

6.      all Exit Financing Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the required parties to the Restructuring Support Agreement), other than such conditions that relate to the effectiveness of the Plan and related transactions;

7.      the Upfront Cash Repayment shall have been distributed to the ABL Agent;

8.      the New Organizational Documents shall be adopted on terms consistent with the Restructuring Support Agreement and the Restructuring Term Sheet;

9.      Debtor Nielsen & Bainbridge, LLC shall have assumed and assigned the Pension Plan~~s~~ and any agreements, documents, and instruments related thereto to ~~an entity to be agreed by the Plan Administrator, the Initial Plan Sponsors, and the Sponsor~~<u>Belk, Inc. pursuant to the Pension Plan Assumption and Assignment Agreement</u>;

10.     all Allowed Professional Fee Claims of Professionals approved by the Bankruptcy Court shall have been paid in full and the Professional Fee Escrow Account shall have been established and funded pending approval by the Bankruptcy Court in accordance with the Plan; and

11.     any and all requisite governmental, regulatory, and third party approvals and consents shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired or terminated without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on the Restructuring Transactions, the financial benefits of such Restructuring Transactions to the Initial Plan Sponsors, or the ability of the Initial Plan Sponsors to participate in the governance of the Reorganized Quoizel.

C.     *Waiver of Conditions Precedent.*

The Debtors, with the consent of the Initial Plan Sponsors, solely to the extent consistent with the approval rights set forth in the Restructuring Support Agreement, and except for the condition set forth in Articles IX.B.8, may waive any of the conditions to Confirmation or the Effective Date set forth in Article XI.A or Article XI.B of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan; *provided*, *however*, that any waiver with respect to the conditions set forth in Article XI.B(6)–(7) or any modification to the Wind-Down Budget or Wind Down shall be subject to the consent of the ABL Agent.

D.     *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

E.      *Effect of Non-Occurrence of Conditions to Consummation.*

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (2) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

## ARTICLE XII
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification of Plan.*

Subject to the limitations contained in the Plan and consistent with the approval rights set forth in the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the Restructuring Support Agreement, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall constitute approval of all permitted modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date with the consent of the Initial Plan Sponsors.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XIII
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.        decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.        resolve any matters related to:  (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.        ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.        adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.        adjudicate, decide, or resolve any and all matters related to any Causes of Action;

7.        adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.        enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.        enter and enforce any order for the sale of property pursuant to sections 363, 1123, 1141(c), or 1146(a) of the Bankruptcy Code;

10.        resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.        grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

12.        issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

13.        resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article X hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

14.        resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article IX hereof;

15.        enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

17.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

18.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

22.     enforce all orders previously entered by the Bankruptcy Court;

23.     hear any other matter not inconsistent with the Bankruptcy Code;

24.     enter an order or Final Decree concluding or closing the Chapter 11 Cases; and

25.     enforce the injunction, release, and exculpation provisions set forth in Article X hereof.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect.*

Subject to Article XI.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.     *Additional Documents.*

On or before the Effective Date, and with the consent of the Initial Plan Sponsors, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement.  The Debtors and the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

D.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E.      *Service of Documents.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Nielsen & Bainbridge, LLC<br>12303 Technology Boulevard<br>Suite 950<br>Austin, Texas 78727<br>Attention:  Hope Margala<br>Email:  hmargala@nbg-home.com | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Facsimile:  (212) 446-4900<br>Attention:  Joshua A. Sussberg, P.C. ~~and~~, Steven N. Serajeddini, P.C., and Brian Schartz, P.C.<br>Email:  joshua.sussberg@kirkland.com, steven.serajeddini@kirkland.com<br>bschartz@kirkland.com |
| **United States Trustee** | **Counsel to the First Lien Term Loan Lenders** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001<br>Attention: Dennis F. Dunne and Matthew L. Brod<br>E-mail: ddunne@milbank.com<br>mbrod@milbank.com |
| **Counsel to the Initial Plan Sponsors** | **Counsel to the Second Lien Term Loan Lenders** |
| Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001<br>Attention: Dennis F. Dunne and Matthew L. Brod<br>E-mail: ddunne@milbank.com<br>mbrod@milbank.com | Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001<br>Attention: Dennis F. Dunne and Matthew L. Brod<br>E-mail: ddunne@milbank.com<br>mbrod@milbank.com |

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to Entities that continue to receive documents pursuant to Bankruptcy Rule 2002 requiring such Entity to File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.      Term of Injunctions or Stays.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

G.      Entire Agreement.

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

H.      Plan Supplement.

All documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the Plan Supplement has been Filed, copies of the documents contained therein shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from https://omniagentsolutions.com/NBGHome or the Bankruptcy Court's website at www.txsb.uscourts.gov/bankruptcy.  Unless otherwise ordered by the Bankruptcy Court, to the extent any document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

I.      Nonseverability of Plan Provisions.

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or the Reorganized Debtors', as applicable, and the Initial Plan Sponsors' consent, *provided*, that any such deletion or modification must be consistent with the Restructuring Support Agreement; and (3) nonseverable and mutually dependent.

J.      Votes Solicited in Good Faith.

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in

compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, no such parties, individuals, or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

K.     *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, the Restructuring Support Agreement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

L.     *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M.     *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, the Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred, other than fees incurred on or after the Effective Date, by the Committee and its Professionals.  The Reorganized Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committee after the Effective Date.

Dated:  June 2~~0~~9, 2023

                                              NIELSEN & BAINBRIDGE, LLC


                                              By: *Amy Lee*_____
                                              Name:  Amy Lee
                                              Title:   Chief Transformation Officer